**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| WENDY WELLIN, as the Special Administrator of the Estate of Keith S. Wellin and as Trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2011, | ) ) ) ) ) ) ) ) ) ) ) | **C.A. NO. 2:13-CV-1831-DCN** **SPECIAL MASTER'S REPORT AND RECOMMENDATION RE: DR. ANN PLUM'S MOTION FOR PROTECTIVE ORDER, ECF NO. 370 IN 2:13-CV-1831-DCN** |
| PLAINTIFF, | ) ) | |
| vs. | ) ) | |
| PETER J. WELLIN, et al., | ) ) | |
| DEFENDANTS, | ) ) | |
| LARRY S. MCDEVITT, as Trustee of the Wellin Family 2009 Irrevocable Trust, | ) ) ) | **C.A. NO. 2:13-CV-3595-DCN** |
| PLAINTIFF, | ) ) | |
| vs. | ) ) | |
| PETER J. WELLIN, et. al., | ) ) | |
| DEFENDANTS, | ) ) | |
| PETER J. WELLIN, et. al., | ) ) | |
| PLAINTIFF, | ) ) | **C.A. NO. 2:14-CV-4067-DCN** |
| vs. | ) ) ) | |

WENDY WELLIN, individually and as )
Trustee of the Keith S. Wellin Florida )
Revocable Living Trust u/a/d December )
11, 2011, )
)
             DEFENDANT. )

Currently before the undersigned is the motion of non-party witness, Dr. Ann Plum, for a protective order to prevent disclosure of certain information she asserts is protected by attorney-client privilege, the work-product doctrine, and/or the common interest privilege  The motion is before the undersigned, sitting as Special Master, pursuant to the February 17, 2015 Order of the United States District Court for the District of South Carolina, Charleston Division, Hon. David C. Norton presiding.  See ECF Nos. 270, 258, and 35.[1]

These lawsuits involve multiple issues surrounding the handling and disposition of the assets, trusts, and estate of Keith S. Wellin (Keith).   The factual allegations and procedural histories of these cases are extensively outlined in the Order of Judge Norton issued in *Wellin I*, Case No. 2:13-cv-1831-DCN, ECF No. 158, filed on June 28, 2014, and in the Amended Report and Recommendation of the Special Master, ECF No. 320, filed on July 31, 2015.

Dr. Plum moves for a protective order pursuant to Rule 26(c), Fed.R.Civ.P., and Rule 30.04 of the Local Civil Rules (D.S.C.) to protect information and communications sought during her deposition on October 29, 2015, taken in Syracuse, New York.

---

[1] The electronic case filing numbers refer to entries submitted in Case Nos. 2:13-cv-1831-DCN, 2:13-cv-3595-DCN, and 2:14-cv-4067-DCN respectively.  These cases have been consolidated for pre-trial purposes.  Hereinafter, unless otherwise indicated, all references to electronic filing numbers will be directed to filings in Case No. 2:13-cv-1831-DCN only.

## **FACTS/PROCEDURAL HISTORY PERTINENT TO THE MOTION FOR PROTECTIVE ORDER**

Dr. Plum is one of eight grandchildren of Keith S. Wellin, deceased, whose wills, trusts and estate plans are at issue in these multiple proceedings. Although none of the grandchildren are parties to these consolidated cases, they are contingent beneficiaries under the Wellin Family 2009 Irrevocable Trust executed by Keith S. Wellin.

During Dr. Plum's deposition, she was asked various questions by opposing counsel about communications between Dr. Plum and her attorneys, communications among her attorneys, her brother, her cousins, her mother, and her mother's attorney. As to each offending question, Dr. Plum's counsel objected and instructed Dr. Plum not to answer to the extent to do so would violate the attorney-client privilege, work-product privilege, or the protections afforded by the joint-client and common interest doctrine. On the basis of these objections and instructions from counsel, Dr. Plum declined to answer on numerous occasions. Attached to this Report as **Exhibit I** is an Appendix containing each question, objection and answer in numerical order.

Dr. Plum separates these questions into three categories: 1) questions seeking to discover the substance of Dr. Plum's communications with counsel, immunized from discovery by the attorney-client and work-product privileges; 2) questions seeking to discover confidential information and communications with the other Wellin grandchildren, protected from discovery by the joint-client doctrine; and 3) questions seeking to ascertain confidential information and communications with Dr. Plum's mother, Cynthia Plum, shielded from discovery by the common-interest rule.

3

## DISCUSSION

### I.  Conflict of Laws

To resolve these privilege issues, it is first necessary to determine the law to be applied. Because these cases are diversity cases, the availability of an evidentiary privilege is governed by the law of the forum state. Fed.R.Evid. 501; *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 107 n. 5 (4th Cir. 1995).

Rule 501of the Federal Rules of Evidence provides as follows:

> Except as otherwise provided by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.  However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness . . . shall be determined in accordance with state law.

In accordance with the second sentence of Rule 501, state law supplies the rule of decision to be applied in this diversity matter. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938); Rules of Decision Act, 28 U.S.C. § 1652; *Hatfill v. New York Times Co.,* 459 F. Supp. 2d 462, 465 (E.D. Va. 2006); *Mordesovitch v. Westfield Ins. Co.*, 244 F. Supp.2d 636 (S.D.W.Va. 2003).  This includes the forum state's conflict-of-laws rules. *Hatfill*, 459 F.Supp.2d at 465.

Under *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) and its progeny, federal courts sitting in diversity jurisdiction must apply the forum state's *substantive* law, including its conflicts of law rules, to determine what state law should govern the application of the privilege.  South Carolina is both the forum of the pending actions and the

Motion for Protective Order. Therefore, a Federal Court must apply the choice of law rules prevailing in South Carolina. *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009)("Because we have diversity jurisdiction in this case, we apply the choice of law rules of the forum state."); *See also, Legos v. Stratos Lightwave, Inc.*, 224 F.R.D. 576, n. 7 (S.D.N.Y. 2004)(and cases cited therein.)

As counsel for Plaintiff Larry McDevitt and counsel for Plaintiff Wendy Wellin correctly note, South Carolina still endorses the traditional choice of law principles reflected in the Restatement (First) of Conflict of Laws. *See, e.g., Menezes v. WL Ross & Co., LLC*, 403 S.C. 522 at 551 (2013). South Carolina is one of thirteen states adhering to the choice of law rule traditionally applied in tort cases, *lex loci delicti*, which demands application of the substantive law of the state in which the injury occurred. *Dawkins v. State*, 306 S.C. 391, 412 S.E.2d 407 (1991)(it is well established in South Carolina that in tort cases the law of place where injury was occasioned or inflicted, governs in respect of right of action, and law of forum in respect to matters pertaining to remedy only); *Oshiek v. Oshiek*, 244 S.C. 249, 136 S.E.2d 303 (1964); *Bannister v. Hertz Corp.*, 316 S.C. 513, 450 S.E.2d 629 (Ct. App. 1994).

However, South Carolina has not had occasion to establish a choice of law doctrine applicable to privilege issues. Neither the undersigned nor counsel for the parties has identified any South Carolina case which considers the question of which state's law should govern when the law of two or more states is implicated. To be sure, no South Carolina court has ever endorsed the traditional choice of law principle *lex loci delicti* in the context of applying privilege law to a discovery dispute. Furthermore, the First Restatement makes no mention of how choice of law decisions regarding privileges should be handled. *Cf. In Re Yasmin*, 2011 WL 1375011 at 8 (S.D. Ill. April 12, 2011)(summarizing the various approaches adopted by courts throughout the country

in analyzing choice of law rules for the assertion of a privilege). South Carolina law simply provides no guidance as to how to proceed with regard to determining the controlling law.

