**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| WENDY WELLIN, *as the Special Administrator of the Estate of Keith S. Wellin and as Trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2001,* | ) ) ) ) ) ) | |
| Plaintiff, | ) | No. 2:13-cv-1831-DCN |
| | ) | |
| vs. | ) | |
| | ) | |
| PETER J. WELLIN, *et. al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| LARRY S. McDEVITT, *as Trustee of the Wellin Family 2009 Irrevocable Trust,* | ) ) | |
| | ) | No. 2:13-cv-3595-DCN |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PETER J. WELLIN, *et. al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| PETER J. WELLIN, *et. al.,* | ) | |
| | ) | No. 2:14-cv-4067-DCN |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WENDY WELLIN, *individually and as Trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2011,* | ) ) ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

The following matter is before the court on a Report and Recommendation

("R&R") by Special Master William L. Howard regarding non-party movant Dr. Ann

1

Plum's ("Plum") motion for a protective order.  ECF No. 370.[1]  For the following

reasons, the court adopts as modified and rejects in part the R&R, and grants in part and

denies in part Plum's motion for a protective order.

## I.  BACKGROUND

Because the parties are well-acquainted with this litigation, the court will provide

only a brief recitation of the underlying facts and focus on the matters at hand.  The

above-captioned actions each involve claims related to the estate plan of Keith Wellin

("Keith").  Keith's wife, Wendy Wellin ("Wendy"), in her capacity as special

representative of Keith's estate and as trustee of the Keith S. Wellin Florida Revocable

Living Trust u/a/d December 11, 2001, brings an action against Keith's children, Peter J.

Wellin, Cynthia W. Plum and Marjorie W. King (collectively, the "Wellin Children"),

alleging the Wellin Children cheated Keith out of his wealth in a number of ways.  ECF

No. 103, May 2014 Order 4–6.  One of Wendy's more significant allegations is that the

Wellin Children improperly orchestrated a 2009 transaction by which Keith transferred

certain Berkshire Hathaway Class A common shares to the Wellin Family 2009

Irrevocable Trust (the "Irrevocable Trust"), and later used their positions as co-trustees of

the Irrevocable Trust to liquidate and distribute the shares amongst themselves.  Id. at 2–

5.  Larry McDevitt ("McDevitt"), in his capacity as trust protector of the Irrevocable

Trust, has brought a separate action against the Wellin Children, alleging their liquidation

of the trust assets frustrated the intent and purpose of the trust.  Id. at 7.  Finally, the

Wellin Children have filed their own action against Wendy, in her individual capacity,

alleging she was the one who took advantage of Keith, by isolating him and exerting

---

[1] Unless otherwise stated, all citations to ECF Numbers reference Case Number
2:13-cv-1831-DCN.

undue influence over his estate planning decisions at a time when his mental and physical capacity was diminished.  ECF No. 113 in Case No. 2:14-cv-4067-DCN, Wellin II Order 5, 6.

These three actions, <u>Wellin v. Wellin, et. al.</u> ("<u>Wellin I</u>"), No. 2:13-cv-01831-DCN, <u>McDevitt v. Wellin, et. al.</u> ("<u>McDevitt</u>"), No. 2:13-cv-03595-DCN, and <u>Wellin, et. al. v. Wellin</u> ("<u>Wellin II</u>"), No. 2:13-cv-4067-DCN, have been consolidated for the purposes of pretrial discovery.  ECF No. 271.  On February 17, 2015, this court appointed William L. Howard to serve as special master over all non-dispositive, pre-trial matters and motions in these cases, including those pending before this court at the time.  ECF No. 270.

Plum is the daughter of Cynthia W. Plum (individually, "Ceth") and one of Keith's eight grandchildren.  Though Plum is not a party to this litigation, she and Keith's other grandchildren (collectively, the "Wellin Grandchildren") are represented in this action by the law firm Duffy and Young of Charleston, South Carolina, and are contingent beneficiaries under the Irrevocable Trust.  In connection with a previous discovery dispute between McDevitt and the Wellin Children, Plum and the other Wellin Grandchildren each signed virtually identical affidavits, wherein they expressed their support for the Wellin Children's actions and their view that McDevitt was not acting in the best interests of the Irrevocable Trust and its beneficiaries.  ECF No. 306-2, Plum Aff. ¶ 6.  These affidavits were filed by the Wellin Children to support their argument that McDevitt did not represent the true interests of the Irrevocable Trust's beneficiaries. <u>Id.</u>

3

On October 7, 2015, Wendy subpoenaed Plum to appear for a video deposition on October 29, 2015. ECF No. 370 at 3. During the course of Plum's deposition, she was asked various questions by opposing counsel about communications between herself and her attorneys, communications among her attorneys, her brother, her cousins, her mother, and her mother's attorney. R&R at 3. Plum's counsel objected to such questions, citing the attorney-client privilege, work-product privilege, or the protections offered by the joint-client and common interest doctrines. Id. On the basis of these objections and instructions from counsel, Plum declined to answer on numerous occasions. Id.

Following her deposition, Plum filed the instant motion for a protective order on November 12, 2015.[2] ECF No. 370. Plum argues that her communications with her attorneys were protected by the attorney-client privilege and the work-product privilege, her communications with the other Wellin Grandchildren were protected by the joint-client doctrine, and her communications with her mother and her mother's attorneys were protected by the common interest doctrine. Id. McDevitt and Wendy each filed a response on December 3, 2015. ECF Nos. 380, 381. Plum filed a reply on December 14, 2015. ECF No. 385.

The Special Master issued the R&R on March 8, 2016, recommending the court apply New York privilege law and find that the bulk of Plum's communications were protected by either the attorney-client privilege, work-product privilege, or the joint-client and common interest doctrines. R&R at 11–13, 22–24. Wendy and McDevitt filed

---

[2] Though Local Civil Rule 30.04(c) provides that such motions must be filed within seven days of the suspension or termination of the deposition, Plum received an extension to file the instant motion on November 12, 2015.

4

objections to the R&R on April 4, 2016, ECF Nos. 430–32,[3] and Plum filed a reply on April 21, 2016.  ECF No. 440.  The matter is now ripe for the court's review.[4]

## II.  STANDARDS

"The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by forbidding or limiting the scope of discovery.  Fed. R. Civ. P. 26(c)(1).  "The scope and conduct of discovery are within the sound discretion of the district court." Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co., 56 F.3d 556, 568 n.16 (4th Cir. 1995) (citing Erdmann v. Preferred Research, Inc. of Ga., 852 F.2d 788, 792 (4th Cir. 1988)); see also U.S. ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 290 (4th Cir. 2002) (stating that district courts are afforded "substantial discretion . . . in managing discovery").

"The party moving for a protective order bears the burden of establishing good cause." Webb v. Green Tree Servicing LLC, 283 F.R.D. 276, 278 (D. Md. 2012). "Normally, in determining good cause, a court will balance the interest of a party in obtaining the information versus the interest of his opponent in keeping the information confidential or in not requiring its production." UAI Tech., Inc. v. Valutech, Inc., 122 F.R.D. 188, 191 (M.D.N.C. 1988).  In other words, "the Court must weigh the need for the information versus the harm in producing it." A Helping Hand, LLC v. Baltimore

---

[3] Wendy filed one set of objections in her individual capacity and another in her representative capacity.  ECF Nos. 430, 432.  However, the objections filed in her representative capacity simply adopt and incorporate her individual objections.  ECF No. 432.

