IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Wendy C. H. Wellin, as Special Administrator of the Estate of Keith S. Wellin and as Trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2001, *Plaintiff,* | ) ) ) ) ) | Civil Action No.  2:13-cv-01831-DCN |
| vs. | ) ) | **THE ESTATE'S MOTION FOR** |
| Peter J. Wellin, Cynthia W. Plum and Marjorie W. King, individually and as co-Trustees and beneficiaries of the Wellin Family 2009 Irrevocable Trust u/a/d November 2, 2009,  and Friendship Management, LLC, *Defendants.* | ) ) ) ) ) ) ) ) | **PARTIAL SUMMARY JUDGMENT AS TO THE VALIDITY OF KEITH S. WELLIN'S NOVEMBER 20, 2013 SUBSTITUTION OF ASSETS** |

Wendy C. H. Wellin, as Special Administrator of the Estate of Keith S. Wellin and as Trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2001 (the "Estate"), by and through her undersigned counsel, moves for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to the validity of Keith Wellin's November 20, 2013 substitution of assets in the Wellin Family 2009 Irrevocable Trust.

**NATURE OF THE CASE**

This matter was initiated by Keith S. Wellin in 2013 upon his discovery of various breaches of duty by his three adult children, Peter J. Wellin, Cynthia W. Plum and Marjorie W. King (collectively, the "Wellin Children") and certain estate planning entities that they controlled. These entities included the Wellin Family 2009 Irrevocable Trust (the "2009 Trust"), Friendship Partners, LP (the "LP") and its general partner, Friendship Management, LLC (the "LLC").

Several new and additional claims arose relating to actions taken by Mr. Wellin, the Wellin Children and the Trust Protector of the 2009 Trust in November and December 2013. Two of the disputed actions taken by Mr. Wellin were a substitution of assets in the 2009 Trust and

appointment of a new Trust Protector to the 2009 Trust on November 20, 2013. On November 20, 2013, Mr. Wellin exercised the right, expressly reserved to him by the terms of the 2009 Trust, to reacquire the assets of the 2009 Trust by substituting assets of an equivalent value, and the Wellin Children have refused to recognize the validity of this substitution. Instead, they determined to liquidate the partnership and distribute to themselves individually the assets to which Mr. Wellin was legally entitled by virtue of his substitution.

The validity of Mr. Wellin's asset substitution is an issue which bears upon the resolution of the Estate's Fourth, Fifth, Seventh, Eighth, Ninth, Tenth and Eleventh Causes of Action. *See* 2nd Am. Compl., April 30, 2015, C/A No. 2:13-cv-01831-DCN, ECF No. 301.[1] By virtue of Mr. Wellin's substitution, he is owed funds in excess of $90,000,000.00, which have been wrongfully withheld by the Wellin Children, who dispute the validity of Mr. Wellin's substitution. Even if the Wellin Children argue that there is a dispute of material fact with respect to their father's capacity to take the disputed November 2013 actions, the Court should nevertheless grant partial summary judgment on the remaining legal issues associated with the substitution.

## FACTS

Keith Wellin purchased a sizeable holding of Berkshire Hathaway throughout the 1960s and 1970s. For the most part, he continued to hold the shares, which appreciated significantly, over the following decades. Mr. Wellin eventually contributed 896 of his Berkshire Hathaway Class A shares to the LP, a family limited partnership controlled by its general partner, the LLC, which was in turn controlled by its Manager, Cynthia Plum ("Plum"). Eventually, Mr. Wellin transferred the 988,963 limited partner units (the "LP Units") received from his contribution to the Keith S. Wellin Florida Revocable Living Trust (the "Revocable Trust"). *See generally* Mot.

---

[1] All references to electronic case filing numbers are to Civil Action No. 2:13-cv-01831-DCN.

Summ. Judg. as to Limited Partner Status, April 10, 2019, ECF No. 879 (describing 2003 and 2007 transfers and attaching documents relating to same).

*The 2009 Trust*

The 2009 Trust was established in November 2009 under South Dakota law. Ex. 1, 2009 Trust, Nov 2, 2009. Mr. Wellin was named the Grantor of the 2009 Trust, and the Wellin Children were named as Trustees, Investment Committee members and Distribution Committee members. *Id.* The 2009 Trust was funded with a nominal amount of cash. South Dakota Trust Company was appointed as a corporate Trustee and Mr. Wellin's counsel, Tom Farace, was appointed as Trust Protector. *Id.* The Wellin Children were also named as the beneficiaries of the 2009 Trust, along with their lineal descendants. *Id.*

The 2009 Trust was intentionally structured to qualify as a grantor trust for tax purposes. Ex. 2, Farace Dep. Tr. 13:18–14:24, Jan. 26, 2016 (discussing 2009 Trust, attached to this Motion as Ex. 1). A grantor trust is one which is disregarded as an entity separate from its grantor (in this case, Mr. Wellin) for income tax purposes. Under I.R.C. § 671, the grantor of a grantor trust is treated as the owner of the trust's assets for tax purposes so long as the trust contains certain powers or circumstances of control identified in I.R.C. §§ 673 to 677. At its creation, there were two powers included in the 2009 Trust with the intent of causing it to be treated as a grantor trust. Ex. 2, Farace Dep. Tr. 14:2-19, 162:17-21. First, Mr. Wellin reserved the power to reacquire trust corpus for assets of an equivalent value. Ex. 1, 2009 Trust § IX(A). Second, the corporate trustee was granted the power to add spouses of the Wellin Children and spouses of their children as beneficiaries. Ex. 1, 2009 Trust § IX(B). Mr. Wellin reserved the power to release his power of substitution and permitted the corporate trustee to release its power to add spouse beneficiaries. Ex. 1, 2009 Trust § IX(C). Additionally, the Trust Protector was expressly granted the power to

amend the trust instrument or to revoke, suspend or modify any of the powers provided therein. Ex. 1, 2009 Trust §§ VI(A)(2), VI(A)(3) and VI(A)(8).

*The 2009 Transaction and Subsequent Interest Payments*

On November 30, 2009, the 2009 Trust purchased the Revocable Trust's 988,963 LP Units (the "2009 Transaction"). Ex. 3, Purchase Agreement, Nov. 30, 2009. The purchase price was determined by an appraisal performed by Management Planning, Inc. (the "MPI Appraisal"), which opined that the fair market value of the LP Units was based on a discount of 44.75% to the net asset value of the partnership for lack of control and lack of marketability.[2] Ex. 6, MPI Appraisal, Nov. 30, 2009. The 2009 Trust paid the purchase price by issuing a Promissory Note to the Revocable Trust with a face value equal to the fair market value of the LP Units, as determined by the MPI Appraisal and its identified discounts. Ex. 7, Promissory Note, Nov. 30, 2009. This Promissory Note was secured by the 988,963 LP Units. Ex. 8, Pledge Agreement, Nov. 30, 2009. Additionally, the Wellin Children each guaranteed to the Revocable Trust a limited portion of the amount due under the Promissory Note. Ex. 9, Guarantee Agreement, Nov. 30, 2009. The Promissory Note was refinanced several times, most recently in 2012. Ex. 10, Refinanced Promissory Note, Sept. 4, 2012. With each refinancing, the security interest in the LP Units and the limited guarantee of the Wellin Children continued. Ex. 11, Pledge Modification Agreement, Sept. 4, 2012; Ex. 12, Guarantee Modification Agreement, Sept. 4, 2012.

Because of the 2009 Trust's status as a grantor trust, any income or gain, including capital gains, resulting from the 2009 Trust's ownership of the interest in the LP would be included in Mr.

---

[2] At all times prior to November 2013, Friendship Partners, LP's assets consisted of the 896 Berkshire Hathaway Class A shares contributed by Mr. Wellin, an additional 10 Berkshire Hathaway Class A shares contributed by Friendship Management, LLC, the General Partner, and a nominal amount of cash. Ex. 4, LLC Dep. Tr. 89:1-5, 91:15-21, Feb. 8, 2018; Ex. 5, Plum Dep. Tr. 204:21–205:2, Aug. 25, 2016.

