THE ESTATE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO PETER WELLIN'S ROLE AS A FIDUCIARY AND AGENT
OF KEITH WELLIN IN NOVEMBER 2009 AND JANUARY 2013

# EXHIBIT 36

Freeman Expert Report

**Expert Witness Report**

**of**

**<u>John P. Freeman</u>**

**Pursuant to**

**Rule 26(a)(2)(B)**
**of the Federal Rules of**
**Civil Procedure**

**<u>May 30, 2018</u>**

## RULE 26(a)(2)(B) DISCLOSURE  OF JOHN P. FREEMAN

This report is submitted pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

## **INTRODUCTION**

I have been retained as an expert witness on behalf of Keith S. Wellin, now deceased and represented by Wendy C. H. Wellin, as Special Administrator of his Estate and as Trustee of the Keith S. Wellin Florida Revocable Living Trust.  My research in this matter is of the type that is standard for experts in the field.  The opinions I have drawn from the facts available to me are based on my knowledge, background, training and experience as an expert in fiduciary obligations and conflicts of interest.  In expressing my opinions, I rely on and apply the standards governing persons occupying positions of trust and confidence.  I hold the foregoing opinions to a reasonable degree of professional certainty.  I respectfully reserve the right to amend or supplement my opinions as additional information becomes available, including information that may be derived from the depositions of Attorneys Bryson Geer and John Hagerty, and the reopened deposition of Jonathan Harris.

I may be called to testify as to the Defendants' conduct concerning their dealings with and related to certain financial transactions concerning Keith S. Wellin, now deceased ("Decedent"), in light of the facts and circumstances presented in this case.  In my testimony, I will express opinions based on my review of materials concerning the extent to which Defendants' actions and inactions met the standards of appropriate conduct, given that Decedent reposed trust and confidence in them.[1]  Set forth below are the disclosures I am able to make as of June 1, 2018, in accordance with Rule 26(a)(2)(B).

---

[1] For example, in the summer of 2011, Peter Wellin reported having asked Tom Farace "whether my father had lost trust in me.  He said no."  P. Wellin "Narrative", July 25, 2011, *Peter_Wellin_ESI_00002849*.  Around two years later, in an email to Tom Farace sent on June 5, 2013, Peter Wellin reported, "Dad . . . reaffirmed his trust in me with respect

Opinions held and the reasons therefor are presented below.  Opinions are not separately numbered.  Thus, some parts of the Overview Summary contain opinions and reasons supporting those opinions.

**SECTION I**          **QUALIFICATIONS OF THE WITNESS, INCLUDING A LIST OF ALL PUBLICATIONS AUTHORED BY THE WITNESS IN THE PREVIOUS TEN (10) YEARS:**

I have been retained to assist Decedent and his counsel as an expert witness in this case.  I have been retained many times to evaluate and assist in prosecuting claims involving alleged misconduct by those occupying positions of trust and confidence.  I also participated many times in cases involving alleged over-reaching in the investment field.

Following my graduation from the University of Notre Dame Law School in 1970, I worked at the Jones Day law firm (then known as Jones, Day, Cockley and Reavis).  At Jones Day, I worked on investment-related matters and litigation.  I left Jones Day in 1972 to take a Fellowship at the University of Pennsylvania Law School's Center for Study of Financial Institutions.  I subsequently received my L.L.M. from the University of Pennsylvania Law School, where I served as a Fellow at the Law School's Center for Study of Financial Institutions.  My work at Penn Law School involved study of investment-related matters and duties owed by those who participate in investment activities, including business managers and investment advisors.  In 1973, I joined the faculty of the University of South Carolina Law School ("USC").  I retired in 2008 and am a Distinguished Professor of Law Emeritus at USC.  Several of the courses I taught at USC dealt

---

to managing his financial affairs." P. Wellin Email to T. Farace, June 5, 2013, Peter_*Wellin_ESI_00001346*.  In another "Narrative", he explained that he "took the responsibility entrusted in [him] by [his] father seriously for management of his finances on behalf of "[Wendy] and the family."  P. Wellin "Narrative", Jan. 2012, *Peter_Wellin_ESI_00002651*.  Prior to July 2013, Decedent clearly reposed confidence in Defendant Peter Wellin and used him "as a sounding board for all his estate planning decisions."  P. Wellin "Narrative", Jan. 2012, *Peter_Wellin_ESI_00002635*.  Indeed, according to Peter Wellin, "dad had always used me as a sounding board for all his estate planning decisions."  P. Wellin "Narrative", July 31, 2011, *Peter_Wellin_ESI_00002852* (emphasis original).

with investment-related activities and the standards of conduct applicable to those who participate in such activities, including managing partners, LLC managers, agents, and trustees. Such courses included, Agency, Partnership, Legal Accounting, Business Associations (including LLCs), Securities Regulation, Corporate Finance, and White-Collar Crime.

Besides teaching law at USC for 35 years, I was a Visiting Professor in residence at the University of Texas Law School and Loyola Law School in Chicago. I also worked for the Securities and Exchange Commission as special counsel. My work with the SEC dealt with a special project applicable to money managers. As a law school professor, I taught about the duties owed by those involved in agency, partnership, and LLC relationships, including the responsibilities owed by holders of Powers of Attorney. Over the years, I taught investment-related topics at numerous CLE programs. I have also taught investment-related principles to members of the judiciary. When the South Carolina Code's corporate law provisions were revised, I served as the Reporter for the sections dealing with the rights of shareholders and the conduct of officers and directors. I lectured about the duties owed in the investment setting by those in whom trust and confidence has been reposed before specialized investment industry groups, such as the National Associations of State Securities Administrators and the Public Investors Arbitration Bar Association. I served as an arbitrator in various investment-related disputes and participated in numerous investment-related arbitrations as a lawyer or expert witness.

Much of my professional life has been devoted to teaching and legal scholarship. Much of my writing from 1968 onward involved analyzing the duties owed by those in trust and confidence relationships, including investment managers and their service providers. I testified about such matters before the United States Senate and South Carolina's General Assembly, and I assisted the State Securities Commissioner and the Attorney General in handling various investment-related investigations and prosecutions.

I have been admitted to practice as a lawyer for 47 years.  I am a member of the Bars of the States of South Carolina and Ohio.  I have been admitted to practice in various federal courts, including the United States Supreme Court, the United States Courts of Appeals for the Fourth, Fifth and Eleventh Circuits, and the United States District Courts for the Northern District of Ohio, the District of South Carolina, and the District of Colorado.  I also have substantial experience in evaluating cases involving trust and confidence relationships and investment activities as a practicing lawyer.  I tried and/or settled a wide variety of cases over the years involving trust and confidence relationships, governance issues, allegedly tax-advantaged investments, or allegedly improper investment advisory activities.  I also participated as a lawyer or expert witness in a variety of major investment-related cases, including the HomeGold Financial/Carolina Investors fraud, the Al Parish financial fraud, and cases involving alleged financial misconduct by MeadWestvaco/International Paper, SCANA, KPMG, Deutsche Bank, Horry County State Bank, Sidley Austin Brown & Wood, BB&T, Bankers Trust of New York, BNY Mellon, and Just for Feet, Inc.  For a complete list of the matters in which I have testified at trial or in deposition in the past four years, please see Exhibit B.

I am familiar with the obligations of persons placed in positions of trust, having participated in such cases as an arbitrator, lawyer, litigation consultant, or as an expert witness on various occasions.  I have lectured on the standards applicable to persons in trust and confidence relationships many times, and I have written about the topic. Specifically, these recognized standards (hereinafter, "applicable standards") include:

➢ The obligation to act with reasonable care, competence and diligence normally exercised by agents under the circumstances.

➢ The basic principle that when taking action within the scope of an agency relationship, an agent's duty is to act loyally for the principal's benefit.  This obligation requires that the

agent subordinate the agent's interests to those of the principal and place the principal's interests first as to matters connected with the agency relationship.    Conflicts with the agent's self-interest are to be resolved in the principal's favor.

➢ The obligation not to use the principal's property, including confidential information, for the agent's own purposes or those of a third party.

➢ The obligation not to compete with the principal and to refrain from assisting others to do so, including the duty not to act or agree to act for persons whose interests conflict with the principal.

➢ The obligation to deal fairly with persons making investment decisions and to provide full and fair disclosure of all material facts to persons participating in investment transactions.

➢ The obligation not to deal with the principal as or on behalf of an adverse party in a transaction connected with the agency relationship in the absence of consent given by the principal where the agent (1) acts in good faith, (2) makes disclosure of all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment, and (3) otherwise deals fairly with the principal.

➢ The obligation to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when the agent knows or has reason to know that the principal would wish to have the facts, or the facts are material to the agent's duties to the principal, and where the facts can be provided to the principal without violating a superior duty owed by the agent to another person.

I have frequently served as an expert witness in cases addressing questions involving agents and investment managers' obligations and the duty of full disclosure. I have testified before federal and state court or arbitration panels many times concerning the conduct of those occupying positions of trust. I have also testified before the South Carolina Office of Disciplinary Counsel's

hearing tribunal as an expert on investment matters.  My curriculum vitae is attached as Exhibit

A, which further establishes my qualifications.

**SECTION II**        <u>A COMPLETE STATEMENT OF ALL OPINIONS TO BE EXPRESSED AND THE BASIS AND REASONS FOR THEM:</u>

### OVERVIEW SUMMARY OF FACTUAL BACKGROUND

### DECEDENT REPOSES TRUST: THE 2003 TRANSACTIONS

On December 8, 2003, Friendship Management, LLC ("the LLC"), a Delaware Limited

Liability Company, was formed with the individual Defendants as members holding 20% each,

and with Defendant Cynthia Plum also serving as the LLC's sole manager.[2]  The remaining 40%

was held by the 2003 KSW Family Trust.[3]  Decedent was the settlor of the 2003 KSW Family

Trust, and his children and grandchildren were the beneficiaries.[4]

From the LLC formation onward, Defendants participated in the actual management,

operation, and control of the LLC.  On December 12, 2003, Friendship Partners, LP (the "LP"), a

Delaware Limited Partnership, was formed with Decedent, in his individual capacity, as Limited

Partner and the LLC as General Partner.[5]  Decedent owned 98.9% of the LP's equity, having made

a large capital contribution by transferring 896 shares of Class A Berkshire Hathaway shares

---

[2] For documents associated with the formation of Friendship Management, LLC, *see* Certificate of Formation, Friendship Management, LLC, Dec. 9, 2003, *FARACE 002010–FARACE 002011*; Operating Agreement, Friendship Management, LLC, Dec. 11, 2003, *FARACE 001143–FARACE 001163*; Voting Agreement, Friendship Management, LLC, Dec. 11, 2003, *FARACE 001131–FARACE 001134; and* Balance Sheet, Friendship Management, LLC, Dec. 31, 2003, *FARACE 002036*.

[3] *Id.;* Trust Agreement, 2003 KSW Family Trust, Dec. 5, 2003, *FARACE 000832–FARACE 000846*.

[4] *Id.*

[5] For documents associated with the formation of Friendship Partners, LP, see Certificate of Formation, Friendship Partners, LP, Dec. 9, 2003, *FARACE 002054–FARACE 002055*; Agreement of Limited Partnership, Friendship Partners, LP, Dec. 12, 2003, *FARACE 002057–FARACE 002080*; Annex A to Agreement of Limited Partnership, Friendship Partners, LP, 2003, *FARACE 001123*; and Balance Sheet, Friendship Partners, LP, Dec. 21, 2003, *FARACE 002084*.

("BRKa") to the LP with the remainder owned by the LLC-general partner.[6]  By doing this, Decedent gave control of the shares to the LP, subject to decision-making by the LLC (controlled by Defendant Cynthia Plum) as its general partner.

Decedent's BRKa holdings were the largest portion of his equity portfolio.  Decedent had the prescience to acquire more than 1,500 shares of BRKa in the 1960s and 70s, and he had the further good sense to hang on to it going forward.  As a result, the cost basis for the BRKa stock position was estimated at $120 per share by 2013.. [7]  Inevitably, because of dramatic appreciation in the BRKa share value, selling Decedent's BRKa position would have significant tax consequences. [8]

In December 2007, Decedent, in his individual capacity, assigned his 98.9% economic interest in the LP to the Keith S. Wellin Florida Revocable Living Trust u/a/d 12/11/01 ("Revocable Trust").[9]  Decedent created the Revocable Trust in late 2001 and amended it several times.[10]  In the operative version at the time of the 2007 assignment, Decedent's son Defendant

---

[6] *See* Annex A to Agreement of Limited Partnership, *FARACE 001123*.

[7] B. McLoughlin Dep. Tr. 27:19–30:12, Dec. 15, 2015.

[8] *Cf.* M. Simon Dep. Tr. 282:17–283:2, 300:14–301:6, Oct. 28. 2015.

[9] For the documents associated with this assignment, see Notice of Proposed Transfer of Limited Partnership Interest, Dec. 19, 2007, *FARACE 002106*; Response of General Partner Pursuant to Right of First Refusal, Dec. 21, 2007, *FARACE 002107–FARACE 002108*; Transfer of Interest, Dec. 26, 2007, *FARACE 002109*; Notice of Assignment of Limited Partnership Interest, Dec. 26, 2007, *FARACE 002110*; and Assignment & Assumption of Limited Partnership Interest, Dec. 26, 2007, *FARACE 002111–FARACE 002112*.

For Decedent's Revocable Trust u/a/d Dec. 11, 2001, see Trust Agreement, Keith S. Wellin Florida Revocable Living Trust, Dec. 11, 2001, *FARACE 009598–FARACE 009621*.  For Decedent's Sixth Amended Revocable Trust u/a/d Dec. 11, 2001, which was effective at the time of this assignment, see Sixth Amd. Trust Agreement, Keith S. Wellin Florida Revocable Living Trust, Oct. 22, 2007, *FARACE 000979–FARACE 001007*. Marjorie King was later removed from the nomination as the alternate successor Trustee in the event that Peter Wellin failed to qualify or serve. *See* Seventh Amd. Trust Agreement, Keith S. Wellin Florida Revocable Living Trust, Nov. 26, 2008, *FARACE 00949–FARACE 00977*.  The final version of Decedent's Revocable Trust, which nominates Decedent's wife to succeed him as Trustee, was executed on June 27, 2014.  *See* Revocable Trust Agreement, Keith S. Wellin Florida Revocable Living Trust, June 27, 2014, *K. Wellin Estate 0179–K. Wellin Estate 0215*.

[10] *Id.*

Peter Wellin was nominated to succeed Decedent as Trustee of the Revocable Trust.[11]  Defendants

Cynthia Plum and Marjorie King were nominated as the alternate co-successors to the office of

Trustee in the event Defendant Peter Wellin pre-deceased his father or otherwise failed to serve.[12]

From December 26, 2007, forward, the Revocable Trust held Decedent's financial interest

in the LP, including his right to receive income, earnings, fees, distributions, profits, and capital

accounts, with Decedent as the Trustee and sole lifetime beneficiary of his Revocable Trust.

Because the general partner did not admit a substitute limited partner,[13] Decedent remained a

limited partner in the LP after the assignment of his financial interest.

### DECEDENT REPOSES TRUST: THE POWERS OF ATTORNEY

A fiduciary relationship is founded upon trust or confidence reposed by one in the integrity

and loyalty of another.  In my opinion, Decedent's conceding control of his BRKa shares to his

children demonstrated the trust and confidence he reposed in the Defendants individually and

collectively.  Further, Decedent's granting of powers of attorney in favor of Defendants Peter

Wellin and Cynthia Plum also demonstrated the trust and confidence he reposed in them.[14]

Under applicable standards of behavior, by assuming these responsibilities and agency

powers, Defendants Peter Wellin and Cynthia Plum acknowledged their relationship of trust and

---

[11] Sixth Amd. Trust Agreement, Keith S. Wellin Florida Revocable Living Trust, Oct. 22, 2007, *FARACE 000979–FARACE 001007.*

[12] *Id.*

[13] *See* Footnote 9, above.

[14] Fl. General Power of Attorney, Dec. 11, 2001, *FARACE 011864–FARACE 011869*; N.Y. Durable General Power of Attorney, Dec. 11, 2001, *FARACE 014841–FARACE 014843*; Me. Durable Fin. Power of Attorney, Dec. 11, 2001, *FARACE 015382–FARACE 015389.*  Defendant Peter Wellin was granted powers of attorney in the five states in which Decedent lived or did business, and Defendant Cynthia Plum was named as Decedent's successor attorney-in-fact under those powers of attorney initially in 2001 and as restated or issued in 2006.  *See* Fl. General Power of Attorney, May 23, 2006, *FARACE 000487–FARACE 000492*; N.Y. Durable General Power of Attorney, May 23, 2006, *FARACE 000497–FARACE 000500*; Ga. Financial Power of Attorney, Sept. 20, 2006, *FARACE 000509–FARACE 000515*; S.C. General Durable Power of Attorney, Sept. 20, 2006, *FARACE 000528–FARACE 000534*; and Me. General Durable Power of Attorney, Sept. 20, 2006, *FARACE 000554–FARACE 000560.*

confidence toward Decedent and agreed to deal with Decedent and his property unselfishly and in his best interest.  Moreover, there is other evidence that Decedent reposed confidence and that Peter Wellin and Cynthia Plum accepted the trusting relationship.  For example, Peter Wellin admitted at his deposition, "My father trusted me and I think he knew I would be even-handed in any situation."[15]

Defendant Peter Wellin's own writings, drafted in 2011 and 2012, referred in various ways to him having a relationship of trust and confidence with his father.[16]  For example, at one point Peter Wellin wrote that Decedent reposed "confidence in me with respect to his financial matters".[17]  Similarly, Peter Wellin affirmed he "took the responsibility entrusted in me by my father seriously for management of his finances".[18]  Peter Wellin also admitted he discussed with Tom Farace, Decedent's former estate planning attorney, a potential loss of Decedent's trust in him[19] but remained involved with Decedent's estate planning and financial matters.[20] Defendant Cynthia Plum acknowledged her relationship of trust and confidence with Decedent at her

---

[15] P. Wellin Dep. Tr. 179:3-5, Aug. 30, 2017.  *See also id.* at 208:14-18 ("My motivation was to protect his interest and his estate plan. . . . I was his trusted advisor."); *Id.* at 420:17-20, Aug. 31, 2017 ("I can't impress upon you how close we were and how well we knew each other.  And he trusted me to do whatever I felt was the right thing.").

[16] *See* P. Wellin "Narrative", Jan. 2012, *Peter_Wellin_ESI_00002648–Peter_Wellin_ESI_00002670.*

[17] *Id.*, P. Wellin "Narrative" at *Peter_Wellin_ESI_00002658.*

[18] *Id.*, P. Wellin "Narrative" at *Peter_Wellin_ESI_00002651.*

[19] *Id.*, P. Wellin "Narrative" at *Peter_Wellin_ESI_00002657* ("I asked [Tom Farace] whether my father had lost trust in me. Tom said no, that Dad did want me to remain involved in his planning.").

[20] *E.g.*, *id.*, P. Wellin "Narrative" at *Peter_Wellin_ESI_00002657* ("I asked [Tom Farace] if it was reasonable for me, as my father's POA and successor trustee under his trust, to have an opportunity to discuss issues alone with Dad on a regular basis. He said no, it was not unreasonable."); *see also id.*, P. Wellin "Narrative" at *Peter_Wellin_ESI_00002648* ("Following [Decedent's] marriage to Wendy Lane (his fourth wife), . . . he and I maintained a close bond, talked frequently . . . . I remained very involved in his financial matters and more specifically, his estate planning."); *id.*, P. Wellin "Narrative" at *Peter_Wellin_ESI_00002656* ("Tom's delay in contacting me was a concern, as it was in stark contrast to the way he had involved me fully in the past in my father's financial planning."); and *id.*, P. Wellin "Narrative" at *Peter_Wellin_ESI_00002660* ("It's reassuring to know Dad has not changed his long-standing directive that I be included in all matters of his financial planning.").

deposition: when asked, "Did you believe that your father had absolute trust and confidence in you?" she testified, "Yes, I did."[21]

According to Decedent's affidavit, he "relied upon Peter Wellin and Cynthia Plum's education, knowledge, personal integrity and relationship as my children and placed special trust and confidence in them regarding the care, welfare and administration of my property and assets."[22]  Decedent further testified via affidavit he "reposed special confidence in my children, Peter Wellin and Cynthia Plum, to act in good faith with respect to my interests," and he "trusted and relied upon my children to act in my best interests with respect to their financial and estate planning advice" and "relied upon [them] to act as my fiduciaries."[23]

Decedent testified to the same effect during his deposition.  For example, he testified he permitted his children to communicate with Mr. Farace because he had faith in and trusted them.[24] From my perspective, Mr. Farace placed great reliance on Defendant Peter Wellin when it came to handling estate planning tasks for Decedent.  In Mr. Farace's words:  "I think to summarize, [Decedent] would basically say I'm a big picture guy, kind of want to know the plan, but I want you to discuss the details and work out logistics with my son, Peter."[25]

---

[21] C. Plum Dep. Tr. 61:7–9, Aug. 25, 2016.

[22] K. Wellin Aff. ¶ 3, Sept. 13, 2013, C/A No. 2:13-cv-01831-DCN, ECF No. 46-2.

[23] *Id.*

[24] K. Wellin Dep. Tr. 6:9-21, Feb. 7, 2014.

[25] T. Farace Dep. Tr. 26:2-5, March 3, 2015.  *See also id.* 56:22-57:5 (Farace's instructions were that Decedent "wanted to know the big picture but to deal with details with Peter and communicate with the children anything they need to know about the transaction.").

