IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Wendy C.H. Wellin, as the Special Administrator of the Estate of Keith S. Wellin, and as Trustee of the Keith S. Wellin Florida Revocable Living Trust u/a/d December 11, 2001, | ) ) ) ) ) ) | Civil Action No.  2:13-cv-01831-DCN **THE WELLIN CHILDREN'S RESPONSE IN OPPOSITION TO THE ESTATE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO VALIDITY OF KEITH S. WELLIN'S NOVEMBER 20, 2013 SUBSTITUTION OF ASSETS** |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| Peter J. Wellin, et al., | ) ) | |
| Defendants. | ) ) | |

Peter J. Wellin, Cynthia W. Plum, Marjorie W. King, and Friendship Management, LLC (the "Wellin Children") hereby submit this response in opposition to the Motion for Partial Summary Judgment as to the Validity of Keith S. Wellin's November 20, 2013 Substitution of Assets (ECF No. 881) filed by Wendy Wellin as Special Administrator of the Estate and Trustee of the Revocable Trust (the "Estate").

## I.    Introduction

The Wellin Children have filed a motion for summary judgment regarding Keith Wellin's purported substitution of assets (the "swap") in which they ask the Court to find as a matter of law that the swap was invalid. ECF No. 888. In its crossing motion for summary judgment, the Estate asks the Court to find as a matter of law that the swap was valid. ECF No. 881. The Estate's motion, however, does not address any of the arguments set forth in the Wellin Children's motion. *See generally* ECF No. 881.[1] Thus, the Court should deny the Estate's motion

---

[1] Long before filing its motion, the Estate was aware of the Wellin Children's arguments as to why the swap was invalid. *See, e.g.*, Peter Wellin's Response to the Estate's contention interrogatory regarding the swap, attached as Exhibit A, at pp. 15-17.

for summary judgment for all of the reasons set forth in the Wellin Children's motion and unaddressed in the Estate's motion.

In its motion, the Estate makes only two arguments as to why the swap was supposedly valid. *See* ECF No. 881 at 15-24. First, the Estate argues that Keith sought to remove from the Wellin Family 2009 Irrevocable Trust (the "Irrevocable Trust") only assets of equivalent value based on a "defined value formula," and did not seek to remove from the Irrevocable Trust a specific number of LP units that Keith deemed to be equivalent value. *Id.* at 15-18. As explained in the Wellin Children's motion (ECF No. 888 at 9-14) and as discussed below, this is false. In fact, the purported swap was for a specific number of LP units—581,554.8645. Further, at the hearing the morning after the purported swap, Keith's counsel stated that Keith "now is sitting on 58% of these shares worth an estimated $90 million." 11-21-13 H'rg Tr., ECF No. 888-1, at 14:8-9; *see also* Bennett Dep. Tr., ECF No. 888-8, at 619:9-20 (Bennett admitting in his deposition that he does not recall ever speaking with Keith about executing a swap where he received a number of LP Units based on a discount other than the one used in Schedule A, much less confirming that Keith would want to execute such a swap). And, critically, the Estate's Amended Complaint alleges only that the swap was valid based on the specific formula used by Keith, and alleges that the swap resulted in Keith acquiring a "58.15548645% interest" in the LP. *See* Estate's Amended Complaint, ECF No. 301 at ¶¶ 55, 62, 122. The Estate has never sought to amend its complaint to allege that, through the swap, Keith acquired a 58.15548645% interest in the LP pursuant to the formula he used *or some different interest based on a different formula*. The Estate is attempting to amend its pleading through its motion for summary judgment, which is not permissible.

Second, the Estate argues that two cases—*Benson v. Rosenthal* and *Manatt v. Manatt*—support a finding that the swap was valid. But, as discussed below, *Benson* and *Manatt* are easily distinguishable from this case. Indeed, neither of these cases addresses *any* (much less all) of the reasons identified in the Wellin Children's motion that the swap was invalid.

Finally, the Estate asks the Court to grant summary judgment on its argument that the phrase "equivalent value" in Article IX.A of the Irrevocable Trust (the swap provision) means "fair market value as determined under Treasury Regulation Sections 20.2031-1(b) and 25.2512-1, which govern the valuation of assets for purposes of calculating gift and estate taxes." The Court should reject this argument for numerous reasons, including the following:

- The swap was invalid for reasons entirely independent of the meaning of the phrase "equivalent value," and the Court therefore need not reach this issue.

- The Estate's interpretation of "equivalent value," which is not defined in the Trust or in statutory law or case law, is not <u>a</u> reasonable interpretation, much less <u>the only</u> reasonable interpretation.

- As the Estate's valuation expert admits, determining the proper standard of value is highly fact and context specific.

- Interpreting "equivalent value" as the Estate suggests would have a highly inequitable result, and at a minimum, a question of fact exists as to whether accepting the Estate's argument would be consistent with Mr. Crow's "three pillars" of common sense, informed judgment, and reasonableness, which must be considered when deciding what standard of value to apply.

- The lone court to rule on the meaning of "equivalent value" for purposes of a disputed swap transaction held, after a trial, that no discounts were appropriate, consistent with the opinion of the Wellin Children's valuation expert.

- Courts have held that discounts are not appropriate in analogous contexts.

- The Estate has not moved to exclude the opinions of Dr. Bajaj, much less established that his opinions are unreliable or otherwise inadmissible under *Daubert*.

3

- Tom Farace, the architect of the 2009 Transaction, testified that no discount applies to the value of the LP Units when controlled by the Wellin Children, which is consistent with the opinion of Dr. Bajaj.

- The course of conduct between the parties, upon which the Estate relies in its motion, does not support the Estate's motion and, in fact, undermines the Estate's arguments.

- The Estate's expert fails to apply his proposed standard of value to the Note, which is one of the two assets involved in the purported swap transaction.

For all of these reasons, which are discussed in more detail below, the Estate's motion should be denied.

**II.    The Estate is attempting to amend its complaint through its summary judgment motion, which is not permissible.**

In its Amended Complaint, the Estate does *not* allege that the swap involved a "defined value formula" or otherwise allege that Keith intended to execute the swap pursuant to any formula other than the one explicitly relied upon in the swap document. To the contrary, the Amended Complaint alleges that "the valuation utilized in the substitution of assets was based upon the same formula that [the Wellin Children] had used on at least five occasions"—that is, the formula used by MPI that is used in the swap document to calculate the 581,554.8645 LP Units Keith allegedly received through the swap. *See* Estate's Amended Complaint, ECF No. 301 at ¶ 55 (alleging that "[t]he Decedent determined the percentage of Friendship Partners, LP acquired in the substitution to be a 58.15548645% interest" and citing the Substitution document executed by Keith); *id.* at ¶ 62 (alleging that the swap entitled Keith to receive "an amount in excess of $91,000,000.00 *based on the 58.15548645% interest calculated by the Decedent to have been acquired in the substitution*") (emphasis added); *id.* at ¶ 122 (alleging that the Wellin Children "knew that the valuation utilized in the substitution of assets was based upon the same formula that they had used on at least five occasions"). The Estate has never sought to amend its

4

complaint to allege that, through the swap, Keith acquired a 58.15548645% interest in the LP pursuant to the formula he used *or some different interest based on a different formula*. The Estate is attempting to amend its pleading through its motion for summary judgment.