The application of the traditional choice of law principle, *lex loci delecti*, in the context of these issues would be impractical and unworkable. The deposition at issue was taken for joint use in all three consolidated cases identified in the above caption. The causes of action set forth in the Second Amended Complaint in *Wellin I* alone include the following: 1) Breach of Fiduciary Duty against individual Defendants: 2) Conversion; 3) Breach of Contract; 4) Rescission; 5) Unjust Enrichment; 6) Breach of Fiduciary Duty by Friendship Management LLC., a Delaware limited liability corporation, as well as the Wellin Children Defendants; 7) Aiding and Abetting Breach of Fiduciary Duties by Peter Wellin and Marjorie W. King; and 8) Civil Conspiracy by the three Wellin Children Defendants. See ECF No. 301. Causes of action in the other consolidated cases include Breach of Fiduciary Duties, as well as Defamation.

The Wellin Children, who are alleged to have committed torts against the testator and the Wellin Family 2009 Irrevocable Trust, lived in Maine, Pennsylvania and Washington State during the time in question. *Id.* They are alleged to have breached fiduciary duties over a period of multiple years under five powers of attorney from five different states, all executed by Keith Wellin. *Id. at* ¶¶ 22 & 23. The 596 shares of Class A Berkshire Hathaway stock, alleged to have been sold, with the proceeds converted by the Wellin Children Defendants, were owned by Friendship Partners, LLP, a Delaware Limited Liability Partnership, which was the sole asset of the Trust. Its general partner, Friendship Management, LLC, is a Delaware limited liability corporation. Both of these entities have or had operating agreements containing choice of law provisions stating that they are governed by Delaware law.

6

The Plaintiff in *Wellin I* alleges that Keith Wellin substituted a promissory note worth approximately Fifty Million Dollars ($50,000,000.00) in the 2009 Irrevocable Trust in return for an equivalent interest in Friendship Partners, LLP.  Plaintiff alleged that thereafter Keith Wellin's daughter, Cynthia W. Plum, as Manager of Friendship Management, LLC, the general partner in Friendship Partnership, LLP, along with Keith's two other children, Peter Wellin and Marjorie W. King, improperly orchestrated a dissolution of Friendship Partners, LLP. and a sale of its asset, the 896 shares of Class A Berkshire Hathaway stock worth approximately One Hundred Fifty Million Dollars ($150,000,000.00), converting over Ninety Million dollars ($90,000,000.000) to their own use, in violation of their fiduciary duties.

These actions, culminating in the sale of the stock and the issuance and/or deposit of the checks drawn upon the account of Friendship partners, LLP to the individual defendants, would be the last events necessary to make them liable for the alleged tort of conversion.  *See Lister v. Nationsbank of Delaware, N.A.*, 329 S.C. 133, 494 S.E.2d 449 (Ct. App. 1997)(holding South Carolina law applied under *lex loci delicti* analysis where unauthorized charge on Plaintiffs' credit card account occurred in South Carolina); Restatement (First) of Conflict of Laws §377 (1934)("The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place.").  Consequently, under the traditional territorial approach, *lex loci delicti*, these alleged torts occurred in several states, none of which is South Carolina.

However, the alleged breach of fiduciary duties by Friendship Management, LLP and its managing partner, which resulted in the dissolution of Friendship Partners, LLP and the disbursement of the proceeds from the sale of the stock, are controlled by Delaware law. *Menezes v. WL Ross and Co.*, 403 S.C. 522, 403 S.C. 522, *2 (2013)("Delaware law controls the question of

the accrual date as claims concerning the fiduciary duties of corporate officers are governed by the state of incorporation").

South Carolina has not had an opportunity to address a choice of law issue in the context of a multi-state tort. All of the South Carolina cases found by the undersigned regarding this issue are single-state torts involving personal injury, such as automobile or train accidents. *See Dennis v. Atlantic Coastline R.R.*, 70 S.C. 254, 49 S.E. 869 (1904)(train wreck in North Carolina); *Rauton v. Pullman Co.*, 183 S.C. 495, 191 S.E. 416 (1937)(loss of berth on railway car in Mexico City, Mexico, tried in tort); *Mobley v. Bland*, 200 S.C. 448, 21 S.E.2d 22 (1942)(automobile accident in N.C.; *McDaniel v. McDaniel*, 243 S.C. 286, 133 S.E.2d 809 (1963)(wrongful death from auto accident in Georgia); *Oshiek v. Oshiek*, 244 S.C. 249, 136 S.E.2d 363 (1964)(Auto accident-personal injury in Georgia); *Algie v. Algie*, 261 S.C. 103, 198 S.E.2d 529 (1973)(airplane crash in South Carolina); *Bannister v. Hertz Corp.*, 316 S.C. 513, 450 S.E.2d 629 (1994)(personal injury from automobile accident in North Carolina); *Bravis v. Dunbar and Delta Airlines*, 316 S.C. 263, 449 S.E.2d 495 (Ct. App. 1994)(personal injury from overhead luggage while de-planing in Atlanta, Georgia)(abrogated on other grounds).

Confronted with this problem, the District Court for the District of South Carolina concluded in a diversity action that the territorial approach was not helpful in deciding which state's law should control in a case in which the tort was alleged to have started in North Carolina, continued through South Carolina, and culminated in Georgia. *Tully v. Pate*, 372 F.Supp. 1064, 1071 (D.S.C. 1973). For that reason, the Court applied an interest analysis. *Id.*; *See also In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, 2011 WL 1375011 (S.D. Ill., April 12, 2011)(concluding in multi-district litigation that the small minority of jurisdictions which continue to follow the traditional choice of law principles largely reflected in

the Restatement (First) of Conflict of Laws (1934), including South Carolina, would apply the conflict rule for privilege choice of law matters as set forth in section 139 of the Second Restatement because the First Restatement does not address this issue and these jurisdictions do not appear to have otherwise established rules for assessing privilege choice of law matters).

At the final hearing regarding this matter, counsel for Plaintiff Larry McDevitt and Wendy Wellin argued there is no need to further analyze South Carolina's choice of law principles because the application of privilege issues should be deemed procedural rather than substantive. Under the First Restatement, if an issue is procedural or relates to the "competency or credibility of witnesses" or to "the admissibility of a particular piece of evidence," then the law of the forum controls. See §§ 596 & 597 of Restatement (First) of Conflict of Laws. As such, counsel for Mr. McDevitt and Wendy Wellin argue that the law of the forum should apply without further analysis. Contrary to this assertion, I find the majority of courts deem the application of privilege to be substantive, thus requiring a further choice of law analysis. *See In Re Yaz,* 2011 WL 137511 at 10 (concluding "Federal Rule of Evidence 502 rejects the notion that the attorney-client privilege issue is procedural.")(citing Fed.R.Evid. 501 Advisory Committee Notes, H.R. 93-650 and *Republic Gear Co. V. Borg-Warner Corp.*, 381 F.2d 552, 555 at 2 (2d Cir. 1967).

Addressing this point, the Advisory Committee stated in H.R. 93-650 that it "included in its amendment [to Rule 501] a proviso . . . designed to require the application of State privilege law in civil actions and proceedings governed by *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), a result in accord with current federal court decisions." H.R. 93-650, Article V, p. 7082. The Committee continued, stating "[t]he rationale underlying the proviso is that the federal law should not supersede that of the States *in substantive areas such as privilege* absent a compelling reason." *Id.* (emphasis

9

added).  Thus, Federal Rule of Evidence 501 rejects the notion that the attorney-client privilege

issue should be deemed procedural. *In Re Yaz,* 2011 WL 137511 at 10.

In deciding this issue, I agree with the reasoning of the Court in *Republic Gear Co.*, which

concluded as follows:

> [A] rule of privilege is unlike the ordinary rules of practice which refer to the
> processes of litigation, in that it affects private conduct before the litigation arises.
> Rules of privilege are not mere housekeeping rules which are rationally capable of
> classification as either substantive or procedural for purposes of applying the
> doctrine of *[Erie]*.  Such rules affect peoples conduct at the stage of primary private
> activity and should therefore be classified as substantive or quasi-substantive.[2]

Having concluded the attorney-client privilege is substantive, and having further concluded

South Carolina courts have not addressed this issue in the context of a multi-state tort, I believe that,

if faced with this issue, South Carolina courts would defer to the Restatement (Second) of Conflict

of Laws for a choice of law analysis for privilege issues. *See Episcopal Church in S. Carolina v.