[4] Because the parties do not object to the special master's recommendation to deny portions of Plum's motion, the court adopts those recommendations without analysis.

Cty., Md., 295 F. Supp. 2d 585, 592 (D. Md. 2003) (internal quotation marks omitted).

"The standard for issuance of a protective order is high." Nix v. Holbrook, 5:13-cv-02173, 2015 WL 631155, at *2 (D.S.C. Feb. 13, 2015) (citing Minter v. Wells Fargo Bank, N.A., 258 F.R.D. 118, 125 (D. Md. 2009)). However, courts are afforded broad discretion "to decide when a protective order is appropriate and what degree of protection is required." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984).

Local Rule 30.04(C) provides that "[c]ounsel shall not direct or request that a witness not answer a question, unless that counsel has objected to the question on the ground that the answer is protected by a privilege. . . . Counsel directing that a witness not answer a question on those grounds or allowing their clients to refuse to answer a question on those grounds shall move the court for a protective order under Fed. R. Civ. P. 26(c) or 30(d)(3) within seven (7) days of the suspension or termination of the deposition." "When a party withholds information otherwise discoverable by claiming that the information is privileged . . . , the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A). Generalized objections asserting the protection of the attorney-client privilege or the work-product doctrine do not comply with the Federal Rules of Civil Procedure. AVX Corp. v. Horry Land Co., Inc., 2010 WL 4884903, at *3 (D.S.C. Nov. 24, 2010) (citation omitted).

## III.   DISCUSSION

### A.    Choice of Law

Before addressing the merits of Plum's motion for a protective order, the court

must first determine which state's law governs Plum's claim of attorney-client privilege.[5]

Plum argues that New York law governs, Plum's Reply to Objections 5–12, while Wendy

and McDevitt each contend that South Carolina law governs.  Wendy's Objections 9–13;

McDevitt's Objections 5–7.

Federal Rule of Evidence 501 provides that, "in a civil case, state law governs

privilege regarding a claim or defense for which state law supplies the rule of decision."

Fed. R. Evid. 501.  Federal courts have interpreted this language to require the court to

determine the "availability of an evidentiary privilege" based on the choice of law rules

of the forum state.  See Winthrop Res. Corp. v. Commscope, Inc. of N.C., 2014 WL

5810457, at *1, *1 n.2 (W.D.N.C. Nov. 7, 2014) (quoting Ashcraft v. Conoco, Inc., 218

F.3d 282 282 n.5 (4th Cir. 2000)); Hatfill v. New York Times Co., 459 F. Supp. 2d 462,

465 (E.D. Va. 2006); Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 1998

WL 1742589, at *1 (E.D.N.C. Sept. 28, 1998).  This approach accords with the Supreme

Court's holding in Klaxon Co. v. Stentor Elec. Mfg. Co. that a federal court tasked with

applying state law must apply the forum state's choice of law rules.  313 U.S. 487, 496

(1941).  This prevents "the accident of diversity of citizenship" from "disturb[ing] [the]

equal administration of justice in coordinate state and federal courts sitting side by side,"

and ensures that states remain "free to determine whether a given matter is to be

governed by the law of the forum or some other law."  Id.  This rationale further suggests

---

[5] The parties agree that federal law governs Plum's claim of work-product privilege.

7

that Rule 501 does not resolve the conflicts of law analysis for a claim of privilege, but commits that analysis to the law of the forum state. If Rule 501 simply provided that the privilege rules of the forum state apply, then the forum state would not be uniformly "free to determine whether" a privilege issue should be governed by its own law or some other law, as that decision would be made by Rule 501 in diversity actions. Therefore, Rule 501 requires this court to look to South Carolina's choice of law rules to determine what privilege law applies.

South Carolina has not yet established a choice of law doctrine applicable to privilege issues. Like the parties and the Special Master, this court was unable to unearth any decision addressing this issue in a South Carolina court. Though "South Carolina courts generally follow the traditional choice of law rules as stated in the Restatement [First] of Conflicts of Laws," Menezes v. WL Ross & Co., LLC, 744 S.E.2d 178, 182 n.2 (S.C. 2013), the First Restatement does not explicitly address this issue either. In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig., 2011 WL 1375011, at *8 (S.D. Ill. Apr. 12, 2011).

> Under the First Restatement, matters are either substantive or procedural and procedural matters are to be governed by the law of the forum. Sections 596 and 597 of the First Restatement, specifically provide that the law of the forum governs issues of "the competency and credibility of witnesses" and the "admissibility of a particular piece of evidence."

Id. Some courts applying the First Restatement have determined that privilege law is an evidentiary matter and is therefore categorized as "procedural" and subject to the law of the forum. E.g., Winthrop Res., 2014 WL 5810457, at *1 n.2 ("In North Carolina, '[t]he law of the forum governs the admissibility of evidence.' Therefore, the North Carolina attorney-client privilege applies." (quoting Frugard v. Pritchard, 450 S.E.2d 744, 744

8

(N.C. 1994)); <u>Hatfill v. New York Times Co.</u>, 459 F. Supp. 2d 462, 466 (E.D. Va. 2006)

(applying traditional choice of law principles and finding that the law of privilege is

procedural).  This approach certainly comports with "the common law rule [] that

questions of evidence, including privileges, were 'procedural' and governed by the law of

the forum."  § 5435 State Law Proviso—Choice of Law, 23 Fed. Prac. & Proc. Evid. §

5435 (1st ed.).

> However, other courts have observed that
>
> [a] rule of privilege is unlike the ordinary rules of practice which refer to the processes of litigation, in that it affects private conduct before the litigation arises.  Rules of privilege are not mere housekeeping rules which are rationally capable of classification as either substantive or procedural for purposes of applying the doctrine of [<u>Erie</u>].  Such rules affect people's conduct at the stage of primary private activity and should therefore be classified as substantive or quasi-substantive.

<u>In re Yasmin</u>, 2011 WL 1375011, at *8 (second alteration in original) (quoting <u>Republic</u>

<u>Gear Co. v. Borg-Warner Corp.</u>, 381 F.2d 551, 555 (2d Cir. 1967)).  This position draws

support from cases addressing the procedural-substantive distinction recognized in <u>Erie</u>

<u>R. Co. v. Tompkins</u>, 304 U.S. 64 (1938), which broadly held that, in diversity cases,

"federal courts are to apply state substantive law and federal procedural law."  <u>Hanna v.</u>

<u>Plumer</u>, 380 U.S. 460, 465 (1965).  This rule is rooted in concerns for the uniform

application of state law.  <u>Id.</u> at 467–68 (discussing <u>Erie</u>'s interest in ensuring citizens

enjoy equal protection under state law, regardless of whether their disputes arose with

fellow citizens or non-citizens, and concern with forum-shopping); <u>id.</u> at 474 (Harlan, J.,

concurring) (discussing <u>Erie</u>'s concern with the uncertainty created by subjecting citizens

to two, potentially conflicting, sets of rules governing their everyday behavior).