Wellin's taxable income.  This would make him the party responsible for any taxes due on such income or gain.  Defendant Plum's authority as Manager of the LLC vested in her the sole power to cause a sale of the LP's assets, giving her the ability to determine whether or when Mr. Wellin would become responsible for the significant taxes that would be due as a result of such a sale. Ex. 4, LLC Dep. Tr. 277:18–279:9; Ex. 5, Plum Dep. Tr. 114:13-20, 204:16–205:2.

In 2010, 2011 and 2012, the 2009 Trust paid the annual interest payment owed under the Promissory Note by transferring some of the LP Units back to the Revocable Trust.  Ex. 13, 2010 Interest Payment; Ex. 14, 2011 Interest Payment; Ex. 15, 2012 Interest Payment.  Each year, the 2009 Trust calculated the number of LP Units needed to make its annual interest payment by applying to the then current net asset value of the LP the same discounts identified by Management Planning, Inc. in the MPI Appraisal.  *See* Exs. 13, 14 and 15.

### *November 2013*

In 2013, litigation commenced between Mr. Wellin and his children.  Mr. Wellin initiated a lawsuit against his children in July 2013 asserting various claims including breach of fiduciary duty.  Compl., July 3, 2013, ECF No. 1.  By this time, the value of Berkshire Hathaway had grown to such a level that the capital gains that would result to Mr. Wellin, by virtue of the 2009 Trust's grantor trust status, upon a sale of the stock held by the LP would be financially devastating to Mr. Wellin.  Ex. 16, Hr'g Tr. 58:17–98:5, Nov. 18, 2013; *see also* Ex. 17, Gumb Aff. July 25, 2013. Therefore, Mr. Wellin also requested, and was granted, a temporary restraining order enjoining his children from selling or otherwise transferring any assets owned by either the 2009 Trust or the LP (including the shares of Berkshire Hathaway originally contributed by Mr. Wellin) without Mr. Wellin's express, written and notarized consent.  Order, July 3, 2013, ECF No. 6.  The Wellin Children retaliated by filing a Petition for the Appointment of a Conservator against their father in the Charleston County Probate Court, alleging that he lacked capacity and was unable to manage

his financial affairs and sought the appointment of a conservator to manage his assets. Pet. Conservatorship, July 19, 2013, available at ECF No. 22-1.

At a hearing on November 18, 2013, the Wellin Children represented to this Court through counsel that they intended to sell a significant portion of the assets held by the LP if the temporary restraining order were lifted. Ex. 16, Hr'g Tr. 137:21-24. Their counsel reiterated the same by letter to the Court the following day. Brunson Ltr., Nov. 19, 2013, ECF No. 69. Faced with this ominous signal, Mr. Wellin consulted with counsel and, with counsel's assistance, took several actions designed to protect himself from the potential financial ruin a sale of the LP's stock might cause.[3] *See generally* Ex. 18, Bennett Dep. Tr. 559:4–578:25, 579:25–594:8, 753:11–754:5, Nov. 7–8, 2017.

One of these actions was Mr. Wellin's exercise of his power of asset substitution. To evidence his exercise, he executed a document titled "Exercise of Right of Substitution" in his individual capacity and in his capacity as Trustee of his Revocable Trust. This substitution stated:

> "Effective this 20th day of November, 2013, the Grantor, Keith S. Wellin, does hereby exercise the right granted to him by Article IX(A) of the 2009 Trust and substitute the promissory note issued by the 2009 Trust in his favor on September 4th, 2012 with a face value of $49,802,115 and a current outstanding balance of $50,211,446.55 (being principal and accrued but unpaid interest as of the date hereof" (the "Note") in exchange for Units in Friendship Partners, LP representing an assignee interest therein with a fair market value equal to $50,211,446.55.

---

[3] For example, Mr. Wellin appointed a new Trust Protector, removing Tom Farace from this position. Ex. 19, Trust Protector Removal & Successor Trust Protector Appointment, *2009 Trust*, Nov. 20, 2013; *see also* Ex. 1, 2009 Trust § VI(A)(9), at 13 (grantor's authority to remove and replace Trust Protector). The newly-appointed Trust Protector, Lester Schwartz, removed the original corporate trustee and appointed Brown Brothers Harriman as successor corporate trustee. Ex. 20, Trustee Removal & Successor Trustee Appointment, 2009 Trust, Nov. 20, 2013. Additionally, Mr. Schwartz amended the 2009 Trust, including removing the corporate trustee's power to add spouse beneficiaries. Ex. 21, Trust Amendment, 2009 Trust, Nov. 20, 2013; *see also* Ex. 1, 2009 Trust §§ VI(A)(2), VI(A)(3) and VI(A)(8) (Trust Protector's power to amend). This action removed one of the two grantor trust powers contained in the trust.

"The number of Units in Friendship Partners, L.P. transferred in substitution for the Note are determined in accordance with the calculations attached hereto as Schedule A. The discounts applied to the assets of Friendship Partners, L.P. and the individual units are consistent with the discounts applied by the general partner of Friendship Partners L.P. with respect to various transfers between the 2009 Trust and Keith S. Wellin from 2009 through 2012, and the calculation is consistent with the methodology employed by Management Planning, Inc. in its report dated November 30, 2009.

"Keith S. Wellin recognizes that the cash held by Friendship Partners, L.P. may be different than the estimated balance reflected on Schedule A. If the general partner of Friendship Partners, L.P. provides to Keith S. Wellin evidence of a different cash balance, the Units transferred to Keith S. Wellin shall be adjusted to reflect a number of Units transferred to Keith S. Wellin with a fair market value equal to the value determined by inserting the correct cash balance into the calculations on Schedule A."

Ex. 22, Exercise of Right of Substitution, *2009 Trust*, Nov. 20, 2013. Attached to the Exercise of Right of Substitution was a calculation of the estimated fair market value of Friendship Partners, LP and the LP Units received by Mr. Wellin by virtue of the substitution. *Id.* The substituted Promissory Note was also marked "paid in full", evidencing its satisfaction by virtue of the receipt of the LP Units. Ex. 23, Promissory Note marked "Paid in Full", Nov. 20, 2013. Thus, by the exercise of his right of substitution in the 2009 Trust, Mr. Wellin received an economic interest in Friendship Partners, LP with a fair market value equal to the outstanding principal and interest of the Promissory Note.

After exercising his power of substitution Mr. Wellin then released his reserved power of substitution. Ex. 24, Release of Right of Substitution, *2009 Trust*, Nov. 20, 2013. This release of the power of substitution became effective at 11:59pm on November 20, 2013. *Id.* In the Release of Right of Substitution, Mr. Wellin acknowledged his substitution of assets made earlier the same

day and stated "[t]his instrument is intended to be effective after the time of such exercise." *Id.* This action removed the second grantor trust power contained in the trust.[4]

All of the documents executed on November 20, 2013 by Mr. Wellin and Mr. Schwartz were provided to the Wellin Children through their counsel the same day. Ex. 25, Bennett Letter, Nov. 20, 2013; Ex. 26, Bennett Email, Nov. 20, 2013 (enclosing letter and Nov. 20, 2013 documents and stating, "Grantor trust status is turned off effective at the end of today.").

Mere days after receiving notice of their father's substitution of assets and the termination of the grantor trust status of the 2009 Trust, Defendant Plum caused the LP to liquidate its entire holding of Berkshire Hathaway.[5] Ex. 27, Plum Letter, Nov. 22, 2013. While Plum alone held the sole legal ability to cause such a sale by virtue of her position as Manager of the LLC, the General Partner of the LP, her actions were taken with the full knowledge and approval of her siblings, who like Plum were also Trustees, committee members and beneficiaries of the 2009 Trust. Ex. 4, LLC Dep. Tr. 276:18–279:9; Ex. 5, Plum Dep. Tr. 60:15-19, 114:13-20; Ex. 28, P. Wellin Dep. Tr. 270:13-14, 310:14–311:3, Aug. 30, 2017; Ex. 29, King Dep. Tr. 295:10-18, 372:12–328:25, June 23, 2016. The sale of the Berkshire Hathaway shares continued until December 2, 2013, with

---

[4] With these three actions taken on November 20, 2013, Mr. Wellin's interest in not incurring a $40,000,000 tax liability became more closely aligned with his children. Ex. 18, Bennett Dep. Tr. 540-541. By the release of the power of substitution and the removal of the corporate trustee's power to add spouse beneficiaries, the 2009 Trust ceased to be a grantor trust for tax purposes. After exercising his right of substitution, Mr. Wellin received a portion of the economic interest in Friendship Partners, LP held by the 2009 Trust. Thus, after the substitution and the change in grantor trust tax status, both Mr. Wellin and the 2009 Trust would share any liability for capital gains or other taxes incurred by any sale of the underlying assets of Friendship Partners, LP. *Id.* This should have dis-incentivized the Investment Committee of the 2009 Trust – the Wellin Children – from causing the trust to incur capital gains or other taxes. *Id.* at 729 (the asset substitution was an effort to protect Mr. Wellin's interest, align his interest with that of his children, and provide an incentive for the children not to trigger a sale).