**DECEDENT REPOSES TRUST:  THE 2009 "INTENTIONALLY DEFECTIVE GRANTOR TRUST" TRANSACTION**

In 2009, Decedent established the Wellin Family Irrevocable Trust u/a/d November 2, 2009 ("2009 Trust"), an intentionally defective grantor trust, with the individual Defendants and the South Dakota Trust Company controlling this entity as co-trustees.[26]  The individual Defendants also controlled the 2009 Trust as Investment Committee Members and Distribution Committee Members.[27]  Using their authority as Trustees of the 2009 Trust, the individual Defendants caused the 2009 Trust to purchase Decedent's 98.9% limited partnership interest in the LP in exchange for a Promissory Note (the "2009 Transaction").[28]  This plan was created with the assistance of the individual Defendants, led by Defendant Peter Wellin, who interfaced with Mr. Farace.[29]

---

[26] Trust Agreement, Wellin Family 2009 Irrevocable Trust, Nov. 2, 2009, *FARACE 001183–FARACE 001244.*

[27] *See* Trust Agreement § VII, Wellin Family 2009 Irrevocable Trust, *FARACE 001196–FARACE 001203.*

[28] For purchase and sale documents associated with the 2009 Transaction, see Direction Letter, Nov. 23, 2009,*FARACE 001258–FARACE 001259*; Initial Promissory Note, Nov. 30, 2009, *FARACE 001300–FARACE 001309*; Final Promissory Note, Nov. 30, 2009, *FARACE 001311–FARACE 001320*; Pledge Agreement, Nov. 30, 2009, *FARACE 001324–FARACE 001334*; Guarantee Agreement, Nov. 30, 2009, *FARACE 001336–FARACE 001351*; Acknowledgements of Receipt of Nominal Consideration, *FARACE 001353–FARACE 001355*; and Management Planning, Inc., *Fin. Analysis and Evaluation of Limited Partnership Interests in Friendship Partners, LP,* Nov. 30. 2009, *FARACE 001382–FARACE 001459.*

    For documents associated with the assignment of partnership interest associated with the 2009 Transaction, see Notice of Proposed Transfer of Limited Partnership Interest, Nov. 25, 2009, *FARACE 001360*; Response of General Partner Pursuant to Right of First Refusal, Nov. 27, 2009, *FARACE 001362–FARACE 001364*; Transfer of Interest, Nov. 30, 2009, *FARACE 001366–FARACE 001370*; Notice of Assignment of Limited Partnership Interest, Nov. 30, 2009, *FARACE 001372*; and Assignment & Assumption of Limited Partnership Interest, Nov. 30, 2009, *FARACE 001374–FARACE 001380.*

[29] For evidence of Defendants' involvement in Decedent's estate planning specifically with respect to the 2009 Transaction, see Nixon Peabody Billing Records, Aug.– Dec. 2009, *NPW20017680–NPW20017685*; P. Wellin Email to T. Farace, Aug. 14, 2009, *NPW20003139–NPW20003141* ("Dad appears favorable to the idea we discussed"); P. Wellin Email to T. Farace, Sept. 24, 2009, *NPW20003149* ("I want to confirm you received my vm.  Again, my father is interested in proceeding."); P. Wellin Email to C. Plum, Sept. 22, 2009, *Cynthia_Plum_ESI_00000117* ("Finally was able to bring up Tom Farace's idea with dad again.  He wants to do it."); P. Wellin Email to T. Farace, Oct. 7, 2009, *NPW20003160* (asking if Mr. Farace was "working on the sale"); T. Farace email to P. Wellin, Oct. 21, 2009, *NPW20003368* (transmitting first draft of dynasty grantor trust); *see also generally* Estate's Mem. in Opp. to the Wellin Children's Mot. for Partial Summ. J. at 13-14, Sept. 22, 2017, C/A No. 2:13-cv-01831-DCN, ECF No. 640, (outlining numerous contacts with Wellin children and Decedent regarding the 2009 Transaction based on Nixon Peabody billing records).

When evaluating the conduct of the Wellin children, it is important to understand not only the nature of the 2009 Transaction but also its ramifications.

The chosen estate planning protocol offered multiple potential benefits to Decedent. Decedent's sale of LP units offered the opportunity to cut the size of his estate substantially, with no gain recognized by the 2009 Trust despite the bargain purchase price.  Going forward, the transfer held the potential for freezing most of the growth in Decedent's estate and passing future gains in the BRKa shares to Decedent's heirs free from gift, estate, or generation-skipping tax. The plan featured two implicit assumptions: (1) the various gifts and asset transfers would not leave Decedent cash poor, and (2) the LP's highly appreciated holdings would not liquidate during Decedent's lifetime.  Under the plan, the value of Decedent's financial interest in the large sum of BRKa stock, which the LP held, and which was transferred into the 2009 Trust, was subject to being adversely affected in multiple ways that, based on my review of the record, were never made clear to Decedent in accordance with applicable standards of care for fiduciaries.

First, Decedent, acting through his Revocable Trust, lost his beneficial ownership interest in the BRKa shares held by the LP in exchange for a note.  Under the terms of the 2009 Transaction, the nature of his interest in the LP transformed from equity into debt.  This entailed the sale of one security (the limited partnership equity interest held by Decedent's Revocable Trust) and the issuance of another security in return (a promissory note).  The value of Decedent's investment holding went from one that varied with the price of BRKa shares to a fixed sum: the note's

---

In contrast with the picture portrayed by documents in the record, at Peter Wellin's deposition, he suggested that the strategy had been mapped out by Farace and his father.  P. Wellin Dep. Tr. 197:23-25, Aug. 31, 2017 ("The strategy was developed entirely by Farace and other attorneys at Nixon Peabody through the consultation with my father.").

principal amount plus interest earned.  Though the BRKa stock was subject to market fluctuation, its historical return had been remarkable—annual appreciation was around 20 percent per year.[30]

Because of this "freeze" in value, the individual Defendants would enjoy future gains in BRKa stock as beneficiaries of the 2009 Trust, while Decedent would not.  However, taxable gains from any sales of the appreciated BRKa shares continued to rest entirely on Decedent's shoulders due to the 2009 Trust's status as a "grantor trust".  In short, the 2009 Transaction presented Decedent with the potential for both an estate tax benefit at a cost of taking on added personal risk.  As a potential benefit, the transaction promised *estate* tax savings due to the valuation discount, the asset freeze, and low interest charges.  However, Decedent's heightened risk involved giving up valuable property (his economic interest in the limited partnership, which allowed him to share in future gains in the BRKa stock) in return for personally shouldering the full brunt of a potentially debilitating tax bill in the event Defendant Cynthia Plum caused the BRKa stock to be sold during Decedent's lifetime.  Thus, Decedent faced a potentially open-ended tax liability with no ability to control the Trustees, or acting alone, to turn off grantor-trust status.

By substituting debt for equity, the value of Decedent's interest in the assets would no longer rise with the value of the BRKa stock held by the LP.  Yet, if the BRKa continued to appreciate, his potential tax obligation would someday exceed the value of the note issued to him.  The transaction caused Decedent to lose the equity upside that operated as a hedge to protect the

---

[30] "Over the past 50 years, the compound annual gain in Berkshire's book value per share was 19%.  The gain on its stock came in slightly above this, with a compound annual return of 20.8%.  The latter translates into a total gain of just under two million percent."  John Maxfield, "You can learn a lot about Berkshire Hathaway by examining the trend in its annual performance since 1965," The Motley Fool, July, 23, 2017, a*vailable at https://www.fool.com/investing/2017/07/23/an-interesting-chart-about-berkshire-hathaway.aspx,*  last  visited November 26, 2017.

tax payment obligation looming if anyone sold the BRKa stock during Decedent's lifetime. This reality was significant[31] but was never explained to Decedent.[32]

Second, the promissory note used to compensate Decedent for relinquishing his 98.9% interest in the LP was paper with a discounted value. Specifically, in exchange for a note with a face value of roughly $50 million, Decedent sold his economic interest in the LP, which represented stock having an underlying value of $90 million, to the 2009 Trust.[33] This resulted in

---

[31] Over the past 50 years, the compound annual gain on BRKa stock has exceeded 20 percent. *See https://www.fool.com/investing/2017/07/23/an-interesting-chart-about-berkshire-hathaway.aspx* If BRKa had continued to appreciate at it historic growth rate of around 20 percent per year over the nine-year period of the original promissory note, the value of the stock held by the limited partnership would have approximately $467 million at the time the note came due with an imbedded tax liability of $150 million, nearly three times the value of the note plus interest available to pay the obligation.

[32] *See, e.g.*, C. Plum Dep. Tr. 190:17-23, Aug. 25, 2016:

> Q:     Was there an understanding between you and your father that you would not sell the Berkshire shares unless the proceeds of the sale were distributed to him to use to pay off the tax bill?
>
> A:     No, there was no understanding. We never discussed selling the -- Dad and I and Mari and Peter never discussed selling the Berkshire stock.

*See also* C. Plum Dep. Tr. at 193:18-24:

> Q:     As of 2003 and beyond, you were aware that  if you made the decision to sell the stock, that  your father would have to pay the capital gains associated with that sale?
>
> A:     I was aware, but, again, we never  discussed selling the stock, so I'm not -- I didn't -- I didn't think about it.

Testifying on behalf of Friendship Management, LLC, 30(b)(6) deposition, Peter Wellin admitted that prior to July 2, 2013, Friendship Management never discussed selling the assets held in the limited partnership. Friendship Management, LLC, Dep. Tr. 85:20-25, Feb. 8, 2018. Peter Wellin later stated that he had conversations with Mr. Farace about the "potential sale of stock, how that would be handled during settlement of an estate." *Id.* at 87:13-24. By definition any such sale would post-date Decedent's death. Also, during the LLC's 30(b)(6) deposition, Peter Wellin stated he recalled "talking to Tom Farace, about what unwinding the 2009 transaction during our father's lifetime would entail, and whether or not it was a good thing to do." *Id.* at 230:23, 231:1, Feb. 9, 2018. If this colloquy occurred, there is no sign in the record that either Mr. Farace or Peter Wellin ever shared the substance covered with Decedent. Peter Wellin also testified that his sister, Cynthia Plum, was "possibly a part of some sort of conversation with respect to the liquidation of the partnership during our father's lifetime, if that was at all a worthwhile scenario." *Id.* at 230:15-18.

[33] The Note was used by the Wellin Family 2009 Irrevocable Trust to purchase a 98.9% limited partnership interest in Friendship Partners LP. The partnership interest was worth around $90.0 million; the purchase price based on the note's face value was $49,803,115. *See* Gumb Aff., at 6, n.3, Sept. 12, 2013, Aug. 27, 2013, C/A No. 2:13-cv-01831-DCN, ECF 46-3.

15

an immediate wealth transfer of over $40 million from Decedent to the 2009 Trust, which was controlled by the individual Defendants and of which they were the primary beneficiaries.

Third, the $50 million note received for the LP interest transfer representing $90 million in stock had additional negative characteristics for Decedent.[34]  The maturity date was subject to extension and was in fact extended by a succession of notes "given for the purpose of continuing, revising and restating the Note originally dated November 30, 2009."[35]  This feature effectively restarted the nine-year due-date countdown each ensuing year after 2009.  By 2013, the ultimate maturity date was pushed to 2021.[36]  The 2009 Trust made interest payments without any cash changing hands because the payments were made with LP units, which were in turn transferred into an annually-established Grantor Retained Annuity Trust ("GRAT").[37]  The GRAT strategy

---

[34] *See* Promissory Note, Nov. 30, 2009, *FARACE 001311–FARACE 001320*

[35] *See*, Promissory Note, Sept. 4, 2012 at *K.WELLIN 99417.*

[36] *Id.* For documents reflecting the 2010 refinancing of the Promissory Note, see Refinanced Promissory Note, Dec. 6, 2010, *FARACE 001821–FARACE 001830*; Guarantee Modification Agreement, Dec. 6, 2010, *FARACE 001831–FARACE 001848*; Pledge Modification Agreement, Dec. 6, 2010, *FARACE 001849–FARACE 001861*; and Investment & Administration Direction, Dec. 6, 2010, *FARACE 001865–FARACE 001867.*

For documents reflecting the 2011 refinancing of the Promissory Note, see Refinanced Promissory Note, Nov. 30, 2011, *FARACE 000400–FARACE 000409*; Guarantee Modification Agreement, Nov. 30, 2011, *FARACE 000410–FARACE 000427*; Pledge Modification Agreement, Nov. 30, 2011, *FARACE 000428–FARACE 000440;* and Investment & Administration Direction, Nov. 9, 2011, *FARACE 000443–FARACE 000445.*

For documents reflecting the 2012 refinancing of the Promissory Note, see Refinanced Promissory Note, Sept. 4, 2012, *FARACE 001699–FARACE 001708*; Guarantee Modification Agreement, Sept. 4, 2012, *FARACE 001709–FARACE 001729*; Pledge Modification Agreement, Sept. 4, 2012, *FARACE 001730–FARACE 001742*; and Investment & Administration Direction, Sept. 4, 2012, *FARACE 001745–FARACE 001747.*

[37] For an overview of the GRAT strategy, *see NPW20007357–NPW20007361.*

For documents reflecting the 2009 Trust's first interest payment on the Promissory Note in 2010, see Notice of Proposed Transfer of Limited Partnership Interest, Nov. 26, 2010, *FARACE 001789–FARACE 001792*; Response of General Partner Pursuant to Right of First Refusal, Nov. 29, 2010, *FARACE 001793–FARACE 001794*; Transfer of Interest, Nov. 30, 2010, *FARACE 001795*; Assignment & Assumption of Limited Partnership Interest, Nov, 30, 2010, *FARACE 001796–FARACE 001801*; Notice of Assignment of Limited Partnership Interest, Nov. 30, 2010, *FARACE 001802 – FARACE 001806*; Balance Sheet, Friendship Partners, LP, Nov. 30, 2010, *FARACE 001817*; and Freely Traded Fair Market Value, Friendship Partners, LP, Nov. 30, 2010, *FARACE 001819.*

For documents reflecting the 2009 Trust's second interest payment on the Promissory Note in 2011, see Notice of Proposed Transfer of Limited Partnership Interest, Nov. 28, 2011 *FARACE 000341–FARACE 000344*;

exacerbated the effect of the 2009 Transaction on Decedent's liquidity by keeping the LP units

paid by the 2009 Trust out of Decedent's revocable trust.

Whereas, in my experience, notes are normally paid off with interest in cash at maturity,

this note did not possess that feature.[38]  Neither cash payment on maturity nor cash payment of the

interest due was assured; the individual Defendants in their sole discretion had the power to pay

off the note by issuing a replacement note or by supplying partnership interests.[39]  Because the

note did not require payment in cash, it was possible that a payoff on the note could be deferred

indefinitely.  In conjunction with the note, Decedent received only a security interest in his LP

interest plus a guarantee of payment from the individual Defendants, up to a maximum total of

less than $5 million, 1/10 of the note's face value.[40]  Payments of interest were not promised in

---

Response of General Partner Pursuant to Right of First Refusal, Nov. 29, 2011, *FARACE 000345–FARACE 000246*; Transfer of Interest, Nov. 30. 2011, *FARACE 000347*; Assignment & Assumption of Limited Partnership Interest, Nov. 30, 2011, *FARACE 000348–FARACE 000354*; Notice of Assignment of Limited Partnership Interest, Nov. 30, 2011, *FARACE 000355–FARACE 000360*; Balance Sheet, Friendship Partners, LP, Nov. 30, 2011, *FARACE 000390*; and Freely Traded Fair Market Value, Friendship Partners, LP, Nov. 30, 2011, *FARACE 000391*.

For documents reflecting the 2009 Trust's third interest payment on the Promissory Note in 2012, see Notice of Proposed Transfer of Limited Partnership Interest, Nov. 28, 2012, *FARACE 001617–FARACE 001620* ; Response of General Partner Pursuant to Right of First Refusal, Nov. 29, 2012, *FARACE 001621*; Transfer of Interest, Nov. 30, 2012, *FARACE 001622*; Assignment & Assumption of Limited Partnership Interest, Nov. 30, 2012, *FARACE 001623–FARACE 001629*; Notice of Assignment of Limited Partnership Interest, Nov. 30, 2012, *FARACE 001630–FARACE 001634*; Balance Sheet, Friendship Partners, LP, Nov. 20, 2012, *FARACE 001690*; and Freely Traded Fair Market Value, Friendship Partners, LP, Nov. 30, 2012, *FARACE 001691–FARACE 001692*.

[38] *See* Promissory Note at 5, Nov. 30, 2009, *FARACE 001315*.

[39] *Id.*

[40] *See* Guarantee Agreement, Nov. 30, 2009, *FARACE 001336–FARACE 001351*; Pledge Agreement, Nov. 30. 2009, *FARACE 001324–FARACE 001334*. Guarantee Modification Agreement, Dec. 6, 2010, *FARACE 001831–FARACE 001848*; Pledge Modification Agreement, Dec. 6, 2010, *FARACE 001849–FARACE 001861*; Guarantee Modification Agreement, Nov. 30, 2011, *FARACE 000410–FARACE 000427*; Pledge Modification Agreement, Nov. 30, 2011, *FARACE 000428–FARACE 000440*; and Guarantee Modification Agreement, Sept. 4, 2012, *FARACE 001709–FARACE 001729*; Pledge Modification Agreement, Sept. 4, 2012, *FARACE 001730–FARACE 001742*.

cash absent an "Event of Default,"[41] and in fact, the 2009 Trust made noncash interest payments in LP units for the first three years.[42]

Fourth, the LP interest-for-debt transfer in design and execution carried the risk of leaving Decedent cash poor. Besides its subjection to annual extension, the note carried a low interest rate that was reduced annually with, as noted above, no obligation the interest be paid in cash. Rather, interest could be and was paid by paper credits of partnership units. In effect, through the complex, multi-faceted transaction, Decedent gave up a major share of his wealth to the individual Defendants for a heavily discounted debt instrument having no enforceable due date and no clear right to be paid out in cash.

Fifth, while it promised potential tax advantages for his Estate and the Wellin Children, the 2009 Transaction exposed Decedent to grave risks due to a lack of liquidity during his lifetime. A major source of the lurking (and undisclosed) liquidity risk was the potential tax liability Decedent faced in the event the LP's large holding of BRKa stock was sold during his lifetime. If this happened, he faced financial peril due to the limited amount of assets available to him to satisfy the capital gains taxes arising from the LP's liquidation of its BRKa stock holdings. As discussed above, this financial peril tended to increase due to the fact the BRKa stock continued to rise in value.[43]

Because of the 2009 Transaction, a significant portion of Decedent's portfolio of BRKa stock transformed in a dangerous way that was not "tax-advantaged" for him. From the outset,

---

[41] *See* Promissory Note at 4–5, Nov. 30, 2009, *FARACE 001314–FARACE 001315*. In fact, under paragraph 10 of the Note, payments of amounts owed, including presumably payments arising from a default, "may be made in cash or in property (whether tangible or intangible) or a combination thereof." *Id.* at 5–6, *FARACE 001315–FARACE 001316.*

[42] *See* Footnote 37, above (collecting documents reflecting payment of Promissory Note interest in limited partnership units of Friendship Partners, LP in 2010, 2011, and 2012).

[43] Gumb Aff. ¶¶ 25–26, July 25, 2013.

that undisclosed financial risk and its potential consequences were inherent in the 2009 Transaction.[44] After the note transfer, all it took for peril to ensue was for the BRKa stock held by the 2009 Trust to continue to substantially appreciate and for Defendants to sell the stock while Decedent was still alive. This disastrous stock sale scenario was not just a hypothetical possibility; it came to pass at the hands of Decedent's children. Based on my experience and specialized knowledge and the facts of this case, Decedent's fiduciaries should have disclosed that risk and its consequences, but they did not.[45]

In his Affidavit, Decedent testified he relied upon Defendant Peter Wellin and his agents and fiduciaries to act in his best interest when they contemplated and implemented the 2009 Transaction.[46] Decedent testified he relied on the misrepresentation "the transaction was in [his] best interest,"[47] and he was not informed the seemingly attractive transaction contained a potential liquidity trap, such that it "could expose [him] to significant tax liability without corresponding access to cash flow."[48] Defendant Peter Wellin testified he never discussed with his father, Decedent:

> ➢ Decedent would be taxed on all income and capital gains of the trust;[49]
>
> ➢ Decedent would lack the ability, acting on his own, to turn off grantor trust status;[50]

---

[44] T. Farace Dep. Tr. 382:4–17, Jan. 27, 2016; s*ee also* T. Farace Dep. Tr. 160:23–161:12, Jan. 26, 2016.

[45] *See* Farace Dep. Tr. 420:18–421:10. Peter Wellin testified that he could not remember ever discussing with his father the fact that sale of the BRKa stock that Decedent contributed to the limited partnership would trigger capital gains tax on his father during his lifetime. *See* P. Wellin Dep. Tr. 239:24–241:6; 309:22–310:5, Aug. 30, 2017.

[46] K. Wellin Aff. ¶ 3, Sept. 13, 2013, 2:13-cv-01831-DCN, ECF No. 46-2.

[47] *Id.* at ¶ 5.

[48] *Id.* at ¶ 3.

[49] P. Wellin Dep. Tr. 233:16-24 (Aug. 30, 2017).

[50] *Id.* at 233:25–234:4.

➢ the Wellin Children could never be removed as Trustees;[51]

➢ Decedent lacked the power to remove the South Dakota Trust Company as corporate trustee;[52] or

➢ Decedent could not demand payment of the note absent unusual circumstances.[53]

Defendant Peter Wellin further testified he never discussed with Decedent the risk that the Wellin Children would sell the BRKa stock during Decedent's lifetime, thereby triggering a huge capital gains tax to be paid by Decedent or his estate.[54]  In my opinion, in light of the facts and circumstances presented in this case, the various risks to Decedent were material, both individually and in the aggregate, and they required full disclosure from Defendants under the applicable standard.

According to repeated testimony by Mr. Farace, he never considered or disclosed the potential financial harm in any of his dealings with Decedent or Decedent's family members.  For example, Mr. Farace testified as follows:

> Q:    At the time that this limited partnership was created, it was not constructed with the notion or the idea that the underlying Berkshire assets would be liquidated, thereby triggering the capital gains to Mr. Wellin during his lifetime; is that fair?

> MR. BRUNSON: Object to the form· Asked and answered.

> A:    I believe that's what the expectation was.[55]

Similarly, Mr. Farace also testified:

---

[51] *Id.* at 234:5-9.

[52] *Id.* at 234:10-14.

[53] *Id.* at 234:15-23.

[54] *Id.* at 240:22–241:6.

[55] T. Farace Dep. Tr. 61:21–62:3, Jan. 26, 2016.

[Q:]   Can you explain whether there was ever an intent at the time of entering into this 2009 transaction that the underlying Berkshire stock -- whether there was an intent to sell or liquidate that during Keith's lifetime?