The law, however, is well-settled that a plaintiff cannot constructively amend his complaint through a summary judgment motion. As the Fourth Circuit has held:

> We conclude that the district court did not err in refusing to consider the new argument as an impermissible attempt to constructively amend the complaint. Because a complaint "guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations," constructive amendment of the complaint at summary judgment undermines the complaint's purpose and can thus unfairly prejudice the defendant. . . . Indeed, Appellant did not at any time request leave to amend her pleadings. As a result, Appellee conducted discovery and crafted defenses based on Appellant's claim as set forth in the amended complaint . . . ."

*Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946–47 (4th Cir. 2013); *see also Snowden v. United Rentals (N. Am.) Inc.*, No. 2:14-CV-2740-PMD, 2015 WL 5554337, at \*4–5 (D.S.C. Sept. 21, 2015) ("Snowden's Response and affidavit appear to be an attempt to constructively amend the Amended Complaint. The Court declines to allow such an amendment. The discovery period ended before the parties began summary judgment briefing. Allowing a constructive amendment at this late stage would unfairly prejudice United and undermine the fairness of the proceedings."); *Dorsey v. Aetna Life Ins. Co.,* No. 2:12-cv-90, 2013 WL 1288165, at \*23 (E.D.Va. Mar.26, 2013) ("To allow the plaintiff to effect a constructive amendment of the complaint on summary judgment, well after the close of discovery, would seriously undermine the fairness of the litigation and unfairly prejudice [the defendant]."); *Bradley v. City of Orangeburg*, No. 5:13-CV-521-TLW, 2015 WL 3542775, at \*1 n. 1 (D.S.C. June 4, 2015) (same).

5

Moreover, allowing the Estate to constructively amend its complaint at the summary judgment stage would be particularly unfair in this case because the Court previously denied the Wellin Children's motion to amend its pleading in this consolidated litigation—*filed more than three years ago*—on the ground that the Wellin Children's request for leave to amend was too late. *See* Order, ECF No. 564 in 2:13-cv-3595. In its Order, the Court held that the deadline in the scheduling order for parties to move to amend their pleadings was May 1, 2015, and held that, because the Wellin Children could have sought to amend their pleading prior to the deadline, they could not demonstrate the "good cause" required under Rule 16(b). *See id.* at 5-9. The Court held:

> "The 'good cause' requirement of Rule 16(b) is unlike the more lenient standard of Rule 15(a) in that Rule 16(b) 'does not focus on the bad faith of the movant, or the prejudice to the opposing party,' but focuses on the diligence of the party seeking amendment."

*Id.* at 4-5 (quoting *George v. Duke Energy Ret. Cash Balance Plan*, 560 F. Supp. 2d 444, 480 (D.S.C. 2008)). Here, the Estate has not attempted to establish, and cannot establish, good cause for failing to seek leave to amend its complaint to assert a claim that the swap was valid pursuant to the formula used in the swap document *or pursuant to some other formula (such as the "defined value formula")*.

Because the Estate is seeking summary judgment on a claim that it has not pleaded, and because the Estate is not entitled to constructively amend its complaint through a summary judgment motion, the Court should deny the Estate's motion.

## III.    The Estate is asking the Court to ignore the plain language of the swap document.

In its motion, the Estate argues that the swap was, by definition, for "equivalent value," because Keith used a "defined value formula." *See* ECF No. 881 at 17-18. As the Estate explains,

defined value formulas are sometimes used in estate planning where one party is not attempting to obtain a particular number of shares or units through a transaction, but rather is merely seeking to obtain however many shares or units are equivalent to a particular dollar amount. *Id.* at 17 ("By employing a defined value clause, interests in a closely-held entity which are difficult to value can be transferred based on a set or defined value of the interests transferred, *rather than based on a set number or percentage of shares or units*.") (emphasis added).

Here, however, Keith *did* seek to obtain "a set number or percentage of shares or units." Specifically, Keith's swap purported to obtain 581,554.8645 LP Units. *See* Swap Document and attached Schedule A, ECF No. 888-2 at 10-11. The Estate is simply asking the Court to ignore this portion of the swap document. As explained in the Wellin Children's motion for summary judgment, the swap document stated that this number of LP Units could be adjusted from the total listed on Schedule A, *but only if and to the extent the cash held by the LP was different than the amount assumed by Keith*. ECF No. 888 at 13.[2] Also, Bennett conceded in his deposition that he does not recall ever speaking with Keith about executing a swap where he received a different number of LP Units from the number set forth in Schedule A, much less asking Keith if he would still want to execute the swap if it were for a different number of units. *See* Bennett Dep. Tr., ECF No. 888-8, at 619:9-20. Indeed, at a hearing the morning after Keith purported to exercise his swap power, his counsel stated to this Court that Keith "now is sitting on 58% of these shares worth an estimated $90 million." 11-21-13 H'rg Tr., ECF No. 888-1, at 14:8-9. Keith's counsel did *not* state that Keith intended to exercise his swap power to obtain an undefined number of LP Units that would be determined through an appraisal conducted at a later date. Keith's counsel only began characterizing the swap document in this way—contrary to

---

[2] The cash held by the LP was *de minimis*.

7

its plain language—at a later date, after Keith purported to release his power to substitute assets at midnight of November 20, 2013.

In its motion, the Estate cites several cases involving disputes between taxpayers and the IRS where the court allowed the taxpayer to use a defined value formula and rejected the IRS's arguments that more taxes should be owed. *See* ECF No. 881 at 17-18. In these cases, the courts emphasize that the taxpayer was <u>not</u> seeking a particular number of shares or units that constitute equivalent value and instead was relying only on a defined value formula. *See, e.g.*, *Estate of Petter v. Comm'r*, 653 F.3d 1012, 1020 (9th Cir. 2011) ("But the Taxpayer's transfer agreements *do not specify the value of an individual LLC unit*.") (emphasis added); *Wandry v. Comm'r*. T.C. Memo 2012-88 (Mar. 26, 2012) ("The only gifts with respect to Norseman membership units that petitioners ever intended to give were of dollar amounts equal to their Federal gift tax exclusions. At all times petitioners understood and believed that the gifts were of a dollar value, *not a specified number of membership units*.") (emphasis added). Unlike in the cases cited by the Estate, Keith *did* specify a number of LP Units that he sought to obtain—specifically, 581,554.8645 LP Units. Thus, these cases are distinguishable.