Church Ins. Co. of Vermont*, 2014 WL 5302955 at 3 (D.S.C. Sept. 22, 2014)("If the South

Carolina Supreme Court has not addressed a particular legal issue raised in this case, this Court

must predict how that court would rule if presented with the issue.").   In particular, § 139 of the

Restatement (Second), which endorses the "significant relationship" test, provides a reasonable,

straightforward resolution to the conflicts of law regarding privileged issues, which by their very

nature, frequently concern communication involving multiples states.

In this dispute, a non-party witness engaged in communications asserted to be privileged

with her attorney in New York.  At the time of these communications, her attorney had made no

appearance in this case on her behalf or on behalf of anyone.  Because the deponent is a resident of

---

[2] As the Court noted in *Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Product
Liability Litigation*, 2011 WL 1375011, * 10, treating the state's attorney-client privilege law as
procedural would create a conundrum because federal courts sitting in diversity are required to
adhere to federal rules of civil procedure.

New York who spoke with her attorney in New York state with regard to the disputed communications, New York has the most "significant relationship" to the communication. Further, the witness's communications with her mother and other family members all took place outside of South Carolina, with New York seemingly being the most consistent place of contact for her. New York law therefore should apply to the instant dispute.

However, § 139 of the Second Restatement still requires further analysis where the disputed communication is deemed privileged under the "significant relationship" state's law but is not deemed privileged under the forum state's law. In such scenarios, the "special reason" factors must be assessed in order to determine whether application of the non-forum's law remains proper. Factors to be considered in assessing whether a special reason exists include:

> (1) the number and nature of the contacts that the state of the forum has with the parties and with the transaction involved, (2) the relative materiality of the evidence that is sought to be excluded, (3) the kind of privilege involved and (4) fairness to the parties.

Restatement (Second) of Conflict of Laws § 139, Comment d (1971).

Counsel for Plaintiff McDevitt argues that South Carolina law should counsel a contrary result on the issue of privilege, at a minimum, in the application of the joint client and common interest doctrines. Regardless of the merits of this assertion, I conclude that the special reason factors would still warrant an application of New York law to the instant dispute.

As to the first special reason factor, I conclude the number and nature of the contacts to South Carolina between the parties to this transaction are not significant. Dr. Plum is a non-party to this South Carolina litigation. She is a resident of New York, and she communicated with her counsel and family members in New York and other states outside of South Carolina. The communications at issue simply do not have strong ties to the forum state. As to the second factor, the relative materiality of the evidence sought to be excluded, I find nothing to indicate that the

11

disputed communication is in any way determinative or significant to the outcome of this case.  The factual recitation contained in the witness' affidavit is admittedly second-hand, and deposing counsel is largely able to ascertain, by process of elimination, the very source of Dr. Plum's knowledge which is the subject of this motion.

With regard to the third factor, it is abundantly clear that the attorney-client privilege, the most cited basis for privilege in this motion, is universally recognized by all states. Both South Carolina and New York recognize the privilege serves an important public policy. As the South Carolina Supreme Court observed:

> "The privilege is based upon a public policy that the best interest of society is served by promoting a relationship between the attorney and the client whereby utmost confidence in the continuing secrecy of all confidential disclosures made by the client within the relationship is maintained. The privilege belongs to the client and, unless waived by him, survives even his death.") *State v. Doster*, 276 S.C. 647, 650, 284 S.E.2d 218, 219 (1981)(quoting *South Carolina State Highway Dept. v. Booker*, 260 S.C. 245, 195 S.E.2d 615 (1973)

Likewise, New York recognizes the same policy considerations, noting the following in *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 124 A.D.3d 129, 133, 998 N.Y.S.2d 329, 332 (1st Dept. 2014):

> "The attorney-client privilege is 'the oldest among common-law evidentiary privileges.' *Spectrum Sys. Intl. Corp. v. Chemical Bank*, 78 N.Y.2d 371, 377, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (1991).  The purpose of this privilege 'is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.' *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L. Ed.2d 584 (1981)."

The attorney-client privilege in New York is generally similar to, if not the same as it is in the forum state, South Carolina.

Furthermore, the common interest and joint client doctrines, while varying from state to state, enjoy widespread application by courts throughout the country.  Both New York and South

12

Carolina recognize the common interest doctrine, although New York has adopted a broad-based application of the protection, whereas South Carolina has only applied the doctrine in one reported case, *Tobaccoville Inc. v. McMaster*, 387 S.C. 287, 692 S.E.2d 526, and limited its adoption of the protection to the facts of the case.

Lastly, fairness to the parties similarly favors application of New York law. The disputed communications took place between a non-party and her lawyer and various family members, only one of which is a party to this action. It would also appear that, in large part, the disputed communications took place under the assumption of privilege and in reliance upon confidentiality. I therefore conclude that the "special factors" favor application of New York law.

## B.    Attorney Client Privilege & Waiver

The first category of disputed testimony from Dr. Plum's deposition arises from and concerns her source of certain facts. While Dr. Plum seems to have provided her knowledge of facts at the deposition, her counsel instructed her not to answer a variety of inquiries which sought to determine the basis for that knowledge to the extent the answers would divulge attorney-client privileged communications or protected work product.

The Plaintiffs do not dispute the existence of an attorney-client relationship between the law firm of Duffy & Young and Dr. Plum nor do the parties disagree that facts derived from counsel are discoverable. *See Henry v. Champlain Enterprises, Inc.* 212 F.R.D. 73, 91 (N.D.N.Y. 2003)(facts, including those communicated by counsel are not protected by the attorney client privilege and work product privilege); *B.C.F. Oil Refin., Inc. v. Consol. Edison Co. of N.Y.*, 168 F.R.D. 161, 165 (S.D.N.Y. 1996)(same but only addressing the attorney client privilege); *In Re Wagar*, 2006 WL 3699544 (N.D.N.Y. 2006). However, Plaintiffs do dispute that Dr. Plum's source of those facts can be protected by privilege where, as here, the facts are affirmatively asserted in a sworn affidavit

13

filed in the proceedings. Under those circumstances, Plaintiffs assert the witness has waived the privilege, and they are entitled to ascertain the basis for the witness' assertions contained in her affidavit. *See Computer Network Corp. v. Spohler*, 95 F.R.D. 500, 502 (D.D.C. 1982); *Saint Annes Dev. Co., LLC v. Trabich*, 2009 WL 324054 (D. Md. Feb. 9, 2009).

On September 24th, 2014, Dr. Plum executed an Affidavit and a Release of any and all claims she might have against her mother, Cynthia W. Plum, her uncle, Peter J. Wellin, and her aunt, Marjorie King, (the Wellin children) for their actions taken to date as members of Friendship Management, LLC, and as Trustees and Distribution Committee members of the Irrevocable Trust. The Affidavit and Release are attached to this Report and Recommendation as **Exhibits II and III**, respectively. Thereafter, on May 28, 2015, the Wellin children filed the Affidavit and Release as attachments to their Response in Opposition to Plaintiff McDevitt's Motion to Compel production of their communications with their litigation attorneys in Civil Action No.: 2:13-cv-03595-DCN, ECF No. 306. In the Motion to Compel, Plaintiff McDevitt, as Trustee under the 2009 Irrevocable Trust, argued entitlement to the Wellin children's' attorney-client communications on the grounds that the "co-trustee exception" to the attorney-client privilege allowed him access to these privileged communications to fulfill his fiduciary duties to the beneficiaries, including the Wellin grandchildren. The Wellin children's Response in Opposition to the Motion to Compel attached and filed the Affidavit and Release of each Wellin grandchild, including Dr. Plum, in support of their position that there were no duties to be performed by Mr. McDevitt on behalf of the Wellin grandchildren. Therefore, the Affidavit of Dr. Plum has been filed with the court, albeit by the Wellin children and not by Dr. Plum. Based upon the filing of the affidavit, Plaintiffs' argue Dr. Plum has waived the attorney-client privilege.