Prior to the adoption of Rule 501, federal courts generally held that privileges were considered substantive for Erie purposes.  See Massachusetts Mut. Life Ins. Co. v. Brei, 311 F.2d 463, 465–66 (2d Cir. 1962) (recognizing that "the weight of authority appears to favor the view that" state law governs privilege under Erie); Hardy v. Riser, 309 F. Supp. 1234, 1237 (N.D. Miss. 1970) (collecting cases).  The enactment of Rule 501 resolved the Erie question by statutorily requiring federal courts to look to state privilege law.  Fed. R. Evid. 501.  This was intended to remove any doubt that remained under Erie, and ensure that "federal law [w]ould not supersede that of the States in substantive areas such as privilege absent a compelling reason."  Fed. R. Evid. 501 advisory committee note's to 1974 enactment.  Thus, it is clear that when privilege is considered in the Erie context, it must be considered at least quasi-substantive.

Of course, this case does not present an Erie problem because it does not involve choice between federal and state law but rather, a choice between the law of different states.  Nevertheless, the court finds that the purposes animating the Erie doctrine are sufficiently similar to the purposes underlying the First Restatement approach to bear upon the analysis here.  The First Restatement explains that "one of [its] chief ends" is to ensure "that the rights and duties of parties arising from a legal situation shall not be substantially varied because of the forum in which an action is brought."  Restatement (First) of Conflict of Laws 12 Intro. Note (1934).  The Erie doctrine shares this broad concern, Hanna, 380 U.S. at 467 ('The Erie rule is rooted in part in a realization that it would be unfair for the character of result of a litigation materially to differ because the suit had been brought in a federal court."), as well as a number of more particular aims

that are achieved by applying state law the way it would be applied in state court.  See id. at 467–68 (discussing Erie's equal protection and forum-shopping concerns).

The First Restatement also expresses its aims in more specific, utilitarian terms, noting that "[i]nternational commerce, to give but one example, could hardly continue if parties were frequently exposed to the hazards and unknown requirements of foreign laws."  Restatement (First) of Conflict of Laws 12 Intro. Note (1934).  Therefore, the Restatement explains,

> the courts of all civilized states now decline the easy and obvious solution of ignoring foreign law and treating the case as a purely domestic one; instead, they seek, by reference to the foreign law deemed appropriate, to protect parties against a substantial change of position because of the fortuitous circumstance that suit is brought in that particular state.

Id.  This policy rationale parallels Justice Harlan's concurrence in Hanna, which stated that "Erie recognized that there should not be two conflicting systems of law controlling the primary activity of citizens, for such alternative governing authority must necessarily give rise to a debilitating uncertainty in the planning of everyday affairs."  Hanna, 380 U.S. at 474 (Harlan, J., concurring).  Thus, the First Restatement and the Erie doctrine seek to advance the same basic aims, albeit in different contexts, by looking to foreign law on substantive issues and forum law on procedural issues.

Many courts have recognized that when the substantive-procedural distinction is tailored to these aims, privilege must be considered substantive because it affects conduct beyond the context of litigation.  See, e.g., In re Yasmin, 2011 WL 1375011, at *8 ("A rule of privilege is unlike the ordinary rules of practice which refer to the processes of litigation, in that it affects private conduct before the litigation arises." (quoting Republic Gear, 381 F.2d at 555)); Com., Cabinet for Health & Family Servs. v. Chauvin, 316

S.W.3d 279, 285 (Ky. 2010) (recognizing that "privileges are not normal evidentiary rules," which are designed to foster "accuracy in fact-finding" and holding that privileges were substantive because they "predominantly foster" objectives other than "accuracy in fact-finding"); State v. Heaney, 689 N.W.2d 168, 174 (Minn. 2004) ("Unlike other rules of evidence that are concerned solely with the reliability of evidence and its ability to guide the court to the truth, privileges are an impediment to truth-finding.  []  They are created to substantively protect a particular type of relationship deemed valuable to society in general.").  These decisions cast doubt on McDevitt's assertion that South Carolina courts would consider privilege a procedural matter under the First Restatement and apply the law of the forum.  Indeed, South Carolina courts recognize the substantive elements of South Carolina privilege law.  See Tobaccoville USA, Inc. v. McMaster, 692 S.E.2d 526, 529 (S.C. 2010) ("[The attorney-client] privilege is based upon a wise policy that considers that the interests of society are best promoted by inviting the utmost confidence on the part of the client in disclosing his secrets to this professional advisor." (quoting State v. Owens, 424 S.E.2d 473, 476 (S.C. 1992))).  Given this recognition, and the purposes underlying the First Restatement's substantive-procedural distinction, there is good reason to think that a South Carolina court would consider privilege a substantive matter.

This court does not adopt any position on the First Restatement analysis.  Instead, the court recognizes that South Carolina has not taken a position on this specific issue.  While other courts in this circuit have applied similar choice of law principles and concluded that privilege is a procedural matter under North Carolina and Virginia law, Winthrop Res., 2014 WL 5810457, at *1 n.2; Hatfill, 459 F. Supp. 2d at 466, the court

also recognizes the persuasiveness of the alternative approach outlined in In re Yasmin, 2011 WL 1375011, at *8, and informed by the principles underlying the First Restatement.  Given the weight of authority on either side, the court finds that South Carolina's traditional choice of law principles simply fail to answer the choice of law question at hand, and it is therefore necessary to predict how a South Carolina court would rule on the issue.

"Where there is no case law from the forum state which is directly on point, the district court attempts to do as the state court would do if confronted with the same fact pattern." Roe v. Doe, 28 F.3d 404, 407 (4th Cir. 1994); see also Twin City Fire Ins. Co. v. Ben Arnold–Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005) ("If the Supreme Court of South Carolina has spoken neither directly nor indirectly on the particular issue before us, we are called upon to predict how that court would rule if presented with the issue." (citation and internal quotation marks omitted)).  "In deciding how the courts of South Carolina would rule, this court is authorized to consider all available legal sources, including restatements of the law, treatises, law review commentaries, decisions from other jurisdictions whose doctrinal approach is substantially the same, and the 'majority rule.'" TCX, Inc. v. Commonwealth Land Title Ins. Co., 928 F. Supp. 618, 623 (D.S.C. 1995) (citation omitted); see also Twin City Fire, 433 F.3d at 369 (holding that in predicting state law, courts may "consider lower court opinions in South Carolina, the teachings of treatises, and the practices of other states."). The court may also consider "well considered dicta," Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs, Inc., 296 F.3d 308, 312 (4th Cir. 2002), and "recent

13

pronouncements of general rules or policies by the state's highest court." Wells v. Liddy, 186 F.3d 505, 528 (4th Cir. 1999).

Plum and Wendy appear to be in relative agreement as to what rule should govern the choice of law analysis. Wendy argues in favor of an interest-based test that applies the privilege law of the state with the greatest interest in the communication. ECF No. 430 at 11. Plum argues that the court should follow the Special Master in adopting the test outlined in the Restatement (Second) of Conflict of Laws § 139 (the "Second Restatement"). ECF No. 440 at 8. The Second Restatement test first asks what state has the most significant relationship with the communication and then applies a decisional framework to determine whether the law of the forum state or the state with the most significant relationship should apply. Second Restatement § 139. Thus, the approaches are not especially dissimilar.[6] Between the two, this court agrees with Plum and the Special Master that the Second Restatement test should apply. The Second Restatement test is considered representative of the prevailing approach among states that have established a choice of law doctrine regarding privileges. In re Yasmin, 2011 WL 1375011, at *8. South Carolina courts have also shown a willingness to apply the Second Restatement in the past. S.C. Dep't of Parks, Recreation, & Tourism v. Brookgreen Gardens, 424 S.E.2d 465, 468 (S.C. 1992) (applying choice of law rule found in Second Restatement § 223(1)); Leasing Enterprises, Inc. v. Livingston, 294 S.C. 204, 207, 363 S.E.2d 410, 411 (S.C. Ct. App. 1987) (same). Although the court recognizes that it applied a more straightforward interest-based analysis in In re N.Y. Renu with

---

[6] Notably, the § 139 test is probably more advantageous to Wendy, because it requires other requirements to be met before the court will apply the law of the state with the most significant relationship to the communication over the law of the forum state. Restatement (Second) of Conflict of Laws § 139 (1971).