[5] This action is contrary to what Plum's counsel represented she would do only days prior. *See* Ex. 16, Hr'g Tr. 154:24–155:2, Nov. 18, 2013; Brunson Ltr., Nov. 19, 2013, ECF 69.

the final proceeds from the sale settling on December 6, 2013.  The total proceeds of the sale were approximately $157,000,000.00.  2nd Am. Compl. ¶ 60, admitted at Ans. to 2nd Am. Compl. ¶ 44, May 14, 2015, ECF No. 305.

### *December 2013*

After Mr. Wellin's exercise of his power of substitution reserved in the 2009 Trust, Plum executed a document purporting to dissolve Friendship Partners, LP.  Ex. 30, Written Consent in Lieu of Meeting, *LLC*, Dec. 1, 2013; Ex. 31, Plan of Dissolution*, LP*.  Simultaneously, the Wellin Children collectively executed two documents: (i) in their capacity as Trustees of the 2009 Trust, they resolved to pay the Promissory Note, ignoring Mr. Wellin's exercise of his power of substitution on November 20, 2013, in which he exchanged the Promissory Note for a portion of the LP Units held by the 2009 Trust, and (ii) in their capacity as members of the Distribution Committee of the 2009 Trust, they purported to distribute all of the 2009 Trust's proceeds from the liquidation of the LP, less $52,000,000.00, to themselves in reciprocal fashion. Ex. 32, Written Consent in Lieu of Meeting of the Distribution Committee and the Individual Trustees, *2009 Trust*, Dec. 1, 2013; Ex. 33, Written Consent in Lieu of Meeting of Individual Trustees*, 2009 Trust*, Dec. 5, 2013.[6]   The collective distribution received by the Wellin Children from the 2009 Trust exceeded $90,000,000.00.   Ex. 36, Plum Letter, Dec. 5, 2013.   Though the Wellin Children executed separate documentation for the LP liquidation, the purported payment of the Promissory

---

[6] These documents were executed by Cynthia Plum, Marjorie King, and Cynthia Plum on behalf of Peter Wellin purportedly as his power of attorney.  Exs. 29–32; *see also* Ex. 27, P. Wellin Dep. 297–300; Ex. 5, Plum Dep. Tr. 99–100, 121–22, 126–30, 138–39; Ex. 28, King Dep. Tr. 290–91, 327–28.  While several of these documents state that they are "effective December 1, 2013", they were actually executed by Plum and King on December 4, 2013.  Ex. 34, Wellin Children's Answers to McDevitt's Second Interrogatories, Oct. 21, 2016;  Ex. 5, Plum Dep. Tr. 121–22. However, the sale of the Berkshire Hathaway stock had not concluded by December 1, 2013.  Ex. 35, LP Account Statements, Nov. and Dec. 2013.

Note, and the purported trust distributions, in reality the cash from the LP was transferred directly by Plum from the partnership to the personal accounts of herself and her two siblings. *Id.*

On December 6, 2013, prior to receiving any notice of the sale of the Berkshire Hathaway stock previously held by the LP or the liquidation of the LP, Mr. Wellin provided the Wellin Children with various documentation of his transfer to himself a portion of the LP Units in payment of the annual payments due to him under two Grantor Retained Annuity Trusts ("GRATs") – both of which held a small number of LP Units.[7] Ex. 37, Bennett Letter I, Dec. 6, 2013. This letter also enclosed a document executed by Mr. Wellin on November 22, 2013 in which he agreed to be bound by the Partnership Agreement of the LP with respect to the interest received from the November 20, 2013 substitution of assets. *Id.*

On December 6, 2013, after receiving from Mr. Wellin (through his counsel) the documentation of the transfers of the LP Units in satisfaction of the GRATs' annuity payments, the Wellin Children provided Mr. Wellin with notice that the LP had been dissolved and the Berkshire Hathaway stock sold. Ex. 38, Hagerty Letter, Dec. 6. 2013 . This letter enclosed three checks: two purportedly representing the liquidation proceeds due to the two GRATs and one purporting to pay the full value of the principal and interest due under the Promissory Note owed by the 2009 Trust. *Id.* The third check was "tendered on behalf of the [2009 Trust]" but was actually signed by Plum in her capacity as Manager of the LLC. *See id.* Finally, this correspondence rejected the November 20, 2013 asset substitution by stating only that "[t]his

---

[7] Prior to Mr. Wellin's payment of the 2013 annuity payments, the KSW 2011 Qualified Grantor Retained Annuity Trust (the "2011 GRAT") held 14,047.9060 LP Units and the KSW 2012 Qualified Grantor Retained Annuity Trust (the "2012 GRAT") held 29,239.9692 LP Units. The 2011 GRAT and the 2012 GRAT were funded, respectively, with the LP Units received by Mr. Wellin in payment of the 2011 and 2012 interest payments on the Promissory Note.

purported exercise of Mr. Wellin's Power of Asset Substitution was ineffective, and the Note remained outstanding until satisfied in full by virtue of the enclosed payment." *Id.*

Mr. Wellin rejected the Wellin Children's attempt to pay the Promissory Note later that day and demanded, through counsel, the full liquidation value of the LP Units obtained through his asset substitution. Ex. 39, Bennett Letter II, Dec. 6, 2013.

*Testimony Regarding and Surrounding Keith Wellin's Asset Substitution*

Scott Barton, Ph.D, was a neuropsychologist affiliated with Roper Rehab in November 2013.[8]  He examined Mr. Wellin on five occasions between November 5, 2013 and November 13, 2013 at Roper Rehab and concluded that Mr. Wellin had the capacity to make financial decisions. Ex. 40, Barton Note, Nov. 21, 2013; Ex. 41, Barton Dep. Tr. 55–76, 125–72, 186–204, July 31, 2014.  For example, Dr. Barton noted that Mr. Wellin was "quite dysarthric" but that his "thoughts appeared to be well organized and coherent – he did not contradict or repeat himself – nor did he appear irrational or confused at any time during our interview."  Ex. 42, Barton Note, Nov. 5, 2013.  Dr. Barton also noted that he "did not see any evidence of confusion or a significant impairment in judgment."  *Id.*  Several days later, after examining Mr. Wellin again Dr. Barton noted, "I once again feel the patient is competent to manage his financial affairs – he does not appear irrational, confused, nor is his memory so impaired he cannot do this."  Ex. 43, Barton Neuropsych. Evaluation Note, Nov. 13, 2013.

Edgar J. Weiss, M.D. is a geriatric psychiatrist who was affiliated with the Medical University of South Carolina in November 2013.  He examined Mr. Wellin on November 7, 2013 and concluded that Mr. Wellin had capacity to make financial decisions.  Ex. 44, Weiss Dep. Tr. 60–101, 110–13, June 24, 2014.  Dr. Weiss documented his conclusions in a letter dated November

---

[8] Unfortunately, Dr. Barton passed away in 2017.

13, 2013, noting that Mr. Wellin "manifested a thorough knowledge of his fortune and what was needed to restore his losses and manage the investments.  He was comfortable discussing the details, his thinking was quite fluid, he mentally manipulated the information and appeared to be capable of abstract thinking and creative thinking."  Ex. 45, Weiss Letter, Nov. 15, 2013.  Dr. Weiss concluded, "It is my opinion that Mr. Keith Wellin has maintained the capacity to manage his finances independently."  *Id.*

Both Dr. Barton and Dr. Weiss testified regarding their examinations of Mr. Wellin and their opinion that he was competent at the hearing before this Court on November 18, 2013.  Ex. 16, Hr'g Tr. 29:13-18, 35:12-22, Nov. 18, 2013.  Also at this hearing, several of Mr. Wellin's other treating physicians testified and opined that Mr. Wellin was competent and capable of making decisions for himself.  *E.g.*, Ex. 16, Hr'g Tr. 10:6-13, 14:7-9.  Mr. Wellin's long-time accountant, Mike Simon, also testified that he personally visited Mr. Wellin on November 17, 2013 and that Mr. Wellin always appeared competent to him.  Ex. 46, Simon Dep. 21:12–23:3, 251:18–252:4, Oct. 28, 2015.