MR. BRUNSON: Object to the form.

A:     My recollection was back at the time in 2009 there was not an intention to sell the Berkshire stock.[56]

And:

Q:     Do you remember testifying earlier today that it was not an intent of the 2009 trust that the Berkshire Hathaway stock be sold during Keith Wellin's lifetime?

A:     I do.[57]

Mr. Farace's testimony the following day confirms there was no expectation of selling the BRKa stock at the time the 2009 Transaction occurred:

Q:     Mr. Farace, you have testified that a main intent of the 2009 trust was that the Berkshire Hathaway stock owned by Friendship Limited Partners would not be sold during Keith Wellin's lifetime; is that correct?

MR. BRUNSON: Object to the form. Mischaracterizes prior testimony.

A:     There was no expectation of selling the Berkshire Hathaway stock.

Q:     Okay. And you would agree that that was one of the main characteristics that everyone agreed to with regard to the 2009 transaction; is that right?

MR. BRUNSON: Object to the form. Misstates the evidence.

A:     Can you repeat that? I'm sorry.

Q:     The fact that -- you agree -- do you agree that one of the main characteristics of the 2009 transaction was that -- was everyone's understanding that the Berkshire Hathaway stock owned by Friendship Limited Partners would not be sold during Keith's lifetime; is that correct?

MR. BRUNSON: Objection. Leading basis -- leading question and no factual basis.

---

[56] T. Farace Dep. Tr. 84:15-23, Jan. 26, 2016.

[57] T. Farace Dep. Tr. 161:19-23, Jan. 26, 2016.

> A:    I don't think that there was ever an inclination or intent to sell the Berkshire Hathaway stock before or after the 2009 transaction.[58]

Indeed, Mr. Farace testified that, had Decedent's children contemplated the sale of the BRKa stock,

more detailed disclosure would have been required at the planning stage:

> Q:    If you had known in 2009 when this trust was being created that the Wellin children intended to sell the Berkshire stock during Keith Wellin's lifetime, would you have advised Keith Wellin to enter into the transaction?
>
> A:    Well, I would have -- if there was a contemplation of selling the stock, I would want to go through kind of the pros and cons as to who should bear the tax liability, etcetera. And then it would have been Keith's, kind of, decision as to which way to go with it.
>
> Q:    But that kind of conversation did not happen in this particular case?
>
> A:    It did not.
>
> Q:    And again, that was because there was no expectation that the Berkshire Hathaway stock was going to be sold before Keith passed away?
>
> A:    That's correct.[59]

Likewise, Decedent's children never discussed with their father the possibility of selling the

BRKa stock during his lifetime.  For example, Defendant Cynthia Plum testified as follows:

> Q:    Did you ever discuss with your father whether he intended for the Berkshire Hathaway stock to be sold during his lifetime?
>
> MR. BRUNSON: Object to the form.
>
> THE WITNESS: My brother, sister, and I never discussed with our father the possibility of selling the Berkshire Hathaway stock.[60]

Similarly:

> Q:    Do you recall discussing with your father, ever, whether or not he intended for the Berkshire Hathaway stock to be sold during his lifetime?

---

[58] T. Farace Dep. Tr. 381:3–382:3, Jan. 27, 2016.

[59] T. Farace Dep. Tr. 399:19–400:11, Jan. 27, 2016.

[60] C. Plum Dep. Tr. 52:25–53:6, Aug. 25, 2016.

A:    I -- as I said before, my brother, sister, and I, we never had a conversation with Dad about the possibility of selling the stock during his lifetime.[61]

Later the same day, Defendant Cynthia Plum also testified:

Q:    Right. Was there ever any discussion of the sale of those assets to generate cash, and that would create a cash account from which you could invest?

A:    We, my brother, sister, and I, we never had any discussions with our father about selling the Berkshire stock.[62]

Additionally:

Q:    Was there an understanding between you and your father that you would not sell the Berkshire shares unless the proceeds of the sale were distributed to him to use to pay off the tax bill?

A:    No, there was no understanding. We never discussed selling the -- Dad and I and Mari and Peter never discussed selling the Berkshire stock.[63]

Further:

Q:    As of 2003 and beyond, you were aware that if you made the decision to sell the stock, that your father would have to pay the capital gains associated with that sale?

A:    I was aware, but, again, we never discussed selling the stock, so I'm not – I didn't -- I didn't think about it.[64]

And finally:

Q:    Did you ever discuss with Mr. Farace whether or not your father intended ever to sell the Berkshire Hathaway stock during his lifetime?

A:    No, I never had any conversation like that with Tom Farace.[65]

---

[61] C. Plum Dep. Tr. 55:19-25, Aug. 25, 2016.

[62] C. Plum Dep. Tr. 185:19-25, Aug. 25, 2016.

[63] C. Plum Dep. Tr. 190:17-23, Aug. 25, 2016.

[64] C. Plum Dep. Tr. 193:18-24, Aug. 25, 2016.

[65] C. Plum Dep. Tr. 56:9-13, Aug. 25, 2016.

Defendant Cynthia Plum also testified the sale of the BRKa was not contemplated until late in 2013:

> Q:    After you obtained the authority to sell the Berkshire shares in 2003, you did not exercise that authority until November of 2013, correct?
>
> A:    Well, we did not contemplate selling any shares of the Berkshire stock until the fall time period of 2013.[66]

And further, Defendant Cynthia Plum testified, "We never contemplated selling the Berkshire stock until November of 2013, and there were a lot of variables -- a lot of balls in the air then."[67]

Finally, Defendant Cynthia Plum testified:

> Q:    Well, I thought we established in 2003, there wasn't ever any intention of dealing with capital gains tax, but it was a mechanism to reduce the estate tax.
>
> A:    In two thousand -- as I said, prior to the fall of 2013, we had never contemplated selling the Berkshire stock, so we didn't even think about these things.[68]

Mr. Farace specifically agreed with Defendant Cynthia Plum that liquidating Decedent's prized BRKa shares had never been an intended consequence of his estate planning work for the Wellin family. During his deposition, Mr. Farace testified:

> Q:    Did you know that in 2013 all of the Berkshire shares that no one had ever intended to sell during his lifetime were sold?
>
> MR. BRUNSON: Object to the form.
>
> A:    I had heard that, yes.
>
> Q:    Were you shocked?
>
> A:    Well, it was never the intent back when I was handling the estate plan.

---

[66] C. Plum Dep. Tr. 204:21–205:2, Aug. 25, 2016. *See also* Friendship Management, LLC 30(b)(6) Dep. Tr. 85:8-25, Feb. 8, 2018; Friendship Management, LLC 30(b)(6) Dep. Tr. 231:22–231:1, Feb. 9, 2018.

[67] C. Plum Dep. Tr. 207:21-24, Aug. 25, 2016.

[68] C. Plum Dep. Tr. 287:2-9, Aug. 25, 2016.

Q:    So did it shock you to learn that?

A:    That was a shock.

Q;    And so something that had never been previously discussed, where Mr. Wellin had never been counseled about this potential tax liability being strung around his neck, had never been contemplated, was not protected against, and it happened. Can you understand why he was upset with his family?

MR. BRUNSON: Object to form.

A:    That's -- I could understand that.[69]

During his deposition, Defendant Peter Wellin testified as follows:

Q:    Did you specifically discuss with your father selling and distributing the Berkshire stock held by the partnership, triggering capital gains tax on your father during his lifetime?

MR. BRUNSON: Object to the form.

THE WITNESS: Yeah, I'm having trouble with the language. So you mean selling the stock and distributing the proceeds? Is that what you're asking?

BY MR. J. HOOD:

Q:    Yeah.

A:    Okay. That wasn't clear. I can't remember if there was a specific conversation, but, you know, this was a sophisticated guy from a business and financial standpoint, and I certainly -- he knew more about the financial options of his estate plan than I did.

Q:    So ultimately, in late December or -- excuse me -- in December, November 2013 time frame, the partnership sold and distributed the Berkshire shares it had held, correct?

A:    The partnership sold the Berkshire shares and distributed the proceeds.

Q:    And it's your contention that the capital gains associated with the sale of that stock is an obligation of your father, now his estate?

A:    Correct. The selling of the stock triggered a capital gains tax, which is the responsibility of the grantor or the estate of the grantor.

---

[69] T. Farace Dep. Tr. 422:18–421:10, Jan. 27, 2016.

Q:    That event, did you ever discuss doing that event with your father?

A:    No, I don't remember discussing that.[70]

If Decedent did not anticipate the possibility of selling the BRKa shares during his lifetime, the adverse consequences that could accompany such a sale were not disclosed to or discussed with Decedent either.  Mr. Farace testified he never had, and was unaware of, any discussions with Decedent involving the risks and possible consequences resulting from the sale of the BRKa shares.[71]  Nor is there any evidence of sale possibility or risk disclosure by anyone in the record.  Therefore, Decedent had no warning of the ramifications of the 2009 Transaction.

Defendant Peter Wellin initially claimed at his deposition that Decedent was well informed about the 2009 Transaction.[72]  According to Defendant Peter Wellin, Decedent "had it explained to him multiple times.  And he was a sophisticated guy with respect to financial transactions.  And I felt as if he was explaining issues to me."[73]  Defendant Peter Wellin also claimed the 2009 Transaction involved "a concept I never fully understood."[74]  In his Affidavit, Defendant Peter Wellin further testified, "This strategy was developed entirely by Farace and other attorneys at Nixon Peabody through the consultation with [Decedent]."[75]  However, in the course of his deposition testimony, Defendant Peter Wellin conceded he "assisted [Decedent] in implementing this -- this modification of his estate plan. . . . I did some grunt work on it.  There were some details

---

[70] P. Wellin Dep. Tr. 239:24–241:6, Aug. 31, 2017.

[71] *See* T. Farace Dep. Tr. 84:15-23, 193:15-21, Jan. 26, 2016; T. Farace Dep. Tr. 302:19-303:4, 379:5-13, 381:3-11, 381:18-382:3, 399:19-400:11, 420:18-421:10; 422:16-19, Jan. 27, 2016.

[72] P. Wellin Dep. Tr. 232:10-13, Aug. 31, 2017.

[73]P. Wellin Dep. Tr. 230:23–231:2, Aug. 31, 2017.

[74] P. Wellin Aff. ¶ 24, Aug. 27, 2013, C/A No. 2:13-cv-01831-DCN, ECF No. 41-2

[75] *Id.* at ¶ 23.

that needed to be worked out."[76]  According to the recollection of Edward Bennett, Decedent's

local estate planning attorney, of Evans Carter Kunes & Bennett, Decedent informed Mr. Bennett,

"The 2009 transaction was brought to him by his son and he was told that Peter had a tax

advantaged transaction and [Decedent] trusted him to handle the details."[77]

Nevertheless, Mr. Farace's billing records show numerous contacts among Mr. Farace,

Defendant Peter Wellin, and Defendant Cynthia Plum in the months leading up to completion of

the 2009 Transaction.  Mr. Farace testified he freely shared with Defendant Peter Wellin drafts of

Decedent's trust, copies of Decedents will, and documents relating thereto.[78]  The Nixon Peabody

bills show six telephone calls and nine emails between Mr. Farace and Defendant Peter Wellin

over the period from August 10, 2009, to November 30, 2009.  Over that time span, four phone

calls and six emails were noted in Mr. Farace's time records between Mr. Farace and Defendant

Cynthia Plum.  Decedent received zero phone calls or emails from Farace regarding the proposed

transaction; the only communications to Decedent on this subject were transmittals of the

transaction documents for execution.[79]  According to Mr. Farace, Decedent informed him that

Decedent was interested in understanding the estate planning "big picture" but wished for Mr.

Farace to "discuss the details and work out logistics with [his] son, Peter."[80]  Mr. Farace stated

that, in dealing with the 2009 Transaction, Defendant Peter Wellin "was certainly acting as a

---

[76] P. Wellin Dep. Tr. 199:10-15, Aug. 30, 2017.

[77] E. Bennett Email to R. Hood, June 26, 2013, *K. Wellin Estate 04152*.

[78] T. Farace Dep. Tr. 61:15-23; 120:21–121:3, March 3, 2015.  There is evidence that Peter Wellin was not as forthcoming about sharing information as his father was with him.  *See* P. Wellin email to T. Farace, Dec. 14, 2009, *NPW20004190–NPW20004191* (discouraging Farace from sending his father a notebook with the final documents relating to the 2009 Transaction).  *See also* T. Farace Dep. Tr. 62:8-18, Jan. 25, 2016 (discussing the same email).

[79] *See* Estate's Mem. in Opp. to the Wellin Children's Mot. for Partial Summ. J., C/A No. 2:13-cv-01831-DCN, ECF No. 640, at 13–14 (chart from Nixon Peabody billing records detailing two contacts with Decedent but numerous contacts with Wellin Children regarding the 2009 Transaction during August-November 2009).

[80] T. Farace Dep. Tr. 26:3-5, Jan. 25, 2016.  *See also* T. Farace Dep. Tr. 56:22–57:5.

trusted advisor to [Decedent] because this was his historical kind of relationship with his father."[81] However, Decedent told Mr. Bennett that Mr. Farace never explained the 2009 Transaction to him.[82]

Decedent's economic expert observed that, in 2013, under the transaction's terms, "Mr. Wellin at no time after November 2009 had any reasonable expectation under those terms of ever living to see a cash payment of any amount from the Borrowers."[83] The "Borrowers" were Defendants, Decedent's children. Today, over eight years after the 2009 Transaction was consummated and nearly four years after his death, neither Decedent nor his Estate have received any return from the exchange of his Berkshire Hathaway holdings—worth $90 million—for a note worth far less. Indeed, the Wellin children now maintain Decedent is owed nothing at all, a position at odds with Defendant Peter Wellin's claim his father could always trust in him to be "even-handed in any situation."[84]

### THE WELLIN CHILDREN RETAIN COUNSEL

In July 2011, Defendant Peter Wellin and his two sisters retained a lawyer named Jonathan T. Harris, in Portland, Maine "regarding issues relating to his and his sisters' rights of access to their father, [Decedent,] and the apparent threat posed by Wendy Wellin to [Decedent]'s trust and other estate planning."[85] Thereafter, Mr. Harris advised Defendants about steps they should take "in anticipation of litigation."[86] The Defendants did not disclose their retention of counsel to

---

[81] T. Farace Dep. Tr. 57:6-11, Jan. 25, 2016.

[82] E. Bennett Email to R. Hood, June 26, 2013, *K. Wellin Estate 04152*.

[83] Gumb Aff. ¶ 27, July 25, 2013.

[84] P. Wellin Dep. Tr. 179:3-5, Aug. 30, 2017.

[85] J. Harris Aff. ¶ 3, Dec. 1, 2014, C/A No. 2:13-cv-03595-DCN, ECF No. 203-4.

[86] J. Harris Aff. ¶ 4, Dec. 1, 2014, C/A No. 2:13-cv-03595-DCN, ECF No. 203-4.

Decedent.  Meanwhile, Decedent continued to rely on his long-time lawyer, Mr. Farace, whose independence had been co-opted by Defendants.[87]  During the same summer, while the Wellin children were retaining counsel, Mrs. Wellin wrote to Mr. Farace about the desirability of "an independent person to help manage [Decedent]'s estate."[88]  However, at that time, Mr. Farace continued to provide reports to the individual Defendants of his dealings with Decedent and Mrs. Wellin.[89]  Meanwhile, Mr. Harris provided advice to Peter Wellin "re possible South Carolina attorney."[90]

Under applicable standards, as Decedent's fiduciaries, Defendants had a duty to disclose to Decedent that they had retained counsel and that they were preparing for litigation involving Decedent or his Estate, particularly when their financial interests were adverse.  Moreover, under no circumstances should Defendants have continued to obtain privileged attorney-client communications between Mr. Farace and Decedent without disclosing their retention of counsel.

Nelson Mullins billings show an attorney at the firm had an initial contact with "client Peter Wellin" on March 12, 2012, mere days after all three Wellin Children visited Decedent in

---

[87] Earlier, Cynthia Plum personally sought legal advice from Mr. Farace about gaining access to Decedent.  *See* T. Farace Letter to C. Plum, May 22, 2002, *DEFS_0111083*.  In July of 2011, right after Jonathan Harris was hired to advise Defendant Peter Wellin and his siblings about matters concerning Decedent's estate planning, Defendant Peter Wellin sent an email to Tom Farace suggesting that Wendy Wellin was guilty of exerting undue influence, questioned whether Wendy Wellin was a reliable surrogate "given her demonstrated self-interest," and portrayed his father as "isolated, disabled, and totally dependent on his caregiver(s)."  P. Wellin email to T. Farace, July 31, 2011, *Peter_Wellin_ESI_00000530-31*.  In the same email, he called on Farace to "keep this email confidential and between us" while simultaneously blind copying his private lawyer, Jonathan Harris.  *Id.* (displaying BCC to J. Harris).  According to Ms. Scarborough, Decedent ultimately replaced Mr. Farace with Edward Bennett, because "Tom Farace had too close of a relationship with the Wellin children, and . . . Mr. Wellin wanted someone independent."  F. Scarborough Dep. Tr. 278:23-25, Feb. 26, 2018.

[88] W. Wellin email to T. Farace, July 5, 2011, *NPW20007503*.

[89] P. Wellin Email to T. Farace, July 31, 2011, *NPW20007910*.

[90] Lambert Coffin Invoice, Nov. 30, 2011, *DEFS_0110621*.  Within a short time, Mr. Harris's billings reflected contact with a South Carolina attorney;[90] specifically, "conferencing with Attorney [Robert] Brunson" of Nelson Mullins[90] and emailing "Brunson regarding engagement."  *See* Lambert Coffin Invoice, April 30, 2012, *DEFS_0110630*.

Charleston, South Carolina.[91]  Within two weeks of the first billing entry, a Nelson Mullins associate recorded meeting with the attorney "regarding case strategy."[92]  The Columbia law firm's preliminary efforts during that first month of work in March 2012 resulted in a bill for $28,895.00.[93]  Upon receipt, Peter characterized the bill as "big, bigger than I thought,"[94] while commenting to his sisters, "I still believe we have no choice but to organize an action plan for any eventuality."[95]

## SUMMER 2012: NON-DISCLOSURE CONTINUES

A narrative written by Peter Wellin in mid-2012 shows that Decedent did not understand the ramifications of the 2009 Transaction.  Writing about a phone conversation with Decedent on June 26, 2012, Defendant Peter Wellin reported:

> He first asked me what his current net worth was.  From memory, I listed his various assets and their approximate value and gave him a rough estimate.  He pressed me on the value of the family partnership and what it added to the total.  I reminded him that he had sold his partnership units several years ago in return for a promissory note and that they were no longer a part of his estate.  I also explained the potential variation in value of these units subject to a tax review.  I was concerned that he did not fully grasp how all the various pieces fit and impacted not only the value of his estate overall, but also the inheritance of the primary beneficiaries.[96]

This quotation presents a disputed factual picture, contrary to Defendant Peter Wellin's own testimony.  I have not identified any evidence in the record showing that, at the time Decedent spoke with Peter Wellin on June 26, 2012, or any time prior to mid-2013, Decedent received full

---

[91] Nelson Mullins Invoice, May 14, 2012, *DEFS_0109992*.

[92] *Id.*

[93] Nelson Mullins Invoice, May 14, 2012, at *DEFS_0109994*.

[94] P. Wellin email to C. Plum and M. King, May 22, 2012, *Peter_ Wellin_ESI_ 00002805*.

[95] *Id.*

[96] P. Wellin "Narrative", June 26, 2012, *Peter_Wellin_ESI_00002855*.

and fair disclosure of all significant facts concerning the operation and risks of the 2009 Transaction or of the accuracy of his net worth, as it was misleadingly depicted on the UBS computer print-out of his account holdings.[97]

## UNINTENDED CONSEQUENCES:  THE 2013 GIFTING

In January 2013, Decedent made cash gifts of $10 million each to the individual Defendants and his wife.  To raise the cash, Decedent sold low basis securities, creating capital gains taxes, plus gift taxes from the gifts to his children.[98]  Decedent's total cost of giving $30 million to his children and $10 million to his wife was $67 million, including an added $27 million in taxes.

Applicable standards require a fiduciary to act solely in the interest of the principal.  Based upon my experience and specialized knowledge, applicable standards require a fiduciary to act for or to give advice for the benefit of the principal upon matters within the scope of their relationship.

---

[97] See Screenshot, June 20, 2013, *K. Wellin Estate 02522–K. Wellin Estate 026223*.  For example, Decedent's wife testified:

> Q:    Did Keith -- did you have any concerns on June 6th, 2013, that Keith, your very sophisticated, successful husband, thought he had $150 million that he didn't have?

> A:    He did. Remember, he says -- and I believe him -- Peter didn't tell him and Tom Farace didn't tell him.

W. Wellin Dep. Tr. 437:17-23, Sept. 20, 2017.  On June 6, 2013, an email arrived from Decedent's stock broker, Brian McLoughlin, notifying Decedent that his net worth did not include Friendship Partnership assets.  Mrs. Wellin also testified about Decedent's reaction to this news:

> Q:    And tell me everything you can recall about your conversation with Keith after you received information from Brian McLoughlin that the Friendship LP money was not Keith's money.

> A:    I just remember he was furious.

> MR. LAY: Object to the form.  Go ahead.

> THE WITNESS: I guess that's all . . . I can recall. It was totally a shock to him. He was furious, furious, furious, furious. And you would be too if you thought you didn't have $150 million that were yours. So after this day . . . all hell broke loose.

W. Wellin Dep. Tr. 432:1-16, Sept. 20, 2017.

[98] *Id.*

In my opinion, the standard of conduct in a situation like this required the fiduciary to ensure the principal made the gifts in a way most favorable to him.  In this case, Peter Wellin should have ensured that Decedent made the 2013 gifts to the Wellin children in stock, rather than in cash, to prevent a significant tax burden on Decedent.  The gifting severely reduced Decedent's liquidity and continued a liquidity-crunch cycle; it required Decedent to sell additional appreciated assets to raise cash to pay the taxes associated with the gifts, which in turn generated more capital gains tax liability, necessitating further asset liquidations to generate funds, which in turn generated greater tax liabilities, and so on.