For all the reasons set forth in the Wellin Children's motion for summary judgment, *see* ECF No. 888 at 12-14, and for the reasons set forth above, the Court should reject the Estate's argument that Keith was not seeking a particular number of units.

### IV.    The cases of *Benson* and *Manatt* are easily distinguishable and are irrelevant to *all* of the Wellin Children's arguments.

The only other argument the Estate makes in its motion for summary judgment regarding the validity of the swap is that two cases—*Benson v. Rosenthal* and *Manatt v. Manatt*—support a finding that the swap in this case was valid. *See* ECF No. 881 at 18-24. The Estate is incorrect.

8

These cases are distinguishable from the instant case and, in fact, do not address *any* (much less all) of the arguments made by the Wellin Children regarding the swap's invalidity.

In its motion, the Estate discusses only the portions of these cases where the courts address whether the trustee had the duty to determine equivalent value of the purported asset substitution *prior to* the substitution or *after* the substitution. *See generally* ECF No. 881 at 19-24.[3] That is, the courts considered whether the trustee had the authority to disallow a purported substitution of assets if the trustee determined that it was not for equivalent value. As the Estate points out, in both cases, the courts held that, under the terms of the trust and applicable state law, the duty to determine equivalent value required the trustee to determine whether the assets substituted are of equivalent value *after* the substitution has occurred—not before it occurs. *See Benson v. Rosenthal*, No. CV 15-782, 2016 WL 2855456, at *4-*6 (E.D. La. May 16, 2016); *Manatt v. Manatt*, No. 4:17-CV-00378-JEG, 2018 WL 3154461, at *4-*7 (S.D. Iowa May 2, 2018). In reaching this conclusion, both courts cited the general state law providing that trusts should be interpreted according to the plain meaning of the words used in the four corners of the trust document. *See Benson*, at *5 ("Generally, Texas courts endeavor to enforce trusts according to the settlor's intent, which [is] divine[d] from the four corners of unambiguous trusts.") (quoting *Rachal v. Reitz*, 403 S.W.3d 840, 844 (Tex. 2013)); *Manatt*, at *3 ("[The court's] interpretation of a trust is guided by the intent of the testator. [The court] determine[s] intent based on the language of the trust itself, utilizing the ordinary and usual meaning of the words included.") (quoting *In re Steinberg Family Living Tr.*, 894 N.W.2d 463, 468 (Iowa 2017)).

---

[3] It is undisputed that the other issues addressed in these opinions, such as whether the purported substitution in *Benson* was a loan from the grantor, and whether the probate exception applied in *Manatt*, are not relevant here.

Here, however, the Irrevocable Trust is governed by South Dakota law—not Texas law (as in *Benson*) or Iowa law (as in *Manatt*)—and South Dakota has a statute squarely addressing the issue litigated in *Benson* and *Manatt*. Specifically, Section 55-2-22 of the South Dakota Trust Code provides:

> ***Notwithstanding the terms of a trust instrument***, if a settlor has a power to substitute property of equivalent value, a trustee has a fiduciary duty to determine that the substituted property is of equivalent value, ***prior to allowing the substitution.***

S.D. Code § 55-2-22 (emphasis added). Thus, regardless of what the trust instrument says, the trustees have a statutory duty under South Dakota law to determine whether a substitution is for equivalent value *prior to allowing the substitution*. Remarkably, the Estate's motion simply ignores this statutory language, even though this language is dispositive of the issue disputed in *Benson* and *Manatt*.[4] The Estate is asking the Court to pretend as though Section 55-2-22 states:

> ***Notwithstanding the terms of a trust instrument***, if a settlor has a power to substitute property of equivalent value, a trustee has a fiduciary duty to determine that the substituted property is of equivalent value, ***after the substitution occurs.***

But the statute does not say this.

Furthermore, in *Benson*, when the grantor exercised his swap power, he provided the trustees with "blank promissory notes containing valuation adjustment clauses that would operate to adjust the notes automatically to a later-determined appraised value." *Benson*, at *1. Here, by contrast, and as discussed above, Keith's swap document provided that he was purporting to obtain a specific number of LP Units—581,554.8645.

---

[4] In its motion, the Estate references—but does not quote—Section 55-2-22, noting that the statute uses the word "substituted," but ignoring the dispositive language in the statute explicitly requiring the trustee to determine equivalent value *prior to allowing the substitution.*

Thus, the cases of *Benson* and *Manatt* are distinguishable and do not address *any* (much less all) of the arguments made by the Wellin Children in their motion for summary judgment regarding the swap.

**V.    The Court should not grant the Estate summary judgment on its argument that "equivalent value," an undefined term in the Irrevocable Trust Agreement, should be interpreted in a way that will allow Keith to obtain assets worth $90 million to the Irrevocable Trust in exchange for a $50 million Note.**

The swap provision in the Irrevocable Trust Agreement authorizes Keith as grantor "to reacquire the trust corpus or a portion thereof by substituting other property *of an equivalent value*." See Irrevocable Trust, ECF No. 41-12, Article IX.A (emphasis added). As the Estate concedes in its motion, "equivalent value" is not defined in the Irrevocable Trust Agreement, in the South Dakota Trust Code, or in South Dakota case law. ECF No. 881 at 24. Nevertheless, the Estate asks this Court to grant summary judgment on its argument that "equivalent value" as used in Article IX.A of the Irrevocable Trust Agreement should be interpreted to mean fair market value as defined in Sections 20.2031-1(b) and 25.2512-1 of the Treasury Regulations, which are the Sections governing the standard of value used to calculate gift and estate taxes. ECF No. 881 at 24-32.

The Court should deny the Estate's motion regarding the interpretation of "equivalent value" for each of the reasons discussed below.

**A.    The Court should not reach this issue because the swap was invalid for reasons independent of the meaning of "equivalent value."**

For all of the reasons set forth in the Wellin Children's motion for summary judgment (and unaddressed in the Estate's motion), the swap was invalid as a matter of law. *See* ECF No. 888. None of these reasons requires the Court to interpret "equivalent value" as that phrase is used in Article IX.A of the Irrevocable Trust Agreement. Thus, the Court should hold that the

swap was invalid for any or all of the reasons set forth in the Wellin Children's motion and should not reach the issue of the meaning of "equivalent value."