Under New York law, confidential communications between attorney and client in the course of professional employment are generally privileged unless waived. CPLR § 4503; *Tupi Cambios, S.A. v. Morgenthau*, 44 Misc.3d 800, 804, 989 N.Y.S.2d 572, 575 (S.Ct. N.Y. Co. 2014). A client can waive the attorney-client privilege by placing "the subject matter of the privileged communication in issue or where invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information." *Id.*, citing *Jakobleff v. Cerrato, Sweeney & Cohn*, 90 A.D.2d 834, 835, 468 N.Y.S.2d 895 (2d Dept. 1983); *Deutsche Bank TrustCo. Of Americas v. Tri-Links Investment trust*, 43 A.D.3d 56, 63-64, 837 N.Y.S.2d 15 (1sr Dept. 2007). Under the "at-issue" doctrine, where a party places legal advice or other privileged facts or communications at issue, the party is deemed to have waived the privilege with respect to such facts or communications and can be compelled to produce them. *American Reinsurance Company v. United States Fidelity and Guaranty Company*, 40 A.D. 3d 486, 492, 837 N.Y.S.2d 616, 622 (1st Dept. 2007).

A client waives the privilege "by placing the subject matter of counsel's advice in issue and by making selective disclosure of such advice." *Tupi Cambios, S.A.,* 44 Misc.3d at 804, 989 N.Y.S.2d at 575, citing *OrcoBank, N.V. v. Proteinas Del Pacifico, S.A.*, 179 A.D.2d 390, 577 N.Y.S.2d 841 (1st Dept. 1992). Such a waiver "reflects the principle that privilege is a shield and must not be used as a sword." *Id.*, (*citing American Reinsurance Company v. United States Fidelity and Guaranty Company*, 40 A.D. 3d at 492). Waiver is often found in cases in which the client asserts an "advice of counsel" defense, but "it has also been applied more broadly to cover circumstances in which a client does not expressly claim that he has relied on counsel's advice, but where the truth of the parties' position can only be assessed by examination of a privileged communication." *Id, 44 Misc.3d at 576, 989 N.Y.S.2d at 805 (quoting Bolton v. Weil, Gotshal &*

15

*Manges LLP,* 4 Misc.3d 1029(A) at *4, 2004 WL 2239545 (Sup.Ct., N.Y. County). It is application of this latter category that Plaintiffs argue compels waiver of the attorney-client privilege to the communications between Dr. Plum and her attorney.

In support of this position, Plaintiffs advance two cases in which waiver was found based upon the filing of an affidavit with the tribunal. In the first case, *Computer Network Corp. v. Spohler*, 95 F.R.D. 500 (1982), the affiant filed an affidavit with the court asserting he was both a corporate officer and general counsel for two corporate defendants. *Id.*, 95 F.R.D. at 502. The court determined the affiant "was being a factual witness concerning fact issues which goes to the heart of this legal controversy." *Id.* Furthermore, the affidavit was submitted to the court by the affiant "to influence the court based on factual representations therein to deny a motion for expedited discovery." *Id.* The court concluded no attorney-client privilege was applicable because the affiant was acting in his role as a corporate officer, and not as general counsel. Thus, his status as an attorney was irrelevant. The court further stated that, even if the communications came within the attorney-client privilege, the privilege was waived. In so finding, the court observed "[a] party cannot voluntarily disclose facts in his favor before a judicial tribunal when they are helpful to his cause, and then invoke the attorney-client privilege as a shield to prevent a searching inquiry so that a court may determine the truthfulness of the facts initially presented." *Id.*

In the second case, *Saint Annes Development Co., LLC v. Trabich*, 2009 WL 324054, Feb. 9, 2009, one of the named defendants refused to answer questions in her deposition on the basis of attorney-client and spousal privilege regarding facts contained in an affidavit she had filed in support of her position in related litigation. Consistent with *Spohler* and the above cited New York authorities, the court ruled the privileges were waived, reasoning "she cannot make assertions of

fact in court documents while also claiming attorney-client privilege to shield the basis for her assertions; she has waived that privilege because she is deemed to have testified in those filings." *Id.*

The above cited cases stand for the proposition that a party who signs and files an affidavit with the court advancing facts in support of a claim or defense cannot hide behind the attorney-client privilege to shield themselves from discovery of the underlying basis for the factual assertions. However, these cases are distinguishable from the issue presented here.

Preliminarily, it is not particularly troubling that Dr. Plum is a non-party to the litigation, and did not, herself, file the affidavit in these proceedings. She professes a common interest in the litigation with her mother, uncle and aunt, the Defendant Wellin children, and the affidavit advanced the position of the said Defendants in their attempt to convince the court not to allow Plaintiff McDevitt access to their attorney-client communications under the asserted co-trustee exception.

However, I conclude what distinguishes the issue in this case from those cited above is that the affiant in this case does not state factual assertions to advance the position of the Defendants. Rather, the factual recitations are couched as things she "understands" to be the case. She does not profess to have first hand knowledge of the facts contained in paragraph 4, 5, or 6 of the affidavit regarding Keith Wellin's estate planning and related documents, the subsequent events regarding the dissolution of friendship Partners, LLP., the sale of the Berkshire Hathaway stock, the subsequent distribution of the proceeds, or first hand knowledge of any of the activities of the Trust Protector described in the affidavit.

According to counsel for Dr. Plum, the affidavit was executed contemporaneously with the signing of the Release, and was intended to memorialize Dr. Plum's understanding of the circumstances upon which the Release was premised. The later filing of the affidavit with the court

17

as an attachment served only to establish the fact of the release of the Wellin children.   In this regard, counsel for Dr. Plum affirmed to the court during argument that Dr. Plum would not testify as to any facts set forth in the affidavit which she merely "understands" to be true.[3]

Based upon the above analysis, I conclude the witness has not asserted facts in the affidavit in support of the Defendant's claims or defenses, and it is clear from her deposition testimony that the facts contained in the affidavit which she understands to be true were told to her by her attorney. Under these circumstances, I conclude Dr. Plum has not waived the attorney-client privilege.   As the court ruled in *Johnson v. Couturier,* 261 F.R.D. 188 (2009), "[t]he undersigned knows of no authority abrogating the attorney client privilege because an informed attorney relates to his uninformed client (prospective or actually retained) the facts of the attorney's investigation. Therefore, the communications, which may be the sum total of the client's knowledge of the case, will remain undisclosed in discovery." *Id.* 261 F.R.D. at 191.

### C.  Joint Client Doctrine.

Under New York law, "the joint client doctrine" provides that "where one attorney represents multiple parties concerning a matter of common interest, any confidential communications exchanged among them are privileged against the outside world." *New York v. Pennachio*, 637 N.Y.S.2d 633, 635 (N.Y. Sup. Ct. 1995).  While mere concurrent representation of two clients by one attorney is insufficient, the protections of the joint client doctrine do attach when

---

[3] Based upon this position, it would appear proper for the Court to grant a Motion *in limine* precluding the introduction of any testimony by the witness at trial regarding the protected information, both because the information contained in paragraphs 4, 5, and 6 of the affidavit are admittedly hearsay, and because the witness cannot use the attorney-client privilege as a shield, and then surprise opposing parties at trial by using any of the requested, underlying information that forms the basis for the witness' "understanding" of facts alleged in those paragraphs. *See In re Poster*, 25 Misc.3d 780, 884 N.Y.S.2d 838 (2009).

those concurrent clients share a "common interest and consult[] the[ir] common attorney for their mutual benefit." *Arkin Kaplan Rice LLP v. Kaplan*, 967 N.Y.S.2d 63, 64 (N.Y. App. Div. 2013).

Not all statements between joint clients are protected. Rather, only those which are "designed to further th[e] [common] interest" are deserving of protection. *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 434 (S.D.N.Y. 2013). Importantly, the joint client doctrine does not create an independent basis for asserting privilege. The doctrine simply avoids a waiver where an otherwise legitimate claim to privilege exists i.e. attorney client or work product.

Based on the record before the Court, it would appear that Dr. Plum and her cousins are indeed joint clients of the law firm of Duffy & Young and that their communications discussing their interests in the instant litigation should be protected insofar as these communications concern their shared legal interest and can be shown to be valid work product or attorney client communications.