<u>Moisureloc Prod. Liab. Litig.</u>, that decision is not particularly persuasive on the issue because it simply applied the most significant interest test without any analysis of why that particular rule applied.  No. 2:06-mn-77777-DCN, 2008 WL 2338552, at *1 (D.S.C. May 8, 2008).   Therefore, the court will apply the Second Restatement § 139 test to determine whether New York or South Carolina law governs the privilege in this case.

Section 139 provides:

> Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect.

To determine what state has the most significant relationship with a particular communication, the court will usually look to the state "where the communication took place."  <u>Id.</u> cmt. e.  Under § 139, this means "the state where an oral interchange between persons occurred, where a written statement was received or where an inspection was made of a person or thing."  <u>Id.</u>  The Second Restatement also indicates that a court can look to the state of the most significant relationship between the parties to the communication.  <u>Id.</u>

The Special Master determined that New York has the most "significant relationship" to the communications at issue here because, at the time the communications were made, Plum was located in New York.  R&R 10–11.  The Special Master highlighted the fact that Plum is not a party to this litigation, and at the time the communications were made, her attorney had not made any appearance in this litigation on her behalf.  <u>Id.</u> at 10.  Wendy and McDevitt argue that South Carolina has the most

15

significant relationship with the communications because the communications were initiated by South Carolina lawyers and related to litigation pending in South Carolina.

The court agrees with Wendy and McDevitt that South Carolina has the most significant relationship with the communications. It is unclear where exactly the communications occurred. The R&R states that Plum "engaged in communications asserted to be privileged with her attorney in New York," R&R at 11, but this statement appears to reflect Plum's location, not her attorneys'. See ECF No. 370 at 8 (stating that "Dr. Plum was at all times located in New York"). It appears that Plum communicated with her attorneys from New York, while they communicated with her from South Carolina. In such circumstances, the location test is far too equivocal to be of any use. Assuming an interstate phone conversation would be considered an "oral interchange," the court does not see how that interchange could be assigned a specific location. Email exchanges are similarly problematic. See In re: Bard IVC Filters Prod. Liab. Litig., 2016 WL 3970338, at *3 (D. Ariz. July 25, 2016) (discussing difficulties in determining where email communications are "received," given that emails can be "received" in multiple states simultaneously and are often contained in a back and forth "string" resulting in every party "receiving" the communication, in some sense).

In lieu of the location test, the Second Restatement also suggests looking to the state where the relationship between the parties was centered.[7] Second Restatement § 139 cmt. e. Applying this test, the court concludes that Plum's relationship with her attorneys was centered in South Carolina. Although Plum is not a party to the current

---

[7] The court recognizes that the Second Restatement reserves this test for situations where the parties to the communications—i.e., Plum and her attorneys—had a "prior relationship," but in these circumstances, the court finds that the relationship approach is still a better fit than the location-based approach.

litigation, Plum cannot deny that she entered into a relationship with South Carolina based attorneys to represent her interests in connection with South Carolina litigation regarding the estate plan of her South Carolina resident grandfather. The Wellin Granchildren argue that this approach would regularly subject unsuspecting individuals to the privilege laws of forum states. ECF No. 440 at 11. However, given the nature of Plum's relationship with her attorneys, the court does not believe that she could not have foreseen that her communications might be judged under South Carolina privilege law. The court is also unconvinced that this result is likely to regularly reoccur. There are a number of factual variations that would have avoided this result. For instance, if Plum had hired New York attorneys, the location test would likely have been dispositive of this issue. Alternatively, if this motion were seeking to discover communications between Plum and an attorney she retained for some purpose unrelated to this litigation—say, her own estate planning attorney—the court might look to the law of the state where that relationship was centered, even if her communications with that attorney were "related" to this litigation. This result is not purely a function of the fact that Plum's communications related to this litigation. It is based on the fact that Plum's relationship with her attorneys arose out of this litigation.

The court has also considered the effects of this determination on the application of the common interest and joint-client doctrines. If Plum's approach were adopted, then each grandchild's claim of privilege would be governed by the law where he or she is located. This would be simple enough, until one considers how the court would evaluate whether the Wellin Grandchildren waived attorney-client privilege by communicating amongst themselves or with their parents. The common interest and joint-client doctrines

17

are not independent privileges; they are exceptions to the waiver of privilege, and therefore require the parties to possess an underlying privilege.  In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129, 902 F.2d 244, 249 (4th Cir. 1990).  If each grandchild's privilege was governed by the law of their home state, it is unclear what privilege law would govern the common interest or joint-client doctrines.  Under Plum's theory, each grandchild would be deriving their common interest or joint-client argument from privileges governed by separate bodies of law.  When such laws inevitably conflict, it is unclear how the court would evaluate a waiver argument.  If one assumes that the court would simply evaluate the argument from the perspective of each grandchild, this would effectively impose the rule of the least protective state on all parties to the communication.  Not only would this charge the Wellin Grandchildren with the task of determining the privilege law in every state where another party to the conversation is located before engaging in common interest or joint-client communications, it would seem inconsistent with the significant relationship test.  If different parties—or in this case, non-parties—are located in different states but are communicating about a common interest, it is sensible to conclude that the state with the most significant relationship to their communications is the state that has the most significant relationship with their common interest.

In light of these considerations, the court finds that South Carolina has the most significant relationship with the communications at issue.  Because South Carolina is both the forum state and the state with the most significant relationship to the communications, it is clear that South Carolina law applies and it is unnecessary to carry the § 139 analysis any further.

However, this may be something of a hollow victory for Wendy and McDevitt as the court is not convinced there is any significant difference between New York and South Carolina law.  As an initial matter, the parties have failed to point to any fundamental differences in the general scope of the privilege under New York and South Carolina law.[8]  South Carolina courts have cited to decisions applying federal privilege law, which is substantially similar to New York privilege law, HSH Nordbank AG New York Branch v. Swerdlow, 259 F.R.D. 64, 70 n.6 (S.D.N.Y. 2009) ("[T]he New York law of attorney-client privilege is, with certain exceptions, substantially similar to the federal doctrine."), when discussing the fundamental principles that govern the privilege or establishing the scope of the privilege.  See, e.g., State v. Thompson, 495 S.E.2d 437, 439 (S.C. 1998) (citing U. S. ex rel. Edney v. Smith, 425 F. Supp. 1038, 1042 (E.D.N.Y. 1976), in applying attorney-client privilege to communications with psychiatrist); State v. Doster, 284 S.E.2d 218, 220 (S.C. 1981) (citing N. L. R. B. v. Harvey, 349 F.2d 900, 901 (4th Cir. 1965), for fundamental proposition that interest in protecting confidential communications must be balanced against interest in the proper administration of justice); Marshall v. Marshall, 282 S.C. 534, 538 (S.C. Ct. App. 1984) (citing S.E.C. v. Kingsley, 510 F. Supp. 561 (D.D.C. 1981), and In re Grand Jury Proceedings, 517 F.2d 666 (5th Cir. 1975), for fundamental proposition that communication must relate to "a fact of which the attorney was informed by his client" in confidence and for the purpose of securing legal assistance).  Federal courts applying South Carolina law have also cited