Mr. Wellin verified the substitution during his February 7, 2014 deposition.  Ex. 47, K. Wellin Dep. Tr. 10:4-11, 36:22–38:21 Feb. 7, 2014.  Mr. Wellin subsequently ratified the substitution by written document executed June 27, 2014.  Ex. 48, Ratification, June 27, 2014.  Mr. Wellin's counsel has also been deposed and testified in relation to the substitution and their recollection of the substitution.  Ex. 18, Bennett Dep. Tr., 753:3-6; Ex. 49, Scarborough Dep. Tr. 71:20–72:6, 184:13–195:1, Feb. 26, 2018.

The Wellin Children have testified that they believed their father's substitution of assets was invalid; however, their justification for this position has wavered over time.  *See*, *e.g.*, Ex. 5, Plum Dep. Tr. 75:20–77:19, 84:8-25; Ex. 28, P. Wellin Dep. Tr.284:2–288:21, 291:16–292:3; Ex.

29, King Dep. Tr. 29:6-10, 30:9-24.   The Wellin Children have also explained their position on the substitution through interrogatory responses.   Ex. 50, Wellin Children's various Answers to Interrogatories, 2014–2018.

There have also been a number of experts identified by the parties in this matter who offered opinions on aspects of Mr. Wellin's substitution of assets.   The Estate identified Diana S.C. Zeydel, Esq., an expert in advanced estate planning techniques and a member of the American College of Trust and Estate Counsel, who testified that the asset substitution was effective on November 20, 2013.   Ex. 51, Zeydel Dep. Tr. 311:18-23, Aug. 28, 2018; *see also* Ex. 52, Zeydel Report, June 1, 2018.   The Wellin Children identified Louis Mezzullo, Esq., who offered testimony on the same subject as well as several others.   Ex. 53, Mezzullo Dep. Tr. 147:17–148:14, Nov. 14, 2018; *see also* Ex. 54, Mezzullo Report, May 31, 2018.   The Wellin Children also identified an attorney named Thomas Simmons, Esq., who intends to offer testimony specific to the duties of Trustees under South Dakota law and the validity of the substitution, though he has never himself assisted a client in performing a substitution and has limited experience with grantor trusts and sales to grantor trusts.   Ex. 55, Simmons Dep. Tr. 56:1-13, Oct. 26, 2018; *see also* Ex. 56, Simmons Report, June 1, 2018.   Mr. Schwartz and Mr. McDevitt identified David English, J.D., a former professor of law and the reporter for the Uniform Trust Code, and Charles D. Fox, IV, Esq., another expert in advanced estate planning techniques, who also plan to opine on this issue.   Ex. 57, English Dep. Tr. 115:3-16, Nov. 19, 2018; *see also* Ex. 58, English Report, June 1, 2018.

### *Valuation Opinions Regarding Limited Partner Units of*
### *Friendship Partners, LP as of November 20, 2013*

In his Exercise of Right of Substitution, Mr. Wellin proposed a calculation of the fair market value of the LP Units applying the discounts identified in the MPI Appraisal, as had been done by the 2009 Trust when issuing in-kind interest payments in 2010, 2011 and 2012.   Ex. 22,

Substitution, *2009 Trust*, Nov 20, 2013. The Estate subsequently identified a valuation expert, Matthew Crow, ASA, of Mercer Capital, who conducted a valuation of the LP Units and opined as to their value on November 20, 2013. Ex. 59, Crow Dep. Tr. 20:24 – 21:7, Aug. 7, 2018; *see also* Ex. 60, Crow Report, June 1, 2018.

Mr. Schwartz and Mr. McDevitt also identified a valuation expert, Michael Paschall of Bannister Financial, who offered an additional opinion on the fair market value of the LP Units as of November 20, 2013. Ex. 61, Paschall Dep. Tr. 12:9-14, 50:1-4, Sept. 5, 2018; *see also* Ex. 62, Paschall Report, June 1, 2018.

The Wellin Children identified an economist, Mukesh Bajaj, who attempted to offer an opinion on the fair market value of the LP Units. Ex. 63, Bajaj Dep. Tr. 169:2-9, Aug. 30, 2018; *see also* Ex. 64, Bajaj Report, June 1, 2018. However, Dr. Bajaj, who is not a member of the American Society of Appraisers, did not cite anything other than a nebulous "economic logic" in support of his opinions and did not offer an opinion of the units' fair market value, applying the definition of fair market value universally accepted by appraisers and the Internal Revenue Service. *Id.*

## ARGUMENT

Summary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Further, a party may move for summary judgment with respect to any claim or defense or any part of any claim or defense. *Id.* Though all reasonable inferences are to be drawn in favor of the nonmoving party, in order to defeat summary judgment, the nonmoving party must identify an error of law or a genuine issue of disputed material fact. *Canopius US Ins. v. Middleton*, 202 F. Supp. 3d 540, 545 (D.S.C. 2016). If the nonmoving party fails to provide evidence establishing

that the factfinder could reasonably decide in his favor, then summary judgment shall be entered regardless of any proof or evidentiary requirements imposed by the substantive law. *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 963 (D.S.C. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If no genuine issue of material fact exists, the moving party is entitled to judgment as a matter of law on the issue(s) presented for summary judgment. Fed. R. Civ. P. 56(a).

I.    **The Court should enter partial summary judgment in favor of the Estate, finding that Keith Wellin's November 20, 2013 substitution of assets was valid and effective.**

The 2009 Trust is governed by South Dakota law. Ex. 1, 2009 Trust § III. Under South Dakota law, the primary task of South Dakota courts interpreting trusts is to ensure that the intentions and wishes of the trustor (or grantor) are honored. *In re Sunray Holdings Trust*, 841 N.W.2d 271, 274 (S.D. 2013). This is a question of law. *SBS Fin. Servs., Inc. v. Plouf Family Trust*, 821 N.W.2d 842, 845 (S.D. 2012).

To carry out a trustor or grantor's intentions and wishes, courts must interpret a trust instrument as written in order to attempt to ascertain and give effect to the settlor's intent. *In re Estate of Stevenson*, 605 N.W.2d 818, 821 (S.D. 2000). Thus, the court first looks to the language of the trust instrument. *In re Sunray Holdings Trust*, 841 N.W.2d at 274. If the language of the trust instrument makes the intention of the trustor or settlor clear, South Dakota courts will declare and enforce the same. *Id.* Absent an ambiguity, the court will not consider extrinsic evidence. *Id.* at 277. An ambiguity is not created simply because the parties differ as to the interpretation of the trust instrument; rather, language is ambiguous where it is reasonably capable of being understood in more than one sense. *In re Florence Y. Wallbaum Revocable Living Trust Agreement*, 813 N.W.2d 111, 117–18 (S.D. 2012) (internal quotation and citation omitted). When interpreting provisions of a trust, ordinary words are given their usual and ordinary meaning. *In re Schwan*

15

*1992 Great Great Grandchildren's Trust*, 709 N.W.2d 849, 854 (S.D. 2006) (citing *In re Brock's Estate*, 117 N.W.2d 734, 735 (S.D. 1970)).

"In interpreting a trust instrument, all the words and provisions appearing in the trust must be given effect as far as possible, and none should be cast aside as meaningless." *In re Florence Y. Wallbaum Revocable Living Trust Agreement*, 813 N.W.2d at 117 (internal quotation and citation omitted).  To hold otherwise would be to convict a testator of performing useless acts.  *In re Schwan 1992 Great Great Grandchildren's Trust*, 709 N.W.2d at 854.