### SPRING 2013: NEW REPRESENTATION BRINGS CHANGE

Decedent called on Mr. Bennett's firm to advise him in May 2013, at a time when he faced a liquidity crisis and the Defendants had weakened the bonds of trust and confidence between them and their father.  Mr. Bennett sensed tension within the Wellin family.[99]  As a result, he suggested setting up a separate revocable trust to house Decedent's testamentary bequest to his wife and attempted to work with Mr. Farace to facilitate that amendment.[100]  As Mr. Bennett reviewed Decedent's then-existing estate plan, he quickly identified the liquidity limitations on Decedent's finances due to his gifts to his children, potential tax bills, and the structure of the 2009 Transaction.

As Mr. Bennett began to gather information and prepared to educate Decedent about the state of his finances, Peter Wellin discovered that Decedent had met with an attorney other than Mr. Farace.  Within weeks of his first conversation with Decedent, Mr. Bennett was contacted by one of the Defendants' local lawyers.  Mr. Bennett testified to his recollection of this call:

---

[99] At his deposition, Mr. Bennett reported on a May 24, 2013, two-hour meeting with Decedent at Decedent's Charleston home, with one of the topics being "the discord between the children and Wendy."  E Bennett Dep. Tr. 32:14-15, 19-20; 34:3-11, Nov. 6, 2017.

[100] E. Bennett Dep. Tr. 32:19-33:18 Nov. 6, 2017.

John communicated all the elements of litigation to me. . . .  He said, you know, questionable capacity, undue influence.  He suggested that the children were being denied access to their father.  He told me somehow that they had cameras in the house.  I have no idea how he would know that since they weren't put in until April of '13, but John seemed to know about that.

Then he communicated to me that the children did not want to prepay or help their father with the liquidity by prepaying this note for three reasons.  And he listed them.  I mean, one of them was they felt like Wendy would spend the money.  The second was that they thought that Keith would give the money to Wendy, and they thought -- and John used the word "bullied" -- he thought that the children were concerned that Keith was being bullied into that.  And the third was that the children expected Berkshire to continue to appreciate and they wanted to continue to hang on to it in the trust and receive the benefit of it until 2021 or whenever the note was ultimately due.[101]

And so, you know, when you add all of those up, you've got a call from a litigator, or a meeting with, you've got all of these elements of litigation being conveyed.  When I conveyed that back to Keith Wellin, it pretty much turned his world upside down because here's a guy he's trusted for many years, his son, Peter Wellin, who's all of a sudden got lawyers in his own hometown, behind his back, that he hasn't disclosed.  I mean, Peter is his fiduciary.  He's his attorney-in-fact.  And Keith trusted him.  And all of a sudden we've got these six, seven, eight elements just being disclosed by John Hagerty who, you know, is -- he's a fairly aggressive personality.  I mean, it's not a kid glove sort of -- sort of approach.

So yeah, this kind of turned Keith's world upside down.  John Hagerty's two -- his call and meeting.  And, of course, I had, gosh, I don't know, close to a dozen phone calls with John over – over June.  What was being conveyed was pretty difficult stuff for dad.[102]

Through Mr. Bennett, Decedent learned some hard truths in early June 2013:

[Decedent] found out he didn't have control of assets that he thought he had control of.  He had severe liquidity issues that he didn't realize.  He had -- his children had litigation attorneys hired in his own hometown, behind his back, while serving as his attorney-in-fact.  They had communicated that they were not interested in prepaying the promissory note and helping him with his liquidity by paying that.  They had communicated that the woman he loved, they thought, was taking advantage of him. . . .  [T]hey communicated they thought he lacked capacity.  They

---

[101] *See also* E. Bennett Dep. Tr. 778:19–777:16, Nov. 8, 2017 (Setting forth Mr. Bennett's understanding that Decedent's prepayment request was "the first time he ever asked a thing of his children from a financial perspective," and explaining the reasons given to justify the children's refusal).

[102] E. Bennett Dep. Tr. 117:24–119:19, Nov. 6, 2017.

communicated that they thought he would be bullied into things.  So, you know, is that -- my interpretation is that kind of rocks somebody's world.[103]

Despite his testimony about looking out for Decedent's best interest, Defendant Peter Wellin sought to interfere with Decedent's attorney-client relationship with Mr. Bennett when it best suited Defendant Peter Wellin.  On June 5, 2013, Defendant Peter Wellin asked Decedent about hiring Mr. Bennett to replace Mr. Farace.  Decedent explained his reason for the switch was that, in his opinion, Mr. Bennett "was better than Tom."[104]  Defendant Peter Wellin testified he recalled the following exchange with Decedent:

> "You know, Dad, you put me in a position of trust years ago, and you did it for a reason."
>
> And I said, "I think the reason you did it was because you knew that I would do what was right for you and the family."
>
> And he said, "Yes, I trust you."
>
> And I said, "Well, Dad, you know, I love you, and I'm going to do what's right and necessary for you and the family."
>
> And he said, "I know you will."[105]

Defendant Peter Wellin refrained from explaining to his father what he meant by the words, "I'm going to do what is right."[106]  Defendant Peter Wellin also refrained from telling his father that he and his two sisters had retained local counsel.[107]

---

[103] E. Bennett Dep. Tr. 170:24–171:14, Nov. 6, 2017.

[104] P. Wellin Dep. Tr. 35:4, Aug. 29, 2013.

[105] P. Wellin Dep. Tr. 35:13-23, Aug. 29, 2017.

[106] P. Wellin Dep. Tr. 36:15-18, Aug. 29, 2017.

[107] P. Wellin Dep. Tr. 37:4-17, Aug. 29, 2017.

Decedent had received conflicted legal assistance for his estate plan from Mr. Farace,[108] and Defendant Peter Wellin sought to interfere with Decedent's efforts to remedy that issue. On June 5, 2013, Defendant Peter Wellin emailed Mr. Farace asking him to "decline participation in the proposed [estate planning] changes" with Mr. Bennett.[109] Defendant Peter Wellin recalled the prospect of his father receiving legal assistance from a new, independent lawyer was "a big red flag" and a "big danger."[110] Based on my experience and specialized knowledge in this field, it is unwise for a fiduciary to take actions calculated to withhold important information from the principal. Full disclosure, rather than concealment or cover-up, is the applicable standard of care for fiduciary relationships.

Applicable standards prohibit a fiduciary from engaging in conduct in which the potential benefit to the fiduciary conflicts with the best interest of the principal. As Decedent's fiduciary, rather than addressing concerns with respect to Decedent's capacity,[111] Defendant Peter Wellin undermined efforts taken by Mr. Bennett to solve the liquidity problem created largely through Decedent's gifts to Defendants Peter Wellin, Cynthia Plum, and Marjorie King.

On Father's Day, June 16, 2013, Decedent and Defendant Peter Wellin spoke by phone.[112] The conversation, as recounted by Defendant Peter Wellin, largely consisted of Decedent asking for financial aid, Peter Wellin claiming ignorance of his father's intentions, and Peter Wellin "testing" Decedent by demanding that his verbally-challenged father "articulate what exactly he

---

[108] Tom Farace's tendency to seek to serve Decedent and his children as actual or de facto clients led to him being caught in the middle when conflicts came to a head as they did in June of 2013.

[109] P. Wellin email to T. Farace, June 5, 2013, *Peter_Wellin_ESI_00001994*.

[110] P. Wellin Dep. Tr. 35:25-36:2, Aug. 29. 2017.

[111] P. Wellin Dep. Tr. 183:22-23, Aug. 30, 2017.

[112] P. Wellin Dep. Tr. 54:18–61:5, Aug. 29, 2017 (discussing his June 16, 2013 (Father's Day), phone conversation with Decedent).

was asking for."[113]  By this time, Mr. Bennett had already broached the subject of prepayment of

the illiquid note generated by the 2009 Transaction with one of the Defendants' attorneys.[114]

The Wellin children, through their attorneys, did not grant Decedent's request for financial

aid in dealing with his liquidity and estate planning issues.[115]  Mr. Bennett described this event at

his deposition:

> And then June 24th, we received the letter from John Hagerty, which my
> interpretation of this is -- of this letter was "We're setting a number of preconditions
> before we will even meet to talk about providing liquidity to Mr. Wellin."

> These preconditions really seemed, to me, to be a pretense.  They were
> requests for financial information, which surely Peter had.  He'd been on --
> receiving access to Mr. Wellin's accounts for years.  So to come in and say, "Well,
> we need to have summaries of his expenditures' seemed odd.  It . . . didn't seem
> like a reasonable request.[116]

---

[113] P. Wellin Dep. Tr. 58:12-17; 60:2-3, Aug. 29, 2017.

[114] P. Wellin Dep. Tr. 59:17:22, Aug. 29, 2017. (Defendant Peter Wellin admitting he was aware of this discussion).

[115] Letter from J. Hagerty to E. Bennett, June 24, 2013, *K. Wellin Estate* 06730-K. Wellin Estate 06732.

[116] E. Bennett Dep. Tr. 725:15–726:17, Nov. 8, 2017. A copy of the transmittal from Mr. Hagerty is found at *K. Wellin Estate 06729-K. Wellin Estate 06733*.  Mr. Bennett characterized Mr. Hagerty's letter as absolutely unreasonable in tone and content.  E. Bennett Dep. Tr. 229:23–230:3, Nov. 6, 2017. Decedent evidently interpreted the letter as an insult.

Mr. Bennett later characterized Decedent's perception of the demands in Mr. Hagerty's letter as: "Unreasonable; inappropriate; offensive." E. Bennett Dep. Tr. 769:25, Nov 8, 2017.  Mr. Bennett further testified the message conveyed by Mr. Hagerty was that of hostility toward Decedent on the part of his children articulated through their legal counsel.  *See* E. Bennett Dep. Tr. 370:16–371:21, Nov. 7, 2017.  Ms. Scarborough shared this sentiment:

> [A:]  I thought that that letter would not have been well received or was not well received by
>        Keith Wellin, that detailed the list of detailed financial information that the children wanted
>        in order to continue discussing this matter with Keith Wellin.

>        I always took that as sort of the straw that broke the camel's back on whether or not he
>        wanted to pursue this through litigation.

> Q:     And did you take that as the straw that broke the camel's back because of something Keith
>        Wellin told you?

> A:     Not directly, no.

> Q:     Indirectly?

> A:     I -- to the best of my recollection, I've had conversations with Mr. Bennett that that letter
>        was not well received by Keith Wellin, that it was akin to his children, you know, putting

Defendants' attorney, Mr. Hagerty, followed up his June 24, 2013 letter with a response on behalf of the Wellin children to Mr. Farace, Mike Simon and Mr. Bennett, demanding that Mr. Farace and Mr. Simon, Decedent's long-time lawyer and accountant, not "send information related to the [2009] Trust or Friendship [Partners, LP] to any parties other than my clients without our consent."[117] Mr. Bennett responded by email the same date with a letter to Mr. Hagerty conveying his belief that such a request was improper.[118] Mr. Bennett explained at his deposition that his responsive email was written

> to remind John that I thought those instructions, as counsel for the trust and partnership, which I understood that he – serving in that capacity, I thought that he was breaching the -- the duty, because the trust provides that the settlor has the right to information about the trust. It's specifically stated in the trust agreement. Mr. Wellin had a security interest in all of the assets of the trust, including books and records of the trust. But with respect to the partnership, I wanted to remind Mr. Hagerty that Mr. Wellin remained and continued to be a limited partner and had all rights to books and records of the partnership.[119]

> Additionally, Mr. Bennett asked Mr. Farace to expedite transmittal of Decedent's files "because there seems to be a bit more disagreement on issues now."[120] Mr. Farace later sent Mr. Hagerty an email stating he did not have "any ability to refuse to honor Mr. Wellin's explicit directive to transfer his files."[121] Decedent's reaction to his children's actions in late June 2013 is apparent from his June 26, 2013 meeting with Mr. Bennett. In an email sent soon after this meeting, Mr. Bennett reported as follows: I met with Keith and Wendy today - he is very focused on this. I walked in and he held up three fingers and said he had three things to tell me:

---

him on an allowance. And I'm not representing that Mr. Bennett used the word "allowance" or that Keith Wellin used the word "allowance." [W]hen I look at that letter . . . that looks to me like a budget or an allowance.

F. Scarborough Dep. Tr. 375:18–376:15, Feb. 26, 2018.

[117] J. Hagerty Letter to T. Farace et al., June 25, 2013, *K. Wellin Estate 06744*.

[118] E. Bennett Email to J. Hagerty et al., June 25, 2013, *K. Wellin Estate 06745*.

[119] E. Bennett Dep. Tr. 756:6-25, Nov. 8, 2017.

[120] E. Bennett Email to T. Farace, June 26, 2013, *K. Wellin Estate 06750*.

[121] T. Farace Email to J. Hagerty, June 28, 2013, *K. Wellin Estate 07111*.

1.    He wanted to sue his son;

2.    The 2009 transaction was brought to him by his son and he was told that Peter had a "tax advantaged transaction" and Keith trusted him to handle the details; and

3.    Keith's lawyer never explained it to Keith[122]

Under applicable standards of behavior for fiduciary relationships, a fiduciary is expected to avoid conflicts of interest with the principal. Notwithstanding the assertion made by Defendants that, in May and June 2013, Decedent was not in his right mind and was subject to undue influence, Defendant Marjorie King and her husband Richard King negotiated with Decedent to buy his home in Friendship, Maine for more than $2 million. Litigation ensued only after these negotiations stalled.

Decedent filed his complaint on July 3, 2013; on July 19, 2013, Defendant Peter Wellin and his two sisters filed a Petition in Charleston Probate Court, seeking a Conservator to protect Decedent's assets "due to his frail health and alleged undue influence asserted by his wife and caretaker, Wendy Wellin."[123] Over time, the parties mounted charges and counter-charges against each other.

**DECEDENT'S DISPUTED PROTECTIVE ACTIONS TAKEN IN NOVEMBER 2013**

On November 20, 2013, Decedent took protective actions available to him under the terms of the 2009 Trust. This involved three related strategies. The first was the appointment of a substitute Trust Protector for the 2009 Trust, Lester Schwartz.[124] Upon his appointment as Trust

---

[122] E. Bennett Email to R. Hood, June 26, 2013, *K. Wellin Estate 04152*.

[123] Order at 2, Feb. 21, 2014, *In re Keith S. Wellin*, Charleston Cnty. Probate Ct., C/A No. 2013-GC-10-129.

[124] Trust Protector Removal and Successor Trust Protector Appointment by Keith S. Wellin, Wellin Family 2009 Irrevocable Trust, Nov. 20, 2013, *K. Wellin 00428*.

Protector, Mr. Schwartz, in turn, removed South Dakota Trust Co. as a corporate trustee,[125] appointed Brown Brothers Harriman as its successor,[126] and amended the 2009 Trust instrument to remove the independent trustee's ability to add contingent beneficiaries.[127] Later that day, Decedent exercised his power of substitution under the 2009 Trust, exchanging the promissory Note with a then-outstanding balance of $50,211,446.55 (principal and accrued but unpaid interest as of November 20, 2013) for interests in the LP, with a fair market value equal to the outstanding balance of the Note.[128]  The value of the asset interest claimed was around 58% of the outstanding partnership units, as a result of the substitution strategy.[129]  Finally, Decedent released  his power of asset substitution under the 2009 Trust after his exercise of the same. [130]   Mr. Bennett testified the asset substitution was valid and resulted in grantor-trust status for the 2009 Trust being turned "off"[131] when combined with the actions of Mr. Schwartz.   Likewise, Mr. Schwartz testified Decedent exercised his right to turn off grantor-trust status, which caused the 2009 Trust to become responsible for the capital gains taxes associated with income flowing to the 2009 Trust.[132]

---

[125] Trustee Removal and Successor Trustee Appointment by Trust Protector Lester S. Schwartz, Esq., Wellin Family 2009 Irrevocable Trust, Nov. 20, 2013.

[126] *Id.*

[127] Trust Amendment by Lester S. Schwartz, Esq., Wellin Family 2009 Irrevocable Trust, Nov. 20, 2013, *K. Wellin 00429–K. Wellin 00432*.

[128] Exercise of Right of Substitution by Keith S. Wellin, Wellin Family 2009 Irrevocable Trust, Nov. 20, 2013, 5:12pm *K. Wellin 00414–K. Wellin 00426.*

[129] *Id.*

[130] Release of Right of Substitution by Keith S. Wellin, Wellin Family 2009 Irrevocable Trust, Nov. 20, 2013, 5:15pm, *K. Wellin 00427* (Effective at 11:59pm).

[131] E. Bennett Dep. Tr. 582:5-10, Nov. 7, 2017.

[132] L. Schwartz Dep. Tr. 134:13–137:5, Jan. 15, 2016.

Nevertheless, Defendants refused to recognize these protective actions as valid.[133]  Moreover, in the Conservatorship proceeding they were pursuing, Defendants refused to comply with a court order requiring them to pay $50,228,000, the minimum amount owed either (1) under the 2009 Note or (2) as a portion of the assets reacquired by Decedent in his November 20, 2013 asset substitution.[134]

## UNINTENDED CONSEQUENCES:
## LIQUIDATION OF THE LP AND SUBSEQUENT DISTRIBUTIONS

Generally, fiduciaries are required to provide full disclosure of significant information and avoid conflicts of interest at all costs, with the fiduciary always acting in the best interest of the principal.  In late November and early December 2013, Defendant Cynthia Plum, as the sole manager of the LLC, caused the LP to liquidate its assets, realizing approximately $157,000,000 in proceeds from the sale of 904 BRKa shares and 3000 BRKb shares owned by the LP.[135]  The liquidation of the BRKa holdings generated over $40 million in potential tax liability earmarked by Defendants for Decedent.[136]  If Decedent's assert swap and grantor trust termination efforts are found to be ineffective, Defendants will end up benefiting doubly through the 2009 Transaction at

---

[133] *See, e.g.* M. Wellin King Dep. Tr. 30:20-24, June 22, 2016; P. Wellin Dep. Tr. 286:13-14, Aug 30, 2017 ("the swap, as it was presented, was not valid"); C. Plum Dep. Tr. 75:22-24, Aug. 25, 2016 ("My father attempted to substitute assets when he lacked capacity, but it was not effective."); J. Hagerty Letter to E. Bennett, Dec. 6, 2013, *DEFS_0101087*.

[134] Order, Feb. 21, 2014, *In re Keith S. Wellin*, Charleston Cnty. Probate Ct., C/A No. 2013-GC-10-129.

[135] C. Plum Letter to UBS, Nov. 22, 2013, *UBS_McDevitt_00001646–UBS_McDevitt_00001646*. Prior to liquidating the stock held by the Partnership, Cynthia Plum, as Manager of the LLC, instructed UBS to convert two (2) Berkshire Hathaway Class A shares to Berkshire Hathaway Class B shares.  *See* C. Plum email to B. McLoughlin, Nov. 14, 2013, *Cynthia_Plum_ESI_00000880–Cynthia_Plum_ESI_00000885* (confirming permission for conversion). *See also generally* Account Statement, Friendship Partners, LP, Nov. 2013, *UBS_McDevitt_00002156–UBS_McDevitt_00001261* (reflecting conversion on page 11, *UBS_McDevitt_00002160*).

[136] The roughly $40 million in potential tax liability could only have been imposed entirely on Decedent if one accepts the Wellin children's position that the 2009 Trust remained a grantor trust.  The Estate maintains that grantor trust status was turned on November 20, 2013.  If the Estate's position prevails, the Estate would only be responsible for 59% of the potential tax liability, and the Wellin Children through the 2009 Trust would be responsible for the other 42%.

Decedent's expense. First, by participating in the 2009 Transaction, Defendants gained personal interests in roughly $90 million of productive, desirable assets formerly held by Decedent while giving a note with a face value of only $50 million in return. Second, by causing the sale of the BRKa shares in 2013 and by rejecting Decedent's November 20, 2013 actions, Defendants attempted to force Decedent to shoulder the resulting taxes (by maintaining the 2009 Trust remained a grantor trust for tax purposes) and sought to avoid paying more than $40 million in taxes that would have been assessed against the 2009 Trust upon an eventual sale[137] and against Defendants' trust holdings, had the stock been sold after Decedent's death. If Decedent's November 20, 2013 protective actions are deemed ineffective, the liquidation of LP assets in 2013 leave Decedent's estate with a huge potential tax bill arising from income taxes on the BRKa sale in addition to any other taxes owed by the Estate, such as any that arose out of Decedent's January 2013 gifts.

In conjunction with the sale of BRKa shares, Defendant Cynthia Plum dissolved the LP.[138] After its dissolution, the LP's assets were held for the benefit of the 2009 Trust. Under generally-accepted standards, the trustee must administer the trust in the best interest of the trust and distribute the property in accordance with the settlor's instructions and desires. Fiduciary duties hold the trustee to an objective standard of care in managing the trust property. Moreover, the trustee has a duty to not comingle trust property with the trustee's personal property. Defendants Peter Wellin, Marjorie King, and Cynthia Plum were Trustees of the 2009 Trust. As noted above, the individual Defendants refused to recognize as valid Decedent's November 20, 2013 asset

---

[137] The due on death clause in the Pledge Agreement would have triggered a $50 million gain to the Trust via satisfaction of a pecuniary obligation with appreciated assets.

[138] Written Consent in Lieu of a Meeting of the General Partner of Friendship Partners, LP, Dec. 1, 2013, *DEFS_000002* (adopting Plan of Dissolution); Plan of Dissolution and Liquidation of Friendship Partners, LP, Dec. 1, 2013, *DEFS_000003–4*.

substitution with respect to the 2009 Trust.[139]  As Settlor of the 2009 Trust, Decedent attempted to ensure his asset substitution, including the transfer of his partnership interest, was valid under the circumstances.  To the extent the 2009 Trust needed to provide additional documentation or assurances under Section 9.2(a) of the LP Agreement or otherwise, though I do not believe this was required, no justification existed for the Trustees withholding such documentation because the settlor of the 2009 Trust held has an absolute right to substitute assets. [140] Nor should the Trustees of the 2009 Trust be allowed to withhold such documentation or prevent such documentation from being generated when the inaction is in their personal pecuniary interests but contrary to the Settlor's right to substitute.