    **B. The definition of "equivalent value" advanced by the Estate is not <u>a</u> reasonable interpretation of the phrase, much less <u>the only</u> reasonable interpretation of the phrase.**

    "A contract is ambiguous when the terms of the contract are reasonably susceptible of more than one interpretation." *Mears Grp., Inc. v. Kiawah Island Util., Inc.*, No. 2:17-CV-02418-DCN, 2019 WL 1100141, at *6 (D.S.C. Mar. 8, 2019) (internal citation omitted). When a party moves for summary judgment regarding the interpretation of a contract, the threshold question for the Court is whether the contract is ambiguous with respect to the language at issue. As this Court recently held:

> "A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation." The court must first determine if the contract at issue is ambiguous. If "the contract is unambiguous on the dispositive issue," it may grant summary judgment. However, if the court determines that the contract is ambiguous, "it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if that evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgment on that basis." But if the review of the extrinsic evidence still "leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact." "Therefore, summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence."

*Id.* at *5 (internal citations omitted).

    In the portion of its motion seeking summary judgment on the interpretation of "equivalent value," the Estate does not mention, much less attempt to apply, any of the above law. *See generally* ECF No. 881 at 24-32. The Estate does state earlier in its motion, without any citation, that "[t]here has been no assertion that the substitution clause contained within the 2009 Trust is ambiguous." ECF No. 881 at 16. But the Estate also argues that the Court should accept

its interpretation of "equivalent value" based on extrinsic evidence. *See* ECF No. 881 at 30-32 (arguing that the parties' course of conduct supports the Estate's proposed interpretation). Thus, it is unclear whether the Estate is arguing that the phrase "equivalent value" unambiguously means what the Estate claims that it means, or if the Estate is arguing that the extrinsic evidence leaves no genuine issues of fact regarding the proper interpretation of the phrase.

In any event, the definition of "equivalent value" proposed by the Estate—"fair market value as defined in Sections 20.2031-1(b) and 25.2512-1 of the Treasury Regulations"—is not even *one* reasonable interpretation, much less the *only* reasonable interpretation. Indeed, the United States Supreme Court has rejected a nearly identical argument to the one being advanced by the Estate. In *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 536–37 (1994), one party argued that the phrase "reasonably equivalent value" should be interpreted to mean "fair market value" as that phrase is commonly understood. The Supreme Court rejected that argument, reasoning as follows:

> "Fair market value" also appears in the Code provision that defines the extent to which indebtedness with respect to an equity security is not forgiven for the purpose of determining whether the debtor's estate has realized taxable income. § 346(j)(7)(B). Section 548, on the other hand, seemingly goes out of its way to avoid that standard term. It might readily have said "received less than fair market value in exchange for such transfer or obligation," or perhaps "less than a reasonable equivalent of fair market value." Instead, it used the (as far as we are aware) entirely novel phrase "reasonably equivalent value." "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another," *Chicago v. Environmental Defense Fund*, 511 U.S. 328, 338, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994) (internal quotation marks omitted), and that presumption is even stronger when the omission entails the replacement of standard legal terminology with a neologism. One must suspect the language means that fair market value cannot—or at least cannot always—be the benchmark.

*Id.* The same logic applies with equal force here. As discussed below, Mr. Farace *did* include a provision in the Pledge Agreement—which he drafted at the same time that he drafted the

Irrevocable Trust Agreement—stating that assets would be valued using the standard proposed by the Estate when assets were automatically transferred upon Keith's death. If Mr. Farace had intended for "equivalent value" to have the definition proposed by the Estate, then he could have defined "equivalent value" in that way or, more likely, avoided using the "entirely novel phrase" of "equivalent value" and instead used the much more common phrase "fair market value," and referenced the relevant Sections of the Treasury Regulations, just as he did in the Pledge Agreement. Moreover, any interpretation of "equivalent value" that results in Keith receiving $90 million in exchange for a $50 million Note is not a reasonable interpretation, as discussed in more detail below.

### C. Determining the proper standard of value is highly fact and context specific and therefore should not be decided on summary judgment in light of the highly unusual circumstances of this case.

It is well-established in the appraisal industry that the standard of value to be used for a given appraisal is highly dependent on the context, facts, and circumstances of the transaction at issue. Indeed, the Estate's expert, Matthew Crow, testified as follows:

Q: Would you agree that there's no appraisal industry standard or guideline that states that you should use fair market value in the context of a contested substitution transaction?

A: There's a two-part answer to that question. There's clearly no appraisal industry standard that specifically references the circumstance. As valuation people, we deal with a very, very, very broad range of economic circumstances in our work that we have to respond to. You couldn't possibly -- well, you could try to list them all and be prescriptive about it, but that's not really how my world works. What the appraisal industry does is to set forth expectations of behavior standards, appraisal practice guidelines, which say that we are compelled to conduct our work in a way that is reasonable, that exercises really -- sits on three pillars: Common sense, informed judgment, and reasonableness. So evaluating whether or not fair market value is appropriate in this circumstance really comes down to evaluating the overall circumstance and determining, based on that, what standard of value makes sense.

Crow Dep. Tr., attached as <u>Exhibit B</u>, at 117:10 – 118:8; *see also* Douglas K. Moll, *Shareholder Oppression and "Fair Value": Of Discounts, Dates, and Dastardly Deeds in the Close Corporation*, 54 Duke L.J. 293, 319–20 (2004) ("Context Matters. Valuation is inherently contextual. Setting and circumstances matter greatly, as they can significantly affect the value of a particular asset.").[5] Thus, according to the Estate's own valuation expert, "equivalent value" should be defined based on the application of the three pillars of "common sense, informed judgment, and reasonableness" to "the overall circumstance." This exercise is inherently

---

[5] The below string cite from this law review article further demonstrates the importance of context in determining value.

> *See, e.g.*, Model Bus. Corp. Act § 13.01 cmt. 2 (2002) ("[D]ifferent transactions and different contexts may warrant different valuation methodologies."); 2 Am. Law Inst., Principles of Corp. Governance: Analysis and Recommendations § 7.22(a) (1994) (stating that fair value "should be determined . . . in the context of the transaction giving rise to appraisal"); Pratt et al., supra note 79, at 22 ("No single valuation method is universally applicable to all appraisal purposes. The context in which the appraisal is to be used is a critical factor."); *id.* at 23 ("The word value means different things to different people. Even to the same person, value means different things in different contexts . . . ."); *id.* at 27 ("To understand what the expression fair value means, you have to know the context of its use."); Richard A. Booth, Minority Discounts and Control Premiums in Appraisal Proceedings, 57 Bus. Law. 127, 156 (2001) (noting that "the standard of value in an appraisal proceeding should reflect the actual transaction under review"); see also Pratt et al., *supra* note 79, at 15 ("Many people hold the mistaken notion that there can be only one 'value.' . . . [T]here are many definitions of value, and the purpose of the appraisal usually determines the appropriate definition of value."); *id.* at 22 ("Many business appraisals fail to reach a number representing the appropriate definition of value because the appraiser failed to match the valuation methods to the purpose for which it was being performed." (emphasis removed)); *id.* at 23 ("The purpose of the valuation often determines the applicable standard of value--that is, the definition of value being sought--and almost always influences it.").