For the same rationale as set forth above, there has been no waiver of privilege protections afforded under the joint client doctrine.

### D. Common Interest

The last disputed assertion of privilege is that pertaining to Dr. Plum's common interest with her mother and her mother's counsel. The common interest doctrine "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer*, 892 F.2d 237, 243, 244 (2nd Cir. 1989). The common interest doctrine also shields protected work product when parties with a common legal interest discuss legal strategy in anticipation of litigation.

Like the joint client doctrine, this doctrine also presupposes the existence of an otherwise valid privilege such as attorney client or work product. It is not an independent basis for privilege.

Dr. Plum was asked to identify the substance of her conversations with her mother and potentially her mother's counsel with regard to the statements in her affidavit and her views concerning Lester Schwartz. I conclude that these questions are protected from discovery under the attorney-client and work product privileges.

Counsel for Plaintiff Larry McDevitt and Wendy Wellin argue that the witness does not have common legal interest with the Wellin Children. I disagree. The common interest privilege is an exception to the rule that the presence of a third party at a communication between counsel and client will render the communication non-confidential. *Ambac Assurance Corporation v. Countrywide Home Loans, Inc.*, 124 A.D.23d 129, 998 N.Y.S.2d 329 (1st Dept. 2014)(citing *Kelly v. Handy & Hartman*, 2009 WL 22227 (S.D.N.Y. July 23, 2009). "The doctrine, a limited exception to waiver of the attorney-client privilege, requires that: (1) the communication qualify for protection under the attorney-client privilege, and (2) the communication be made for the purpose of furthering a legal interest or strategy common to the parties." *Ambac,* 124 A.D.3d at 132-133, 998 N.Y.S.2d at 332 (citations omitted).

New York law is still in a state of flux with regard to certain aspects of the common interest doctrine. Most notably, New York courts disagree with regard to whether or not the communication must be made in "reasonable anticipation of litigation" for the protection to apply. *Compare Hyatt v. Franchise Tax Board*, 105 A.D.3d 186, 206 and cases cited therein (adhering to requirement that communication be "in reasonable anticipation of litigation") with *Ambac*, 124 A.D.3d 129, 133 (rejecting the requirement that litigation be within the

20

contemplation of the parties). However, that dilemma is of no consequence here because clearly there are multiple suits pending between the parties.

Under New York law, confidential communications between a lawyer and his or her client in the course of professional employment are privileged from disclosure (*see* CPLR 4503(a)). To be privileged, the communication must be made for the purpose of seeking or providing legal advice and must have been primarily or predominantly of a legal character. *Hyatt*, 105 A.D.3d at 205, (*citing Spectrum Sys. Intl. Corp. v. Chemical Bank*, 78 N.Y.S.2d 371, 377-378, 575 N.Y.S.2d 809, 581 N.E.2d 1055). The common-interest privilege is an exception to the traditional rule that the presence of a third party waives the attorney-client privilege. *Id.* "The legal interest that those parties have in common must be identical (or nearly identical), as opposed to merely similar." *Id.*, (*citing United States v. Doe,* 429 F.3d 450, 453, *Federal Deposit Ins. Corp. v. Ogden Corp.,* 202 F.3d 454, 461).

Under the posture of this case, I conclude that the witness does have a common legal interest sufficient to establish common interest protection. The Wellin children were the three named beneficiaries under the Wellin Family 2009 Irrevocable Trust and Keith Wellin Estate Plan. The grandchildren, including Dr. Plum, were unnamed contingent beneficiaries under the Wellin Family 2009 Irrevocable Trust. Prior to his death, the Testator, Keith Wellin, filed suit in the first of these consolidated cases to modify his estate plan so as to disinherit his three children, which would affect the contingent interest of the Wellin grandchildren. The suit also seeks rescission of the 2013 Ten Million Dollar ($10,000,000) gifts to each of his three children.

In addition to filing suit, Keith Wellin executed various documents by which he sought to extinguish the grantor status of the Irrevocable Trust, thereby shifting the large tax burden for any sale of the Berkshire Hathaway stock to the Trust. He further executed documents to

substitute an approximately Fifty Million Dollar ($50,000,000) promissory note in the Trust for an interest in Friendship Partners, LLP of equal value, and designated a new Trust Protector for the Irrevocable Trust. The new Trust Protector thereafter made certain modifications to the Trust, to include a provision authorizing him to settle litigation involving the trust.

It is the position of the Wellin children that the newly named Trust Protector is aligned with the Testator, and the reason for this modification was to allow the Trust Protector to transfer the trust assets to Keith Wellin in settlement of the litigation. To avoid this result, they dissolved Friendship Partners, LLP, sold its asset, the Berkshire Hathaway Stock, and as trustees and trust distribution committee members, distributed the sale proceeds out of the trust to their own accounts, where they assert the funds have since been maintained without invasion except for the fees and costs of this litigation.

Dr. Plum testified in her deposition that she had full trust in her mother, and her aunt and uncle, to treat the grandchildren fairly in the disposition of their estates. Based upon her understanding of the above described events, she did not have any faith in the Trust Protector or Plaintiff McDevitt. She clearly expressed her alignment with the interests of the Wellin children Defendants.

Under the unusual circumstances presented in these cases, I conclude the witness, as a grandchild of Keith Wellin, has a legal interest closely aligned with and nearly identical to the interests of the Wellin children. Consequently, I conclude she does share a common interest with the Wellin children.

**For the foregoing reasons, I make the following Recommendations to this Honorable Court:**

**Questions 1, 2, 3, 4, and 5 were answered by the deponent and Dr. Plum's Motion for Protective Order should thereby be denied as moot.**

Question 6 should not be answered in light of the common interest doctrine and Dr. Plum's Motion should thereby be granted.

Questions 7 and 8 were answered by the deponent and Dr. Plum's Motion for Protective Order should thereby be denied as moot.

Questions 9, 10, 11 must be answered by the deponent as it is not privileged under the common interest doctrine because it does not pertain to legal advice or strategy. In that regard, Dr. Plum's Motion for Protective Order should thereby be denied.

Questions 12 and 13 were answered by the deponent and Dr. Plum's Motion for Protective Order should thereby be denied as moot.

Question 14 does not seek communications from counsel and any response is not entitled to work product privilege. Therefore, Dr. Plum's Motion for Protective Order should be denied.

Question 15 was answered by a following question and Dr. Plum's Motion for Protective Order should thereby be denied as moot.

Questions 16 and 17 should not be answered as they are protected by the attorney client privilege and no waiver exists. Therefore, Dr. Plum's Motion for Protective Order should thereby be granted.

Questions 18, 19, and 20 should not be answered as it inquires as to the result of legal advice rendered and/or the substance of that legal advice. In that regard, Dr. Plum's Motion for Protective Order should be granted.

Questions 21 and 22 should not be answered as it is protected under the common interest doctrine and work product doctrines. In that regard, Dr. Plum's Motion for Protective Order should be granted.

Question 23, 24, 25, 26, and 27 should not be answered as it is protected under the 1) attorney client privilege and 2) work product protected extended by the common interest doctrine. In that regard, Dr. Plum's Motion for Protective Order should be granted.

Questions 28, 29, and 30 should not be answered as they seek information protected under the attorney client privilege and common interest doctrine. In that regard, Dr. Plum's Motion for Protective Order should be granted.

Questions 31 and 32 should not be answered as it is protected under the attorney client privilege. In that regard, Dr. Plum's Motion for Protective Order should be granted.

Questions 33 and 34 should not be answered as they seek information protected under the attorney client privilege and common interest doctrine. In that regard, Dr. Plum's Motion for Protective Order should be granted.

Question 35 was answered by the deponent and Dr. Plum's Motion for Protective Order should thereby be denied as moot.

Questions 36 and 37 should not be answered as it seek information that is protected under the attorney client privilege. In that regard, Dr. Plum's Motion for Protective Order should be granted.

Question 38 was answered by the deponent and Dr. Plum's Motion for Protective Order should thereby be denied as moot.

Question 39 should not be answered as it seeks information protected under the attorney client privilege and common interest doctrine. In that regard, Dr. Plum's Motion for Protective Order should be granted.