---

[8] Wendy and McDevitt have pointed out perceived differences in the applicability of the joint-client and common interest doctrines.  While the court does not agree with Wendy and McDevitt's conclusions on these matters, it will address them more specifically as they arise in the analysis.

to federal law, and in some cases cited to New York privilege law directly.[9]  See

IntegraMed Am., Inc. v. Patton, 298 F.R.D. 326, 330 (D.S.C. 2014) (citing federal and

New York law when discussing the "at issue" doctrine regarding waiver of the attorney-

client privilege); see also First S. Bank v. Fifth Third Bank, N.A., No. 7:10-cv-2097,

2013 WL 1840089, at *8 (D.S.C. May 1, 2013) (citing to federal privilege law, which

itself cited to New York privilege law, in addressing common interest exception to

waiver).  This practice suggests South Carolina privilege law is compatible with federal

and New York privilege law.  The court will therefore look to federal and New York law

when South Carolina law does not supply a needed answer in this case.[10]

### B.    Attorney-Client Privilege and Work-Product Doctrine

Under South Carolina law, the attorney-client privilege protects against the

disclosure of confidential communications between a client and an attorney.

Tobaccoville USA, 692 S.E.2d at 529.  This rule is meant to facilitate attorney-client

communications by "invit[ing] the utmost confidence on the part of the client in

disclosing his secrets to this professional advisor."  Id. (quoting Owens, 424 S.E.2d at

476).  The Supreme Court of South Carolina has highlighted the elements of the privilege

as follows:

---

[9] Federal and New York privilege law appear significantly more developed than South Carolina privilege law.  Tellingly, McDevitt's brief largely cites to the law of other jurisdictions, including New York, despite his advocacy in favor of applying South Carolina law in this case.  ECF 431 at 10–19.  Though Wendy's arguments are more focused on South Carolina law, the court notes that even she has to look to a decision under federal privilege law, Upjohn Co. v. U.S., 449 U.S. 383, 395 (1981), to support the fundamental principle that "disclosure of underlying facts is permissible and falls outside the scope of privilege."  ECF No. 430 at 16–17.

[10] The court is aware that this result renders the choice of law analysis largely irrelevant to the instant motion.  Nevertheless, the court has provided this discussion because the parties have expressed interest in clarifying the choice of law analysis going forward.

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

Id. (quoting Doster, 284 S.E.2d 219–20). "In general, the burden of establishing the privilege rests upon the party asserting it." State v. Love, 271 S.E.2d 110, 112 (S.C. 1980).

The work-product doctrine protects an attorney's "mental processes . . . , providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975). Rule 26(b)(3) of the Federal Rules of Civil Procedure governs the production and protection of attorney work-product. Rule 26(b)(3) states,

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). . . .

> If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(A)–(B). The same "principle applies to intangible work product: an attorney's analysis made in anticipation of litigation which has not been memorialized. Such work-product is immune from discovery just as if it had been reduced to writing." U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, 2002 WL 31296430, at *5 (S.D.N.Y. Oct. 11, 2002).

Wendy and McDevitt first argue that much of the information they sought to discover at Plum's deposition was simply not covered by either attorney-client or work-

product privilege.  ECF Nos. 430, 431.  It is well established that the attorney-client

"privilege only protects disclosure of communications; it does not protect disclosure of

the underlying facts by those who communicated with the attorney."  Upjohn Co. v. U.S.,

449 U.S. 383, 395 (1981); see also Renner v. Chase Manhattan Bank, 2001 WL 1356192,

at *5 (S.D.N.Y. Nov. 2, 2001) ("Clients and their attorneys often assume, erroneously,

that merely conveying something to an attorney will cloak the underlying facts from

disclosure.  It will not." (quoting Edna Selan Epstein, The Attorney–Client Privilege and

the Work–Product Doctrine (Section of Litigation, American Bar Association, 4th ed.

2001)).  The same rule applies to the work-product doctrine.  Suggs v. Whitaker, 152

F.R.D. 501, 507 (M.D.N.C. 1993).  At the same time, the court must guard against

inquiries that would necessarily reveal the contents of privileged materials.  Henry v.

Champlain Enterprises, Inc., 212 F.R.D. 73, 91 (N.D.N.Y. 2003); see also Renner, 2001

WL 1356192, at *8 (S.D.N.Y. Nov. 2, 2001) ("[B]illing records that attorneys submit to

clients are generally discoverable, unless production will necessarily reveal client

confidences.").

      The bulk of the questions Plum was asked during her deposition sought the source

of her knowledge on topics related to this litigation.  See R&R Ex. 1, Question List Nos.

16–20, 23–6, 28–30, 33, 34, 36, 37, 39, 40.[11]  These questions largely focused on how

Plum acquired the information in her affidavit, her understanding of McDevitt's actions,

and her understanding of Keith's estate plan more generally.  Id.  Wendy and McDevitt

argue that these questions seek nothing more than underlying factual information, and are

_____

      [11] Exhibit 1 to the R&R provides a numbered list of each of the disputed questions
from Plum's deposition.  The R&R organized its recommendation around this numbered
list, making recommendations as to each specific question.  The court adopts this
framework and will frame its holdings in terms of these questions as well.

22

therefore discoverable under Upjohn.  ECF Nos. 430 at 16–17, 431 at 10–11.  After

examining Plum's deposition transcript, the court is convinced that the answers to these

questions would necessarily reveal the content of Plum's privileged communications with

her attorneys.  As the R&R noted, Plum's affidavit essentially outlines her

"understanding" of how the Irrevocable Trust works, what actions the Wellin Children

took with respect to the trust, and her views on the propriety of those actions and the

actions of McDevitt's predecessor, Lester Schwartz.  R&R at 17.  Such "understandings"

necessarily incorporate facts, but also apply legal interpretation.  By attempting to locate

the source of Plum's knowledge, Wendy and McDevitt are effectively asking, "Did your

attorney say X?"  For Plum to reveal the "source" of the information in her affidavit, she

would have to reveal the source of her "understanding" of these legal matters.  To the

extent these opinions come from her attorneys, her response would reveal the contents of

confidential communications and her attorney's legal opinions.  The same reasoning

applies to questions related to her more general understanding of the legal rights created

by the Irrevocable Trust, the related promissory note, and the obligations of the trust

protector.

McDevitt relies on an assortment of cases to argue that a deponent may not use

attorney-client privilege to refuse to answer questions concerning the deponent's

statements in affidavits, pleadings, or discovery responses.  ECF No. 431 at 11–20.