The South Dakota Trust Code also provides: "Notwithstanding the terms of a trust instrument, if a settlor has a power to substitute property of equivalent value, a trustee has a fiduciary duty to determine that the substituted property is of equivalent value, prior to allowing the substitution."  S.D. Code § 55-2-22 (Lexis, 2019).  As of the date of this filing, no South Dakota appellate court has interpreted this provision.

### A.    Keith Wellin validly exercised his power of substitution on November 20, 2013 pursuant to the terms of the trust instrument and South Dakota law.

There has been no assertion that the substitution clause contained within the 2009 Trust is ambiguous.  Therefore, it is the duty of the Court, applying South Dakota law, to ensure that Mr. Wellin's intentions and wishes are honored and to give effect to all words and provisions of the trust instrument.  Mr. Wellin reserved the right to substitute assets in the 2009 Trust:

> "I hereby retain the power, exercisable during my lifetime, at any time and from time to time, without the consent of or approval by the Trustee, to reacquire the trust corpus or a portion thereof by substituting other property of an equivalent value."

Ex. 1, 2009 Trust § IX(A).  On November 20, 2013, Mr. Wellin notified the Trustees of the 2009 Trust of his substitution of assets, substituting

> ". . . the promissory note issued by the 2009 Trust in his favor on September 4th, 2012 with a face value of $49,802,115 and a current outstanding balance of $50,211,446.55 (being principal and accrued but unpaid interest as of the date

hereof" (the "Note") in exchange for Units in Friendship Partners, LP representing an assignee interest therein with a fair market value equal to $50,211,446.55."

Ex. 22, Substitution, *2009 Trust*. There has also been no assertion that the Exercise of Right of Substitution executed by Mr. Wellin was ambiguous. The Court should therefore honor and enforce the grantor's stated intent and find that Mr. Wellin's November 20, 2013 asset substitution was an exercise of a right expressly reserved to him under the terms of the 2009 Trust. *In re Sunray Holdings Trust*, 841 N.W.2d at 274–77.

This substitution also was, by its very terms, for assets of equivalent value – the unpaid principal and interest owed on the Promissory Note was exchanged for LP Units with a fair market value equal to the same. Ex. 22, Substitution, *2009 Trust*. Thus, by the express terms of the substitution, Mr. Wellin tendered and received assets of equivalent value when exercising his right of substitution on November 20th.

The substitution undertaken by Mr. Wellin employed a technique that has become commonplace in the estate planning world - a defined value clause. By employing a defined value clause, interests in a closely-held entity which are difficult to value can be transferred based on a set or defined value of the interests transferred, rather than based on a set number or percentage of shares or units. *See*, *e.g.*, *Petter v. Comm'r*, 653 F.3d 1012 (9th Cir. 2011) (upholding transfers to family trust and charitable organization in the form of units in LLC with a set dollar value); *McCord v. Comm'r*, 461 F.3d 614 (5th Cir. 2006) (upholding taxpayer's transfer of partnership interests to her children having a "fair market value" of $6,910,933, with anything in excess to charities); *Estate of Christiansen v. Comm'r*, 130 T.C. 1 (2008), *aff'd* 586 F.3d 1061 (8th Cir. 2009) (upholding disclaimer by devisee of portion of inheritance exceeding set dollar value, as finally determined for federal estate tax purposes, and allowing charitable deduction for disclaimed assets); *Wandry v. Comm'r*. T.C. Memo 2012-88 (Mar. 26, 2012) (upholding gifts to taxpayer's

descendants of LLC units with a fair market value for federal gift tax purposes of a set dollar value), attached as <u>Exhibit 66</u>; *see also* <u>Ex. 51</u>, Zeydel Dep. Tr. 265:1-2 (discussing the common use of defined value formulas).

Similarly, a grantor may achieve a valid substitution of assets (exchanging assets of equivalent value) by using a defined value formula to account for a potential dispute over the value of the assets being exchanged. This allowed Mr. Wellin to complete the substitution on November 20, 2013, notwithstanding that a disagreement in value may subsequently impact the number of units he acquired in the substitution. *See* <u>Ex. 51</u>, Zeydel Dep. Tr. 41:13-20, 43:17–46:11, 216–227 (explaining how estate planning practitioners use defined value formulas to achieve asset substitutions and how Mr. Wellin's substitution achieved equivalent value using the same).

The Court should enter partial summary judgment finding that Mr. Wellin validly substituted assets of equivalent value in the 2009 Trust on November 20, 2013.

B.    **Keith Wellin's asset substitution passes muster under other the analysis of analogous cases adjudicating asset substitutions.**

There are two significant cases from other jurisdictions which addressed substitutions made under nearly identical substitution provisions.[9] While the facts in both *Benson v. Rosenthal* and *Manatt v. Manatt* may contain small differences, the analysis of the substitutions at issue in these matters is highly persuasive and should be followed by this Court.

_____

[9] Ostensibly, the substitution provisions at issue in these opinions were, like the substitution provision in the 2009 Trust, designed to cause the trusts to be "grantor trusts" while complying with Revenue Ruling 2008-22, which set forth the circumstances in which a grantor's reserved right of substitution would not cause a trust to be included in the grantor's estate at death. Rev. Rul. 2008-22, attached as <u>Exhibit 67</u>. While the particular situs of a trust may vary from state to state, a trust's substitution clause will generally be based on federal law, as the purpose for such clauses is compliance with federal income and estate tax laws.

1.      **Keith Wellin's asset substitution is valid under the court's analysis in**
        ***Benson v. Rosenthal.***

In *Benson v. Rosenthal*, the United Stated District Court for the Eastern District of

Louisiana was asked to rule upon the validity of several asset substitutions made by a grantor of

several intentionally defective grantor trusts governed by Texas law.  C/A No. 15-782, 2016 U.S.

Dist. LEXIS 64168, attached as <u>Exhibit 68</u>.  These trusts held a variety of assets, including certain

ownership interests in holding companies that in turn held valuable property, including ownership

of the New Orleans Saints, the New Orleans Pelicans, the New Orleans Fox television affiliate,

and other business and real property.  *Id.* at *2–3.

All of the substitution provisions contained in the trusts reserved the grantor's right,

without consent or approval of the trustee or other fiduciary, to reacquire or exchange any property

of the trust by substituting other property of an equivalent value.  *Id.* at *3, *14–16.[10]  The grantor

---

[10] The first set of Benson's trusts provided:

> "Notwithstanding any other provision of this agreement to the contrary, the Grantor
> hereby reserves the right and authority, exercisable in a nonfiduciary capacity and
> without the approval or consent of any person in a fiduciary capacity, to reacquire
> or exchange any property of the Trust created hereunder by substituting other
> property of an equivalent value; however, if this power of substitution is exercised,
> the Grantor shall certify in writing that the substituted property is of equivalent
> value to the property for which it is substituted and the Trustee has a fiduciary
> obligation to independently verify that the properties acquired and the properties
> substituted by the Grantor are in fact of equal value...."

*Benson*, 2016 U.S. Dist. LEXIS 64168, at *14–15 (quoting substitution provision from Benson's
2009 Trusts).  The second set of trusts contained the following power of substitution:

> "Notwithstanding any other provision of this agreement to the contrary, the Grantor
> hereby reserves the right and authority, exercisable in a nonfiduciary capacity and
> without the approval or consent of any person in a fiduciary capacity, to reacquire
> or exchange any property of the Trust created hereunder by substituting other
> property of an equivalent value...."

exercised his power of substitution by substituting several assets into the trusts – certain real property, promissory notes issued to the grantor by the trusts at issue in the case, and newly-issued promissory notes from the grantor – in exchange for assets of equivalent value held by the trusts. *Id.* at *2–4.

Several of the trusts under scrutiny in *Benson* contained a requirement that the trustee had a duty to verify that the substituted property was of equal value. *Id.* at *16–17. The court determined that these terms were unambiguous and noted that "[t]he trusts grant [the grantor] the unilateral power to substitute assets, and while the trustee might ensure equivalent value, he does not have the power to prevent such an exchange." *Id.* at *16. Thus, the trustee did not have the ability to delay the substitution while verifying that equivalent value was provided. *Id.* at *17. This was unacceptable, and the court commented, "[u]nder [the trustees'] reading, which would allow the Trustee to block a substitution until he was satisfied that it was of equivalent value, the phrase 'without the approval or consent of any person' would be rendered meaningless." *Id.* at *17. Such an interpretation was contrary to Texas law, which provided that courts should construe trust instruments to give effect to all provisions so that no provision is rendered meaningless. *Id.* at *17. Even with respect to the trusts which did not contain the valuation requirement, the *Benson* court applied the same analysis and reached the same conclusion. *Id.* at *19.