In furtherance of their position the substitution was ineffective, the individual Defendants attempted to tender $50,228,000 to Decedent on behalf of the 2009 Trust "as payment in full of the outstanding balance on the Note."[141]  By this action, Defendant Cynthia Plum, controlling the LP and with support and approval from her siblings, opted to take a position on the issue of ownership of partnership assets that was openly disputed by Decedent.  Per the standards of conduct for fiduciaries faced with a dispute over partnership asserts, the safer, more prudent, and fair course of action for a fiduciary faced with a dispute over partnership assets would have been to seek a judicial ruling on ownership.  The "payment in full" string attached to the $50 million

---

[139] *See* J. Hagerty Letter to R. Hood at 2, Dec. 6, 2013, *DEFS_0101086-87.*

[140] Trust Agreement § IV.A, Wellin Family 2009 Irrevocable Trust, Nov. 2, 2009, *FARACE 001204.*

[141] *Id.*; Written Consent in Lieu of a Meeting of the Individual Trustees of the Wellin Family 2009 Irrevocable Trust, Dec. 5, 2013, *DEFS_000008–DEFS_000010* (authorizing payment on Promissory Note).  For Peter Wellin's Power of Attorney apparently by which Cynthia Plum executed this document on his behalf, see P. Wellin, Power of Attorney, Nov. 15, 2013, *DEFS_002502–DEFS_002504.*

check was interpreted by the Probate Court as a refusal "to surrender these funds absent the alleged incapacitated releasing his right to dispute the full amount owed."[142]

Before payment was even tendered to Decedent, the individual Defendants, as Trustees of the 2009 Trust, voted to distribute to themselves liquidation proceeds in excess of $30,000,000 each, a transfer the Defendants claimed was tax-free.[143]  They retained liquidation proceeds of $52,000,000—an amount sufficient to cover the Note and its interest—and have been using these funds in part to pay their legal expenses, including fees related to their personal litigation against Mrs. Wellin.[144]  At his 2017 deposition, Defendant Peter Wellin estimated that, since July 1, 2013, he and his two sisters have paid legal fees "probably in the [$]10 to $15 million range,"[145] a portion of which has been paid out of the $52,000,000.

Standards of conduct applicable to fiduciaries require that, if there is reasonable doubt as to the identity of the proper payee, the trustee should seek guidance from the court.  Rather than escrowing the disputed funds and bringing a declaratory action to clarify ownership of the trust assets, the Defendants seized those assets and took no action to safeguard Decedent's right to payment from the LP's liquidation proceeds in the event his legal position was vindicated. Assuming Decedent's November 20, 2013 substitution of assets was valid, Defendants should have distributed 58% of the proceeds to Decedent.  On the other hand, if the substitution of assets

---

[142] Order at 4, Feb. 21, 2014, *In re Keith S. Wellin*, Charleston Cnty. Probate Ct., C/A No. 2013-GC-10-129.

[143] Written Consent in Lieu of a Meeting of the Distribution Committee and the Individual Trustees of the Wellin Family 2009 Irrevocable Trust, Dec. 1, 2013, *DEFS_000005–DEFS_000007* (authorizing distribution to the Wellin Children individually of the Trust assets in excess of $52,000,000.00).  *See also* C. Plum Letter to UBS, Dec. 5, 2013, *DEFS_002532* (authorizing transfer of $31,876,714.15 to personal accounts of Peter Wellin, Cynthia Plum, and Marjorie King respectively).

[144] C. Plum Dep. Tr. 547:9-25, Aug. 26, 2016.  Ms. Plum testified the Wellin Children's legal expenses were being paid by Friendship Management LLC, the Wellin Family Irrevocable Trust, and the children's "individual legacy accounts."  *Id.* at 548:9-14.

[145] P. Wellin Dep. Tr. 343:24–344:11, Aug. 31, 2017.

was ineffective, applicable standards for fiduciaries required Defendants to tender payment of the note plus interest to Decedent. Despite Defendants' concession that $50 million dollars-plus is owed to the Estate,[146] Defendants continue to withhold either payment. In my opinion, based upon the facts of this case and based upon my specialized knowledge and experience, Defendants' conduct deviated from the standards applicable to fiduciaries holding funds that are the subject of an ownership dispute.

## ANALYSIS

### INDIVIDUAL DEFENDANTS' CONTROL OVER DECEDENT AND HIS WEALTH

Under applicable standards that prohibit fiduciaries from engaging in conduct in which the potential benefit to the fiduciary conflicts with the best interest of the principal, duties take on special importance when loyalties conflict. In my experience, rationalization can supplant clear thinking when conflicts arise, which is why conflicts of interest are generally viewed with suspicion. Though Defendant Peter Wellin testified he was loyal to his father, he framed the definition of what was in Decedent's best interest in a self-serving way. Consider this colloquy:

> Q:     Would you agree that you have an obligation as his fiduciary to act in his best interest before your own best interest? . . .

> MR. BRUNSON:  Object to the form.

> THE WITNESS: I think I have an obligation to act in his best interest. And in my experience, my father's best interest included the interest of his family. I mean, he was -- his family was the most important thing to him, his lineal family. And I have difficulty separating those out. . . .

> Q:     Whether or not it is your position that the -- the most important thing to him was his lineal family -- put that aside -- as a general obligation, do you view your  obligation to put his interest before your own? . . . .

> MR. BRUNSON:  Object to the form.

---

[146] R. Brunson, Hr'g Tr. 34:21-25, 35:1-4, Feb. 6, 2014 (Hearing in the Probate Court for Charleston County on Special Conservator E. Bennett's Petition for Guidance).

> THE WITNESS: I view my obligation to my father was to look out for his best interests. Those best interests often, if not all the time, included the interests of his children and grandchildren, based upon my knowledge of my father.[147]

Furthermore, Peter testified:

> I'm going to go broad brush here. Dad's goal in 2003 was to create a legacy that would remain within his lineal family. And that legacy was approximately half his wealth. And that was the purpose of the 2003 transaction, was to set -- put that wealth into a partnership that directed that wealth towards his lineal family members. That was in conjunction with his intent that his estate, that the bulk of his estate, which was separate, would go to his children.

> The radical rewrite of his estate documents, his trust documents, revocable trust documents, in that June/July [2013] time period changed that. There was a departure from his overall estate plan. And as trustees, it was our responsibility to do what we thought was in the best interest of the beneficiaries of the trust.[148]

As Defendant Peter Wellin's own words signify, by June or July 2013, the potential conflict of interest that existed between (1) serving Decedent's best interests and (2) securing financial wealth for Peter Wellin, his siblings, and their children had turned into an open, actual conflict calling for judicial intervention. Defendants have attempted to justify actions that were injurious to Decedent on the ground they were consistent with Decedent's 2003 estate plan. Consider this colloquy involving Defendant Peter Wellin:

> Q    And you didn't think it would cause any harm to your father by selling the Berkshire Hathaway stock in order to generate the $52 million to pay to your father?

> A    You know, to put a broad perspective on this, back in 2003, when he set aside these assets, gave up control and put them in the partnership, he gave up access to those assets. And he never contemplated that he would need those assets. In his mind, this was a gift that he made back in 2003 that was for the benefit of his lineal family members. He never contemplated that he would need to access that money.

---

[147] P. Wellin Dep. Tr. 505:24–507:4.

[148] P. Wellin Dep. Tr. 313:6-25, Aug. 30, 2017.

45

So this all, whether we paid in cash or we paid in stock, in my mind -- and again, I'm not a lawyer -- but in my mind, it was consistent with his plan. It was consistent with his estate plan.

Q    And he also -- your father also never contemplated that you were going to be selling the Berkshire Hathaway stock during his lifetime in order to generate taxes and impose that tax on him?

MR. BRUNSON: Object to the form.

THE WITNESS: I don't think -- I don't think it was something that was -- it wasn't focused on that this might be some -- this would be an option.[149]

Per applicable standards of conduct for fiduciary relationships, a fiduciary cannot place himself in a position in which his interests conflict with his duty to the principal. Based on my experience and specialized knowledge, if there is any conflict of interest, the fiduciary should give full disclosure to the principal and obtain either a written waiver from the principal *after* full written disclosure is made or, better yet, resign from any fiduciary position in which he is in a conflict of interest. Defendant Peter Wellin's testimony suggests that, because his father "never contemplated that he would need access to" his BRKa wealth back in 2003 when he set aside those assets, it became reasonable for Defendant Peter Wellin to take actions prejudicing his father when circumstances changed. Moreover, Defendant Peter Wellin acknowledged the justification for selling the BRKa stock was retaliatory: "[I]t was a direct result of the radical rewriting of my father's estate plan, in June and July of 2013 and going forward, orchestrated by Wendy."[150]

Central to Decedent's estate planning strategy was his contribution of BRKa stock to the LP. Friendship Management, LLC controlled the LP as its general manager, and Defendant Cynthia Plum controlled the LLC as its sole manager, with Defendants Peter Wellin and Marjorie

---

[149] P. Wellin Dep. Tr. 309:5–310:5, Aug. 30, 2013.

[150] Friendship Management, LLC 30(b)(6) Dep. Tr. 253:7-10, Feb. 9, 2018. *See also id.* 254:25-255:3 ("[T]he sale of the stock was very much prompted by the changes to my father's estate plan in June and July of 2013 going forward.").

46

King as Members.[151]  Defendants Peter Wellin and Marjorie King actively participated in the LP with Defendant Cynthia Plum through their control of the LLC.  As a limited partner in the LP, from 2003 onward, Decedent had no legal control over the BRKa holdings he contributed to the LP.[152]  In 2009, the individual Defendants' controlling-person status was solidified when they became Trustees, Investment Committee Members, and Distribution Committee Members of the 2009 Trust.

From 2009 onward, each of the siblings worked together in processing limited partnership paperwork, including by signing off on the note issued to Decedent, by issuing restated notes thereafter, and by authorizing and effectuating noncash interest payments on the obligation. Having control of the LLC which in turn controlled the LP, Defendant Cynthia Plum signed the LP's liquidation paperwork in December 2013, which precipitated the sale of Decedent's BRKa stock.[153]  As members of the Distribution Committee, the Defendants signed off on paperwork directing payment of proceeds from the liquidation of the LP to each other, the beneficiaries of the 2009 Trust.

In solidifying the distribution made by the LP in December 2013, Defendant Cynthia Plum acted in her various formal capacities as Manager of the General Partner, Trustee, and Distribution Committee Member.  She also purported to act on behalf of Defendant Peter Wellin as his attorney-

---

[151] *See* Operating Agreement, Friendship Management, LLC, Dec. 11, 2003, *FARACE 001143–FARACE 001163*; Voting Agreement, Friendship Management, LLC, Dec. 11, 2003, *FARACE 001131–FARACE 001134;* Agreement of Limited Partnership, Friendship Partners, LP, Dec. 12, 2003, *FARACE 002057–FARACE 002080.*

[152] From 2003 to 2009, Decedent enjoyed an ongoing financial interest in the limited partnership.

[153] Written Consent in Lieu of a Meeting of the General Partner of Friendship Partners, LP, Dec. 1, 2013, *DEFS_000002* (adopting Plan of Dissolution); Plan of Dissolution and Liquidation of Friendship Partners, LP, Dec. 1, 2013, *DEFS_000003–4.*

in-fact.[154]  Moreover, each of the individual Defendants subsequently approved the payouts to each

other in reciprocal fashion, as well as the attempted payout to Decedent for $50,228,000.[155]

Defendants demanded that, for him to receive the cash, Decedent must ratify their actions while

disavowing his November 2013 note substitution.  According to a writing sent by Defendants'

counsel on December 6, 2013, Decedent was entitled to the money via his Revocable Trust and

the Trustees characterized the payment as "payment in full of the outstanding balance of the

Note."[156]  The same letter rejected the November 20, 2013 asset substitution by Decedent as

"ineffective."[157]  In return, Defendants' counsel received a letter from Mr. Bennett, returning the

$50,228,000 check and demanding that, instead, Defendants immediately distribute to Decedent

58% of all the assets of the partnership that were being distributed in liquidation of the

partnership.[158]  No such distribution has yet to be made.

**CONFLICTS OF INTEREST INHERENT IN
DEFENDANTS' DEALINGS WITH DECEDENT**

Generally, fiduciaries are required to act in the best interest of the principal and to provide

full and fair disclosure to the principal of facts and potential conflicts of interest that arise in

performing his or her duties.  As discussed above, Defendants were vested with powers and

---

[154] *Id.*  A legal question exists as to the validity of Peter Wellin's Power of Attorney for Cynthia Plum, which he signed individually, and not expressly in his capacity "as trustee or in [his] capacity as a member of the distribution committee or investment committee of a trust, the 2009 irrevocable trust."  See P. Wellin Dep. Tr. 297:12–300:19.

[155] Written Consent in Lieu of a Meeting of the Distribution Committee and the Individual Trustees of the Wellin Family 2009 Irrevocable Trust, Dec. 1, 2013, *DEFS_000005–DEFS_000007* (authorizing distribution to the Wellin Children individually of the Trust assets in excess of $52,000,000.00); Written Consent in Lieu of a Meeting of the Individual Trustees of the Wellin Family 2009 Irrevocable Trust, Dec. 5, 2013, *DEFS_000008–DEFS_000010* (authorizing payment on Promissory Note); P. Wellin, Power of Attorney, Nov. 15, 2013, *DEFS_002502–DEFS_002504*; C. Plum Letter to UBS, Dec. 5, 2013, *DEFS_002532* (authorizing transfer of $31,876,714.15 to personal accounts of Peter Wellin, Cynthia Plum, and Marjorie King respectively).

[156] J. Hagerty Letter to E. Bennett at 2, Dec. 6, 2013, C/A No. 2:13-cv-01831-DCN, ECF No. 301-18.

[157] *Id.*

[158] E. Bennett Letter to J. Hagerty, Dec. 6, 2013. C/A No. 2:13-cv-01831-DCN, ECF 301-19.

responsibilities in shaping Decedent's estate plan. Particularly in the case of Defendant Peter

Wellin, Decedent sought and relied upon the Defendants' advice. The following is a non-exclusive

list of the conflicts of interest in this case:

- ➤ The Wellin children, as beneficiaries of the 2009 Trust, having personal interests in maximizing their distribution of assets from the 2009 Trust while simultaneously as Members of the LLC controlling the profits of the LP, of which Decedent was a partner;

- ➤ The Wellin children actively preparing for litigation regarding Decedent's assets while receiving significant cash gifts from Decedent;

- ➤ Selling the BRKa shares through the LP, which was controlled by the Wellin children, prior to Decedent's death that would necessitate the tax payments come out of Decedent's personal assets or assets that pass through his Estate, rather than Defendants making the tax payments;

- ➤ Defendant Peter Wellin assisting in large part with the creation of Decedent's estate plan despite that he was a recipient of the planned $10 million gift;

- ➤ Defendant Peter Wellin obtaining confidential attorney-client communications between Mr. Farace and Decedent;

- ➤ Defendant Marjorie King negotiating with Decedent over the price of the Friendship, Maine property while the Defendants were actively preparing for a legal attack on Decedent's capacity; and

- ➤ Defendant Cynthia Plum playing a lead role as the manager of the LP while executing the wealth transfer scheme effected by Defendants in late November and December 2013.

### NONCONFORMANCE WITH APPLICABLE STANDARDS

Under applicable standards, fiduciaries are prohibited from acting in ways that benefit

themselves or others at the expense of the principal and from withholding significant information

from the principal. Rather than acting in accordance with Decedent's reasonable expectations, the

individual Defendants acted in concert to benefit themselves personally. Missing from the

disclosures Defendants gave to Decedent were such significant facts as these:

- ➤ The 2009 Transaction may have been tax-advantaged for Decedent's children or his Estate, but it was not tax-advantaged for him during his lifetime. Depending on his longevity and the continued appreciation of BRKa shares, Decedent faced the risk of crushing tax liability without sufficient assets to pay the tax bill. Decedent's

inability to turn "off" grantor trust status solely by his own action posed the risk that Decedent could face huge tax liability with no way to protect against it if circumstances changed.

➢ While Defendant Peter Wellin was named as Decedent's attorney-in-fact, he and Decedent's daughters secretly had hired attorneys in his own hometown to attack Decedent's competence and the behavior and good faith of Decedent's wife.

➢ Decedent faced potentially huge liquidity and tax issues if the BRKa held by the LP was sold during his lifetime. This contingent liability needed to be disclosed; based on the facts of this case as previously discussed, this was never done.

➢ Once Decedent's partnership interest was exchanged for the Note in 2009, there was a risk that no cash payments would be received to pay off the Note for many years.

➢ Decedent could not require prepayment or acceleration on the 2009 Trust's payment of the Note absent an event of default, and the Wellin children could refuse, and did refuse, to prepay the same.

Furthermore, during the time he held Decedent's Powers of Attorney, Defendant Peter Wellin sought to interfere with Decedent's access to legal counsel during a time of need. In that same period, Defendants appear to have been planning a legal attack against Decedent. As holders of powers of attorney or successor appointments, Defendants Peter Wellin and Cynthia Plum were obligated to act solely for the benefit of the principal in all matters connected with the agency.

Later, the Wellin children unilaterally rejected Decedent's efforts to substitute assets and turn off grantor-trust status, and they liquidated assets in a self-serving way rather than holding assets in trust and seeking a judicial determination of the parties' conflicting legal positions.[159] This liquidation exacerbated Decedent's liquidity problems due to the sale of the BRKa stock held in the LP. Rather than avoiding conflicts of interests, Defendants Peter Wellin, Cynthia Plum, and Marjorie King exploited the power derived from their conflicted fiduciary positions for personal

---

[159] Under applicable standards of conduct, if there is reasonable doubt as to the identity of the proper payee, the fiduciary should apply to the court for guidance.

gain by approving of distributions of proceeds from the LP's liquidation of BRKa directly to themselves without honoring Decedent's interest in the LP's liquidation proceeds.

## DEFENDANTS' FURTHER ACTIONS AND INACTIONS DEVIATING FROM APPLICABLE STANDARDS

Through their actions and inactions, the individual Defendants ill-served Decedent while aggressively working to further their own pecuniary interests. In my opinion, conduct engaged in by one or more of the Defendants, principally Defendant Peter Wellin, fell below applicable standards of conduct for fiduciaries.

### Isolating Decedent from Tax Advisors.

Decedent's large gifts made to the individual Defendants and to Mrs. Wellin in 2013 proceeded without Mr. Farace's input. His services went unused despite his familiarity with Decedent's estate plan and financial resources. Defendant Peter Wellin was aware of the planned 2013 gifting before it was finalized. Given his fiduciary position toward Decedent, as holder of Decedent's Power of Attorney and otherwise, it was Defendant Peter Wellin's duty to ensure that Decedent had the benefit of careful, independent professional planning assistance to evaluate the impact of the planned gifting on Decedent's estate plan. No such professional planning assistance was ever sought or rendered.

In an Affidavit he filed in this matter, Defendant Peter Wellin wrote about his dealings concerning Decedent's January 2013 gifting, including his contacts with Mike Simon, Decedent's CPA.[160] In Peter Wellin's Affidavit, Mr. Simon was presented as his father's "long time accountant [who Decedent] continuously relied on . . . to advise and assist him with tax and estate planning."[161] For his part, Mr. Simon denied that his work for Decedent included estate

---

[160] P. Wellin Aff. ¶¶ 9, 28–33, Aug. 27, 2013, C/A No. 2:13-cv-01831-DCN, ECF 41-2.

[161] *Id.*

planning.[162]  According to Mr. Simon, it was Mr. Farace's job, not his, to "advise [Decedent] with respect to how to minimize the tax impact on his estate at his death."[163]

When Defendant Peter Wellin revealed Decedent's January 2013 gifting plan to Mr. Simon, Mr. Simon opined the gifting plan would be "very expensive" with costs running to $67 million to make the $40 million gifts.[164]  In a report he prepared about events surrounding the gifting, Mr. Simon stated he considered the gifting to entail "an extremely costly [plan that] would utilize a majority of his remaining portfolios, which both Peter and I thought were imprudent."[165] Defendant Peter Wellin's deposition testimony never referred to his concern or to Mr. Simon's that the gifting scheme was imprudent.  According to Defendant Peter Wellin's later testimony, and in contrast with Mr. Simon's recollection, at the time of the gifting, Defendant Peter Wellin saw no problems with the plan to give huge sums of after-tax money:

> As far as liquidity problems, he was comfortable he had the assets to make these gifts, and I had no reason to doubt him. . . . I thought he had adequate assets to make these gifts, as well. And he had a promissory note that -- with respect to liquidity in his estate, he had a promissory note that was going to be – would be funded $50 million on his death. So there was no issue, as far as . . . I know, about funding his bequest in his estate after the making of these gifts.[166]

Once the imprudence of Decedent's tax-*dis*advantaged gifting had become obvious, Mr. Simon asked Defendant Peter Wellin if he, Mr. Simon, "should get ahold of Tom Farace, because Tom Farace was the estate attorney and this would have an impact on the plan that Tom Farace did."[167]  According to Mr. Simon, Defendant Peter Wellin's response was that his father "did not

---

[162] M. Simon Dep. Tr. 16:22–17:9, Oct. 15, 2015.

[163] M. Simon Dep. Tr. 17:4-6, Oct. 15, 2015.

[164] M. Simon Dep. Tr. 103:1–104:3, Oct. 15, 2015.

[165] M. Simon, Memo, Jan. 24, 2013, *SIMON 08870*.

[166] P. Wellin Dep. Tr. 158:15-25, Aug. 29, 2017.

[167] P. Wellin Dep. Tr., 104:9-12, Aug. 29, 2017.

think it would be necessary for Tom to be called, Tom shouldn't be called on the matter."[168] However, according to Defendant Peter Wellin, when he discussed the tax consequences of the planned gifting with Mr. Simon,

> Simon also asked whether Farace should be consulted, and I told Simon that Dad said that he saw no need to involve Farace. However, I urged Simon to contact Farace directly if he would be more comfortable doing so. Simon told me that he would assess the tax consequences of the proposed gifts and get back to me.[169]

In my opinion, based upon my specialized knowledge and experience and based on the facts of this case, there can be no dispute that Decedent had a long-time attorney-client relationship with Mr. Farace or that Mr. Farace was Decedent's estate planning counsel at that time. Mr. Farace had previously been consulted when Decedent made gifts that affected his overall estate plan.[170] According to Defendant Peter Wellin's affidavit, he relayed Mr. Simon's concern over the gifts' large tax burden to Decedent.[171] Yet, Defendant Peter Wellin's affidavit says nothing about relaying to his father the professional concern that Mr. Simon expressed about Decedent making the gifts without first consulting tax lawyer Mr. Farace. Indeed, Mr. Simon called Mr. Farace after the transaction had occurred.[172]

The gifting scheme had a $67 million price tag, with $27 million of that cost being taxes. Additionally, the scheme was executed in a non-tax efficient manner (conveying cash rather than BRKa stock). According to Mr. Simon, "I was surprised that it was done in cash as opposed to

---

[168] P. Wellin Dep. Tr., 104:13-15, Aug. 29, 2017.