*Id.* at 319 n.98.

dependent on the facts and circumstances of the case and therefore is not appropriate for summary judgment, particularly under the unusual facts and circumstances of this case.

> ### D. Interpreting "equivalent value" as the Estate suggests would have a highly inequitable result, and at a minimum, a question of fact exists as to whether accepting the Estate's argument would be consistent with Mr. Crow's "three pillars" of common sense, informed judgment, and reasonableness.

It is well-settled that summary judgment should not be granted where, after construing all facts and inferences in the light most favorable to the non-moving party, a reasonable jury could agree with the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."); *id.* at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *id.* at 255 ("The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.").[6] Here, when construing the facts and inferences in the light most favorable to the Wellin Children, a reasonable jury *could* agree with the Wellin Children's position regarding the interpretation of "equivalent value," which, as explained in Dr. Bajaj's report, requires a determination of value based on the economic realities that existed at the time of the purported swap rather than reliance on the fiction of a hypothetical

---

[6] *See also Seventeen S., LLC v. D.R. Horton, Inc.*, No. CV 4:13-03119-BHH, 2016 WL 2610075, at *6 (D.S.C. May 6, 2016) ("Indeed, after viewing the evidence in the light most favorable to Plaintiffs as the non-moving party and drawing all inferences in their favor, the Court finds that a genuine issue of material fact exists as to the intended scope of Wizman's option to construct under Paragraph 4(c)(i) of the Agreement. Both parties offer reasonable interpretations of the contractual terms at issue, and the submitted affidavits fail to definitively resolve these ambiguous terms as a matter of law. It is not within the Court's purview at this stage to determine which of the available interpretations it finds more persuasive; the presence of a genuine issue of material fact precludes such a determination.") (internal citations omitted).

willing buyer and willing seller, which did not exist here. *See* Bajaj Affirmative Report, attached as <u>Exhibit C</u>, at 16-31.

As the Estate mentions in a footnote, calculating fair market value under the Sections of the Treasury Regulations identified by the Estate typically includes applying discounts for lack of control and lack of marketability. *Id.* at 26 n.12. According to the Estate's expert, Matthew Crow, application of these discounts to the swap means that Keith was entitled to swap a promissory note with a face value of $50 million—a note which, two days before the swap, Keith's counsel characterized as "a worthless note," *see* 11-18-13 H'rg Tr., attached as <u>Exhibit D</u>, at 69:23-25[7]—for LP units with a liquidation value of more than $90 million. *See* Crow Report, ECF No. 881-60. Indeed, the morning after the swap, Keith's counsel characterized the LP Units that Keith purportedly obtained by swapping the Note as being worth approximately $90 million. *See* 11-21-13 H'rg Tr., ECF No. 888-1, at 14:8-9.(Keith's counsel stating to this Court that, after the swap, Keith "now is sitting on 58% of these [LP] shares worth an estimated $90 million"). Thus, the Estate's valuation expert opines that applying control and marketability discounts to the LP Units is consistent with "common sense, informed judgment, and reasonableness," even though application of these discounts (according to Mr. Crow) results in the Estate receiving more than $90 million in exchange for a $50 million note. Likewise, even though the Estate's expert admits that the proper standard of value depends on the circumstances

---

[7] Notably, in his motion for temporary restraining order filed before the purported swap, Keith's counsel argued that the value of the Note was much less than its outstanding balance. *See* Motion for TRO, ECF No. 5-1 at 6 ("The Note is essentially worthless to the Plaintiff, who is in very poor health, as it cannot be called until 2021, and can only be sold for a fraction of its face value because of its nominal interest rate, its maturity date and provision that it cannot be called early, and the fact that it can be repaid with any property, including an illiquid limited partner interest in Friendship Partners, LP which would not provide any control to the holder of the payee of the Note over the consideration he was just paid.").

of the transaction, he opines (and the Estate argues in its motion for summary judgment) that the Court should apply the same standard of value in the context of this hostile swap transaction executed in the midst of litigation that it would apply when determining the taxes owed on a gift or a bequest. *See* ECF No. 881 at 25-29.

In his rebuttal report, Dr. Bajaj persuasively explains why Mr. Crow's opinions are unreliable and why his use of the hypothetical willing buyer willing seller standard for purposes of this transaction is inconsistent with economic logic and common sense. *See* Bajaj Rebuttal Report, attached as Exhibit E, at 8-20. As explained in the affirmative and rebuttal expert reports of Dr. Bajaj, it is undisputed that the Wellin Children controlled both the Irrevocable Trust and the LP and therefore had the ability to convert the LP Units held by the Irrevocable Trust into its underlying stock or cash, which is what the Wellin Children stated they intended to do at the hearing two days before the purported swap, and which is what the Wellin Children in fact did in the two weeks following the purported swap. *See id.*; *see also* Bajaj Affirmative Report, Exhibit C, at 16-31. Thus, discounting the value of the LP Units for purposes of the swap ignores the economic reality that existed, which was that the value of the LP Units to the Irrevocable Trust was the same as their liquidation value. Indeed, relying on its ability to convert the LP Units to cash or stock, the Irrevocable Trust agreed to prepay the $50 million Note with stock only two days before the purported swap. ECF No. 69 (11-19-13 Letter from the Wellin Children's counsel to the Court confirming their intention to prepay Note with stock as soon as the Court lifted the TRO). Further, approximately two weeks after the purported swap, the Irrevocable Trust did in fact convert its LP Units to cash and deliver a $50 million check to Keith's Revocable Trust in prepayment of the Note, but Keith's counsel returned the check the same day and stated that Keith was entitled to more than $90 million in light of the swap. ECF No. 888-3.