Question 40 should not be answered as it is seeks information that is protected under the attorney client privilege. In that regard, Dr. Plum's Motion for Protective Order should be granted.

Respectfully Recommended, this _____ 8th _____ day of March, 2016.

William L. Howard, Special Master

# EXHIBIT I

## *APPENDIX*

Q1 (Page 127):

> Q:   How do you know about it?
>
> *Mr. Duffy: Object to the extent it calls for attorney-client communications. You should not answer.*
>
> Q:   That's right, to the extent it would require you to tell me anything you learned from your lawyers or discussed with your lawyers, that's information I don't get. So aside from  that, if you have an understanding of what it is, that's what I'm seeking to know.
>
> *Mr. Duffy: You can answer as your understanding, to the extent it would involve communications with me or my firm, you should not answer.*
>
> Q:   What are you going to do?
>
> *Mr. Duffy: So are you - - you need to either claim that the question calls for you to give attorney-client privilege information or answer as to a separate understanding.*
>
> A:   Okay

Q2 (Page 128)

> Q:   Have you had any discussion with your mother about it at any point in time?
>
> *Mr. Duffy: And I'll object to the extent it is - - involved preparation or strategies with the litigation in which you have a common interest with your mother, then you should not answer.  If it is a general discussion about the trust itself, not related to the litigation, you're free to answer.*
>
> A:   Can you - - I guess clarify the question, please.
>
> Q:   Have you had any discussion with your mother about the 2009 - - the Wellin Family Irrevocable Trust at any point in time?
>
> *Mr. Duffy: And I'll clarify my objection.  You may testify whether you've had those discussions.  You should not discuss the substance of those discussion if they involved litigation.*
>
> A:   Okay. Yes.

Q3 (Page 129):

    Q:    What did your mother tell you?

    *Mr. Duffy: And I'll object and instruct you not to answer to the extent it involved litigation decisions or preparation of strategy for litigation.*

    A:    Okay.  So if it doesn't involve that, I should answer.

    *Mr. Duffy: Correct.*

    A:    Just that really that she was going to be involved in the legal matters concerning the trust and then later that there was concern over the trust protector but that's pretty much it that I can remember.

Q4 (Page 130):

    Q:    What did your mother tell you about the creation of the trust in 2009?

    *Mr. Duffy: Follow the same instructions, please.*

    A:    She didn't tell me anything specific other than it was set up by my grandfather as supposed to pass on to his descendants and their descendants and their descendants and so on and so forth.

Q5 (Page 131):

    Q:    Did your mother ever suggest that the trust was put in place as a specific way to keep Wendy from getting any money?

    *Mr. Duffy: I'll object and instruct you that should your answer require you to disclose communication s you've had concerning the litigation or the strategy in the litigation, that you should not answer.  Otherwise you can answer.*

    A:    No, she did not tell my anything about that.

Q6 (Page 132):

    Q:    What prompted you to seek legal counsel?

    *Mr. Duffy: Again, the same instruction and objection to the extent it calls for communication and common litigation interests that you would have with any of the other parties to the lawsuit.*

    A:    Okay.  So I guess I can - -

*Mr. Duffy: You can decline to answer based - -*

A:      I'm going to decline to answer based on common interest.

Q7 (Page 133):

Q:      Common interest with who?

*Mr. Duffy: You can answer.*

A:      With my mom, my brother, my aunt and uncle and my cousins.

Q8 (Page 143):

Q:      Have you ever discussed this letter with any of your cousins at any point in time?

*Mr. Duffy: I'm going to object to the question in that if it involves any of your - - any discussion about the litigation with your cousins, then you should not answer. Otherwise you can answer.*

A:      Not to my recollection.  Hang on, I just want to make sure I'm clear on the objection.  So  you would be asserting common interest on that if those discussion took place, just between cousins?

*Mr. Duffy: Common interest if it involved their position, strategy, responses, whatever in the litigation, yes.*

     *Mr. Hudson: Even if it was limited to just the cousins themselves?*

*Mr. Duffy: Depending on what the communication was, sure.  And if they're related to the litigation specifically then, yes, and I should be a little more precise.  If it related to efforts in the litigation on a - - gathering information or addressing what your lawyers had told you as a group, that's what I mean when I say referencing the litigation.*

Q9 (Page 153):

Q:      Did you communicate with your brother in your effort to respond to the subpoena?

*Mr. Duffy: And I'll object to the extent you had discussions with your brother that relate to directions you received from counsel and working together with your common interest in this litigation.*

A:      I decline to answer.

Q10: (Page 153)

Q:      Did you have any discussion with any of your cousins in your effort to respond to the subpoena?

*Mr. Duffy; Same objection, same instruction.*

A:      I decline to answer.

Q11 (Page 153):

Q:      Did you have any discussions with your - - either of your parents in your effort to respond to the subpoena?

*Mr. Duffy: Same objection, same instruction*

A:      I decline to answer.

Q12 (Page 176):

Q:      Have you ever texted with any of your cousins about Wendy Wellin?

A:      No.

*Mr. Duffy: I'll object to the extent it involves communication concerning the litigation as I defined it earlier but otherwise you can answer.*

A:      Not to my recollection.

Q13 (Page 177):

Q:      Have you ever texted with any of your cousins about Wendy and Keith's relationship in any capacity?

*Mr. Duffy; Same objections, same instruction.*

A:      Not to my recollection.

Q14 (Page 182):

Q:    Do you know if that's the case?  Anything that the search terms pulled up got produced?

*Mr. Duffy: Object to the form to the extent you're asking for communications with her counsel and how you responded to requests in the litigation.*

Q15 (Page 193):

Q:    How did you come to be aware of that gift?

*Mr. Duffy: I'll object to the extent it involves communications with your lawyers or with people with whom you share a common interest, if it was in response to efforts in the litigation or in strategy in the litigation.*

……………………

Q:    Did your mother ever inform you that her father gave her a $10 million dollar gift in January of 2013?

A:    Yes, she did.

Q16 (Pages 204-205):

Q:    The information in the Affidavit, where did that information come from?  Did you have personal knowledge of it or was it given to you by somebody else?

*Mr. Duffy: I'll object to the extent that it calls for communications you had with counsel.  If you have a separate understanding you're welcome to testify to that.*

*Mr. Blanchard: Any Affidavit, I'm asking about any Affidavit.*

*Mr. Duffy: You can ask her about her understandings of the information but if you're asking her how she got certain information, if it's from counsel, I'm instructing her not to answer as it is communications.*

*Mr. Blanchard: She put in an affidavit.  I think she's waived any privileges if that's the source of the information.  Are you instructing her not to answer the question?*

*Mr. Duffy: I'm instructing her not to answer to the extent it calls for her to disclose attorney-client communications, yes.*

A:    I decline to answer.

Q17 (Pages 205-206):

> Q:    Miss. Plum, as far as the source of the information in the Affidavit, did it come from    anyone other than your legal counsel?

> *Mr. Duffy: Same objection which obviously would reveal what communications are with legal counsel.  If you have a separate understanding or you received information separately, you can discuss what information or actually I - - strike that long-winded objection.*

> *I object and instruct you not to answer because it would disclose your communications.*

> A:    I decline to answer.

> *(In audible comment from the phone.)*
>     *Mr. Hudson: You need to mute your phone.*

Q18 (Page 206):

> Q:    So in preparing and signing an Affidavit, you have relied upon the advice of your legal counsel?

> *Mr. Duffy: Object to the form and instruct you not to answer as to any communications you had with counsel substantively regarding these matter.*

Q19 (Pages 206-207):

> Q:    I'm not asking for the substance of your communications with legal counsel.  I'm asking  you, in signing this affidavit, did you rely upon the legal advice of your counsel?