However, the court finds these cases distinguishable based on the factual nature of the

information in dispute.  For instance, in Saint Annes Dev. Co., LLC v. Trabich, the

court—applying New York law—held that a defendant who had made certain factual

assertions in court filings could not assert the attorney-client privilege to "shield the basis

23

of her assertions." 2009 WL 324054, at *5 (D. Md. Feb. 9, 2009). Similarly, in

Computer Network Corp. v. Spohler, the court determined that an attorney who

submitted an affidavit to the court, was acting as "a factual witness concerning fact issues

which goes to the heart of this legal controversy," and therefore had to allow discovery of

the factual basis of his assertions. 95 F.R.D. 500, 502 (D.D.C. 1982).[12] Notably, the

Spohler court contrasted the attorney's affidavit with a memorandum that "weaves in

factual representations with legal arguments." Id. The court thinks this comment is

telling, as it hints at the problems presented by allowing inquiry into a deponent's "basis"

for legal, rather than factual, assertions.

McDevitt later makes an almost identical argument that Plum waived any

privilege she may have had regarding her understanding of the case by filing her

affidavit. ECF No. 341 at 31–635. This argument fails for the same reasons as the first.

The cases McDevitt cites deal with the discovery of facts that were put in issue, not legal

theories. In addition to relying on the aforementioned Trabich and Spohler decisions,

McDevitt highlights In re Rodriguez, a bankruptcy decision holding that an attorney who

signed a proof of claim becomes a fact witness with respect to the allegations contained

in the proofs and therefore, "[t]he work product and attorney client privileges [are]

waived as to the facts alleged in the proof of claim." 2013 WL 2450925, at *6 (Bankr.

S.D. Tex. June 5, 2013) (emphasis added).

---

[12] McDevitt highlights two additional cases which the court finds similarly distinguishable because they deal with primarily factual material. See E.E.O.C. v. Unit Drilling Co., 2014 WL 3548845, at *7–8 (N.D. Okla. July 17, 2014) (allowing discovery of factual basis of factual assertions contained in letter sent to state agency); E.E.O.C. v. Caesars Entm't, Inc., 237 F.R.D. 428, 433 (D. Nev. 2006) ("The attorney-client privilege does not prevent the disclosure facts communicated to an attorney, and the work-product doctrine does not prevent the disclosure of facts communicated by an attorney to a client that the attorney obtained from independent sources.").

Here, Plum's affidavit does not make her a fact witness in any substantial sense. The affidavit asserts Plum's general understanding of the case, Plum Aff. ¶¶ 4–6, which is derived from both the facts and her knowledge of the parties' legal rights and obligations. Wendy and McDevitt were unquestionably entitled to ask Plum about the facts she considered in reaching her conclusions—i.e., the actions she believed the trust protector took, the actions she believed the Wellin Children took, etc.—but to the extent Plum acquired her understanding of the parties' legal rights and obligations from her attorneys, allowing the parties to discover this source would effectively reveal the contents of Plum's legal advice. McDevitt has not cited any authority indicating such disclosure is appropriate. In principle, McDevitt's argument could be applied to require disclosure of the source of the legal theories animating pleadings and briefs, but pleadings and briefs are not thought to inject privileged information into the case. The fact that Plum presented her legal theories via affidavit in the rather unique context of this litigation does not provide a sufficient reason to alter the scope of discovery.

Therefore, the court finds that Questions 16–20, 23–26, 28–30, 33, 34, 36, 37, and 40, which addressed the source of Plum's understanding of the case, sought privileged information. The court further finds that Plum did not waive any privilege by filing her affidavit. These findings also apply to Question 39 seeks privileged information, to the extent it relates to information communicated by Plum's attorney.

The court also finds that Questions 31 and 32, which seek to determine who asked Plum to sign the affidavit and who Plum consulted before signing, seek privileged information to the extent Plum's answers would implicate confidential communications with her attorneys.

The court finds that Question 6, which asks why Plum sought representation in this action, also seeks privileged information to the extent Plum's answer would necessarily require her to reveal the contents of confidential communications she made to her attorneys in seeking their representation.

Finally, the court finds that Plum has failed to show that her answers to Questions 21, 22, and 27 would reveal privileged information.  These questions dealt with communications between Plum and the Wellin Children regarding the possibility of Plum becoming a trustee and the background facts of this litigation.  Because it is clear that the conversations were between Plum and the Wellin Children, there is no indication that privileged communication was involved.[13]

### C.     Common Interest Privilege

The R&R also found that the common interest doctrine protected certain conversations between Plum and her mother or her mother's counsel.  R&R 19–22.  Wendy and McDevitt challenge this finding on three basic grounds:  (1) South Carolina law does not recognize the common interest doctrine under the circumstances at hand; (2) Plum has failed to show that she possesses a sufficiently common interest with her mother for the doctrine to apply; and (3) Plum has not shown that her communications with her mother also involved an attorney.

The Supreme Court of South Carolina has explained that

The common interest doctrine is not a privilege in itself, but is instead an exception to the waiver of an existing privilege. The doctrine "protects the transmission of data to which the attorney-client privilege or work product

---

[13] This finding is separate from the court's later finding in part III.C. that these communications would have waived the privilege covering any of the information conveyed in these conversations.

protection has attached" when it is shared between parties with a common interest in a legal matter.

Tobaccoville USA, 692 S.E.2d at 531 (quoting John Freeman, The Common Interest Rule, S.C. Law., May/June 1995, at 12).  Thus, the common interest doctrine "presupposes the existence of an otherwise valid privilege."  The proponent of the common interest doctrine must also establish "that the parties had some common interest about a legal matter."  IntegraMed Am., Inc. v. Patton, 298 F.R.D. 326, 333 (D.S.C. 2014) (In re Grand Jury Subpoena: Under Seal, 415 F.3d 333, 341 (4th Cir. 2005)).  "The purpose of the privilege is to allow persons with a common interest to 'communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims.'"  In re Grand Jury Subpoena: Under Seal, 415 F.3d at 341 (quoting In re Grand Jury Subpoenas 89–3 and 89–4, John Doe 89–129, 902 F.2d 244, 249 (4th Cir. 1990)).

McDevitt first suggests that South Carolina's common interest doctrine is only available under the specific facts presented in Tobaccoville USA, "where several states [were] parties to a settlement agreement, the state laws that regulate[d] and enforce[d] that settlement all [had] the same provisions, the attorneys general of those settling states [were] involved in coordinating regulation and enforcement, and the settling states [had] executed a common interest agreement."  692 S.E.2d at 531.  While the Tobaccoville USA court limited its adoption of the common interest doctrine to the facts before it, this court is not convinced the Tobaccoville USA decision can be read to definitively hold that the doctrine is not available in other situations.  The sentence directly preceding the court's concededly narrow holding indicates that the doctrine's availability is simply an open question under South Carolina law.  See id. ("South Carolina courts have not

27

previously addressed this doctrine and determined its applicability in this state."). The doctrine is unquestionably available under federal and New York privilege law, which is at least suggestive of South Carolina courts' position on the issue, given South Carolina courts' tendency to cite to New York or federal privilege law. See Ambac Assur. Corp. v. Countrywide Home Loans, Inc., 57 N.E.3d 30 (N.Y. 2016) (discussing common interest doctrine under New York law); In re Grand Jury Subpoenas 89–3 and 89–4, John Doe 89–129, 902 F.2d at 249 (recognizing common interest rule under federal law). Indeed, federal courts applying South Carolina law have previously recognized the doctrine. See First S. Bank, 2013 WL 1840089, at *8; Fort v. Leonard, 2006 WL 2708321, at *3 (D.S.C. Sept. 20, 2006). Given these indications that South Carolina courts would recognize the common interest doctrine outside the limited context presented in Tobaccoville USA, the court finds that McDevitt's initial argument fails.