The *Benson* court also rejected the notion that the trustee's obligation to ensure equivalent value in a substitution required the trustee to agree to the valuation prior to the substitution taking place. *Id.* at *18. This would lead to "absurd results" essentially preventing a grantor from ever making an exchange under the substitution power. *Id.* The underlying assets of the Benson trusts

---

*Id.* at *15 (quoting substitution provision from Benson's 2012 Trusts and noting that the substitution provisions in the remaining trusts at issue were "substantially similar" to those contained in the 2012 Trusts).

included holding companies, ownership of which were held in the trusts, were closely-held limited liability companies which were not easily or quickly valued. *Id.* The court concluded, "[t]his Court does not read the Substitution Provisions of these trusts as requiring a contemporaneous exchange. The trusts merely require that when a grantor unilaterally effects a substitution, he is bound to offer equivalent value in exchange." *Id.* at *18–19. Thus, the *Benson* court concluded that the grantor's substitutions were effective as of the date they were tendered. *Id.* at *20.

The substitution clause contained in the 2009 Trust bears marked similarity to the substitution clauses in *Benson*. Like the Benson Trusts, the 2009 Trust reserved to Mr. Wellin the unilateral right to substitute assets without the consent or approval of the Trustees. Ex. 1, 2009 Trust § IX(A). Like the Benson Trusts, the 2009 Trust required that the substituted assets be of equivalent value. *Id.* Benson's 2009 Trusts required that the trustee ensure that the substituted property was of equivalent value – the same requirement imposed on the Trustees of the 2009 Trust under S.D. Code § 55-2-22.

The facts presented in *Benson* also are similar to the facts in the present case. As with *Benson*, at the time of the substitution, the 2009 Trust's assets include interests in a closely-held entity (the LP) that was difficult to value. *Benson* also involved, among other assets, the substitution of promissory notes issued by the trusts with which Mr. Benson engaged in a substitution, just as the Promissory Note issued by the 2009 Trust was owed to Mr. Wellin through his Revocable Trust. As in *Benson*, one of the Trustees' arguments against the substitution is that they were not provided with an opportunity to value the substituted assets prior to the substitution occurring.

The Court should adopt the same analysis and reach the same conclusion of the *Benson* court – that the grantor's substitution of assets was valid on the date it occurred, and a dispute over

the valuation of the LP Units transferred in the substitution does not defeat the substitution's validity. To hold otherwise would be to give the Trustees of the 2009 Trust the ability to veto or indefinitely delay a substitution, and such a result would be inconsistent with the very terms of the trust instrument.

### 2. Keith Wellin's asset substitution is valid under the court's analysis in *Manatt v. Manatt*.

Last year, the United States District Court for the Southern District of Iowa addressed a similar substitution issue. *Manatt v. Manatt*, C/A No. 4:17-cv-00378, 2018 U.S. Dist. LEXIS 111372 (S.D. Iowa, May 2, 2018), attached as Exhibit 69. There, the grantor substituted cash and the forgiveness of a trust-issued promissory note into his intentionally defective grantor trust in exchange for shares in a closely-held corporation. *Id.* at *2. The shares were valued at a certain dollar amount, and the total amount of cash substituted for the shares was reduced by the value of an outstanding promissory note owed by the trust to the grantor, which had originally been issued to purchase some of the shares. *Id.* The trustee attempted to resist the substitution by claiming that the substituted assets were not equivalent in value. *Id.* at *2–3. The trustee, who was also the beneficiary of the trust, then attempted to pay off the note that was forgiven by the grantor as part of the substitution and asserted he then owned the shares outright. *Id.* at *2

Interpreting an analogous substitution provision (which reserved to the grantor the unilateral right to substitute assets of an equivalent value) under Iowa law, the court firmly rejected the trustee's assertion that a substitution could not take place until he valued the substituted assets. *Manatt*, 2018 U.S. Dist. LEXIS 111372, at *12–17.[11] Such an interpretation of the substitution

---

[11] The substitution provision in the *Manatt* trust provided:

"During my lifetime, I [the grantor], acting alone in my individual and not in any fiduciary capacity, shall have the power, with respect to any trust created under this

power in the trust would improperly create a condition precedent to the grantor's substitution, which contradicted the plain language of the substitution provision. *Id.*

The court, following *Benson v. Rosenthal,* emphasized that the substitution clause of the trust contemplated that the trustee's duty to assess the value of the "substituted" property indicated the past tense, meaning that the duty to value trust assets occurred after the substitution itself and could not prevent the substitution from happening. *Id.* at *16. Likewise, the court noted that Revenue Ruling 2008-22 also used the past tense in describing the trustee's duty to assess the value of the "substituted" assets. *Id.* at *17–18. Thus, the court concluded that the trustee's fiduciary duty to determine whether the substitution was of equivalent value could not abridge, delay or block the grantor's right of substitution, and the substitution was legally effective on the date of the grantor's action. *Id.* at *18–19.

The *Manatt* substitution also bears marked similarity to Mr. Wellin's November 20, 2013 asset substitution. As in *Manatt*, the substituted assets were shares in a closely-held entity. The *Manatt* trustee made an argument similar to the Wellin Children in that he believed he could interfere with the substitution by claiming that the trustee should have been provided an opportunity to value the assets prior to the substitution occurring. This argument was also rejected by the *Manatt* court and should likewise be rejected here. While not the only asset substituted, the

---

instrument, to reacquire trust assets by substituting other property having an equivalent value herewith, provided, however, that this substitution power cannot be exercised in a manner that can shift benefits among the trust beneficiaries as provided in Rev. Rul. 2008-22. Neither the consent of the trustee nor the consent of any other person shall be required. . . . In all events, the trustee shall satisfy himself or herself that the properties acquired and substituted pursuant to this paragraph are, in fact, of equivalent value; and further the trustee shall ensure that this substitution power is exercised in a manner that cannot shift benefits among the trust beneficiaries as such phrase is used in Rev. Rul. 2008-22. . . ."

*Manatt*, 2018 U.S. Dist. LEXIS 111372, at *9–10.

grantor in *Manatt* reduced the value of the cash tendered in the substitution by the outstanding balance of a promissory note owed to him by the trust – this feature of the *Manatt* substitution was accepted without question.  So too should Mr. Wellin's tendering of the Promissory Note owed to him by the 2009 Trust be accepted as an asset capable of being exchanged in a substitution.

Most importantly, the *Manatt* case interpreted a clause imposing a trustee's obligation to ensure equivalent value which used the past tense –  as does the South Dakota code provision imposing the trustee's duty to ensure that the "substituted" property is of equivalent value.  *See* S.D. Code § 55-2-22.  Thus, the timing issue created by the Wellin Children's arguments should be resolved by following *Manatt* and applying the same logic.

**II.** **The Court should find as a matter of law that the assets involved in Keith Wellin's substitution should be valued using the widely accepted standard of fair market value.**

The Estate also requests partial summary judgment ruling that, in determining equivalent value for purposes of Mr. Wellin's November 20, 2013 asset substitution, the applicable legal standard for determining the value of the asset tendered to the 2009 Trust by Mr. Wellin (the Promissory Note) and the value of the assets received by Mr. Wellin from the 2009 Trust (assignee interests in the LP) is fair market value as set forth in Treasury Regulations § 25.2512-1 and § 20.2031-1(b).

South Dakota law requires a trustee to ensure that, where a settlor exercises his power of substitution, the substituted property is of an equivalent value.  S.D. Code § 55-2-22.  However, the South Dakota Trust Code does not define "equivalent value" for purposes of this section and, as of the date of this filing, no South Dakota court has identified a definition of "equivalent value" with respect to this section.  Moreover, no South Dakota law or court has ruled on what standard of value to apply to any asset involved in a substitution, for the purpose of ensuring equivalent value is provided in the context of a substitution.