[169] P. Wellin Aff. ¶ 29, Aug. 27, 2013, C/A No. 2:13-cv-01831-DCN, ECF 41-2.

[170] T. Farace Dep. Tr. 94:22-95:7, Jan. 26, 2016.

[171] P. Wellin Aff. ¶ 30, Aug. 27, 2013, C/A No. 2:13-cv-01831-DCN, ECF 41-2 ("After I spoke to Simon, Dad called me back. I told him that Simon had expressed concern with the tax consequences of the gifts, in particular the generation-skipping penalty on the gifts to the grandchildren.").

[172] M. Simon Dep. Tr. 130:13-20, Oct. 15, 2015.

securities, which is something [Decedent] always did."[173]  For his part, Mr. Farace "was surprised

the gifts were made."[174]  He noted, "I don't recall being alerted to those gifts, no."[175]  In my opinion,

someone facing a danger, threat, or problem involving his or her estate plan should receive

specialized legal help, ideally from a professional well conversant with that estate plan.  Mr. Farace

purported to be the one with this know-how, but Defendants screened him from assisting Decedent.

At his deposition, Mr. Farace explained, "I would have expected to get a call to talk about the pros

and cons of that particular gift and to work through, you know, what those numbers would mean

to his total plan."[176]

Mr. Simon testified he considered the gifting scheme imprudent and that Defendant Peter

Wellin agreed.  Under applicable standards, a fiduciary should have advised Decedent to postpone

action until he counselled with Mr. Farace.  Failing that, I believe a fiduciary should have directly

contacted Mr. Farace to warn him that implementation of the gifting plan was imminent.

In addition to the foregoing opinions, three related points of concern exist stemming from

Defendant Peter Wellin's August 26, 2013 Affidavit.  First, even though he had ready access to

tax advice through both Mr. Simon and Mr. Farace, and even though Defendant Peter Wellin knew

that the tax cost of Decedent's plan to gift $40 million to his children and his wife would be $27

million, through Defendant Peter Wellin's did not provide Decedent with the opportunity to

discuss the intended gifts with his counsel or his tax professionals outside of Defendant Peter

Wellin's presence.  In my experience, such a large cost item should have been placed on the table

for careful consideration by Decedent *and* his tax professionals in advance of the gifting.

---

[173] *Id.* at 132:7-9.

[174] T. Farace Dep. Tr. 94:16, March 3, 2015.

[175] *Id.* at 93:16-17.

[176] *Id*. at 94:18-21.

Second, Defendant Peter Wellin's affidavit makes it clear that Decedent was, at the time of the gifting, "convinced that the BRKa Shares . . . would continue to appreciate."[177] Decedent's belief that BRKa continued to be a desirable investment gives more reason to deem ill-advised and concerning Decedent's decision to sell the stock and incur substantial capital gains taxes rather than just gift the BRKa stock outright.

Third, it is worth reflecting on Defendant Peter Wellin's reasoning about why the $27 million tax payment obligation Decedent was shouldering in early 2013 posed no serious liquidity problems for Decedent.  As quoted above, a major reason offered by Defendant Peter Wellin when he was deposed was that Decedent held a promissory note worth $50 million that would be funded on his death.  However, history shows us that, when Decedent asked for the note to be prepaid to help with his liquidity crunch, Decedent was rebuffed by his children and their counsel.

**Attempted Interference with Decedent's Access to Professional Assistance in 2013.**

On June 5, 2013, Defendant Peter Wellin wrote Mr. Farace asking him not to cooperate with Decedent's wish to change counsel.[178]  In so acting, Defendant Peter Wellin interfered both with his father's access to counsel and with Mr. Farace's duty to facilitate Decedent's transition to Mr. Bennett's firm as Decedent's new lawyer.  Under well-understood ethics rules, Mr. Farace was duty-bound to lend support to that transition.[179]  Five days later, on June 10, 2013, Defendant

---

[177] P. Wellin Aff. ¶ 34, Aug. 27, 2013, C/A No. 2:13-cv-01831-DCN, ECF 41-2.

[178] *See* P. Wellin Email to T. Farace, June 5, 2013, *Peter_Wellin_ESI_00001993– Peter_Wellin_ESI_00001994*.

[179] *See* SCACR 407, Rule 1.16(d) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred.").

Peter Wellin sent Mr. Farace another email, asking him to become involved in "a meeting with the attorney Wendy identified as taking your place in my father's affairs."[180]

On June 25, 2013, the Wellin children's counsel sent a letter to Mr. Farace and Mr. Simon warning them "not to send information related to the [2009] Trust or Friendship [Partners L.P.] to parties other than my clients [i.e., not Decedent or his new lawyer, Edward Bennett] without our consent."[181] The attorney added: "If documents have been sent, we would like to know what was sent and that demand be made immediately for their return."[182] In addition to sending the letter on behalf of Defendants in their individual capacities as Trustees, the Defendants' attorney sent the letter on behalf of Defendant Cynthia Plum in her capacity as manager of the LP.[183] Applicable standards provide that a limited partner is entitled to access information and materials regarding the limited partnership and is in fact provided access to that information.[184] Furthermore, in Section D(8) of Article VII of the Wellin Family 2009 Irrevocable Trust, Decedent specifically retained the right to review all books and records of the 2009 Trust.[185]

By the June 25th letter, the Wellin children claimed ownership of their father's estate planning papers, spanning more than a decade, and claimed the right to dictate to Decedent's long-time estate planning lawyer and his CPA. Mr. Farace later testified that, when he was "performing legal work that related to the Intentionally Defective Irrevocable Trust, that [Decedent] was [his]

---

[180] *See* P. Wellin Email to T. Farace, June 10, 2013, *Peter_Wellin_ESI_00001993–Peter_Wellin_ESI_00001991.*

[181] J. Hagerty Letter to T. Farace, et al., June 25, 2013, *K. Wellin Estate 06744.*

[182] *Id.*

[183] *Id.*

[184] *See* Agreement of Limited Partnership of Friendship Partners, LP, Dec. 12, 2003, § 6.1, *FARACE 002067.*

[185] Trust Agreement Article VII, § D(8), Wellin Family 2009 Irrevocable Trust, *FARACE 001201 – FARACE 001202.*

client."[186]  Asked whether he was the lawyer for Defendants Peter Wellin, Cynthia Plum, or Mari

King in conjunction with the 2009 Transaction, Mr. Farace testified, "I was not."[187]  Mr. Farace

rejected the Wellin children's June 25, 2013 directive, citing client loyalty and professional

duty.[188]  In my opinion, actions taken by or on behalf of Defendants to interfere with an accountant-

client and attorney-client relationship deviated from applicable standards for fiduciaries.

### The $25 Million Revocable Trust Attempt

Shortly after he arrived on the scene in Spring 2013, Mr. Bennett sensed the tension

existing between Mrs. Wellin and Defendant Peter Wellin over money matters.  It was Decedent's

wish to leave his wife $25 million at his death.  Rather than leave that bequest in a trust controlled

by Defendant Peter Wellin as trustee and risk friction down the line, Mr. Bennett proposed to have

her bequest flow into a second revocable trust, with Mrs. Wellin serving as successor trustee after

Decedent's death.  Yet, when asked about this proposed plan at his deposition, Defendant Peter

Wellin stated, "I don't think it made sense."[189]  When asked to explain what it was about the plan

that was objectionable, Defendant Peter Wellin first stated: "The idea that I considered to be crazy

is if $25 million is segregated from my father's control in whatever form, whether it be gifted or

put in an irrevocable trust, that's crazy; and that was crazy at the time."[190]  However, the proposed

revocable trust would have been in Decedent's control during his lifetime.

When pressed what he knew about the specifics of the plan discussed with Mr. Farace and

his father, Defendant Peter Wellin admitted he did not really understand the plan that was under

---

[186] T. Farace Dep. Tr. 124:21-25, March 3, 2015.

[187] T. Farace Dep. Tr. 243:19–244:7, Jan. 27, 2016.

[188] T. Farace email to J. Hagerty et al., June 28, 2013, *K. Wellin Estate 07111*.

[189] P. Wellin Dep. Tr. 178:25, Aug. 30, 2017.

[190] P. Wellin Dep. Tr. 181:17-21, Aug. 30, 2017.

discussion. "It was confusing to me at the time based on the knowledge -- based on the information I had received, it was confusing to me what exactly was planned. . . . I did not have a full understanding."[191]   Despite his status as Decedent's power of attorney, Defendant Peter Wellin never sought to get a "full understanding" of the proposed estate planning change, either by contacting Mr. Bennett or Mr. Farace.[192]   However, the substance of the $25 million revocable trust plan, which did not call for an immediate transfer of $25 million to Mrs. Wellin, was covered by Mr. Bennett in a June 10, 2013 meeting with Defendants' attorney.[193]   Peter Wellin's inability or unwillingness to grasp his father's plan for using a revocable trust to facilitate the $25 million bequest to Mrs. Wellin did not meet the applicable standard for a fiduciary.

## Defendant Peter Wellin "Testing" Decedent

Defendant Peter Wellin testified that, when he spoke to his father on June 16, 2013, after Decedent had suffered a stroke that temporarily impaired his speaking abilities, the conversation mostly consisted of Defendant Peter Wellin "testing" his father by demanding that he "articulate what exactly he was acting for."[194]   If Defendant Peter Wellin was genuinely concerned about Decedent's capacity, the controlling documents created a process for succession in the event Decedent became incompetent.  Based upon my experience and specialized knowledge and based on the facts of this case, the applicable standards of care for fiduciaries required Defendant Peter Wellin to follow the steps outlined in Decedent's controlling testamentary documents in the event of incapacity, and at a minimum, required Defendant Peter Wellin to visit his father in person to determine how to handle any health issues of Decedent's.

---

[191] *Id.* at 181:25–183:3, 182:19.

[192] *Id.* 182:20-183:7.

[193] E. Bennett Email to W. Wellin, June 10, 2013, *K. Wellin Estate 03603.*

[194] P. Wellin Dep. Tr. 58:12-17; 60:2-3, Aug. 29, 2017.

The Wellin children's attorney demanded in a letter on June 24, 2013, that, as a precondition to discussing Decedent's finances, numerous tasks must be performed, including Mr. Farace providing detailed information and Mr. Bennett, Mr. Farace, and Mr. Simons meeting to gather facts about Decedent's financial condition and estate planning history. The aim of gathering such data, according to the Wellin children's attorney, was "so that Peter is able to fulfill his duty as Power of Attorney."[195] However, five months earlier, Defendant Peter Wellin demanded no information or contact from Mr. Farace before approving the $67 million gifting scheme. Moreover, the attorney's letter demanded two-years' worth of detailed spending information, including credit card and UBS stock account statements. Exactly why this information was crucial remains unclear because Defendant Peter Wellin, as Decedent's Power of Attorney, already had access to the data and was monitoring spending in Decedent's accounts.[196] The letter also demanded information about Decedent's real estate dealings and "[a] draft budget of the Wellins' household expenses . . . for the next 12 months."[197] In my opinion, this conduct did not meet the applicable standard of conduct for a fiduciary.

### Wearing Two Hats:  Negotiating with an Allegedly Incompetent Father

The Wellin children wore different hats in their various roles in dealing with their father and his estate planning, and sometimes those different roles conflicted. One conflict of interest arose out of Defendant Marjorie King's attempted purchase of the Friendship, Maine home from Decedent while the Wellin children met with their attorneys to discuss challenging Decedent's capacity.

---

[195] J. Hagerty letter to E. Bennett, June 24, 2013, *K. Wellin Estate 06730–K. Wellin Estate 06731*.

[196] Defendant Peter Wellin apparently took time throughout 2013 to save on his own computer screen shots of Decedent's checking account balances and checks.  *See Peter_Wellin_ESl_00001353- Peter_Wellin_ESl_00001356*.

[197] J. Hagerty letter to E. Bennett, June 24, 2013, *K. Wellin Estate 06731*.

Under one view of the Friendship, Maine real estate sale, the Wellin children collectively negotiated for a low purchase price and sought to secure payment of notes held by Decedent's grandchildren from the sale proceeds.[198]  A below market price for the Friendship, Maine home carried gift tax considerations and added costs for Decedent.  Defendant Marjorie King's husband, Richard King, complained at his deposition about what he perceived to be "an insincere effort to try to consummate the transaction" during April, May, and June 2013.[199]  When Defendant Marjorie King sought to do business with Decedent in a multi-million dollar transaction, she and her siblings had retained counsel, and by June, they had alleged incompetence, lack of capacity, and undue influence.  The Defendants' inconsistency deviated from applicable standards requiring fiduciaries to refrain from participating in conflict of interest transactions and to provide full disclosure of significant information to the principal.

### THE FINAL INDIGNITY:  GROSS UNFAIRNESS

Defendants used the LP to send Decedent's Revocable Trust a check for $50,228,000 as payment in full of the outstanding balance of on the Note.[200]  The check was never cashed.  The debt remains unpaid, despite Judge Condon's Order calling for disbursement of funds to Decedent's Estate.  Defendants now take the position that the obligation to Decedent has been extinguished entirely. The 2013 stock sale and the ensuing declination to pay what was owed to Decedent were actions taken on behalf of and with the full support of Defendants Marjorie King and Peter Wellin, who testified in 2013, "I have no intention or desire to sell any of the stock owned by the partnership for the purpose of . . . injuring Dad."[201]

---

[198] *See* R. King Email to P. Wellin, May 28, 2013, *Richard_King_00000522– Richard_King_00000523*.

[199] R. King Dep. Tr. 112:21–113:4 (Oct. 1, 2015).

[200] J. Hagerty Letter to R. Hood at 2, Dec. 6, 2013, *DEFS_0101086-87*.

[201] P. Wellin Aff. ¶ 41, Aug. 27, 2013, C/A No. 2:13-cv-01831-DCN, ECF 41-2.

Currently, Decedent's Estate shows nothing positive derived from Decedent entrusting 896 shares of BRKa common stock to the LP in December 2003. At that time, Decedent's capital contribution to the LP was around $85 million. By early December 2013, despite market ups and downs, the value of that original investment had more than doubled to around $170 million.

### CONCLUSION

In my opinion, Defendant's conduct discussed above failed to meet applicable standards of care, skill, diligence and loyalty owed by fiduciaries. I reserve the right to amend or supplement my opinions as further information becomes available.

**SECTION III**         **DATA OR OTHER INFORMATION CONSIDERED BY THE WITNESS IN FORMING THE OPINIONS:**

In addition to the materials identified above in my report, and standards of conduct applicable to those owing fiduciary duties, I have reviewed the following items:

See attached Exhibit C.

**SECTION IV**         **EXHIBITS THAT WILL BE USED TO SUMMARIZE OR SUPPORT THE OPINIONS:**

I may rely on any applicable law as well as any of the materials identified in Exhibit C to support his opinions and testimony. I further understand that counsel have agreed to a delayed disclosure of exhibits in this matter and reserve the right to supplement this report at that time.

**SECTION V**         **LISTING OF ANY OTHER CASES IN WHICH THE WITNESS HAS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION DURING THE PREVIOUS FOUR (4) YEARS:**

Please see the attached Exhibit B.

**SECTION VI**      STATEMENT OF COMPENSATION TO BE PAID FOR THE WITNESS' STUDY AND TESTIMONY IN THE CASE:

$725.00 per hour


**As stated above, I reserve the right to alter, amend, or supplement my opinions should additional information become available.**


_____      May 30, 2017

John P. Freeman      Date

# <u>EXHIBIT A</u>

**Expert Witness Report**

**of**

**<u>John P. Freeman</u>**

**RESUME**
**John P. Freeman**
**Professor of Law Emeritus**

| | |
|---|---|
| **Address and phone numbers:** | 200 West Highland Drive<br>Unit 107<br>Seattle, Washington 98119<br>(803) 361-6934<br>jfreemanusc@gmail.com |
| **Education history:** | LL.M., 1976, University of Pennsylvania Law School; J.D., 1970, University of Notre Dame Law School; B.B.A., 1967, University of Notre Dame (Accounting) |
| **Employment history:** | 1970-72, Attorney, Jones, Day Law Firm, Cleveland, Ohio |
| | 1972-73, Fellow, University of Pennsylvania Law School Center for the Study of Financial Institutions |
| | 1973-75, Assistant Professor of Law, University of South Carolina |
| | 1974 and 1975 (Summers), Special Counsel, Division of Investment Management, SEC, Washington, D.C. |
| | 1975-78, Associate Professor of Law, University of South Carolina; Visiting Associate Professor of Law at Loyola Law School (Chicago) Spring 1977 |
| | 1978-2008, Professor of Law, University of South Carolina; Visiting Professor of Law at University of Texas Law School, summer 1978 |
| **Present:** | Distinguished Professor Emeritus and John T. Campbell Chair in Business and Professional Ethics Emeritus |

**Honors and Awards:** **Undergraduate:**  Member Beta Alpha Psi (Honorary Accounting Fraternity)

**Law School:**  Executive Editor, Notre Dame Lawyer; Distinguished Military Graduate

    **Professional:**  At University of South Carolina Law School: Senior Class Annual Outstanding Faculty Award of 1975, 1976, 1977, 1984

Winston Churchill Award, South Carolina Jury Trial Foundation 1995; Distinguished Service Award, South Carolina Trial Lawyers Association 2000; Appointed Member, South Carolina Judicial Merit Selection Commission (presently serving) John Belton O'Neall Inn of Court McDonald/Rhodes Award 2010

**Admitted to Practice:**  Ohio; South Carolina

**Teaching History**
**Courses Taught:**  Professional Responsibility, Legal Accounting, Business Associations, Corporations, Agency-Partnership, Securities Regulation, Corporate Finance, Business Planning, Legal Research and Writing, Business Crime, Legal Malpractice Component of Advanced Legal Profession Seminar

**Scholarly and Professional Publications**

Author, 1999-2008, Regular Legal Ethics Column for South Carolina Lawyer.

Article, Protecting Judicial Independence, 6 Charleston L. Rev. 511 (2012).

Article, Appearance of Impropriety, Recusal, and the *Segars-Andrews* Case, 62 S.C.L. Rev. 485 (2011).

Article (with Stewart Brown and Steve Pomerantz), Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Duty Test, 61 Okla. L. Rev. 83 (2008).

Article, The Mutual Fund Distribution Fee Mess, 32 J. Corporation Law 739 (2007).

Viewpoint, Say No to Vending Machine Justice, S.C. Lawyer, July 2007, at 8.

Article, It's the Conflict of Interest, Stupid, Money Mgm't Exec., May 17, 2004, at 14.

Chapter on Legal Opinion Liability in Legal Opinion Letters A Comprehensive Guide to Opinion Letter Practice (M. John Sterba, Jr., ed. 2003) (plus annual updates).

Chapter in South Carolina Damages Treatise on Damages in Securities Cases (2004).

Article, The Ethics of Using Judges to Conceal Wrongdoing, 55 S.C.L. Rev. 829 (2004).

Article (with Stewart Brown), Mutual Fund Advisory Fees: The Cost of Conflicts of Interest, 26 J. Corporation Law 610 (2001).

Article, Liens, Fees and Taxes, South Carolina Trial Lawyer, Summer 2000, at 26.

Article, A Business Lawyer Looks at the Internet, 49 S.C.L. Rev. 903 (1998).

Article, Payments to Medical Care Providers:  What Are the Lawyer's Obligations' South Carolina Lawyer, September-October 1994, at 39.

Article, Current Developments in Lawyer Liability:  Coping with the Fraudulent Client, Delaware Lawyer, Winter 1993, at 27.

Article, Treble Damage Statutes Can Increase Trust Recoveries, 4 Probate Practice Reporter, June 1992, at 1.

Article (with Nathan Crystal), Scienter in Professional Liability Cases, 42 S.C.L. Rev. 783 (1991).

Article, How Computerized Databases Are Redefining Due Diligence, Carolina Lawyer (July-August 1991).

Article, When Are Lawyers' Gifts to Judges Improper' Carolina Lawyer (November-December 1990).

Article, Current Developments in Legal Opinion Liability, 1989 Col. J. Bus. L. 235.

Article, Understanding the Joint Client Exception to the Attorney-Client Privilege, Carolina Lawyer (July-August 1989).

Article, A RICO Primer, 1985 Small Business Counselor No. 4.

Article, The Use of Mutual Fund Assets to Pay Marketing Costs, 9 Loy. Chi. L.J. 553 (1978).

Article, Marketing Mutual Funds and Individual Life Insurance, 28 S.C.L. Rev. 1-124 (1976), reprinted in Nat'l Ins. L. Rev. Serv. (1977).

Article, Opinion Letters and Professionalism, 1973 Duke L.J. 371-439, reprinted in Securities Law Review 1974 (E. Folk, III, ed.).

Co-author, Multi student Survey, The Mutual Fund Industry:  A Legal Survey, 44 Notre Dame Lawyer 732-983 (1969).

Case Comment, Escott v. BarChris Constr. Corp., 44 Notre Dame Lawyer, 122-40 (1968).

**Other Scholarly Activities**

Speeches (with accompanying outlines) presented at numerous CLE courses sponsored by various entities including the South Carolina Bar, University of South Carolina Law School and the South Carolina Supreme Court.