In sum, the Estate contends that it is entitled to receive not merely the $50 million face value of the Note that the Irrevocable Trust attempted to pay both before and after the swap (and which the Irrevocable Trust would have been able to pay but for the *ex parte* TRO that was ultimately dissolved by this Court the day after the swap), but rather that it is entitled to receive over $90 million based on the purported swap of the Note. If the Estate is correct, then Keith was able to convert a note with a $50 million face value (which his counsel characterized as "worthless" two days before the swap) into more than $90 million in cash in a matter of two weeks. Likewise, if the Estate is correct, then the Irrevocable Trust will be forced to pay more than $90 million in exchange for a $50 million promissory note that it could have prepaid at any time by converting LP Units with an underlying cash value of only $50 million. On the other hand, if the Wellin Children are correct, then the Estate will be entitled (if the swap is deemed to be valid) to no more than $50 million in exchange for a $50 million note. The Wellin Children respectfully submit that their position, as articulated by Dr. Bajaj, is more consistent with Mr. Crow's three pillars of "common sense, informed judgment, and reasonableness." In any event, the Court need not accept the Wellin Children's position to deny the Estate's motion; rather, the Court need only find that, viewing the evidence and inferences in the light most favorable to the Wellin Children, a reasonable jury *could* agree with the Wellin Children on this issue as articulated by Dr. Bajaj.

### E. The lone court to rule on the meaning of "equivalent value" for purposes of a disputed swap transaction held—after a trial—that no discounts were appropriate.

The only case the Wellin Children have identified where a court determines the standard of value that should be used in the context of a disputed swap transaction is *In re Dino Rigoni Intentional Grantor Tr. for Benefit of Rajzer*, No. 321589, 2015 WL 4255417 (Mich. Ct. App.

July 14, 2015). In *Rigoni*, as in this case, the grantor purported to exercise his power under the trust to substitute property of "equivalent value," and the grantor and the trustees hired competing experts to opine on the value of the assets purportedly swapped. One of the disputes in the case was whether discounts for lack of marketability and control should apply in the context of a disputed swap. The grantor's expert, David Distel, opined that discounts for lack of marketability and lack of control should apply. *Id.* at *3. The trustee's expert, Eric Adamy, opined that discounts for lack of marketability and lack of control were not appropriate under the circumstances, reasoning "that the fair market value standard with discounts presumes a willing buyer and willing seller, and that in this case [the beneficiary of the trust] was not a willing seller, which affected his analysis similarly to cases involving minority shareholder oppression." *Id.* at *4.

Following a bench trial and post-trial briefing, "the trial court found Adamy's method of valuation to be correct." *Id.* at *5. The grantor appealed this finding, but the Court of Appeals of Michigan affirmed, holding that "evidence was presented to the trial court in support of its conclusion that it was appropriate in the instant case not to apply any discounts to the membership interests held by the trusts." *Id.* at *8.[8] Further, the Court of Appeals interpreted the "equivalent value" language in the substitution provision as prohibiting the grantor "from depleting the trust corpus." *Id.* (quoting *Estate of Jordahl v. Commissioner*, 65 T.C. 92 (United States Tax Court, 1975).

---

[8] The Court of Appeals noted that, although the grantor argued that discounts were used when originally valuing the membership interests when they were purchased by the trust, no evidence was presented at trial of precisely what discounts, if any, were used in originally valuing the notes. This, however, was not the sole basis for the ruling of the trial court or for the affirmance of the Court of Appeals.

Discounts are inappropriate in this case for the same reasons the trial court and the Court of Appeals found them to be inappropriate in *Rigoni*. As in *Rigoni*, the Wellin Children are not "willing sellers," and valuing the assets based on a model that presumes a willing buyer and willing seller therefore does not make sense. Also, as in *Rigoni*, applying discounts would permit the grantor to deplete the corpus of the Irrevocable Trust, which is contrary to the intent of the substitution provision which only allows substitutions of "equivalent value." Two days before the purported swap, the Irrevocable Trust offered to prepay the Note in stock, which Keith could then convert into cash (or borrow against), *see* ECF No. 69, and the Irrevocable Trust then delivered a check for $50 million in cash shortly after the purported swap in an attempt to prepay the Note. If Keith is permitted to reject the tender of the $50 million face value of the Note and instead obtain LP Units from the Irrevocable Trust that the Irrevocable Trust undeniably could have converted into cash of more than $90 million, then Keith will have (substantially) depleted the corpus of the Irrevocable Trust.

Thus, the *Rigoni* opinion demonstrates that the Estate's interpretation of "equivalent value" is not the only reasonable interpretation, as would be required for summary judgment; indeed, in *Rigoni*, both the trial court and the Court of Appeals rejected the Estate's interpretation of "equivalent value."

### F. Courts, including this Court, have held that discounts are not appropriate in analogous contexts.

The case of *Morrow v. Martschink*, 922 F. Supp. 1093 (D.S.C. 1995) (Norton, J.) is instructive. In *Morrow*, which was a non-jury action, this Court determined the value of the plaintiff's interest in a family-owned, closely held business as part of the business's dissolution. The Court held a hearing where it heard testimony of the parties' competing expert witnesses and received documentary evidence, and The Court then issued its findings of fact and conclusions of

law. *Id.* at 1095. At the hearing, the defendants' expert, Mr. Barry Gumb, testified that discounts for lack of control and lack of marketability should apply. *Id.* at 1104. In holding that no discounts should apply, this Court reasoned as follows:

> Plaintiff argues that discounts should not apply in this situation, citing as authority cases in which minority shareholders exercised their rights under dissenting shareholder statutes. Defendants correctly argue, however, that this is not a dissenters' rights case, since no merger, exchange, or by-law change is at issue. See S.C.Code Ann. § 33–13–102 (1976 as amended). Nevertheless, the same principles that caution against minority and marketability discounts in dissenters' rights cases apply here to the "family buy-out" situation. It is clear that discounts are not always applicable, even though the interest being valued represents a minority and lacks marketability. Haynsworth at 489. "For example, it would be inappropriate to impose a discount in a dissenters' rights case or in a case where a minority interest has been improperly squeezed out of the business. Allowing discounts in these situations would undercut the purpose of dissenters' rights statutes to give minority shareholders the fair value of their shares, and it could also encourage squeeze outs." *Id.*

> Furthermore, a lack of marketability discount is especially inapplicable to "an intra-family transfer" in a closely held company. *Id.* n. 92. "In family businesses, the members do not want outsiders to have ownership interests. Thus, the lack of marketability can actually enhance the value of the stock or partnership interest." *Id.*

> This court has stated that "normally applied discounts should not be imposed in a forced sale situation." *Hendley v. Lee*, 676 F.Supp. 1317, 1330 (D.S.C.1987) (citing Haynsworth at 459). "Discounts properly apply to the total value of the company in a 'willing buyer/willing seller' context, but do not apply at all when neither party is willing and the transaction is between insiders." *Id.*