> *Mr. Duffy: And the extent of that question is did you rely on advice of counsel when you were signing the Affidavit?  That's - - is that the question?*

> > *Mr. Blanchard: I'm asking her in signing the Affidavit, the information in the Affidavit, did you rely upon the advice of legal counsel?*

> *Mr. Duffy: To the extent your question - - Frank, I think you asked two different questions and I want to make sure which one you're asking.  You asked initially if you relied on advice of legal counsel in signing the Affidavit and then you said the information in the Affidavit, did you rely on legal counsel.  I'm objecting and instructing her not to answer as to any - - to reveal any communications with her lawyers and - - regarding the substance of the - - of the lawsuit generally or of the Affidavit.*

Q:    Let me break that into two parts.  In signing this Affidavit did you rely upon the advice of legal counsel?

*Mr. Duffy: I instruct you not to answer that.*

A:    I decline to answer.

Q20 (Page 208):

Q:    Miss. Plum, as far as the source of the information contained in this Affidavit, did you rely upon legal counsel for that source?

*Mr. Duffy: Same objection and instruction.*

A:    I decline to answer.

Q21 (Page 210):

Q:    Why were you being asked to be a trustee?

*Mr. Duffy: I'll object to the extent it calls for any disclosure of litigation strategy, work product with others with whom you share common interest in the litigation.*

A:    I decline to answer.

Q22 (Page 212):

Q:    Tell me about those conversations.

*Mr. Duffy: Same objection as to the - - I object and instruct you not to answer to the extent it discloses strategic communications regarding the litigation in which you share a common interest or any work product for the same.*

A:    I decline to answer.

Q23 (Page 217-218):

Q:    The information you just testified about as far as what the Trust Protector would do or possibly may do, where did that come from?

*Mr. Duffy: I'll object to the extent it calls for communications with your counsel or with others who share - -*

*Mr. Blanchard: She already testified to it so it's out there.*

*Mr. Duffy: Right, she testified to her understanding when she wrote and signed the Affidavit and that's what you're entitled to know.*

A:    I decline to answer.


Q24 (Page 220):

Q:    Your source of that information is from where?

*Mr. Duffy: Object to the form and instruct you not to answer if you were - - if you would be disclosing attorney-client communications.*

A:    I decline to answer.

Q25 (page 220):

Q:    Do you have any source of information other than what your legal counsel has told you?

*Mr. Duffy: Same objection, same instruction.*

Q26 (Page 220):

Q:    I did not hear your answer.

A:    I decline to answer.

Q27 (Page 220):

Q:    What did you ask her?

*Mr. Duffy: Object to the question and instruct you not to answer to the extent it discloses litigation strategy with people with whom you share common interest in the litigation.*

A:    I decline to answer.

*Mr. Blanchard: You can't make an allegation in this lawsuit and I think I'm entitled to understand the basis for the allegations. If she's going to testify to that in court, I think I'm entitled to ask the question.*

*Mr. Duffy: DR. Plum isn't making allegations in the lawsuit. She provided an Affidavit that stated her understanding when she signed a release and she's providing you what her understanding was.*

*Mr. Blanchard: So you're instructing her not to answer the question.*

> *Mr. Brunson: I'm not sure what question you're referring to but my instruction stands by whatever the last one was.*

*Mr. Blanchard: Madam Court Reporter, can you read that question.*

*(Whereupon, the requested record was then read.)*

> *Mr. Duffy: If you're asking if I continue to object, yes.*

*Mr. Blanchard: Are you going to instruct her not to answer the question?*

> *Mr. Duffy: Yes.*

*Mr. Blanchard: My understanding is, Brian, is that he is instructing the witness not to testify as to what she asked her mother; is that correct:*

> *Mr. Duffy: That's right, to the extent - - my point was to the extent that it reveals work product or attorney-client communications it would be subject to the common interest protection.*

Q28 (Page 224):

    Q:    Who told you that the Trust Protector cannot make any changes without discussing with it with Keith Wellin's children?

> *Mr. Duffy: I object and instruct you not to answer to the extent it reveals attorney-client communications or communications concerning this litigation in preparation for the litigation that you have with others who have common interest in the litigation.*

    A:    I decline to answer.

Q29 (Page 231):

    Q:    The source of the information that you have about the promissory note and the way that it works, where did that come from?

> *Mr. Duffy: Object to the form of the question, instruct you not to answer if it's going to disclose any communications with your attorneys.*

    A:    I decline to answer.

Q30 (Page 233-234):

Q:    Have you discussed it with any of the other grandchildren of Keith Wellin?

*Mr. Duffy: And I'll object and instruct you not to answer to the extent it was in response to the direction you received from counsel or otherwise preparing for the litigation in which you share a common interest with them.*

A:    I decline to answer.

Q31 (Page 241):

Q:    Who asked you to sign it?  I'm sorry, who asked you to sign it?

*Mr. Duffy: I object and instruct you not to answer to the extent it calls for attorney-client communications.*

A:    I decline to answer.

Q32 (Page 243-244):

Q:    Did you discuss that with anybody before you signed the Release?

*Mr. Duffy: Object to the form and instruct you not to answer to the extent it calls for attorney-client communications.*

A:    I decline to answer.

Q33 (Page 244):

Q:    Where did the date come from?  How do you know that date?

*Mr. Duffy: I object to the extent you're asking for a communications.  You're welcome to testify as to your understanding about the date, other than privileged communications.*

A:    I decline to answer.

Q34 (Page 245):

Q:    Where did the information come from?

*Mr. Duffy: Same objection and instruction.  If you have independent knowledge, you're welcome to testify to it.*

A:    I decline to answer.

Q35 (Page 245):

    Q:    Do you have any of the other than what your legal counsel told you?

    *Mr. Duffy: Same.*

    A:    Not to my recollection.

Q36 (Page 246):

    Q:    Why did you use the phrase "purported Trust Protector"?

    *Mr. Duffy: You're welcome to testify to your understanding but I object to the question and instruct you not to answer if you must reveal attorney-client communications for that.*

    A:    I decline to answer.

Q37 (Page 247):

    Q:    Would you agree that the source of the information for the allegation in this section of the Affidavit came from your legal counsel?

    *Mr. Duffy: Object to the form and instruct you not to answer.*

    A:    I decline to answer.

Q38 (Page 247):

    Q:    Do you have any independent source of information to support this allegation other than what your legal counsel told you?

    *Mr. Duffy: Object and instruct you to answer as to any sources - - any independent information with firsthand knowledge you have, but otherwise you're not to answer.*

    A:    I decline to answer.

    Q:    (Page 248)Well, I think your lawyer instructed you to answer to the extent that you can.

    *Mr. Duffy: Same objection.*

    Q:    Do you have any independent knowledge other than what your legal counsel told you?

> *Mr. Duffy: Same objection, same instruction.*

A:   I mean, the only other knowledge was, I guess that my mom said that he was a Trust Protector and, you know, said that there was concern about, you know, him passing amendments and not talking to them.

Q39 (Page 248):

Q:   Would you agree with me that the allegation in this section of the Affidavit is based on what your attorney told you and what your mother told you?

> *Mr. Duffy: Object to the question and instruct you not to answer. I believe you've already answered the question and this is invasive of the privilege.*

A:   I decline to answer.

Q40 (Page 280):

Q:   And other than what was told to you by your attorneys you didn't know anything in there, did you?

> *Mr. Duffy: Object to the form of the question and instruct you not to answer. We've plowed this ground many times but that's my instruction.*

> *Mr. Wooten: Same objection.*

A:   I decline to answer.

# EXHIBIT II

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Lester S. Schwartz, as Trust Protector of the Wellin Family 2009 Irrevocable Trust, ) ) ) | Civil Action No.: 2:13-cv-03595-DCN |
| Plaintiff, ) ) ) | |
| vs. ) ) ) | |
| Peter J. Wellin, Cynthia W. Plum and Marjorie W. King, Individually and as Co-Trustees and Beneficiaries of the Wellin Family 2009 Irrevocable Trust, Friendship Management, LLC, and Cynthia W. Plum as Manager of Friendship Management, LLC, ) ) ) ) ) ) ) ) ) | **AFFIDAVIT OF ANNE W. PLUM** |
| Defendants, ) ) ) | |
| Peter J. Wellin, Cynthia W. Plum and Marjorie W. King, as Co-Trustees of the Wellin Family 2009 Irrevocable Trust, ) ) ) ) | |
| Counterclaim Plaintiffs, ) ) ) | |
| vs. ) ) ) | |
| Lester S. Schwartz, Esq., as Trust Protector of the Wellin Family 2009 Irrevocable Trust u/a/d November 2, 2009, and Keith Wellin, as Grantor of the Wellin Family 2009 Irrevocable Trust u/a/d November 2, 2009, ) ) ) ) ) ) ) ) | |
| Counterclaim Defendants. ) ) ) | |

Appearing before me, Anne W. Plum, the undersigned affirms and says that:

1.    My name is Anne W. Plum, and I am the daughter of Cynthia W. Plum. Keith S. Wellin is my grandfather. I am over eighteen (18) years of age, and I am able to attest to the matters contained in this affidavit.