Wendy and McDevitt both argue that, even if the common interest doctrine is available, Plum has failed to demonstrate that she possesses the requisite common interest with her mother for it to apply in this case. ECF Nos. 340 at 19–20, 341 at 24–25. The common interest doctrine applies "whenever multiple clients share a common interest about a legal matter." In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129, 902 F.2d at 249. It is clear that Plum and her mother both have legal interests at stake in this litigation. The question is whether those interests are sufficiently similar to the Wellin Children's interests to be regarded as "common" within the meaning of the doctrine.

Courts have not been entirely consistent in expressing the precise level of commonality required for the common interest doctrine to apply. New York courts

28

require the parties' shared legal interests to be "identical (or nearly identical), as opposed to merely similar." Hyatt v. State Franchise Tax Bd., 105 A.D.3d 186, 205 (N.Y. App. Div. 2013). A shared "desire to succeed in an action does not create a 'common interest.'" SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties LLC, 2002 WL 1334821, at *3 (S.D.N.Y. June 19, 2002). Federal courts have articulated the requirement in similar terms. See Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146, 1172 (D.S.C. 1974) ("A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a client concerning legal advice."). Nevertheless, more recent decisions from federal courts in this district have not included such language and have instead phrased the rule in more general terms. See First S. Bank, 2013 WL 1840089, at *8 (recognizing the privilege whenever "the parties share a common interest about a legal matter, even when the holder of the interest is a non-party or a potential co-party to prospective litigation").

Plum argues that her status as a contingent beneficiary of the Irrevocable Trust establishes a common legal interest with her mother. ECF No. 380-5, Plum Dep. 225:22–228:14. In addition to being trustees of the Irrevocable Trust, the Wellin Children are also beneficiaries. Thus, to the extent the Wellin Children and Wellin Grandchildren are all beneficiaries of the Irrevocable Trust, Wellin II, Am. Compl. ¶ 39, 62, the court finds that they possess an identical legal interest in this litigation.[14] The fact that the parties

---

[14] Because the court ultimately finds that Plum's assertion of the common interest doctrine fails on other grounds, the court has not conducted an in depth review of every interest the Wellin Children and the Wellin Grandchildren may share in the labyrinthine set of claims that comprise this litigation. See R&R at 21–22 (outlining numerous ways in which Wellin Grandchildren's interest align with the Wellin Children). Nevertheless,

also possess other, potentially divergent interests does not change the analysis. So long

as the parties communicated privileged material in an effort to advance their common

interest, the interest requirement is satisfied.

McDevitt next argues that the common interest rule only applies to

communications involving attorneys and that Plum has failed to show such involvement

in this case. ECF No. 431 at 25. The court has been unable to find any decisions

addressing this issue under South Carolina law. However, the question has been squarely

addressed under federal law. In United States v. Gotti, the Eastern District of New York

rejected the defendants' attempt to "extend the application of the [common interest][15]

privilege to conversations among the defendants themselves even in the absence of any

attorney during the course of those conversations." 771 F. Supp. 535, 545 (E.D.N.Y.

1991). The court held that "[s]uch an extension is supported neither in law nor in logic."

Id.; see also United States v. Lucas, 2009 WL 5205374, at *6 (N.D. Ohio Dec. 23, 2009)

("[T]his joint defense privilege requires the involvement of counsel."). The Eastern

District of New York addressed the reason for this rule in Walsh v. Northrop Grumman

Corp., where clients again tried to apply the common interest doctrine to communications

---

the court notes that the common interest doctrine requires the proponent to establish
"'that any exchange of privileged information was 'made in the course of formulating a
common legal strategy [,]' and that the parties understood that the communication would
be in furtherance of the shared legal interest." Fireman's Fund Ins. Co. v. Great Am. Ins.
Co. of New York, 284 F.R.D. 132, 140 (S.D.N.Y. 2012) (alteration in original) (quoting
Sokol v. Wyeth, Inc., 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008)). Therefore, to
the extent other common interests exist, the parties will need to draw a connection
between that interest and any communications they claim are privileged because of that
interest.

[15] Though the Gotti court referred to the "joint-defense privilege" it was clearly
referencing the same situation the court faces here—multiple clients being represented by
separate attorneys sharing information pursuant to a common litigation strategy. See
Gotti, 771 F. Supp. at 545.

amongst themselves.  165 F.R.D. 16, 18 (E.D.N.Y. 1996) ("Salomon wants to protect

confidences it shared with its own attorneys and then shared, not with Northrop's

attorneys, but with Northrop.").  The court found that extending the common interest

doctrine to communications among the clients

> would mean that a party could shield from disclosure any discussions it
> had with another person about a matter of common interest simply by
> discussing that matter first with its attorneys. Such an extension of the
> privilege would run counter to the axiom, repeated often in this circuit,
> that the attorney-client privilege should be strictly confined within the
> narrowest possible limits underlying its purpose

Id.  South Carolina law also recognizes this policy of narrow construction.  See Doster,

284 S.E.2d at 220 (explaining that the attorney-client privilege should be strictly

construed in recognition of the "public interest in the proper administration of justice").

Therefore, the court finds that South Carolina courts would likely adopt this limitation on

the common interest doctrine.

Notably, Plum cites United States v. Schwimmer, 892 F.2d 237, 244 (2d Cir.

1989), to argue that "the common-interest rule [] does not require the attorneys

representing the common-interest parties [] be present at or participate in the

communication."  ECF No. 370 at 25.  However, the relevant language in Schwimmer

states that "it is [not] necessary for the attorney representing the communicating party to

be present when the communication is made to the other party's attorney."  892 F.2d at

244.  By its terms, this language only excuses the absence of one attorney.  The court in

HSH Nordbank AG New York Branch v. Swerdlow, 259 F.R.D. 64, 72 (S.D.N.Y. 2009),

explicitly distinguished Schwimmer from Walsh, thereby confirming that Schwimmer

does not stand for the position Plum asserts here.  Nordbank, 259 F.R.D. at 72

(explaining that Walsh, where "one of the parties first discussed the information with its

attorney and then shared the information with the other party (not the other party's counsel)," had no bearing on the interpretation of <u>Schwimmer</u>). The <u>Nordbank</u> court went on to distinguish its own facts from <u>Walsh</u>, explaining that "Nordbank's counsel was directly involved in the communications involving the non-party lenders and—for that reason—all parties expected that the communications would remain confidential." <u>Id.</u> This distinction further confirms <u>Walsh</u>'s holding that the common interest doctrine does not extend to communications that do not involve at least one of the clients' attorneys.

Applying that rule in this case, it is clear from Plum's deposition testimony that no attorney was involved in her conversation with her mother, aunt, and uncle about becoming a trustee. Plum Dep. 210:8–11. Therefore, even if that conversation implicated privileged information,[16] that privilege was waived and Plum's motion must be denied with respect to Questions 21 and 22. It is not clear whether her attorneys or her mother's attorneys were involved in supplying her "understanding" of the matters at issue in this litigation. But to the extent Plum has not shown attorney involvement, she has failed to carry her burden to prove that the common interest doctrine applies. Therefore, Plum's motion must be denied with respect to Questions 23 through 29, 33, 34, and 39, to the extent she relies on the common interest doctrine as an exception to the waiver of privilege.