**A. <u>The accepted standard of fair market value – the price at which the assets would change hands between a hypothetical willing buyer and a hypothetical willing seller, both having knowledge of material facts and neither being under any compulsion to buy or sell – is appropriate for valuing assets in a substitution.</u>**

The purpose of the equivalent value requirement is to ensure that an asset substitution, included in a trust for purposes of causing the trust to be classified as a grantor trust, does not result in the inclusion of trust assets in the estate of the settlor or grantor for estate tax purposes. *See* Rev. Ruling 2008-22, attached as <u>Exhibit 67</u>; <u>Ex. 51</u>, Zeydel Dep. Tr. 210:23–211:16; <u>Ex. 53</u>, Mezzullo Dep. Tr. 78:4–79:11. Logically, equivalent value should be evaluated in light of the well-settled valuation principles applicable for transfer tax purposes.

It is well settled that, for purposes of gift and estate taxes, value is defined as "fair market value", being "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *See* Treas. Reg. § 20.2031-1(b) and § 25.2512-1. The regulations specifically apply the fair market value standard to valuations of interests in a business, including interests in a partnership. Treas. Reg. § 20.2031-3; §25.2512-3(a). In evaluating fair market value, "[a]ll relevant facts and elements of value as of the time of the gift shall be considered." Treas. Reg. § 25.2512-3(a). "When determining the fair market value under this test, a fact finder must look to 'the existing facts, circumstances, and factors at the valuation date that influence a <u>hypothetical</u> willing buyer and willing seller in determining a selling price." *Estate of Godley v. Comm'r*, 286 F.3d 210, 214 (4th Cir. 2002) (citing *Estate of Newhouse v. Comm'r*, 94 T.C. 193, 231 (1990)) (emphasis added); *see also Estate of Bright v. United States*, 658 F.2d 999, 1006–07 (5th Cir. 1981); *U.S. v Simmons*, 346 F.2d 213, 217 (5th Cir. 1965); Rev. Rul. 59-60, 1959 -1 C.B. at 237, attached as <u>Exhibit 70</u>.

In determining the fair market value of an interest in a partnership, the inquiry does not end once the fair market value of the partnership as a whole is determined. It is generally accepted that discounts are applicable to certain attributes of the particular interest being valued.[12]

In determining fair market value, there is no "family attribution" – the interests held by related parties, even the same person in multiple capacities, are not aggregated for purposes of determining fair market value. In *Estate of Bright*, the Court considered the issue of valuation of the 55% of the outstanding stock in several closely held corporations she and her husband owned as community property at her death. *Estate of Bright*, 658 F.2d at 1000. Her interest in the stock was devised pursuant to her Will to a trust for the benefit of her children, with her husband as Trustee. *Id.* The district court determined that as a matter of law, no element of control could be attributed to Mrs. Bright in determining the fair market value of her stock for estate tax purposes. *Id.* On appeal, the IRS argued that the relationship between the Decedent, the executor or the legatee (in this case, Mr. Bright, as executor and then as Trustee of the testamentary trust) and another stockholder (in this case, Mr. Bright individually) was a relevant factor in determining the value of the stock held by Mrs. Bright's estate.[13] *Id.* at 1001–02. Specifically, the IRS asserted

---

[12] In determining the fair market value of an interest in a partnership, a "lack of control" or "minority" discount may be allowed to reflect "a limited partner's lack of rights generally associated with managing or controlling a partnership*." See Temple v. U.S.*, 423 F. Supp. 2d 605, 619 (E.D. Tex. 2006) (citing *Estate of Godley*, 286 F.3d at 214). Additionally, a "marketability" discount may apply to interests in an entity, such as a partnership, that is not readily traded on an established market, to account for the diminution in value resulting from the lack of a ready market for such interests. *See Estate of Ford v. Comm'r*, T.C. Memo, 1993-580, *aff'd* 53 F.3d 924 (8th Cir. 1995) (citing *Estate of Andrews v. Comm'r.*, 79 T.C. 938, 953 (1982)), attached as <u>Exhibit 71</u>. A transfer of a minority interest in a closely held entity is often entitled to both a minority discount and a marketability discount. *See Estate of Ford v. Comm'r*, 53 F.3d 924 (8th Cir. 1995); *Estate of Berg v. Comm'r*, 976 F.2d 1163 (8th Cir. 1992); *Estate of Miller v. Comm'r*, T.C. Memo 2009-119 (valuation discount applied to decedent's interest in family limited partnership funded with marketable securities), attached as <u>Exhibit 72</u>.

[13] The court separate addressed an argument on whether it was a 27.5% block of stock or 50% of a 55% block of stock, and found it was the former. *Estate of Bright*, 658 F.2d at 1000–02.

that the fact that "Mr. Bright held the estate's 27% block after [Mrs. Bright's] death as executor and subsequently as trustee of the testamentary trust for their children, while he simultaneously held another 27% block in his individual capacity, thus continuing the control block after death" would have formed part of the basis of expert testimony but for the district court's pre-trial ruling. *Id.* at 1002.

The Court found that "the case law reflects long established precedent that family attribution should not apply to lump a decedent's stock with that of related parties for estate tax valuation purposes." *Id.* at 1005. As the Court rightfully noted, "[i]t would be strange indeed if the estate tax value of a block of stock would vary depending upon the legatee to whom it was devised." *Id.* at 1006. The Court ultimately held that "family attribution cannot be applied to lump the estate's stock to that of any related party, but rather that the stock is deemed to be held by a hypothetical seller who is related to no one." *Id.* at 1007. The Internal Revenue Service later acquiesced to this valuation principle in Rev. Rul. 93-12, 1993-1 C.B. 202, attached as Exhibit 73.

These guiding principles were precisely the foundation upon which the Estate's expert, Mr. Crow, and Mr. McDevitt's expert, Mr. Paschall, offered their opinions of the LP Units' value on November 20, 2013. *See* Ex. 60, Crow Report; Ex. 62, Paschall Report.

In direct opposition to *Estate of Bright*, the Wellin Children's expert, Mukesh Bajaj ("Bajaj") now appears to argue that, to determine the value of the LP Units received by Mr. Wellin in the substitution, the fact that the Wellin Children controlled the LP (through Ms. Plum's role as Manager of the LLC) renders the discounts typically found in a minority interest inapplicable and that the LP Units should be valued taking into account the Wellin Children's control through Plum's status as Manager of the LLC. Ex. 63, Bajaj Dep. Tr. 257:20-24. Bajaj cites no authority for this determination, and when asked for any cases, precedents or guidance disallowing the use of the

estate and gift tax definition of fair market value, stated "I don't know what authority or guidance, because this is not a situation that is worthy of an academic study in publication, so I won't expect there to be any." Ex. 63, Bajaj Dep. Tr. 249:3-10; *see also id.* at 250:11-16.  The Wellin Children's trust expert, Mr. Mezzullo, also testified that he was not aware of any law which required the use of some standard other than the fair market value for assessing equivalent value in an asset substitution.  Ex. 53, Mezzullo Dep. Tr. 141:17-21, 157:1-10.

Bajaj's view of the applicable standard of valuation ignores the well-settled law that the hypothetical willing buyer–willing seller standard is applicable to all estate and gift tax valuations and that the subjective intentions of the parties are irrelevant.  *See Bright,* 658 F.2d at 1007.  The Wellin Children's expert seems to hang his hat on the notion that the substitution is not an "estate or gift tax transaction", allowing him to value the LP Units disregarding the "hypothetical" willing seller and taking into consideration the Wellin Children's control of the LP, but cites no authority for that belief. [14]  Ex. 63, Bajaj Dep. Tr. 54:17-24, 90:4-19.

Additionally, the position of the Wellin Children and Bajaj creates the absurd result that the exercise of the substitution provision, if its exercise requires a valuation of the substituted assets without the use of the hypothetical willing buyer–willing seller standard, would result in a gift to the 2009 Trust by Mr. Wellin – a gift which would then require the use of the hypothetical willing buyer–willing seller standard to value the gift.  This would result in the same asset (the LP Units received by Mr. Wellin) to be valued with two different standards, resulting in two different values, all in the same transaction.  Bajaj even acknowledges that this absurd result would likely

---

[14]  Both the Estate's valuation expert, Mr. Crow, and McDevitt's valuation expert, Mr. Paschal, agree that fair market value as set forth in the Treasury Regulations §20.2031-1(b) and §25.2512-1 is the applicable standard – they simply disagree as to the amount of the various discounts.  As the calculation of fair market value is a matter of fact, this difference will be resolved by the trier of fact.  *See generally* Ex. 59, Crow Report; Ex. 61, Paschall Report.

occur. Ex. 63, Bajaj Dep. Tr. 87:5-20, 275:5–277:16. By definition, if the transaction would result in a gift by Mr. Wellin, it should be considered an "estate or gift tax transaction" to which the hypothetical willing buyer-willing seller standard must be applied.