CLE Presentations 2004-16:  Special Relationships and Legal Ethics, Oct. 14, 2016, S.C. Bar, Columbia, S.C.; Who's My Client?  Understanding the Relationship Between In-House Attorneys, Members and Lobbyists; SC House of Representatives In-House CLE, Oct. 13, 2016, Columbia, S.C.;  Incivility, Attempted Shaming and Other Ethics No-Nos, South Carolina Public Defender Ass'n, Sept. 28, 2016, Myrtle Beach, SC;  Pascoe v. Wilson and other Ethics Lessons, Lexington County Bar Ass'n, August 4, 2016; Ethical Issues for South Carolina Environmental Practitioners, June 3, 2016, Columbia SC; Hot Ethics Issues for Environmental/Regulatory Practitioners, Jan. 22, 2016, S.C. Bar, Charleston, S.C.; S.C. Bar, Business Lawyer Horror Stories II, Oct. 3, 2014; Greenwood, S.C., S.C. Ass'n of Criminal Defense Lawyers, "Whose Theme and Theory is it Anyway?" July 11, 2014; Ft. Worth, Texas, Advice on Duties Owed by Members of the Board of Trustees, May 16, 2014; Charleston Bar Ass'n, 20 Ethics Tips for a Happier Professional Life, Feb. 7, 2014;2004-13:  Ass'n of S.C. Claimants Attorneys for Workers Compensation, Ethics Seminar March 22, 2013; SC Bar, Ethical Issues in Working with Vets and Their Families, Feb. 12, 2012; Expert Witness Participant, SC Bar-ABOTA, Masters in Trial Program, Feb. 1, 2013; SC Bar, Ethical Issues in Handling VA Appeals, Jan. 12, 2013; SC Bar, Ethical Issues in a Non-Adversarial System, Dec. 11, 2012; Richland County Bar Ass'n Ethics CLE, Nov. 9, 2012;University of South Carolina Law School, Alumni Reunion Ethics CLE, Nov. 3, 2012; General Assembly Legal Staff, Ethics for Government Lawyers, Oct. 3, 2012; Setzler Scott Law Firm (In-house CLE), West Columbia, SC, Ethics CLE, Feb. 14, 2012; Charleston Law School, Panel, Symposium on Lawyer and Judicial Fitness, Feb. 10, 2012; Charleston County Bar Ass'n, Ethics CLE, Feb. 3, 2012; SC Bar, Panel on Lawyer Confidentiality, Jan. 19, 2012; Nov. 15, 2011, SC Workers Comp. Comm., Legal Ethics; Richardson Patrick-Sponsored CLE, Charleston, SC, April 29, 2011; National Ass'n State Securities Administrators, Ethics in Securities Litigation, Charleston, Jan. 24, 20011; Richland County Legal Ethics Update, Nov. 5, 2010; S.C. Law Review Symposium, Judicial Recusal, Oct. 21, 2010; League of Women Voters, Lecture on Judicial Selection, Oct. 8, 2010, Charleston, S.C.; KershawHealth Board of Directors, Advice on Your Duties as Board Members, July 15, 2010, Camden, SC; American Ass'n of Matrimonial Lawyers, Ethics in Marital Cases, March 19, 2010 (Aruba), John Belton O'Neall Inn of Court, Ethics Lessons Taught by Lawyers, Nov.

17, 2009; South Carolina Defense Trial Lawyer's Ass'n, Judicial Selection in South Carolina, Nov. 7, 2009; Richland County Bar Ass'n, Legal Ethics, Nov. 6, 2009; South Carolina Legislature Employees, Legal Ethics Update, Oct. 21, 2009; Budget & Control Board, Ethics Lecture to SC State Employees, Oct. 2, 2009; South Carolina Bar, Family Law Ethics Update, Sept. 18, 2009; Motley Rice Law Firm, Legal Ethics Update, Sept. 11, 2009; South Carolina Judicial Selection Commission, Judicial Ethics, July 31, 2009; John Belton O'Neall Inn of Court, Ethics of Advertising Firms, Jan. 20. 2009; S.C. Bar, Ethics Presentation "Business Lawyer Horror Stories, Nov. 21, 2008; Participant, Mutual Fund Industry Regulation Roundtable, Chicago-Kent Law School, Nov. 7, 2008; SC Legislature, Ethical Duties of Legislative Employees, Oct. 2, 2008; SC Bar, Dealing with Ethical Duties When Dealing with Pro Se Parties, Oct. 10, 2008; Richardson Patrick Local Counsel CLE, Litigation Ethics, May 2, 2008 (Charleston, SC); Inst. of Public Utilities, 39th Ann. Reg. Policy Conf., Panel on Equity and Responsibility in the Public Utilities Sector (Charleston, SC), Dec. 3, 2007; S.C. Attorney General's Office; Litigation Ethics, Nov. 9, 2007; Richland County Bar, Ethics Update, Nov. 2, 2007; SC Bar, Litigation Ethics, Oct. 26, 2007; S.C. Children's Law Center, Ethical  Problems in the Child Abuse Area, Oct. 19, 2007; National Ass'n of Medicaid Fraud Control Units, Ethics and the Government Lawyer (Savannah, Ga.), Oct. 1, 2007; SCACPA Litigation Conf., Litigation Ethics (Kiawah Island, SC), Sept. 21, 2007; S.C. Circuit Court Judges, May 17, 2007, Practice Tips in Civil Litigation; Energy & Mineral Law Foundation, May 15, 2007, Panel Member, Legal Ethics, 2 hr.; S.C. Government Investigators, Ethical Duties of Investigators, Feb. 23, 2007; S.C. Bar, Employment Law Section, Ethics Update, Jan. 26, 2007; S.C. Association of Counties, Ethics Update, Dec. 8, 2006; Lexington County Bar Ass'n, Ethics Update, Dec. 6, 2006; Richland County Bar, Ethics Update, Nov. 3, 2006; S.C. State Government Lawyers, Ethics Update, Nov. 3, 2006; S.C. Judicial Merit Selection Commission, Overview of Judicial Ethics, Sept. 14, 2006 (½ hr.); Federal Bar Ass'n, SC Bar, Ethics and Professionalism, Sept. 8, 2006; Commercial Law League of America, Avoiding Grievances and Malpractice Worries in Your Practice, July 6, 2006, Asheville, N.C. (2 hours); National Structured Settlement Trade Ass'n, Ethics in Litigation, Westin Rio Mar, Puerto Rico, May 9, 2006; S.C. Chamber of Commerce, Legal Ethics for the Employment Lawyer, Hilton Head, S.C., May 6, 2006;  American Ass'n Matrimonial Lawyers, Ethic Lecture, Los Cabos, Mexico, March 11, 2006; SC Bar, Legal Ethics for Health Care Providers, Jan. 28, 2006; S.C. Association of Counties, Ethics Update, Dec. 9, 2005; SCTLA, Making Money Out of Discovery Abuse, Dec. 2, 2005, Atlanta; Ass'n of S.C. Claimants Attorneys for Workers Compensation, Ethics Seminar, Nov. 4, 2005, Asheville; S.C. Bar, Ethics in Masters Court, Oct. 14, 2005; N.C. Bar-S.C. Bar Construction Law Ethics Program, Asheville, Oct. 1, 2005; S. C. Bar, Unauthorized Practice Problems in Probate Court, Sept. 16, 2005; Greenville County Solicitor's Office, Prosecutorial Ethics, May 9, 2005; Mass Tort Seminar, NYC,  Discovery Abuse Issues, March 18, 2005; S.C. Ass'n of Counties, Legal Ethics, Dec. 10, 2004; Federal Bar Ass'n, S.C., Ethics CLE, Dec. 10, 2004 ½ hr.; S.C. Bar Construction Law Section, Ethics CLE on the new Oath; Dec. 3, 2004; NASAA, Salt Lake City, Legal Ethics for Securities Enforcement Lawyers, Dec. 4, 2004; DSS Ethics Training, Dec. 3, 2004; (2-hr. lecture); PIABA, Ethics for Securities Lawyers, and Comments on the Mutual Fund Mess, Oct. 20, 2004 (2 hrs.); Commercial Law League of America, Southern Region Members' Ass'n, Ethical Issues in Commercial Law, Oct. 1, 2004; S.C. Bar, Annual Probate Bench/Bar, Ethics in Probate Court, Sept. 17, 2004; Charleston Bar Ass'n, Lawyer's Oath Seminar, August 27, 2004; S.C. Government Lawyers, Legal Ethics for Government Attorneys, August 20, 2004; S.C. Judiciary, Judicial Ethics Lecture, August 19,

2004; S.C. Bar, Accounting for Non-tax Lawyers, May 2, 2004; Palmetto Land Title Ass'n, Ethics for Closing Attorneys, April, 24, 2004; Richardson, Patrick Law Firm, CLE on Legal Issues Concerning the Mutual Fund Mess, March 26, 2004; S.C. Bar, An Update on Ethical Considerations for the Guardian, March 5, 2004; S.C. Prof. Society on the Abuse of Children, Ethics and Child Abuse, Feb. 26, 2004; National Ass'n of State Boards of Accountancy, Professionalism, Accountability and the Accounting Profession, Feb. 9, 2004; Fidelity Nat'l Title, Ethical Duties of Closing Attorneys, Feb. 5, 2004; S.C. Bar, Annual Convention, Ethical Issues in Handling the Appeal, Jan. 22, 2004 (co-presenter).

Member, ABA Section of Business Law Task Force on Legal Opinions
Participant in Conference on Legal Opinions at Silverado, California, May 31-June 3 (1989).

University and Community Service
Author, Report on Tax Sheltered Annuities to USC Faculty and Staff (1976).
Faculty Senate (1996-98)

University Committees
Promotion and Tenure
Faculty Welfare

Annuities and Insurance
Budget Committee

Law School Committees
Faculty Selection
Academic Standing
Minority Student Affairs
Executive Committee
Dean Evaluation Committee
Dean Search Committee
Chairman, Supreme Court Commission on CLE and Specialization(1980-83)
President, Leaphart Elementary School PTO (1983)
Chairman, Irmo Middle School School Improvement Council (1985)
Member, Irmo Middle School School Improvement Council (1985-89),
President, Irmo High School Parent, Teacher, Student Association (1988-89, 1992-93) Member
Executive Board (1988-93)
Member, Irmo High School-School Improvement Council (1988-93)
Founder and Past-president, University of Notre Dame Club of South Carolina
Lexington District Five and South Carolina State School Volunteer of the Year 1993

# <u>EXHIBIT B</u>

**Expert Witness Report**

**of**

**<u>John P. Freeman</u>**

**LISTING OF CASES IN WHICH EXPERT
JOHN FREEMAN TESTIFIED
OVER LAST FOUR YEARS**

Patel v. Patel and Phillips v. Patel
Testified about governance and financial matters at depositions and at trial of one case
Case brought in Greenville SC
Counsel for Plaintiffs Jim Gilreath and Cheryl Perkins

Maybank v. BB&T
Testified at deposition and at trial in Greenville re financial and fiduciary duty issues
Counsel for Plaintiffs is Mitchell Willoughby

Burton Estate v. Pitts
Testified at deposition and trial in Columbia about malpractice issues
Counsel for Plaintiff is Roger Jellenik

Griffin v. Walker
Testified at deposition re ethics issues in real estate transaction
Counsel for Defendant is Ronnie Crosby

Craig v. West
Testified at trial in Lexington
Counsel for Defendant Bobby Hood, Jr.

Thomas v. HCSB et al
Testified at deposition and arbitration re debenture investment matters
Counsel for Plaintiff is Rutledge Young, III

Johnson v. Lander University
Testified at deposition re corporate structure
Counsel for Plaintiffs is Fatima Zeidan

Reed v. Big Water Resort, LLC
Testified at deposition re piercing, amalgamation and related issues
Counsel for Plaintiffs is Brady Thomas

Tinkler v. Dewees Island Property Owners Ass'n
Testified at trial re governance issues in Charleston
Counsel for Plaintiffs is Matt Yelverton

Bell v. McGowan
Testified at trial and deposition re malpractice
Counsel for Plaintiffs Cam Lewis

In Re:  Infinity Business Group, Inc., Debtor
Deposition and trial testimony re business investment issues in bankruptcy case
Counsel for Trustee is Clarence Davis

Byrdnest, LLC, et al. v. Ramaci, et al.
Testified at deposition re securities and governance issues
Plaintiff's counsel is Ben Traywick

In Re:  Medical Management Group, LLC
Testified at deposition re business issues
Plaintiff's counsel is Biff Sowell

Harty v. Aylor
Testified at deposition in malpractice case
Plaintiff's counsel is Alan Lazenby

Peak Insurance v. Horger
Testified at arbitration in malpractice case
Plaintiff's lawyer is Ric Gass

Waverly POA v. Wieland Homes
Testified at deposition and trial in developer liability case
Plaintiff's lawyer is John Hayes

Truitt v. Popowski Law Firm
Testified at deposition
Plaintiff's lawyer is Tom Pendarvis

# <u>EXHIBIT C</u>

**Expert Witness Report**

**of**

**<u>John P. Freeman</u>**

**Materials Provided to John Freeman for Review**

| Depositions with Exhibits |
|---|
| Keith S. Wellin Dep., Feb. 7, 2014 |
| Peter J. Wellin Dep., Aug. 29-31, 2017 |
| Peter J. Wellin (2 hr) Dep., Aug. 29, 2017 |
| Cynthia W. Plum Dep., Aug. 25 - 26, 2016  (redacted) |
| Cynthia W. Plum (2 hr) Dep., Dec 20, 2017 |
| Marjorie W. King Dep., June 22 - 23, 2016 (redacted) |
| Marjorie W. King (2 hr) Dep., Oct 26, 2017 |
| 30b6 Friendship Management (Peter Wellin) Feb. 8-9, 2018 |
| Wendy C. H. Wellin (2 hr) Dep., June 19, 2017 |
| Wendy C. H. Wellin Dep  Sept 19 - 21, 2017 (redacted) |
| Thomas M. Farace Dep., Mar. 5, 2015, Jan. 26-27, 2016 |
| Lester M. Schwartz Dep., Jan. 13 & 15, 2015 |
| Larry S. McDevitt Dep., Jan. 29, 2016 |
| Michael Simon Dep., Oct. 28, 2015 |
| Brian J. McLoughlin Dep., Dec. 15, 2015 |
| Edward G. R. Bennett Dep., Nov 6-8, 2017 |
| F. Patricia Scarborough Dep., Feb. 26, 2018 |
| Daniel Marson (2 hr) Dep., Feb. 22 2018 |
| Richard B. King Dep., Oct. 1, 2015 (redacted) & June 21, 2016 |
| Campbell Hart Dep., June 24, 2016 |
| Heather H. Lane Dep., Dec. 7, 2015 (redacted) |
| Samuel A. Plum Dep., Nov. 19, 2015 (redacted) |
| Pamela Wellin Dep., Dec. 17, 2015 (redacted) |
| Jonathan Harris Dep., Dec. 16, 2016 |
| Patti Graumann Dep., Aug. 22, 2016 |
| Cressida Dixon Dep., July 12, 2016 |
| Brett Sovine Dep., Feb. 16, 2016 |
| Lynn Watson Dep., Feb. 27, 2016 |

| Pleadings & Other Filings |
|---|
| Compl., C/A No. 2:13-cv-01831-DCN, ECF No. 001 |
| Answer, C/A No. 2:13-cv-01831-DCN, ECF No. 022 |
| Am. Compl.  C/A No. 2:13-cv-01831-DCN, ECF No. 112 |
| Answer to Am. Compl., C/A No. 2:13-cv-01831-DCN, ECF No. 114 |
| M. Guardian ad Litem, C/A No. 2:13-cv-01831-DCN, ECF No. 144 |
| Mem. in Opp'n to M. Guardian ad Litem, C/A No. 2:13-01831-DCN, ECF No. 156 |
| Notice of Removal, C/A No. 2:13-cv-03595-DCN, ECF No. 001 |
| Answer, C/A No. 2:13-cv-03595-DCN, ECF No. 022 |
| Mot. to Dismiss, C/A No. 2:13-cv-03595-DCN, ECF No. 020 |
| Mem. in Opp'n to M. to Dismiss, C/A No. 2:13-cv-03595-DCN, ECF No. 026 |
| Second Am. Compl., C/A No. 2:13-cv-01831-DCN, ECF No. 301 |
| And. Second Am. Compl., C/A No. 2:13-cv-01831-DCN, ECF No. 364 |
| Am. Compl., C/A No. 2:14-cv-4067, ECF No. 195 |
| Answer to Am. Compl., C/A No. 2:14-cv-04067-DCN, ECF No. 209 |
| Simon Aff. Jul. 2, 2013, C/A No. 2:13-01831-DCN, ECF No. 5-2 |
| Day Ltr., C/a No. 2013-GC-10-00129, July 25, 2013 |
| McCurdy Aff., 2013-GC-10-00129, July 24, 2013 |

| |
|---|
| Stapleton Aff., 2013-GC-10-00129, July 25, 2013 |
| M. Judg. on the Pleadings/Summ. Judg., C/A No. 2:13-cv-01831-DCN, ECF No. 41 |
| Peter Wellin Aff. Aug. 26, 2013, C/A No. 2:13-cv-01831-DCN, ECF No. 41-2 |
| Mem. in Opp'n to M. Judg. on the Pleadings/Summ. Judg., C/A No. 2:13-cv-01831-DCN, ECF No. 46 |
| Mem. in Opp'n to M. Judg. on the Pleadings/Summ. Judg., C/A No. 2:13-cv-01831-DCN, ECF No. 50 |
| Hr'g Tr., Nov. 18, 2013, C/A No. 2:13-cv-01831-DCN |
| Order, C/A No. 2:13-cv-01831-DCN, ECF No. 82 |
| Order, C/A No. 2:13-cv-01831-DCN, ECF No. 91 |
| Order, C/A No. 2013-GC-10-00129, Feb. 20, 2014 |
| Order, C/A No. 2013-GC-10-00129, Feb. 21, 2014 |
| Austin Report, C/A No. 2013-GC-10-00129, April 24, 2014 |
| Culp Report, C/A No. 2013-GC-10-00129, June 13, 2014 |
| Mulbry Ltr., 2013-GC-10-00129, Aug. 19, 2014 |
| Weiss Ltr., 2013-GC-10-00129, Sept. 3, 2014 |
| P. Wellin Am. Aff. Jan. 22, 2016, C/A No. 2:13-cv-01831, ECF No. 394-1 |
| P. Wellin 2nd Am. Aff. Aug. 11, 2017, C/A No. 2:13-cv-01831-DCN, ECF No. 620-1 |

| Documents |
|---|
| BARC 00299 - BARC 00306 |
| BBH 0204 - BBH 0206 |
| BBH 0224 - BBH 0230 |
| BBH 1870 - BBH 1873 |
| BBH 1930 - BBH 1931 |
| Cynthia_Plum_ESI_000026 |
| Cynthia_Plum_ESI_000030 |
| Cynthia_Plum_ESI_000036 |
| Cynthia_Plum_ESI_000039 - Cynthia_Plum_ESI_000042 |
| Cynthia_Plum_ESI_000057 - Cynthia_Plum_ESI_000061 |
| Cynthia_Plum_ESI_000071 - Cynthia_Plum_ESI_000075 |
| Cynthia_Plum_ESI_000079 - Cynthia_Plum_ESI_000081 |
| Cynthia_Plum_ESI_000083 |
| Cynthia_Plum_ESI_000086 - Cynthia_Plum_ESI_000087 |
| Cynthia_Plum_ESI_000089 |
| Cynthia_Plum_ESI_000115 - Cynthia_Plum_ESI_000205 |
| Cynthia_Plum_ESI_000208 |
| Cynthia_Plum_ESI_000211 - Cynthia_Plum_ESI_000213 |
| Cynthia_Plum_ESI_000215 |
| Cynthia_Plum_ESI_000222 |
| Cynthia_Plum_ESI_000226 - Cynthia_Plum_ESI_000227 |
| Cynthia_Plum_ESI_000234 - Cynthia_Plum_ESI_000247 |
| Cynthia_Plum_ESI_000254 |
| Cynthia_Plum_ESI_000256 |
| Cynthia_Plum_ESI_000259 - Cynthia_Plum_ESI_000261 |
| Cynthia_Plum_ESI_000263 - Cynthia_Plum_ESI_000264 |
| Cynthia_Plum_ESI_000266 |
| Cynthia_Plum_ESI_000268 - Cynthia_Plum_ESI_000272 |
| Cynthia_Plum_ESI_000283 - Cynthia_Plum_ESI_000286 |

| |
|---|
| Cynthia_Plum_ESI_000288 |
| Cynthia_Plum_ESI_000293 |
| Cynthia_Plum_ESI_000295 |
| Cynthia_Plum_ESI_000297 |
| Cynthia_Plum_ESI_000304 - Cynthia_Plum_ESI_000309 |
| Cynthia_Plum_ESI_000321 - Cynthia_Plum_ESI_000323 |
| Cynthia_Plum_ESI_000325 - Cynthia_Plum_ESI_000326 |
| Cynthia_Plum_ESI_000333 - Cynthia_Plum_ESI_000334 |
| Cynthia_Plum_ESI_000335 |
| Cynthia_Plum_ESI_000351 |
| Cynthia_Plum_ESI_000353 - Cynthia_Plum_ESI_000355 |
| Cynthia_Plum_ESI_000866 |
| Cynthia_Plum_ESI_000880 - Cynthia_Plum_ESI_000885 |
| Cynthia_Plum_ESI_000888 - Cynthia_Plum_ESI_000889 |
| Cynthia_Plum_ESI_000894 - Cynthia_Plum_ESI_000898 |
| Cynthia_Plum_ESI_000929 - Cynthia_Plum_ESI_000930 |
| Cynthia_Plum_ESI_000933 - Cynthia_Plum_ESI_000934 |
| Cynthia_Plum_ESI_000937 - Cynthia_Plum_ESI_000939 |
| Cynthia_Plum_ESI_001071 - Cynthia_Plum_ESI_001072 |
| Cynthia_Plum_ESI_001075 |
| Cynthia_Plum_ESI_001078 |
| Cynthia_Plum_ESI_001082 - Cynthia_Plum_ESI_001083 |
| Cynthia_Plum_ESI_001108 |
| Cynthia_Plum_ESI_001135 |
| Cynthia_Plum_ESI_001151 - Cynthia_Plum_ESI_001152 |
| Cynthia_Plum_ESI_001157 |
| Cynthia_Plum_ESI_001179 |
| Cynthia_Plum_ESI_001188 |
| Cynthia_Plum_ESI_001196 |
| Cynthia_Plum_ESI_001233 - Cynthia_Plum_ESI_001287 |
| Cynthia_Plum_ESI_001782 - Cynthia_Plum_ESI_001783 |
| Cynthia_Plum_ESI_001843 |
| Cynthia_Plum_ESI_001844 - Cynthia_Plum_ESI_001845 |
| Cynthia_Plum_ESI_001851 |
| Cynthia_Plum_ESI_001896 |
| Cynthia_Plum_ESI_001907 |
| Cynthia_Plum_ESI_001976 |
| Cynthia_Plum_ESI_001982 |
| Cynthia_Plum_ESI_001989 |
| Cynthia_Plum_ESI_002029 |
| Cynthia_Plum_ESI_002080 |
| Cynthia_Plum_ESI_002155 |
| Cynthia_Plum_ESI_002158 - Cynthia_Plum_ESI_002159 |
| Cynthia_Plum_ESI_002198 |
| Cynthia_Plum_ESI_002213 |
| Cynthia_Plum_ESI_002215 |
| Cynthia_Plum_ESI_002234 - Cynthia_Plum_ESI_002235 |
| Cynthia_Plum_ESI_002240 |
| Cynthia_Plum_ESI_002275 |
| Cynthia_Plum_ESI_002282 |
| Cynthia_Plum_ESI_002300 |