> This court concludes that no minority discount or marketability discount should be applied to reduce the fair value of Plaintiff's shares. These discounts have not been recognized in South Carolina in the context of corporate dissolution actions and have been rejected by many courts. *See, e.g.*, "Propriety of applying minority discount to value of shares purchased by corporation or its shareholders from minority shareholders," 13 A.L.R.5th 840, 850 (1993); Balmonte, Measuring stock value in appraisals under the Illinois Business Corporation Act, 80 Ill.B.J. 236 (1992); Heglar, *Rejecting the minority discount*, 1989 Duke L.J. 258 (1989). Assessment of such a penalty would, in effect, compensate Defendants as if they had paid a premium for their own inherited stock in Martschink Realty. Further, Plaintiff is not selling her stock in the open market, but instead will be selling her stock to the Company or family-member Defendants who own the rest of the

Company. While there may be a limited market for sale of stock in Martschink Realty, there is a substantial and active market for the real estate it owns. Finally, none of the shareholders owns a majority interest in the corporation, and Plaintiff, in fact, owns more of an interest at 30.2% than any other single shareholder. Therefore, the court will use no discounts in calculating the value of Plaintiff's interest.

*Id.* at 1104-05.

The *Morrow* holding is relevant to this case for at least four reasons: (1) it recognizes that, "even though the interest being valued represents a minority and lacks marketability," discounts are not appropriate where allowing them will deprive the holder of the interest of fair value, which is precisely what would occur here if the Irrevocable Trust must pay $90 million for a $50 million note; (2) it recognizes that a lack of marketability discount is inapplicable to "an intra-family transfer" in a closely held company such as the one in this case; (3) it recognizes the well-settled rule that discounts should not be imposed where there is a forced sale, such as in this case, as opposed to a sale between a willing buyer and willing seller[9]; and (4) most importantly for purposes of the Estate's motion, the holding in *Morrow* demonstrates that the Court should not blindly apply discounts under the hypothetical willing buyer willing seller standard, but rather should allow the trier of fact to consider the context and all relevant facts and circumstances before deciding how to value the asset in question. For all of these reasons, summary judgment regarding the meaning of "equivalent value" is inappropriate.

### G. The Estate has not moved to exclude the opinions of Dr. Bajaj, much less established that his opinions are unreliable or otherwise inadmissible under *Daubert*.

The Estate has not argued—much less established—that Dr. Bajaj's opinions should be excluded under *Daubert*. Further, the Estate could not make such a showing. Dr. Bajaj is highly

---

[9] *See also Kreischer v. Kerrison Dry Goods Co.*, 172 F.3d 863 (4th Cir. 1999) (recognizing that "there is authority supporting the proposition that discounts are not appropriate in forced buy-out cases").

qualified to offer opinions regarding the valuation of the LP Units for purposes of the purported swap transaction. As explained in his report, he graduated from Berkeley with a Ph.D. in Business Administration with a specialty in finance and has his M.B.A. from the University of Texas at Austin. *See* Bajaj Affirmative Report, <u>Exhibit C</u>, at 1-2. Dr. Bajaj "specialize[s] in analyzing the valuation of assets including stocks, bonds, and interests in privately held companies, [and] family limited partnership interests," among other things, and he has been qualified to testify regarding valuation issues in numerous cases. *Id.* In his report, Dr. Bajaj persuasively explains why, as a matter of economic logic and common sense, the valuation of the LP Units should not ignore the economic reality that existed—namely, that the Wellin Children had the ability to convert the LP Units into stock or cash. *Id.* at 16-31. Further, Dr. Bajaj explains that, where the Wellin Children could convert approximately 320,000 LP Units into $50 million in cash, forcing the Wellin Children to transfer more units than this—and certainly forcing them to transfer nearly *double* this number, as proposed by the Estate's expert—would result in a depletion of the Trust corpus. *Id.* Dr. Bajaj's opinions—which are supported, not only by common sense, but also by the opinions of the trustee's expert in the *Rigoni* matter and the holding of the Michigan Court of Appeals accepting those opinions, and which are also supported by this Court's holding in the *Morrow* case and the cases cited therein—are reliable and easily satisfy the *Daubert* standard for admissibility of expert testimony.

Because the Estate cannot establish that Dr. Bajaj's opinions should be excluded from trial, the Court should not grant summary judgment regarding the subject matter of Dr. Bajaj's opinions. *See, e.g.*, *Suryadevara v. Unum Grp.*, No. 12 CV 3651 ILG RER, 2014 WL 1310348, at *4 (E.D.N.Y. Mar. 28, 2014) ("At the outset, it should be noted that '[w]here, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment.' This is

unsurprising, since the court's task 'is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.' Accordingly, where 'intelligent adjudication requires more than the use of lay knowledge and the resolution of a disputed issue hinges in large measure upon conflicting opinions and judgments of expert witnesses, summary judgment is not appropriate.'") (internal citations omitted); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 346 F. Supp. 3d 174, 194 (D. Mass. 2018) ("Although competing expert reports alone do not necessarily preclude summary judgment, where, as here, SFFA and Harvard's statistical experts each present more than 'merely conclusory allegations,' and the 'indisputable record facts' at this stage do not sufficiently 'contradict or otherwise render [either side's expert] opinion[s] unreasonable,' summary judgment is not appropriate.") (internal citations omitted).

### H. Tom Farace testified that no discount applies to the value of the LP Units when controlled by the Wellin Children.

Tom Farace, who is the architect of the 2009 Transaction, testified that no discounts for lack of marketability or lack of control apply where LP units are controlled by the Wellin Children. *See* Farace Dep. Tr., January 27, 2016, attached as <u>Exhibit F</u>, at 294:11-24. This is consistent with the opinion of the Wellin Children's expert, Dr. Bajaj. Farace's testimony further demonstrates that the Estate's interpretation of "equivalent value" is not <u>the only</u> reasonable interpretation, as would be required for the Estate to be entitled to summary judgment on this issue.