2.    I have reviewed the pleadings in the above-captioned action pending before this Court, as well as the pleadings in the action of Keith Wellin v. Peter J. Wellin *et al.*, Civil Action No. 2:13-CV-01831-DCN, including the complaint and answer, as well as many of the briefs filed in federal court by both sides.

3.    I have retained independent counsel, separate from the counsel retained by my mother in these actions, to advise me in connection with this matter. Specifically, I have retained Brian Duffy of the law firm Duffy & Young. Prior to signing this affidavit and the attached Release, I have had the opportunity to consult with Mr. Duffy.

4.    I understand that my grandfather created the Wellin Family 2009 Irrevocable Trust ("Irrevocable Trust") in 2009 and sold to the Irrevocable Trust a 98.90% limited partnership interest in Friendship Partners, LP ("FLP"), a limited partnership that owned 896 Class A Berkshire Hathaway ("BRKa") common shares worth approximately $90 million at that time. I have reviewed the Irrevocable Trust agreement and consulted with my counsel, and I understand my rights under the Irrevocable Trust.

5.    I understand that the 906 BRKa shares were worth approximately $157 million on or around December 1, 2013, and that on or around that date, Cynthia Plum ("Plum"), as Manager of Friendship Management, LLC, the general partner of the FLP, directed the liquidation and dissolution of the FLP, resulting in the sale of all the BRKa shares and distribution of most of the proceeds (approximately $147 million) to the Irrevocable Trust.

2

DEFS_009526

Additionally, I understand that on or around that date, Plum, Peter Wellin, and Marjorie King ("King"), the sole members of the Distribution Committee of the Irrevocable Trust and Trustees of the Irrevocable Trust, elected to use approximately $50 million of the proceeds from the sale of the BRKa shares to prepay a promissory note owed by the Trustees and due in 2021. I also understand that Plum, Peter Wellin, and King directed the Irrevocable Trust to make distributions of the remaining proceeds of the BRKa shares – totaling approximately $96 million – to themselves in equal amounts.

6.    I fully support the actions taken by the Distribution Committee and Trustees of the Irrevocable Trust to allow the FLP to distribute the proceeds of the sale of the BRKa stock directly to Peter Wellin, Plum and King under the circumstances now existing and to prepay the promissory note. I view the actions of the purported Trust Protector, Lester Schwartz, as breaches of his duties to the Irrevocable Trust and as being unauthorized and inappropriate. The purported Trust Protector appears to be taking actions that are either self-interested or in the interests of parties other than the Irrevocable Trust and its beneficiaries, and his actions, including the filing of an action in South Carolina Probate Court, are not in my best interests.

7.    I hereby release any and all claims that I may have against Peter Wellin, Plum and King for their actions taken to date as members of Friendship Management, LLC, and as Trustees and Distribution Committee members of the Irrevocable Trust. I specifically reserve all rights to pursue claims against the purported Trust Protector and all others working in concert with him to undermine the intent of the Irrevocable Trust and to harm my interests as a beneficiary.

3

DEFS_009527

9.    Exhibit 1 to this Affidavit contains a Release wherein I reaffirm my statements in this Affidavit and formally release any and all claims I may have against Peter Wellin, Plum and King related to the matters described above.

10.    I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____
Anne W. Plum
ᴬʷᵗ 9/24/14

SWORN to and subscribed before me
this 24 day of September 2014.

_Elizabeth Farrell_
Notary Public

Expires: 04/20/2018

NOTORIAL SEAL
ELIZABETH FARRELL, Notary Public
City of Philadelphia, Phila County
My Commission Expires April 20, 2018

4

DEFS_009528

# EXHIBIT III

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Lester S. Schwartz, as Trust Protector of ) Civil Action No.: 2:13-cv-03595-DCN
the Wellin Family 2009 Irrevocable Trust, )
                                          )
                     Plaintiff,           )
                                          )
        vs.                               )
                                          )
Peter J. Wellin, Cynthia W. Plum and      )
Marjorie W. King, Individually and as Co- )
Trustees and Beneficiaries of the Wellin  )
Family 2009 Irrevocable Trust, Friendship )
Management, LLC, and Cynthia W. Plum      )
as Manager of Friendship Management,      )   RELEASE OF CLAIMS BY DR. ANN
LLC,                                      )   WOODHOUSE PLUM
                                          )
                     Defendants,          )
                                          )
─────────────────────────────────────────)
                                          )
Peter J. Wellin, Cynthia W. Plum and      )
Marjorie W. King, as Co-Trustees of the   )
Wellin Family 2009 Irrevocable Trust,     )
                                          )
        Counterclaim Plaintiffs,          )
                                          )
        vs.                               )
                                          )
Lester S. Schwartz, Esq., as Trust Protector )
of the Wellin Family 2009 Irrevocable     )
Trust u/a/d November 2, 2009, and Keith   )
Wellin, as Grantor of the Wellin Family   )
2009 Irrevocable Trust u/a/d November 2,  )
2009,                                     )
                                          )
        Counterclaim Defendants.          )
                                          )
─────────────────────────────────────────)



        I intend to and do hereby release, acquit, dismiss and forever discharge Peter J. Wellin

("Peter Wellin"), Cynthia W. Plum ("Plum" or "Mother") and Marjorie W. King ("King"),

Plum Ann 000048

individually and as co-trustees, beneficiaries, and Distribution Committee members of the Wellin Family 2009 Irrevocable Trust, as well as Peter Wellin and King in their capacities as members of Friendship Management, LLC, and Plum as Manager of Friendship Management, LLC, and Friendship Partners, LP, of and from any and all causes of action, damages, costs and all claims of any nature and kind whatsoever on account of, related to, or in any way growing out of their actions to date regarding the Wellin Family 2009 Irrevocable Trust, including, but not limited to, those actions taken on or around December 5, 2013, that resulted in the sale of the 896 Berkshire Hathaway Class A Shares (the "BRKa Shares") and the distribution of the proceeds of that sale.

In consideration for executing this release of claims, my Mother hereby promises to consider my best interests in her management, administration, or disbursement of the funds disbursed to her or an entity under her control from the Wellin Family 2009 Trust; in other words, she promises to manage, administer, or disburse such funds in part for my best interest. This release of claims is purely retrospective and does not release potential causes of action, damages, costs and claims arising from any duty owed to me apart from actions taken to date regarding the Wellin Family 2009 Irrevocable Trust as detailed above.

*(Signatures on Following Page)*

Plum Ann 000049

I HAVE READ THE ABOVE, UNDERSTAND THE SAME, AND AGREE TO BE

LEGALLY BOUND BY ALL OF THE TERMS OF THIS FULL AND FINAL RELEASE.

IN WITNESS WHEREOF, the undersigned has hereunto set her hand and seal at

Philadelphia_____, Pennsylvania____, this _24_ day of _september____, 20_14_.
(city)                    (state)

_Dr. Ann Woodhouse Plum_

_Cynthia W. Plum_

SWORN to and subscribed before me on

this _24_ day of _Sept____, 20_14_

_Elizabeth Farrell_

Notary Public for _Penna_
                   (State)

My Commission Expires: _04/20/2018_

NOTARIAL SEAL
ELIZABETH FARRELL, Notary Public
City of Philadelphia, Phila County
My Commission Expires April 20, 2018

Plum Ann 000050