Before turning to the joint client privilege the court briefly notes that Wendy and McDevitt also argue that Plum failed to show that the communications at issue were

---

[16] In part III.B. above, the court found that Plum had failed to demonstrate that these communications were privileged.

subject to any claim of privilege.  However, this argument was effectively addressed by the court's discussion in part III.B. above.

D.     **Joint-Client Doctrine**

The R&R does not contain an extensive discussion of the joint-client doctrine, but concludes that the doctrine applies to Plum's communications with the other Wellin Grandchildren made in furtherance of their common interest in this litigation.  R&R 18–19.  Notably, the R&R does not actually refer to the joint-client doctrine in its conclusions but appears to refer to the common interest doctrine in its place.  Id. at 22–24.  Thus, the R&R appears to analyze the joint-client doctrine under the same principles as the common interest doctrine.

The parties take a similar approach.  McDevitt argues that:  (1) the joint-client doctrine, like the common interest doctrine, does not exist under South Carolina law; and (2) even if the court recognized the joint-client doctrine, it is unavailable in this case because the doctrine does not apply to communications that do not involve an attorney.  ECF No. 431 at 28–31.  Plum contends that her communications with the other Wellin Grandchildren are protected by the joint-client doctrine because they are all clients of Duffy and Young, and the communications in question were made in furtherance of their shared legal interests.  ECF No. 440 at 20.

The joint client doctrine is simply the principle that "where one attorney represents multiple parties concerning a matter of common interest, any confidential communications exchanged among them are privileged against the outside world." People v. Pennachio, 637 N.Y.S.2d 633, 635 (N.Y. Sup. Ct. 1995).  It is sometimes considered distinct from the common interest doctrine, which applies "when parties with

33

separate lawyers consult together under the guise of a common interest or defense." Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc., 213 B.R. 433, 435 (Bankr. S.D.N.Y. 1997). Indeed, some courts applying the joint-client doctrine refer to it as a direct application of the attorney-client privilege. See Arkin Kaplan Rice LLP v. Kaplan, 107 A.D.3d 502, 502 (N.Y. App. Div. 2013) ("[W]e note that communications between [the] defendants . . . , made during the course of [their attorney's] joint representation of them, fall within the scope of the attorney-client privilege because [they] shared "a common interest" [] and consulted [their attorney] for their 'mutual benefit'"). Other courts consider the joint-client doctrine to be the "core" of the common interest doctrine. N. River Ins. Co. v. Columbia Cas. Co., 1995 WL 5792, at *2 (S.D.N.Y. Jan. 5, 1995). What is clear is that the joint-client doctrine is functionally similar to the common interest doctrine. Like the common interest doctrine, the joint-client doctrine only applies to communications made in furtherance of the clients' common interest. See Arkin Kaplan Rice, 107 A.D.3d 502, 502 (N.Y. App. Div. 2013) (recognizing joint client doctrine would apply where defendants consulted attorney for their mutual benefit); Yemini v. Goldberg, 821 N.Y.S.2d 384, 386 (N.Y. Sup. Ct. 2006) ("In order for the common or joint defense privilege to be applicable, the communication must necessarily involve the common defense of the parties invoking this rule."). Given this similarity to the common interest doctrine, the court sees no reason why South Carolina courts would not apply the joint client doctrine. Therefore, the court rejects McDevitt's argument that the doctrine is unavailable.

However, this similarity also suggests McDevitt's second argument is correct. As discussed above, the common interest doctrine requires an attorney to be involved in a

communication between clients for the doctrine to apply, otherwise "a party could shield from disclosure any discussions it had with another person about a matter of common interest simply by discussing that matter first with its attorneys," resulting in an unwarranted expansion of the scope of privilege.  Walsh, 165 F.R.D. at 18.  The same problem would seem to apply in the joint-client context.  Moreover, there is caselaw supporting this position.  See Pennachio, 637 N.Y.S.2d at 635 ("[I]f the four defendants here were represented by a single attorney, then communications exchanged at the joint meetings would be privileged under New York law.") (emphasis added); see also Starlight Int'l Inc. v. Herlihy, 186 F.R.D. 626, 645 (D. Kan. 1999) (stating that "[t]he work-product doctrine, as set forth in Fed.R.Civ.P. 26(b)(3), does not prevent inquiry into discussions between the individual defendants," where defendants were represented by the same attorneys).  Therefore, the court finds that the joint-client doctrine does not protect communication made outside the presence of the clients' attorney.

Here, Plum refused to answer whether she had discussed the Wellin Children's actions with respect to the Irrevocable Trust with any of the other Wellin Grandchildren.  Plum. Dep. 233:24–234:7.  Plum did not indicate whether her attorneys were involved in any such discussions.  Therefore, Plum has failed to demonstrate that any privilege applicable to Question 30 was not waived.

## IV.  CONCLUSION

For the foregoing reasons, the court **ADOPTS** the R&R to the extent consistent with this order, and **REJECTS** the remainder of the R&R.  The court GRANTS in part and **DENIES** in part Plum's motion for a protective order.  Specifically, the court:

- **DENIES AS MOOT** Plum's motion as to Questions 1–5, consistent with the special master's recommendation.

- **DENIES** Plum's motion as to Question 6 to the extent she relies on the common interest doctrine as an exception to the waiver of privilege, but **GRANTS** Plum's motion as to that Question in all other respects.

- **DENIES AS MOOT** Plum's motion as to Questions 7 and 8, consistent with the special master's recommendation.

- **DENIES** Plum's motion as to Questions 9–11, consistent with the special master's recommendation.

- **DENIES AS MOOT** Plum's motion as to Questions 12 and 13, consistent with the special master's recommendation.

- **DENIES** Plum's motion as to Question 14, consistent with the special master's recommendation.

- **DENIES AS MOOT** Plum's motion as to Questions 15, consistent with the special master's recommendation.

- **GRANTS** Plum's motion as to Questions 16–20.

- **DENIES** Plum's motion as to Questions 21 and 22.

- **DENIES** Plum's motion as to Questions 23–26 to the extent she relies on the common interest doctrine as an exception to the waiver of privilege, but **GRANTS** Plum's motion as to such Questions in all other respects.

- **DENIES** Plum's motion as to Question 27.

- **DENIES** Plum's motion as to Questions 28 and 29 to the extent she relies on the common interest doctrine as an exception to the waiver of privilege, but **GRANTS** Plum's motion as to such Questions in all other respects.

36

- **DENIES** Plum's motion as to Questions 30.

- **GRANTS** Plum's motion as to Questions 31 and 32.

- **DENIES** Plum's motion as to Questions 33 and 34 to the extent she relies on the common interest doctrine as an exception to the waiver of privilege, but **GRANTS** Plum's motion as to such Questions in all other respects.

- **DENIES AS MOOT** Plums motion as to Question 35, consistent with the special master's recommendation.

- **GRANTS** Plum's motion as to Questions 36 and 37.

- **DENIES AS MOOT** Plums motion as to Question 38, consistent with the special master's recommendation.

- **DENIES** Plum's motion as to Question 39 to the extent she relies on the common interest doctrine as an exception to the waiver of privilege, but **GRANTS** Plum's motion as to that Question in all other respects.

- **GRANTS** Plum's motion as to Question 40.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 30, 2016**
**Charleston, South Carolina**