In this case, Mr. Wellin exchanged the Promissory Note for an interest in the LP having a fair market value equal to then outstanding balance of principal and accrued interest due under the Promissory Note of $50,211,446.55. Both the Wellin Children's valuation expert and Mr. McDevitt's valuation expert concede that interests in the LP were not publicly traded on any market or exchange. *See* Ex. 63, Bajaj Dep. Tr. 113:22-25; Ex. 61, Paschal Dep. Tr. 156–157:22-14. The LP was controlled by Cynthia Plum, through her role as Manager of the LLC, which served as the LP's general partner. Ex. 61, Paschal Dep. Tr. 32–33:9-2; Ex. 63, Bajaj Dep. Tr. 107:13-22, 103–104:22-1. A holder of LP Units would have limited to no control over the management of the LP. Partnership Agreement § 7.1, available at ECF No. 879-3. Both the Wellin Children's valuation expert and Mr. McDevitt's valuation expert appear to accept these facts relating to the control of the partnership and these general valuation principles.

If Mr. Wellin were to exchange the Promissory Note for LP Units that were valued, as proposed by the Wellin Children's expert, taking into account the control over the LP enjoyed by the Wellin Children in separate capacities, Mr. Wellin would be exchanging the Promissory Note under which he was owed $50,211,446.55 for 321,297.9873 LP Units which have a value of $50,211,446.55 on an undiscounted basis. However, unlike the Wellin Children, Mr. Wellin was not, in any capacity, general partner of the LP. He had no control over the management of the LP, including its distribution decisions. Ex. 5, Plum Dep. Tr. 114:13-20, 204:16–205:2 (agreeing that Plum, as Manager, held the sole and exclusive power to control when the LP made a distribution). Mr. Wellin would have no ready market to sell his LP Units. Even if one accepted the Wellin

Children's expert proposition that the appropriate standard was willing buyer-willing seller (without the addition of "hypothetical"), and one took into account any rights or powers personally to Mr. Wellin, the LP Units would have a value to Mr. Wellin of something less than the value to the Wellin Children, taking into account their control of the LP through Plum's position as Manager of the LLC. The LP Units in Mr. Wellin's hands would be subject to both a lack of control discount and a marketability discount. Even if one assumed that the discount was something less than that determined by the Estate's expert, the value of the Promissory Note surrendered by Mr. Wellin would not be equivalent to the discounted value of the LP Units received by Mr. Wellin. By definition, this cannot be equivalent value. This result is avoided by determining fair market value based on the value to a hypothetical willing seller or willing buyer, which would appropriately take into account the lack of control over the LP of any holder of LP Units, as well as the lack of marketability.

**B.     The course of conduct between Mr. Wellin and the Wellin Children demonstrates an agreement and intent to use the hypothetical willing buyer–willing seller standard of fair market value.**

The historical course of conduct of the parties in this matter is even further evidence that fair market value is the applicable legal standard for determining the value of the LP Units. Every prior transfer of the LP Units, from the inception of the 2009 Transaction to the last interest payment made in 2012, has utilized the fair market value standard as set forth in the Treasury Regulations §20.2031-1(b) and §25.2512-1.

When the LP Units were sold to the 2009 Trust in November 2009 by Mr. Wellin's Revocable Trust, the value of the LP Units for purposes of that sale were determined by the MPI Appraisal which utilized the fair market value standard based on a hypothetical willing buyer–willing seller. This is what allowed the Wellin Children, in their capacity as Trustees of the 2009

Trust, to acquire LP Units with an undiscounted value of $91,145,548.00 in exchange for a Promissory Note with a face value of only $49,802.115.00. *See* Ex. 6, MPI Appraisal. No expert has challenged the propriety of using this valuation standard in 2009.

In 2010, the Wellin Children, in their capacity as Trustees of the 2009 Trust, transferred to Mr. Wellin's Revocable Trust LP Units in payment of the interest due on the Promissory Note. Ex. 13, 2010 Interest Payment. The LP Units were valued by the Wellin Children by applying the discounts determined in the MPI Appraisal to the value of the LP's assets at the time of the transfer. *Id.* Again, in 2011 and 2012, the Wellin Children, in their capacity as Trustees of the 2009 Trust, transferred to Mr. Wellin's Revocable Trust LP Units in payment of the interest due on the Promissory Note and again they applied the MPI Appraisal discounts to the value of the LP's assets at the time of the payments. Ex. 14, 2011 Interest Payment; Ex. 15, 2012 Interest Payment.

Concurrently with the sale of the LP Units to the 2009 Trust by Mr. Wellin's Revocable Trust, the Wellin Children, in their capacity as Trustees of the 2009 Trust, executed a Pledge Agreement granting Mr. Wellin's Revocable Trust a security interest in the LP Units. Ex. 8, Pledge Agreement; *see also* Ex. 11, Modified Pledge Agreement. One provision of that Pledge Agreement was that, upon Mr. Wellin's death, LP Units "with a value equal to the sum of the then outstanding principal of and any accrued and unpaid interest on the Promissory Note shall be automatically transferred to [Mr. Wellin's Revocable Trust] in payment of the Promissory Note . . . ." Exs. 8 and 11 at § 4.06. The Pledge Agreement expressly provided that "[a]ny property other than cash transferred to and retained by the Payee pursuant to this Section 4.06, in payment of any amount of principal of or interest on the Promissory Note, shall be valued as of the date of such transfer in accordance with the principles set forth in Treasury Regulations §§ 25.2512-1 to 25.2512-8 (26 C.F.R. §§ 25.2512-1 to 25.2512-8)". *Id.* The principles of the regulations in §§ 25.2512-1 to

25.2512-8 require that assets are to be valued based on the fair market value standard utilizing the hypothetical willing buyer-willing seller. *See* Treas. Reg. §§ 25.2512-1 to 25.2512-8 (26 C.F.R. §§ 25.2512-1 to 25.2512-8).

In sum, each and every transaction between Mr. Wellin's Revocable Trust and the 2009 Trust, regardless of which party was the transferor and which party was the transferee, utilized the fair market value standard based on a hypothetical willing buyer-willing seller. Mr. Wellin's substitution proposed to do the same. Ex. 22, Substitution, *2009 Trust*; Ex. 18, Bennett Dep. Tr. 622:20–623:10. Only now, when the transfer is against the wishes of the Wellin Children, despite their voluntary execution of the 2009 Trust agreement (which expressly granted Mr. Wellin the right to substitute without "the consent of or approval by the Trustees"), do they argue that fair market value should be determined without regarding to the hypothetical willing buyer willing seller standard. The argument of the Wellin Children's expert that "economic logic" dictates that the Wellin Children as Trustees should be unwilling to accept any discount to the value of the LP Units rings hollow in light of this established course of conduct for valuing the LP Units – a course of conduct that consistently included discounts to the LP Units of almost 45%. Ex. 65, Bajaj Dep. Tr. 150:14–151:9.

## CONCLUSION

The Court should therefore award partial summary judgment finding that Keith Wellin's November 20, 2013 asset substitution was effective and finding that the limited partner units substituted must be valued using the fair market value standard of the hypothetical willing buyer– hypothetical willing seller, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Respectfully submitted,

HOOD LAW FIRM, LLC
172 Meeting Street/Post Office Box 1508
Charleston, SC  29402
Phone: (843) 577-4435/Facsimile: (843) 722-1630
Email: Info@hoodlaw.com


**s/ James B. Hood**
_____
Robert H. Hood (1939)
Molly H. Craig (6671)
James B. Hood (9130)
Virginia Rogers Floyd (12212)

*Attorneys for Wendy C. H. Wellin, as Special Administrator of the Estate of Keith S. Wellin and as Trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2001*

**April 16, 2019**
Charleston, South Carolina