| |
|---|
| Cynthia_Plum_ESI_002308 |
| Cynthia_Plum_ESI_002315 |
| Cynthia_Plum_ESI_002328 |
| Cynthia_Plum_ESI_002398 - Cynthia_Plum_ESI_002408 |
| DEFS_000001 - DEFS_000010 |
| DEFS_000081 - DEFS_000084 |
| DEFS_000305 - DEFS_000382 |
| DEFS_000450 - DEFS_000452 |
| DEFS_000699 - DEFS_000700 |
| DEFS_000755 - DEFS_000757 |
| DEFS_000852 |
| DEFS_002502 - DEFS_002504 |
| DEFS_002531 |
| DEFS_002532 |
| DEFS_003822 - DEFS_003863 |
| DEFS_009610 - DEFS_009614 |
| DEFS_010061 - DEFS_010084 |
| DEFS_010085 - DEFS_010107 |
| DEFS_010108 - DEFS_010131 |
| DEFS_0101077 - DEFS_0101083 |
| DEFS_0101086 - DEFS_0101087 |
| DEFS_0101844 - DEFS_0101845 |
| DEFS_0101852 - DEFS_0101865 |
| DEFS_0108740 |
| DEFS_0108741 - DEFS_0108752 |
| DEFS_0109285 - DEFS_0109296 |
| DEFS_0109992 - DEFS_0110009 |
| DEFS_0110615 - DEFS_0110640 |
| DEFS_0111083 |
| FARACE 000042 - FARACE 000043 |
| FARACE 000045 - FARACE 000046 |
| FARACE 000328 - FARACE 000339 |
| FARACE 000341 - FARACE 000363 |
| FARACE 000365 - FARACE 000372 |
| FARACE 000374 - FARACE 000386 |
| FARACE 000390 - FARACE 000392 |
| FARACE 000394 - FARACE 000398 |
| FARACE 000400 - FARACE 000413 |
| FARACE 000441 - FARACE 000445 |
| FARACE 000447 - FARACE 000461 |
| FARACE 000476 - FARACE 000492 |
| FARACE 000497 - FARACE 000500 |
| FARACE 000509 - FARACE 000515 |
| FARACE 000528 - FARACE 000534 |
| FARACE 000554 - FARACE 000560 |
| FARACE 000730 - FARACE 000742 |
| FARACE 000757 - FARACE 000768 |
| FARACE 000832 - FARACE 000846 |
| FARACE 000888 - FARACE 000916 |
| FARACE 000918 - FARACE 001069 |
| FARACE 001123 - FARACE 001126 |

| |
|---|
| FARACE 001131 - FARACE 001134 |
| FARACE 001143 - FARACE 001163 |
| FARACE 001183 - FARACE 001244 |
| FARACE 001258 - FARACE 001261 |
| FARACE 001268 - FARACE 001291 |
| FARACE 001300 - FARACE 001309 |
| FARACE 001311 - FARACE 001320 |
| FARACE 001322 |
| FARACE 001324 - FARACE 001334 |
| FARACE 001336 - FARACE 001351 |
| FARACE 001353 - FARACE 001360 |
| FARACE 001362 - FARACE 001364 |
| FARACE 001366 - FARACE 001370 |
| FARACE 001372 |
| FARACE 001374 - FARACE 001380 |
| FARACE 001382 - FARACE 001459 |
| FARACE 001617 - FARACE 001634 |
| FARACE 001636 - FARACE 001638 |
| FARACE 001668 - FARACE 001687 |
| FARACE 001690 - FARACE 001692 |
| FARACE 001694 - FARACE 001712 |
| FARACE 001743 - FARACE 001747 |
| FARACE 001749 - FARACE 001763 |
| FARACE 001789 - FARACE 001806 |
| FARACE 001808 - FARACE 001814 |
| FARACE 001817 |
| FARACE 001819 |
| FARACE 001821 - FARACE 001834 |
| FARACE 001864 - FARACE 001867 |
| FARACE 001932 - FARACE 001939 |
| FARACE 001983 - FARACE 001995 |
| FARACE 002010 - FARACE 002011 |
| FARACE 002036 |
| FARACE 002054 - FARACE 002055 |
| FARACE 002057 - FARACE 002080 |
| FARACE 002084 |
| FARACE 002106 - FARACE 002112 |
| FARACE 002179 - FARACE 002191 |
| FARACE 002199 - FARACE 002200 |
| FARACE 002393 - FARACE 002406 |
| FARACE 004771 - FARACE 004773 |
| FARACE 004796 - FARACE 004797 |
| FARACE 006282 - FARACE 006291 |
| FARACE 006293 - FARACE 006312 |
| FARACE 006395 - FARACE 006424 |
| FARACE 006558 - FARACE 006559 |
| FARACE 007823 - FARACE 007825 |
| FARACE 009598 - FARACE 009621 |
| FARACE 009738 - FARACE 009793 |
| FARACE 012008 - FARACE 012034 |
| FARACE 015881 - FARACE 015902 |

| |
|---|
| FARACE 016087 - FARACE 016115 |
| K. Wellin 00414 - K. Wellin 00433 |
| K. Wellin 00436 |
| K. Wellin 00440 |
| K. Wellin 00576 |
| K. Wellin 017528 |
| K. Wellin Estate 0003 - K. Wellin Estate 0004 |
| K. Wellin Estate 0010 - K. Wellin Estate 0022 |
| K. Wellin Estate 0023 - K. Wellin Estate 0058 |
| K. Wellin Estate 0059 - K. Wellin Estate 0106 |
| K. Wellin Estate 0112 - K. Wellin Estate 0159 |
| K. Wellin Estate 0166 - K. Wellin Estate 0215 |
| K. Wellin Estate 0225 |
| K. Wellin Estate 0836 - K. Wellin Estate 0837 |
| K. Wellin Estate 02038 - K. Wellin Estate 04816 |
| K. Wellin Estate 05088 |
| K. Wellin Estate 05091 |
| K. Wellin Estate 05100 - K. Wellin Estate 05104 |
| K. Wellin Estate 05117 - K. Wellin Estate 05118 |
| K. Wellin Estate 06067 - K. Wellin Estate 06068 |
| K. Wellin Estate 06141 |
| K. Wellin Estate 06238 |
| K. Wellin Estate 06729 - K. Wellin Estate 06733 |
| K. Wellin Estate 06743 - K. Wellin Estate 06745 |
| K. Wellin Estate 06750 |
| K. Wellin Estate 07111 - K. Wellin Estate 07112 |
| K. Wellin Estate 07627 |
| K. Wellin Estate 07633 |
| K. Wellin Estate 07638 - K. Wellin Estate 07640 |
| K. Wellin Estate 07939 |
| K. Wellin Estate 07950 |
| K. Wellin Estate 08222 |
| K. Wellin Estate 08888 |
| K. Wellin Estate 09114 |
| K. Wellin Estate 09388 |
| K. Wellin Estate 09432 |
| K. Wellin Estate 10906 - K. Wellin Estate 10933 |
| K. Wellin Estate 10950 - K. Wellin Estate 10952 |
| K. Wellin Estate 64333 - K. Wellin Estate 64336 |
| K. Wellin Estate 64573 |
| K. Wellin Estate 64682 - K. Wellin Estate 64692 |
| K. Wellin Estate 05023 - K. Wellin Estate 05043 |
| Marjorie_King_ESI_000060 - Marjorie_King_ESI_000063 |
| Marjorie_King_ESI_000068 - Marjorie_King_ESI_000073 |
| Marjorie_King_ESI_000079 - Marjorie_King_ESI_000083 |
| Marjorie_King_ESI_000101 |
| Marjorie_King_ESI_000104 - Marjorie_King_ESI_000107 |
| Marjorie_King_ESI_000131 - Marjorie_King_ESI_000134 |
| Marjorie_King_ESI_000142 - Marjorie_King_ESI_000143 |
| Marjorie_King_ESI_000147 - Marjorie_King_ESI_000153 |
| Marjorie_King_ESI_000155 |

| |
|---|
| Marjorie_King_ESI_000370 - Marjorie_King_ESI_000397 |
| Marjorie_King_ESI_000430 - Marjorie_King_ESI_000431 |
| Marjorie_King_ESI_000507 - Marjorie_King_ESI_000509 |
| Marjorie_King_ESI_000515 - Marjorie_King_ESI_000518 |
| NPW20000138 - NPW20000142 |
| NPW20000473 - NPW20000480 |
| NPW20000570 - NPW20000572 |
| NPW20000591 - NPW20000622 |
| NPW20000624 - NPW20000629 |
| NPW20000636 - NPW20000637 |
| NPW20000673 - NPW20000674 |
| NPW20000677 - NPW20000682 |
| NPW20000687 - NPW20000689 |
| NPW20000762 |
| NPW20000827 - NPW20000829 |
| NPW20000831 - NPW20000832 |
| NPW20000845 - NPW20000849 |
| NPW20001166 - NPW20001168 |
| NPW20001192 |
| NPW20001351 - NPW20001360 |
| NPW20001362 - NPW20001372 |
| NPW20001386 |
| NPW20001490 - NPW20001491 |
| NPW20001934 - NPW20001935 |
| NPW20001948 - NPW20001950 |
| NPW20002148 - NPW20002150 |
| NPW20002222 - NPW20002223 |
| NPW20002250 - NPW20002251 |
| NPW20002330 - NPW20002340 |
| NPW20002667 |
| NPW20002771 - NPW20002773 |
| NPW20002777 - NPW20002784 |
| NPW20002839 - NPW20002843 |
| NPW20002920 - NPW20002930 |
| NPW20002985 - NPW20003011 |
| NPW20003113 - NPW20003116 |
| NPW20003139 - NPW20003140 |
| NPW20003149 |
| NPW20003160 - NPW20003163 |
| NPW20003304 |
| NPW20003432 - NPW20003443 |
| NPW20003622 |
| NPW20003625 - NPW20003627 |
| NPW20003789 - NPW20003791 |
| NPW20003992 - NPW20003993 |
| NPW20004085 - NPW20004086 |
| NPW20004136 |
| NPW20004183 |
| NPW20004190 - NPW20014191 |
| NPW20004195 - NPW20004196 |
| NPW20004965 - NPW20004971 |

| |
|---|
| NPW20005012 - NPW20005015 |
| NPW20005187 - NPW20005188 |
| NPW20005251 - NPW20005255 |
| NPW20005266 - NPW20005270 |
| NPW20005378 - NPW20005379 |
| NPW20005507 - NPW20005508 |
| NPW20005515 - NPW20005516 |
| NPW20005889 |
| NPW20005905 - NPW20005907 |
| NPW20006116 - NPW20006119 |
| NPW20006144 - NPW20006151 |
| NPW20006237 - NPW20006239 |
| NPW20006313 - NPW20006327 |
| NPW20006342 - NPW20006346 |
| NPW20006756 - NPW20006760 |
| NPW20006786 - NPW20006791 |
| NPW20007160 - NPW20007167 |
| NPW20007334 |
| NPW20007357 - NPW20007361 |
| NPW20007391 - NPW20007392 |
| NPW20007405 - NPW20007408 |
| NPW20007410 - NPW20007411 |
| NPW20007501 |
| NPW20007503 - NPW20007506 |
| NPW20007509 |
| NPW20007562 - NPW20007564 |
| NPW20007715 - NPW20007716 |
| NPW20007744 - NPW20007751 |
| NPW20007796 - NPW20007797 |
| NPW20007801 - NPW20007805 |
| NPW20007809 - NPW20007811 |
| NPW20007825 - NPW20007826 |
| NPW20007894 - NPW20007896 |
| NPW20007900 - NPW20007903 |
| NPW20007910 - NPW20007911 |
| NPW20007922 - NPW20007925 |
| NPW20007928 |
| NPW20007950 - NPW20007051 |
| NPW20007963 - NPW20007966 |
| NPW20007968 - NPW20007976 |
| NPW20007981 - NPW20007982 |
| NPW20007985 - NPW20007989 |
| NPW20008066 - NPW20008071 |
| NPW20008176 - NPW20008190 |
| NPW20008247 - NPW20008254 |
| NPW20008545 - NPW20008547 |
| NPW20008551 |
| NPW20008553 |
| NPW20008613 - NPW20008614 |
| NPW20008617 - NPW20008621 |
| NPW20008660 - NPW20008661 |

| |
|---|
| NPW20008666 - NPW20008668 |
| NPW20008673 - NPW20008675 |
| NPW20008732 |
| NPW20008776 |
| NPW20008982 - NPW20008983 |
| NPW20009077 - NPW20009080 |
| NPW20009082 - NPW20009083 |
| NPW20009216 - NPW20009234 |
| NPW20009453 - NPW20009454 |
| NPW20009515 - NPW20009521 |
| NPW20009541 |
| NPW20009941 - NPW20009946 |
| NPW20009955 - NPW20009957 |
| NPW20009972 - NPW20009979 |
| NPW20009990 - NPW20009993 |
| NPW20010213 - NPW20010214 |
| NPW20010241 - NPW20010242 |
| NPW20010252 - NPW20010253 |
| NPW20010362 - NPW20010365 |
| NPW20010370 - NPW20010376 |
| NPW20010483 |
| NPW20010527 - NPW20010578 |
| NPW20010649 - NPW20010650 |
| NPW20010694 - NPW20010695 |
| NPW20010754 - NPW20010755 |
| NPW20010843 |
| NPW20010860 - NPW20010864 |
| NPW20011227 - NPW20011228 |
| NPW20011293 |
| NPW20011309 - NPW20011311 |
| NPW20011503 - NPW20011505 |
| NPW20011513 - NPW20011518 |
| NPW20011724 - NPW20011725 |
| NPW20011758 |
| NPW20011917 - NPW20011924 |
| NPW20011927 - NPW10022929 |
| NPW20011933 - NPW20011034 |
| NPW20011975 - NPW20011976 |
| NPW20011983 |
| NPW20011989 |
| NPW20011992 - NPW20011933 |
| NPW20012002 - NPW20012003 |
| NPW20012005 |
| NPW20012007 - NPW20012008 |
| NPW20012127 - NPW20012129 |
| NPW20012305 - NPW20012306 |
| NPW20012307 |
| NPW20012380 - NPW20012381 |
| NPW20012383 |
| NPW20017620 - NPW20017704 |
| Peter_Wellin_ESI_000006 |

| |
|---|
| Peter_Wellin_ESI_000196 - Peter_Wellin_ESI_000198 |
| Peter_Wellin_ESI_000416 |
| Peter_Wellin_ESI_000418 |
| Peter_Wellin_ESI_000421 |
| Peter_Wellin_ESI_000424 - Peter_Wellin_ESI_000437 |
| Peter_Wellin_ESI_000439 - Peter_Wellin_ESI_000442 |
| Peter_Wellin_ESI_000446 - Peter_Wellin_ESI_000451 |
| Peter_Wellin_ESI_000455 - Peter_Wellin_ESI_000457 |
| Peter_Wellin_ESI_000528 |
| Peter_Wellin_ESI_000530 - Peter_Wellin_ESI_000532 |
| Peter_Wellin_ESI_000600 |
| Peter_Wellin_ESI_000671 |
| Peter_Wellin_ESI_000676 - Peter_Wellin_ESI_000679 |
| Peter_Wellin_ESI_000718 - Peter_Wellin_ESI_000719 |
| Peter_Wellin_ESI_000722 - Peter_Wellin_ESI_000723 |
| Peter_Wellin_ESI_000777 - Peter_Wellin_ESI_000780 |
| Peter_Wellin_ESI_000783 - Peter_Wellin_ESI_000787 |
| Peter_Wellin_ESI_000793 |
| Peter_Wellin_ESI_000797 - Peter_Wellin_ESI_000798 |
| Peter_Wellin_ESI_000801 - Peter_Wellin_ESI_000802 |
| Peter_Wellin_ESI_000805 |
| Peter_Wellin_ESI_000809 - Peter_Wellin_ESI_000815 |
| Peter_Wellin_ESI_000824 - Peter_Wellin_ESI_000826 |
| Peter_Wellin_ESI_001021 |
| Peter_Wellin_ESI_001038 |
| Peter_Wellin_ESI_001042 |
| Peter_Wellin_ESI_001059 |
| Peter_Wellin_ESI_001104 - Peter_Wellin_ESI_001105 |
| Peter_Wellin_ESI_001109 - Peter_Wellin_ESI_001114 |
| Peter_Wellin_ESI_001147 - Peter_Wellin_ESI_001162 |
| Peter_Wellin_ESI_001216 - Peter_Wellin_ESI_001222 |
| Peter_Wellin_ESI_001230 - Peter_Wellin_ESI_001235 |
| Peter_Wellin_ESI_001238 - Peter_Wellin_ESI_001248 |
| Peter_Wellin_ESI_001251 - Peter_Wellin_ESI_001253 |
| Peter_Wellin_ESI_001288 - Peter_Wellin_ESI_001291 |
| Peter_Wellin_ESI_001294 - Peter_Wellin_ESI_001299 |
| Peter_Wellin_ESI_001302 - Peter_Wellin_ESI_001308 |
| Peter_Wellin_ESI_001319 |
| Peter_Wellin_ESI_001321 - Peter_Wellin_ESI_001322 |
| Peter_Wellin_ESI_001342 - Peter_Wellin_ESI_001346 |
| Peter_Wellin_ESI_001348 |
| Peter_Wellin_ESI_001353 - Peter_Wellin_ESI_001379 |
| Peter_Wellin_ESI_001609 |
| Peter_Wellin_ESI_001830 - Peter_Wellin_ESI_001848 |
| Peter_Wellin_ESI_001852 |
| Peter_Wellin_ESI_001855 |
| Peter_Wellin_ESI_001870 - Peter_Wellin_ESI_001871 |
| Peter_Wellin_ESI_001950 |
| Peter_Wellin_ESI_001987 - Peter_Wellin_ESI_001988 |
| Peter_Wellin_ESI_001991 |
| Peter_Wellin_ESI_001993-1994 |

| |
|---|
| Peter_Wellin_ESI_002341 |
| Peter_Wellin_ESI_002404 - Peter_Wellin_ESI_002405 |
| Peter_Wellin_ESI_002500 - Peter_Wellin_ESI_002501 |
| Peter_Wellin_ESI_002504 |
| Peter_Wellin_ESI_002542 - Peter_Wellin_ESI_002544 |
| Peter_Wellin_ESI_002546 |
| Peter_Wellin_ESI_002554 - Peter_Wellin_ESI_002556 |
| Peter_Wellin_ESI_002565 - Peter_Wellin_ESI_002567 |
| Peter_Wellin_ESI_002587 - Peter_Wellin_ESI_002591 |
| Peter_Wellin_ESI_002617 - Peter_Wellin_ESI_002670 |
| Peter_Wellin_ESI_002741 |
| Peter_Wellin_ESI_002791 - Peter_Wellin_ESI_002795 |
| Peter_Wellin_ESI_002805 - Peter_Wellin_ESI_002807 |
| Peter_Wellin_ESI_002847 - Peter_Wellin_ESI_003218 |
| Richard_King_000112 - Richard_King_000116 |
| Richard_King_000212 |
| Richard_King_000248 |
| Richard_King_000260 - Richard_King_000261 |
| Richard_King_000277 - Richard_King_000278 |
| Richard_King_000354 - Richard_King_000355 |
| Richard_King_000408 |
| Richard_King_000416 - Richard_King_000417 |
| Richard_King_000441 - Richard_King_000443 |
| Richard_King_000456 |
| Richard_King_000465 - Richard_King_000466 |
| Richard_King_000478 |
| Richard_King_000481 - Richard_King_000483 |
| Richard_King_000497 - Richard_King_000498 |
| Richard_King_000502 - Richard_King_000508 |
| Richard_King_000510 - Richard_King_000513 |
| Richard_King_000522 - Richard_King_000523 |
| Richard_King_000537 - Richard_King_000538 |
| Richard_King_000551 - Richard_King_000554 |
| Richard_King_000561 |
| Richard_King_000571 |
| SIMON 08212 - SIMON 08216 |
| Tune_Subpoena_005334 |
| UBSWellin 0001658 - UBSWellin 0001661 |
| UBSWellin 0001662 - UBSWellin 0001664 |
| UBSWellin 0001728 - UBSWellin 0001738 |
| UBSWellin 0001779 - UBSWellin 0001781 |
| UBSWellin 0002600 |
| UBSWellin 0002689 - UBSWellin 0002691 |
| UBSWellin 0003286 - UBSWellin 0003287 |
| UBSWellin 0003626 - UBSWellin 0003633 |
| UBSWellin 0003653 |
| UBSWellin 0003671 - UBSWellin 0003685 |
| UBSWellin 0003696 |
| UBSWellin 0003698 |
| UBSWellin 0003700 - UBSWellin 0003701 |
| UBSWellin 0003772 - UBSWellin 0003776 |

| |
|---|
| UBSWellin 0003789 - UBSWellin 0003796 |
| UBSWellin 0004278 |
| UBSWellin 0004288 - UBSWellin 0004297 |
| UBSWellin 0004833 |
| WELLIN_GUS 004543 |