**I. The course of conduct between the Wellin Children and Keith in contexts other than swap transactions does not demonstrate an agreement regarding the meaning of "equivalent value" as that phrase is used in the swap provision.**

The Estate argues in its motion that the November 2009 Transaction and the annual interest payments made on the Note in 2010-12 demonstrate an "agreement" between the Wellin Children and Keith to use the hypothetical willing buyer willing seller standard for purposes of the swap transaction. ECF No. 881 at 30-32. But, unlike the swap transaction, all of these transactions *were* between a willing buyer and a willing seller; each of these transactions was part of a sophisticated estate planning technique designed to transfer wealth from Keith Wellin to his lineal descendants in a tax-efficient manner; and each of these transactions occurred at a time when the parties were working together in pursuit of a common goal.[10] The swap, on the other hand, was an attempt to claw back a significant portion of the Irrevocable Trust assets in the midst of litigation and to decrease the assets available for Keith's lineal descendants. Moreover, none of the pre-2013 transactions cited by the Estate were swap transactions or required interpretation of the "equivalent value" language in the swap provision of the Irrevocable Trust. Thus, the prior transactions occurred in different contexts and under entirely different circumstances. As the Estate's own valuation expert, Mr. Crow, explained, determining the appropriate standard of value requires application of "common sense, informed judgment, and reasonableness" to "the overall circumstances." Crow Dep. Tr., attached as Exhibit B, at 117:10 – 118:8. Here, common sense, informed judgment, and reasonableness weigh in favor of recognizing that the prior transactions occurred in entirely different circumstances from the purported swap transaction and did not somehow demonstrate an "agreement" by the Wellin

---

[10] To the extent the Estate disagrees with this assertion and contends that these earlier transactions were not between a willing buyer and willing seller because Keith was not a willing participant in these transactions, this presents, at best, a dispute of fact.

Children to value all assets under all circumstances pursuant to a certain standard of value. In any event, the fact intensive exercise prescribed by Mr. Crow should not occur at the summary judgment stage.

Finally, the Estate argues that the Court should interpret "equivalent value" in the swap provision as meaning "fair market value as defined in the Treasury Regulations governing valuation for gift and estate tax purposes" because the Pledge Agreement executed in connection with the November 2009 Transaction provides that, in the event the Note's balance is accelerated upon Keith's death, any property other than cash should be valued in this manner. ECF No. 881 at 31-32. But this provision demonstrates why the Court should *not* interpret "equivalent value" as the Estate suggests. Mr. Farace drafted the Irrevocable Trust Agreement and the Pledge Agreement as part of the same package of documents to be executed effectuating the November 2009 Transaction. Yet, Mr. Farace identified the relevant Treasury Regulations in the Pledge Agreement but did not reference them in the Irrevocable Trust, and instead used a term in the Irrevocable Trust that is not included in the Pledge Agreement: "equivalent value." For this additional reason, the Estate cannot establish that its interpretation of "equivalent value" is a reasonable interpretation, much less the only reasonable interpretation as required for summary judgment. *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 536–37 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another," and that presumption is even stronger when the omission entails the replacement of standard legal terminology with a neologism. One must suspect the language means that fair market value cannot—or at least cannot always—be the benchmark.") (internal citations omitted).

### J. The Estate inexplicably fails to apply the valuation standard it proposes to the Note.

In its motion, the Estate asks the Court to grant summary judgment on its argument regarding the meaning of "equivalent value," and the Estate asks that the Court deem this to be "the applicable legal standard for determining *the value of the asset tendered to the 2009 Trust by Mr. Wellin (the Promissory Note)* and the value of the assets received by Mr. Wellin from the 2009 Trust (assignee interests in the LP)." ECF No. 881 at 24 (emphasis added). As an initial matter, Keith did not "tender" the Note to the Irrevocable Trust; instead, Keith marked it "paid in full" and asserted that it had been "forgiven."

But, assuming *arguendo* that Keith *had* tendered the Note to the Irrevocable Trust, the Estate does not explain why its expert, Mr. Crow, assumes that the Note's value is the same as its outstanding balance. *See* Crow Report, ECF No. 881-60 at p. 46 (identifying the "Value of Promissory Note" as $50,211,446.55, which was its outstanding balance according to the Estate). In his deposition, Mr. Crow admitted that the value of a promissory note is not always its outstanding balance,[11] but he testified that he used the outstanding balance of the Note as its value because "that was the amount of the liability that was ameliorated for the trust by

---

[11] As Dr. Bajaj explains in his report, the value of a Note "depends on its maturity date, interest rate, and the risk of default, and cannot just be assumed to be the same as its outstanding balance." Bajaj Report, Exhibit C, at 15. Notably, in his motion for temporary restraining order filed before the purported swap, Keith's counsel argued that the value of the Note was much less than its outstanding balance. *See* Motion for TRO, ECF No. 5-1 at 6 ("The Note is essentially worthless to the Plaintiff, who is in very poor health, as it cannot be called until 2021, and can only be sold for a fraction of its face value because of its nominal interest rate, its maturity date and provision that it cannot be called early, and the fact that it can be repaid with any property, including an illiquid limited partner interest in Friendship Partners, LP which would not provide any control to the holder of the payee of the Note over the consideration he was just paid."). Moreover, at the hearing on November 18, 2013—two days before the purported swap transaction—Keith called Barry Gumb, CPA, as an expert witness on, among other things, the value of Keith's assets, and Mr. Gumb specifically opined that the Note was worth less than its $49 million face value. *See* 11-18-13 H'rg Tr., attached as Exhibit D, at 69:23 – 70:4.

substituting it for the assignee interest in the partnership." Crow Dep., attached as <u>Exhibit B</u>, at 109:2-13. In other words, Mr. Crow did not apply the hypothetical willing buyer willing seller standard with discounts for lack of marketability and lack of control when valuing the Note (which Keith purportedly substituted); rather, he only attempted to apply this standard when valuing the LP Units (which Keith purported received). By valuing these assets using different standards, Mr. Crow maximizes the value of the asset Keith purported to substitute and minimizes the value of the asset Keith purported to receive, thereby increasing the number of LP Units that he opines constitute "equivalent value."

The Estate is not entitled to summary judgment on its argument regarding the meaning of "equivalent value" when its own expert does not use this standard for one of the two assets involved in the purported swap.

## VI.    Conclusion

For the foregoing reasons, and for the reasons set forth in the Wellin Children's motion for summary judgment regarding the swap transaction, *see* ECF No. 888, the Court should find the swap to be invalid as a matter of law. Further, the Court should deny the Estate's motion for summary judgment regarding the validity of the swap and regarding the meaning of the phrase "equivalent value" in the swap provision of the Irrevocable Trust Agreement.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By: s/PATRICK C. WOOTEN
    Robert H. Brunson
    Federal Bar No. 4971
    E-Mail: robert.brunson@nelsonmullins.com
    Merritt G. Abney
    Federal Bar No. 9413
    E-Mail: merritt.abney@nelsonmullins.com
    Patrick C. Wooten
    Federal Bar No. 10399
    E-Mail: patrick.wooten@nelsonmullins.com
    151 Meeting Street / Sixth Floor
    Post Office Box 1806 (29402-1806)
    Charleston, SC  29401-2239
    (843) 853-5200

    *Attorneys for the Wellin Children*

Charleston, South Carolina
July 8, 2019